## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada M9L 1T9 | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD 20857 | ) ) ) ) | |
| MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C. 20201 | ) ) ) ) ) | |
| and | ) ) | |
| ANDREW VON ESCHENBACH<br>Acting Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD 20857 | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

## APOTEX INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, Apotex Inc.

("Apotex") hereby moves for a temporary restraining order requiring defendants the Food and

Drug Administration; Michael O. Leavitt, Secretary of Health and Human Services; and Andrew

von Eschenbach, Acting Commissioner of Food and Drugs (collectively, the "Federal

Defendants") to refrain from granting final approval, or causing or allowing final approval to be

granted, to any abbreviated new drug application for pravastatin sodium tablets 10 mg, 20 mg, 40

mg and 80 mg, pending this Court's consideration of a Motion for Preliminary Injunction in this

matter, pursuant to a briefing and argument schedule to be set by the Court. The grounds for this motion are fully set forth in the accompanying memorandum and Declarations of Tammy L. McIntire and William A. Rakoczy, filed contemporaneously herewith.

As indicated in the accompanying Certification pursuant to Local Civil Rule 65.1(a), in advance of this filing, Apotex informed counsel for the Federal Defendants of its intention to seek a temporary restraining order in this matter, as well as the time of the making of the application, and has provided the Federal Defendants with copies of Apotex's complaint, this motion, and all supporting papers, including the proposed order. The Federal Defendants have declined to consent to entry of the requested temporary restraining order, and consultation pursuant to Local Civil Rule 7(m) has failed to narrow the areas of disagreement. Apotex also provided courtesy copies of all papers to anticipated proposed intervenor Teva Pharmaceuticals USA, Inc.

Dated: April 5, 2006.                    Respectfully submitted,

                                         APOTEX INC.


                                  By: _____
                                         Arthur Y. Tsien, D.C. Bar No. 411579
                                         OLSSON, FRANK AND WEEDA, P.C.
                                         1400 16th Street, N.W., Suite 400
                                         Washington, D.C. 20036-2220
                                         (202) 789-1212
                                         (202) 234-3550 (facsimile)

                                         *Counsel for Apotex Inc.*

Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

## CERTIFICATE OF SERVICE

I certify that, on April 5, 2006, I caused a copy of the foregoing Motion for Temporary Restraining Order, Supporting Memorandum, Certification of Counsel Pursuant to Local Rule 65.1(a), Proposed Order, Declaration of William A. Rakoczy, Declaration of Tammy McIntire, Complaint, Local Rule 7.1 Corporate Disclosure Statement, and Civil Cover Sheet and Statement of Related Cases to be served upon the following by hand delivery:

Counsel for Federal Defendants

Andrew E. Clark, Esq.
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
National Place Building
1331 Pennsylvania Avenue, N.W.
Room 950-North
Washington, D.C. 20044
202/307-0067

Counsel for Anticipated Proposed Intervenor Teva Pharmaceuticals USA, Inc.

Jay P. Lefkowitz, Esq.
Steven A. Engel, Esq.
John C. O'Quinn, Esq.
Michael D. Shumsky, Esq.
Kirkland & Ellis LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005
202/879-5000

_____
Arthur Y. Tsien

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada M9L 1T9 | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD 20857 | ) ) ) ) ) | |
| MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C. 20201 | ) ) ) ) ) | |
| and | ) ) | |
| ANDREW VON ESCHENBACH<br>Acting Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD 20857 | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM IN SUPPORT OF APOTEX INC.'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER

William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301

Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212

Dated: April 5, 2006

*Counsel for Apotex Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 3

I.   Statutory Background. .......................................................................................... 3

    A.   Brand Drugs—NDAs. ................................................................................... 3

    B.   Generic Drugs—ANDAs. .............................................................................. 3

    C.   180-Day Generic Marketing Exclusivity. .................................................... 4

    D.   *Teva I and II* Ticlopidine Litigation. ......................................................... 6

II.  Factual Background. ............................................................................................. 8

    A.   The Pravastatin ANDAs. .............................................................................. 8

    B.   Apotex's Declaratory Judgment Action. ...................................................... 9

    C.   FDA's June 28, 2005 Exclusivity Decision. ............................................... 10

    D.   FDA's Administrative Ruling Is Rejected By The Courts And Remanded. ........ 11

    E.   FDA Has Determined That The BMS-Apotex Dismissal Is Not A
         Triggering Court Decision. ......................................................................... 12

ARGUMENT ............................................................................................................... 13

I.   The Harm To Apotex Is Substantial And Irreparable. ..................................... 15

II.  Injunctive Relief Will Not Injure Any Other Interested Parties. ..................... 17

III. There Is A Substantial Likelihood That Apotex Will Succeed On The Merits Of
     Its Claims. .......................................................................................................... 17

    A.   The D.C. Circuit And Another Judge Of This Court Already Have
         Rejected FDA's Interpretation And Determination As Arbitrary,
         Capricious And Contrary To Law For "Want Of Reasoned
         Decisionmaking." ....................................................................................... 18

    B.   FDA Concedes—As It Must—That There Are No Material Differences
         Between The Teva-Syntex Dismissal And The BMS-Apotex Dismissal. ........... 23

C.    FDA's Application Of Its Statutory Interpretation To The BMS-Apotex Dismissal Is Arbitrary, Capricious And Contrary To Law, And Fails For Want Of Reasoned Decision Making. ................................................................. 24

IV.    An Injunction Would Further The Public Interest. .......................................................... 28

CONCLUSION ................................................................................................................................ 28

.

# TABLE OF AUTHORITIES

## Federal Cases

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,*
846 F.2d 731 (Fed. Cir. 1988) ................................................................ 9

*Bennett v. Spear,*
520 U.S. 154 (1997)................................................................................ 13

*Blackman v. District of Columbia,*
277 F. Supp. 2d 71 (D.D.C. 2003) ......................................................... 14

*Bracco Diagnostics, Inc. v. Shalala,*
963 F. Supp. 20 (D.D.C. 1997)............................................................... 28

*Friends of Keeseville, Inc. v. FERC,*
859 F.2d 230 (D.C. Cir. 1988) ............................................................... 12

*Granutec, Inc. v. Shalala,*
139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) ........................ 5

*In re Barr Labs.,*
930 F.2d 72 (D.C. Cir. 1991) ................................................................. 3

*Indep. Petroleum Ass'n of Am. v. Babbitt,*
92 F.3d 1248 (D.C. Cir. 1996) ............................................................... 28

*Minn. Mining & Mfg. Co. v. Barr Labs., Inc.,*
289 F.3d 775 (Fed. Cir. 2002) ............................................................... 5

*Mova Pharm. Corp. v. Shalala,*
140 F.3d 1060 (D.C. Cir. 1998) .............................................. 13, 16, 17, 28

*Omar v. Harvey,*
--- F. Supp. 2d ----, 2006 WL 335764 (D.D.C. Feb. 13, 2006) ............ 14

*Raymen v. United Senior Ass'n,*
No. Civ.A. 05-486(RBW), 2005 WL 607916 (D.D.C. Mar. 16, 2005)............ 13, 14

*SmithKline Beecham Corp. v. Apotex Corp.,*
247 F. Supp. 2d 1011 (N.D. Ill. 2003) ................................................... 3

*Spectronics Corp. v. H.B. Fuller Co.,*
940 F.2d 631 (Fed. Cir. 1991) ............................................................... 26

*Super Sack Mfg. Corp. v. Chase Packaging Corp.,*
57 F.3d 1054 (Fed. Cir. 1995) ............................................................... 26

\* Authorities upon which
Apotex chiefly relies are
marked with an asterisk.

iii

\*    *Teva Pharmaceuticals, USA, Inc. v. FDA,*
     182 F.3d 1003 (D.C. Cir. 1999) ............................................................ passim

\*    *Teva Pharms. USA, Inc. v. FDA,*
     --- F.3d ----, 2006 WL 644903 (D.C. Cir. Mar. 16, 2006) .............................. passim

\*    *Teva Pharms. USA, Inc. v. FDA,*
     254 F.3d 316, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ......................... passim

     *Teva Pharms. USA, Inc. v. FDA,*
     398 F. Supp. 2d 176 (D.D.C. 2005) ................................................................ 11

\*    *Teva Pharms. USA, Inc. v. FDA,*
     No. Civ.A. 99-67(CKK), 1999 WL 1042743 (D.D.C. Aug. 19, 1999) ........... passim

     *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
     559 F.2d 841 (D.C. Cir. 1977) ....................................................................... 14

## Federal Statutes

21 U.S.C. § 355(b)(1) .................................................................................... 3

21 U.S.C. § 355(c)(2) .................................................................................... 3

21 U.S.C. § 355(j)(2)(A) ................................................................................ 4

21 U.S.C. § 355(j)(2)(A)(vii) ......................................................................... 4

21 U.S.C. § 355(j)(2)(B) ................................................................................ 4

21 U.S.C. § 355(j)(5)(B)(iv) ....................................................................... 4, 5

21 U.S.C. § 355(j)(5)(C)(i) ............................................................................ 8

35 U.S.C. § 271(e)(2)(A) ............................................................................... 4

35 U.S.C. § 271(e)(5) .................................................................................... 8

5 U.S.C. § 704 .............................................................................................. 12

## Federal Regulations

21 C.F.R. § 314.53(e) ..................................................................................... 3

## Other Authorities

Pub. L. No. 108-173, § 1102(b)(3),
     117 Stat. 2066, 2460 (2003) ........................................................................... 5

To prevent devastating and irreparable harm, Apotex respectfully seeks—and is entitled to—emergency injunctive relief temporarily preserving the *status quo* and enjoining FDA from approving any ANDA for generic pravastatin pending the resolution of this action on the merits, including full briefing and a hearing.

## INTRODUCTION

This Court is well familiar with the facts of this case. Apotex and others, including Teva, have filed so-called "paragraph IV ANDAs" for generic pravastatin, an important heart medication currently marketed solely by Bristol-Myers Squibb ("BMS") under the brand-name Pravachol®. BMS's sole remaining marketing exclusivity for this product expires on April 20, 2006, which should result in full and open generic competition by Apotex and others. Instead, however, FDA has adopted an unlawful interpretation of the Federal Food, Drug, and Cosmetic Act ("FFDCA")—the very same one that the D.C. Circuit previously rejected "for want of reasoned decisionmaking"—that will deny Apotex access to the market and award Teva a period of so-called "180-day exclusivity" to which it is not entitled. To prevent devastating and irreparable harm to Apotex, the Court should preserve the *status quo* pending resolution of this action on the merits.

As the first paragraph IV ANDA-filer, Teva was eligible for 180-day exclusivity that would begin on the earlier of first commercial marketing or a court decision of non-infringement or invalidity on BMS's patents. Apotex obtained such a court decision in July 2004 when a New York district court dismissed Apotex's declaratory judgment action against BMS for lack of subject matter jurisdiction based on BMS's disavowal of any intent to sue Apotex. FDA agrees that the BMS dismissal order is a decision of a court with estoppel effect that precludes BMS from ever suing Apotex. Applying the D.C. Circuit's decision in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*"), FDA initially

1

determined that the BMS dismissal order triggered Teva's pravastatin exclusivity, which has now expired, and that Apotex could proceed to market in April 2006. Teva challenged that determination before this Court, which granted Teva permanent injunctive relief, holding that the BMS dismissal order was not a triggering court decision. The D.C. Circuit reversed and remanded for further proceedings with directions to vacate the Agency's decision on the ground that *Teva I* did not announce a binding rule of law.

FDA, however, again has adopted the very same "textual" interpretation that the D.C. Circuit rejected in *Teva I*, namely, that the dismissal of a declaratory judgment action is not a triggering court decision. FDA has applied this interpretation to deny approval of Apotex's pravastatin ANDA. But the D.C. Circuit twice rejected this interpretation "for want of reasoned decisionmaking." *Teva Pharms. USA, Inc. v. FDA*, 254 F.3d 316, 2000 WL 1838303, at *2 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"); *Teva I*, 182 F.3d at 1011-12. And, as the D.C. Circuit acknowledged in its most recent decision, FDA still has not provided any support or justification for this interpretation. In sum, that interpretation did not pass muster in *Teva I and II*, and does not pass muster now. As before, FDA's position is arbitrary and capricious and cannot stand. At the very least, Apotex has demonstrated a likelihood of success on the merits at this stage in the proceedings that warrants an injunction temporarily preserving the *status quo* until the merits of FDA's position can be fully briefed and heard.

Absent such an injunction, Apotex admittedly will suffer irreparable harm, even if Apotex ultimately prevails on the merits. Teva intends to launch on or about April 20, 2006, which would effectively give Teva a period of exclusivity to which it may not be entitled and deprive Apotex of the chance to obtain any meaningful relief from this Court. As the D.C. Circuit previously has recognized, denying a competitor access to the market because of

unwarranted market exclusivity constitutes substantial harm. On the other hand, if this Court grants Apotex's requested injunctive relief and temporarily delays the final approval of all pravastatin ANDA-filers, the *status quo* will be maintained until the courts have an opportunity to rule on the merits of FDA's statutory interpretation. Such relief is warranted here.

## BACKGROUND

### I.    Statutory Background.

This action arises under the 1984 "Hatch-Waxman Amendments," which amended the FFDCA and the patent laws "to get generic drugs into the hands of patients at reasonable prices--fast." *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

### A.    Brand Drugs—NDAs.

A company that seeks to sell a new drug must file with FDA a New Drug Application ("NDA"). The applicant must include in its NDA, *inter alia*, technical data on the composition of the drug, the means for manufacturing it, clinical trial results establishing its safety and effectiveness, and labeling describing the use for which approval is requested. *See* 21 U.S.C. § 355(b)(1). The applicant also must submit information to FDA with respect to any patent that "claims the drug for which the application was submitted or which claims a method of using such drug . . . ." 21 U.S.C. § 355(c)(2); *see also id.* § 355(b)(1). FDA publishes all such patent information in the "Orange Book." *See* 21 C.F.R. § 314.53(e).

### B.    Generic Drugs—ANDAs.

Before 1984, a company seeking to market a generic version of an FDA-approved drug had to complete expensive and time-consuming safety and efficacy studies on the drug, even though the NDA-holder had already established the drug's safety and efficacy through its own studies. *See SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1018 (N.D. Ill. 2003). In 1984, Congress simplified the procedure for obtaining approval of generic drugs

3

with the Hatch-Waxman Amendments to the FFDCA. Under Hatch-Waxman, "an abbreviated new drug application ["ANDA"] process allows applicants . . . to proceed more quickly to the marketplace." *Teva I*, 182 F.3d at 1004.

An ANDA applicant must establish that its generic drug product is bioequivalent to the NDA drug. *See* 21 U.S.C. § 355(j)(2)(A). The ANDA also must include a "certification" to any properly-listed Orange Book patents. *See* 21 U.S.C. § 355(j)(2)(A)(vii). The statute provides four certification options, of which only one is relevant here: the so-called "paragraph IV" certification, where the applicant seeks immediate approval because the listed patent is invalid and/or not infringed by the proposed ANDA product. *Id.* Where an ANDA applicant submits a paragraph IV certification, it must notify the patentee and NDA-holder of the factual and legal bases for that certification. *See id.* § 355(j)(2)(B).

C.     **180-Day Generic Marketing Exclusivity.**

Submitting an ANDA containing a paragraph IV certification has two important consequences. First, it constitutes a technical act of infringement, vesting the district courts with subject matter jurisdiction over a patent infringement lawsuit. *See* 35 U.S.C. § 271(e)(2)(A). Second, the first company to submit an ANDA for a drug product containing a paragraph IV certification to any listed patent is entitled to a 180-day generic exclusivity period. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Congress created this exclusivity by preventing FDA from approving competing generic products until 180 days after the earlier of two so-called "triggering" events:

> (I)     the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

> (II)     *the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed.*

4

21 U.S.C. § 355(j)(5)(B)(iv) (2002) (emphasis added).[1]  In other words, 180-day exclusivity is triggered by the earlier of:   (1) the first-filer's commercial marketing ("the commercial marketing trigger"); or (2) relevant to this case, a final, unappealable court decision that the patent is invalid or not infringed ("the court decision trigger").  *Id.*[2]

The fact is, while Congress created the 180-day exclusivity period to encourage challenges to brand-name drug patents, it never intended first-filers to delay all subsequent generic entrants indefinitely.  *See Minn. Mining & Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775, 780 (Fed. Cir. 2002) ("*3M*").  Accordingly, courts have interpreted the court decision trigger broadly.  *See id.* at 786 (Gajarsa, J., concurring).  For instance, the court decision trigger includes *any* court decision on the patent that is the subject of the paragraph IV certification, regardless of whether the first-filer is involved in that particular litigation.  *See Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410, at *5 (4th Cir. Apr. 3, 1998) (finding exclusivity triggered by a court decision involving a subsequent applicant); *see also 3M*, 289 F.3d at 780 (same); *Teva I*, 182 F.3d at 1005 n.3 (same).  The court decision trigger also encompasses a broad spectrum of decisions, including decisions of patent unenforceability, despite the absence of this ground in the express language of the statute, *see Teva I*, 182 F.3d at 1009, and also including the grant of partial summary judgment based on the patent holder's admission of non-infringement, *see id.* at 1010; *Granutec*, 1998 WL 153410, at *5.

---

[1]  The first paragraph IV ANDA for pravastatin was filed prior to the December 8, 2003 enactment of the 2003 Medicare Prescription Drug, Improvement, and Modernization Act ("MMA").  Accordingly, the cited statutory language governs in this case.

[2]  Under Title XI of the MMA, which in relevant part amended the FFDCA for all pending ANDAs, a triggering "court decision" is a final decision from which no appeal has been or can be taken.  *See* Pub. L. No. 108-173, § 1102(b)(3), 117 Stat. 2066, 2460 (2003).

### D.    *Teva I and II* Ticlopidine Litigation.

Most pertinent here, FDA also has treated the dismissal of a declaratory judgment action for lack of subject matter jurisdiction as a court decision trigger following litigation involving the drug ticlopidine and the same parties involved here—FDA, Apotex, and Teva.  In the ticlopidine case (*Teva I and II*), Apotex was entitled to 180-day exclusivity for ticlopidine by virtue of being the first paragraph IV ANDA-filer.  Teva, a later-filer, brought a declaratory judgment action for patent non-infringement against patent-holder Syntex for purposes of obtaining a court decision to trigger Apotex's exclusivity.  At the same time, Syntex disavowed any intent to sue Teva for infringement of the patent-in-suit.  All parties agreed that the court lacked subject matter jurisdiction based on the absence of any actual controversy between the parties.  The court therefore granted Syntex's uncontested motion and dismissed the action for lack of subject matter jurisdiction.  (*See* Rakoczy Decl. Ex. A.)[3]

Thereafter, Teva sought final approval of its ticlopidine ANDA on the grounds that the dismissal of its declaratory judgment action for lack of subject matter jurisdiction constituted a court decision trigger under § 355(j)(5)(B)(iv)(II).  FDA disagreed and determined that such a dismissal was not a "decision of a court."  In reaching this determination, FDA employed a so-called "textual" approach in interpreting the statute, stating that such dismissals are not decisions actually holding a patent to be invalid or not infringed.  FDA took this position despite, for example, its own regulation and prior decisions treating other decisions as court decision triggers, even though such decisions did not involve actual holdings of invalidity or non-infringement.

---

[3] All references to "Rakoczy Decl." are to the Declaration of William A. Rakoczy, submitted concurrently herewith.

In response, Teva sued FDA challenging the Agency's determination that a district court's dismissal of a patent declaratory judgment action was not a "decision of a court." The district court denied Teva's motion for preliminary injunction. On appeal, however, the D.C. Circuit reversed, finding, among other things, that FDA had "fail[ed] to explain adequately its refusal to treat the [Teva-Syntex] Dismissal as a triggering 'court decision' under § 355(j)(5)(B)(iv)(II)," particularly in light of the Agency's own regulation and determination in another case. *Teva I*, 182 F.3d at 1012. The D.C. Circuit further acknowledged that the statute could be interpreted to include dismissals of declaratory judgment actions as triggering events, both in view of the statutory language and its apparent purpose to avoid manipulation of the exclusivity period by the patentee. *See Teva I*, 182 F.3d at 1009, 1011 (recognizing that, where the dismissal of a declaratory judgment action for lack of subject matter jurisdiction estops the patent holder from asserting a claim for patent infringement in the future, such dismissal "appear[s] to meet the requirements of a 'court decision' under § 355(j)(5)(B)(iv)(II)"); *see also Teva Pharms. USA, Inc. v. FDA*, No. Civ.A. 99-67(CKK), 1999 WL 1042743, at *5-*7 (D.D.C. Aug. 19, 1999).

On remand, the district court granted Teva's motion for injunctive relief, holding that the dismissal of Teva's declaratory judgment action for lack of subject matter jurisdiction triggered Apotex's exclusivity for ticlopidine. *Teva*, 1999 WL 1042743, at *7. This time, the D.C. Circuit affirmed, once again holding that FDA "did not meaningfully address [the] question on remand," and that FDA's decision and interpretation refusing to treat the dismissal of Teva's declaratory judgment action as a court decision trigger "fail[ed] for want of reasoned decisionmaking." *Teva II*, 2000 WL 1838303, at *1-*2. As a result, FDA treated the Teva dismissal as a court decision that triggered Apotex's exclusivity for ticlopidine.

The interpretation that the D.C. Circuit twice rejected in *Teva I and II* is precisely the same interpretation that FDA has applied to deny Apotex approval in this case.

## II.    Factual Background.

### A.    The Pravastatin ANDAs.

BMS holds approved NDA No. 19-898 for 10, 20, 40, and 80 mg pravastatin sodium tablets, which it sells under the brand-name Pravachol®. FDA has approved Pravachol® for the treatment of, among other things, hyperlipidemia and the primary prevention of coronary events. BMS submitted several patents for listing in the Orange Book, including U.S. Patent No. 4,346,227 ("the '227 patent").[4] While the '227 patent itself has expired, the pediatric exclusivity associated with that patent does not expire until April 20, 2006.

At least eight companies, including Apotex and Teva, have filed generic pravastatin ANDAs with paragraph IV certifications to one or more of BMS's other Orange Book-listed patents. As the first paragraph IV ANDA-filer, Teva was eligible for 180-day exclusivity beginning the earlier of first commercial marketing or a triggering court decision.

BMS did not sue Apotex or Teva within the 45-day notice period of § 355(j)(5)(B)(iii). In these circumstances, Hatch-Waxman, as amended by the MMA for all pending matters, expressly authorizes an ANDA applicant to file a declaratory judgment action against the patentee in order to obtain patent certainty that its generic drug does not infringe *and* to prevent approval delays by obtaining a triggering court decision. *See* 21 U.S.C. § 355(j)(5)(C)(i) (2003); *see also* 35 U.S.C. § 271(e)(5) (2003). Apotex repeatedly tried to obtain patent certainty *without* resort to litigation. However, while BMS's counsel sent non-binding letters stating that it had no intention of suing, BMS steadfastly refused to sign a

---

[4] BMS also submitted for listing U.S. Patent Nos. 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent").

covenant not to sue.  And, as BMS knew, without such a binding covenant, Apotex had no enforceable guarantee that it could market its ANDA products without fear of litigation.  BMS thus left Apotex with no choice but to attempt to secure a binding court order that would provide preclusive effect, estopping BMS from suing Apotex upon launch.  Apotex sought such relief through the Declaratory Judgment Act, which Congress enacted precisely to prevent patentees like BMS from "brandishing a Damoclean threat with a sheathed sword."  *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988).

**B.     Apotex's Declaratory Judgment Action.**

In April 2004, Apotex sued BMS in the United States District Court for the Southern District of New York, seeking a declaratory judgment that its ANDA products did not infringe the '447, '589, and '985 patents or that such patents were invalid.  BMS moved to dismiss Apotex's declaratory judgment action for lack of subject matter jurisdiction.  BMS argued that Apotex lacked a reasonable apprehension of suit in light of BMS's binding representation, contained in filed court papers and a sworn declaration, that it *"will not sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product."*  (Rakoczy Decl. Ex. B, Tab F at 12) (emphasis added).    BMS's motion and supporting papers, in fact, contained other unequivocal, binding statements about Apotex's right to market free from fear of an infringement suit on the '447, '589, and '985 patents, including:

- "[BMS] has no intention, *now or in the future*, of suing Apotex for infringement of any of the three BMS patents."  (Rakoczy Decl. Ex. B, Tab F at 12) (emphasis added).

- "[I]f [Apotex's] representations [about its ANDA product] are indeed true, [BMS] will not sue Apotex on the '447, '589 or '985 patents."  (*Id.*, Ex. B, Tab F at 13.)

9

While the district court did not rule on BMS's motion, instead striking it for failure to comply with pre-motion procedures, the court ultimately dismissed Apotex's declaratory judgment action for lack of subject matter jurisdiction based upon BMS's binding representations that it would not sue Apotex, now or in the future. (Rakoczy Decl. Ex. B, Tab A.) The July 23, 2004 dismissal order became final and unappealable on August 22, 2004.

### C.    FDA's June 28, 2005 Exclusivity Decision.

After obtaining patent certainty, Apotex moved forward to remove the regulatory barrier to obtaining approval in April 2006, upon expiration of the pediatric exclusivity associated with the '227 patent. On September 7, 2004, Apotex sent a letter to FDA, seeking confirmation that the dismissal of its declaratory judgment action against BMS triggered any generic exclusivity that would be awarded for pravastatin. Apotex submitted the dismissal order, as well as the documents underlying that order, as support for its request. (Rakoczy Decl. Ex. B.)

On June 28, 2005, FDA issued an administrative ruling confirming that the BMS-Apotex dismissal order triggered exclusivity for pravastatin; that such exclusivity expired no later than February 18, 2005; and that Apotex's ANDA would be eligible for approval on April 20, 2006. (Rakoczy Decl. Ex. C at 2.) FDA observed that the court dismissed Apotex's suit only after BMS represented that it did not intend to sue Apotex for infringement, and that the order, coupled with BMS's representations, "precludes a subsequent suit by BMS against Apotex for infringement of these patents." (*Id.* at 4-5.) FDA concluded that, "under the rule of *Teva*, this dismissal qualifies as a court decision under [§ 355(j)(5)(B)(iv)(II)], triggering the running of 180-day exclusivity . . . ." (*Id.* at 4.) In other words, FDA determined that the BMS-Apotex dismissal order was a decision of a court with estoppel effect that precludes BMS from ever suing Apotex on the patents-in-suit.

Under FDA's decision, Teva's exclusivity had already expired, thus allowing all generic manufacturers, including Apotex, to enter the market in April 2006 when BMS's pediatric exclusivity expires. In reaching this administrative decision, FDA stated that the D.C. Circuit's decisions in *Teva I and II* announced a rule of law that compelled this result.

### D.    FDA's Administrative Ruling Is Rejected By The Courts And Remanded.

On July 26, 2005, Teva sued FDA challenging the Agency's administrative ruling and seeking to enjoin FDA from approving any other pravastatin ANDAs until Teva's 180-day exclusivity has expired. On October 21, 2005, this Court granted Teva permanent injunctive relief on the ground that the BMS dismissal order involved a stipulation between the parties and, thus, did not constitute a "court decision." *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 192 (D.D.C. 2005). Apotex and FDA appealed that decision.

On March 16, 2006, the D.C. Circuit vacated the district court's judgment and remanded with instructions to vacate FDA's June 28, 2005 decision and remand to the Agency for further proceedings. *Teva Pharms. USA, Inc. v. FDA*, --- F.3d ----, 2006 WL 644903, at *4 (D.C. Cir. Mar. 16, 2006) ("*Teva III*"). The Court found that, although the *Teva I* Court "stated that the statute *could* be interpreted to include dismissals of declaratory judgment actions as triggering events," the *Teva I* and *II* decisions did not announce a rule of law and, thus, FDA's "'stated rationale for its decision is erroneous'" and cannot be sustained. *Id.* at *3-*4 (citation omitted). Rather, according to the D.C. Circuit, the *Teva I and II* Courts rejected FDA's statutory interpretation and exclusivity determination that a district court's dismissal of a patent declaratory judgment action was not a triggering event because "FDA's decision fail[ed] for want of reasoned decisionmaking" and failed to provide any explanation, much less an adequate one, for its interpretation. *Id.* at *3.

**E.    FDA Has Determined That The BMS-Apotex Dismissal Is Not A Triggering Court Decision.**

During the pravastatin appeal, including in briefing and at argument, FDA repeatedly stated that if the *Teva* decisions provide no "binding, substantive rule of law"—as the D.C. Circuit has now held—its position is "that the plain language of section 355(j)(5)(B)(iv)(II) does not embrace dismissals of declaratory judgment actions for lack of subject-matter jurisdiction" and that "the [BMS-Apotex] dismissal would not qualify as a triggering court decision, because it does not contain a holding of invalidity, non-infringement, or unenforceability." (Rakoczy Decl. Ex. D, FDA Reply Br. at 8, *Teva Pharms. USA, Inc. v. FDA*, Nos. 05-5401, 05-5460 (D.C. Cir.)); *see also Teva III*, 2006 WL 644903, at *4 n.5. Rather, the Agency has stated, "if FDA were free to apply its own interpretation of section 355(j)(5)(B)(iv)(II), it would interpret that provision to require that a court decision hold the patent to be invalid, not infringed, or unenforceable, so that dismissals that hold only that jurisdiction is absent would not constitute triggering court decisions." (Rakoczy Decl. Ex. E, FDA Br. at 54-55, *Teva Pharms. USA, Inc. v. FDA*, Nos. 05-5401, 05-5460 (D.C. Cir.)). In fact, FDA argued that remand was not even necessary in this case, because FDA's so-called "textual" approach is clear—dismissals of declaratory judgment actions are not triggering court decisions. (*See* Rakoczy Decl. Ex. F at 32-33, Mar. 9, 2006 Hr'g Tr., *Teva Pharms. USA, Inc. v. FDA*, Nos. 05-5401, 05-5460 (D.C. Cir.).) FDA, thus, already has determined that the BMS-Apotex dismissal is "not a triggering court decision." (*Id.* at 32.) Such a determination constitutes final agency action that is reviewable by this Court under 5 U.S.C. § 704. *See Friends of Keeseville, Inc. v. FERC*, 859 F.2d 230, 235 (D.C. Cir. 1988) (finding agency action "final" under 5 U.S.C. § 704 where no "'further administrative action is needed to clarify the agency's position'" and the issues do not require further factual development to be susceptible to judicial resolution

(citation omitted)); *see also Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (holding that agency action is "final" where the action "mark[s] the 'consummation' of the agency's decisionmaking process" and where "'rights or obligations have been determined,'" or the action is one from which from which "'legal consequences will flow'" (citation omitted)).

*    *    *

With respect to FDA's current interpretation, the D.C. Circuit has expressly acknowledged that FDA "took a similar position in *Teva I* but failed to provide adequate explanation." *Teva III*, 2006 WL 644903, at *4 n.5. The court further declared that "[i]n this litigation the FDA still has not answered the questions put to it by the *Teva I* court." *Id.* Nevertheless, FDA is still applying the same interpretation to deny approval of Apotex's pravastatin ANDA. To date, FDA has done nothing to attempt to explain or justify this interpretation. Absent emergency injunctive relief from this Court preserving the *status quo*, Apotex will suffer devastating and irreparable harm as a direct result of that interpretation on April 20, 2006, if Teva is permitted to launch before this case is decided on the merits.

**ARGUMENT**

Courts must weigh four factors in deciding whether to grant a preliminary injunction or temporary restraining order: (1) the prospect of irreparable injury to the moving party if relief is withheld; (2) the possibility of harm to other parties if relief is granted; (3) the likelihood that the moving party will prevail on the merits; and (4) the public interest. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Raymen v. United Senior Ass'n*, No. Civ.A. 05-486(RBW), 2005 WL 607916, at *2 (D.D.C. Mar. 16, 2005) (granting temporary restraining order). Plaintiffs "need not prevail on each factor in order to receive injunctive relief." *Raymen*, 2005 WL 607916, at *2. "Rather . . . the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one

13

factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (internal quotations and citation omitted) (granting preliminary injunction).

"[I]ssuing an injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *Raymen*, 2005 WL 607916, at *2 (quoting *Blackman*, 277 F. Supp. 2d at 78). Moreover, "[i]n cases that raise questions 'going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground . . . for more deliberative investigation,' . . . courts should eschew an 'exaggeratedly refined analysis of the merits at an early stage in the litigation.'" *Omar v. Harvey*, --- F. Supp. 2d ----, 2006 WL 335764, at *1 (D.D.C. Feb. 13, 2006) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). "This is particularly true when the moving party seeks to maintain the status quo pending a final determination of the merits." *Omar*, 2006 WL 335764, at *1 (citations omitted).

Courts have granted such relief in cases involving generic exclusivity where necessary to preserve the *status quo* and prevent irreparable harm to the moving party pending resolution of the action on the merits. For example, in a case involving generic exclusivity for metformin hydrochloride extended-release tablets, this Court issued a temporary restraining order requiring FDA to rescind final approval to a competitor drug manufacturer (Ivax Pharmaceuticals) and refrain from granting final approval to any other metformin ER ANDAs pending resolution of the matter on the merits. (*See* Rakoczy Decl. Ex. G, Oct. 29, 2003 Order, *Purepac Pharm. Co. v. Thompson*, No. 03-2210 (D.D.C.).) Likewise, in an action involving generic exclusivity for gabapentin capsules, the D.C. Circuit entered an order staying final

approval of the first-filer and preserving the *status quo*. (*See id.* Ex. H, July 26, 2004 Order, *Apotex, Inc. v. FDA*, No. 04-5211 (D.C. Cir.).) Moreover, even in this case, the D.C. Circuit expedited the appeal of this Court's pravastatin decision precisely because Apotex would suffer devastating and irreparable harm if Teva were allowed to launch before the appeal was decided. (Rakoczy Decl. Ex. I, Nov. 22, 2005 Order, *Teva Pharms. USA, Inc. v. FDA*, No. 05-5401 (D.C. Cir.).)

   Nothing has changed here. The circumstances still warrant emergency injunctive relief preserving the *status quo*. Apotex will be irreparably harmed if Teva is allowed a six-month head start in the generic pravastatin market; neither FDA nor Teva will be injured if injunctive relief is rendered; Apotex has a strong likelihood of prevailing on the merits; and the public will benefit from an order that allows for faithful application of the laws and full generic competition. Moreover, because FDA has not already granted final approval to any pravastatin ANDAs, an order delaying such final approval will do no more than maintain the *status quo*.

## I. The Harm To Apotex Is Substantial And Irreparable.

   As an initial matter, the harm to Apotex could not be more substantial or palpable. Neither FDA nor Teva can seriously argue otherwise. FDA's interpretation admittedly prevents Apotex from marketing generic pravastatin until 180 days *after* Teva launches on or about April 20, 2006, and secures a strangle-hold over the market. Indeed, Teva has publicly announced its intent to launch immediately upon expiration of the '227 patent and its pediatric exclusivity on or about April 20, 2006. (Rakoczy Decl. Ex. J.) Once Teva launches, it will tie up distribution channels and access to customers; enter into long-term sales agreements; increase sales across all product lines; and retain greater market share in the long-term. (McIntire Decl. ¶¶ 4, 17-18.)[5]

---

[5] All references to "McIntire Decl." are to the Declaration of Tammy L. McIntire, submitted concurrently herewith.

Apotex, on the other hand, will lose the opportunity to effectively compete in the pravastatin market. (*Id.* ¶¶ 5, 13-16, 19.)  Thus, absent emergency injunctive relief preserving the *status quo*, FDA's interpretation will deny Apotex access to the market, thus causing Apotex irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails in this action.  As the D.C. Circuit found in *Teva I*, this alone constitutes irreparable harm.  182 F.3d at 1012 n.8; *see also Mova*, 140 F.3d at 1066 n.6.

Apotex conservatively estimates that an unwarranted 180-day head start for Teva would result in over $9.9 million in lost sales for Apotex in the first year alone.  (McIntire Decl. ¶¶ 14, 18, 20.)  Even if Apotex were to prevail in this case, the harm will have been done— Apotex will never recover those lost revenues, profits, and market share.  (*Id.* ¶¶ 13, 15.)  In addition, Apotex will suffer unquantifiable, intangible losses for pravastatin and other product lines.  Apotex, for example, will lose critical access to major customers and the opportunity for long-term contracts.  (*Id.* ¶¶ 5, 17.)  These losses, in turn, would adversely affect Apotex's sales opportunities across all of its product lines.  (*Id.* ¶¶ 5, 18.)  Such lost opportunities will continue to harm Apotex long after Teva's exclusivity expires.  (*Id.*  ¶¶ 6, 17-19.)  Such losses are irreparable in every sense of the term.  *See Teva I*, 182 F.3d at 1011 n.8.  Indeed, this court so found when granting a temporary restraining order in the *Purepac* metformin ER matter.  (*See* Rakoczy Decl. Ex. G.)

*Purepac* involved a similar dispute over an award of 180-day exclusivity for metformin ER.  There, Purepac sought to enjoin FDA from granting final approval to any metformin ER ANDAs on the basis that Purepac, and not Ivax, was entitled to 180-day exclusivity for that drug product.  The Court found that Purepac had shown that it would be

"immediately and irreparably harmed absent temporary relief" and, thus, granted the requested relief. (Rakoczy Decl. Ex. G.)  This Court should do the same here.

## II.  Injunctive Relief Will Not Injure Any Other Interested Parties.

Temporary injunctive relief preserving the *status quo* will not harm any interested parties either.  FDA admittedly has no commercial stake in the outcome of this dispute either way.  Moreover, as a governmental agency, FDA's interests are aligned with the public's interest, which favors injunctive relief.

Nor would Teva suffer any appreciable harm whatsoever from emergency injunctive relief preserving the *status quo*.  If Apotex ultimately prevails in this case on the merits, Teva had no legal right to launch with exclusivity in the first place.  But, if Teva prevails, it can still enjoy its exclusivity.  Moreover, this Court previously accommodated Teva with an expedited schedule on its preliminary injunction motion.  The Court can do so here as well in order to avoid any appreciable harm to Teva.

Thus, absent injunctive relief, Apotex stands to lose millions of dollars, goodwill with its customers, and other significant tangible and intangible benefits, while Teva stands to lose little to nothing if temporary relief is granted.  Accordingly, the balance of harms tips decidedly in favor of granting Apotex's request for a temporary restraining order.  *See Mova*, 140 F.3d at 1066.

## III.  There Is A Substantial Likelihood That Apotex Will Succeed On The Merits Of Its Claims.

FDA has refused to approve Apotex's pravastatin ANDA on the ground that the dismissal of a declaratory judgment action is not "a triggering court decision, because it does not contain a holding of invalidity, non-infringement, or unenforceability." (Rakoczy Decl. Ex. D at 8.)  But the D.C. Circuit and this Court repeatedly have rejected this exact same "textual"

interpretation "for want of reasoned decisionmaking." *Teva II*, 2000 WL 1838303, at *2; *Teva I*, 182 F.3d at 1011-12. Indeed, as the D.C. Circuit made crystal clear, "FDA still has not answered the questions put to it by the *Teva I* court." *Teva III*, 2006 WL 644903, at *4 n.5. That remains true today. To date, FDA still has not attempted to justify, explain or otherwise support the so-called "textual" approach under which it has denied Apotex approval. For this reason alone, Apotex has demonstrated a substantial likelihood of success on the merits.

To the extent FDA argues either that it has not made a final decision (which it clearly has) or that it should be permitted more time to support its "textual" interpretation on remand, such arguments only demonstrate all the more why Apotex is entitled to emergency injunctive relief preserving the *status quo* here. The Court should not punish Apotex and expose it to substantial and irreparable harm just because FDA has failed—in the last six years—to support its "textual" interpretation of the court decision trigger. Either way, at the very least, Apotex has demonstrated a likelihood of success on the merits at this stage in the litigation to warrant an injunction preserving the *status quo* pending resolution of this action on the merits.

A.    **The D.C. Circuit And Another Judge Of This Court Already Have Rejected FDA's Interpretation And Determination As Arbitrary, Capricious And Contrary To Law For "Want Of Reasoned Decisionmaking."**

In the ticlopidine matter, Teva sought to trigger Apotex's 180-day exclusivity for ticlopidine on the grounds that Teva had obtained a dismissal for lack of subject matter jurisdiction of its declaratory judgment action against patent-holder Syntex, and that such dismissal qualified as a "decision of a court" under § 355(j)(5)(B)(iv)(II). FDA refused to recognize the Teva-Syntex Dismissal as a court decision trigger because "the [Teva-Syntex Dismissal] did not on its face state or hold that the Syntex patent was not infringed or that it was invalid or was unenforceable." (Rakoczy Decl. Ex. K, FDA App. Br. at 19, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287, 99-5342 (D.C. Cir.).) FDA "acknowledge[d] that its current

18

interpretation of the court decision trigger is narrower than the statute may be able to support"
and further acknowledged that "Teva's interpretation of the court decision trigger may be
permissible." (*Id.* Ex. L, FDA P.I. App. Br. at 20-21, *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-
5022, 99-5027 (D.C. Cir.).)  However, the Agency maintained that the dismissal did not qualify
as a triggering event because "[a] dismissal of a declaratory judgment action for lack of subject
matter jurisdiction . . . is not a final decision on the merits, particularly when the order
dismissing the case says nothing about the validity, infringement, or enforceability of the patent."
(*Id.* at 22.)

   The D.C. Circuit rejected FDA's position as arbitrary and capricious on the basis
that "*FDA has offered no particular interpretation of [the court decision trigger] provision,*
relying instead on its authority to interpret the provision narrowly until it promulgates a new
rule." *Teva I*, 182 F.3d at 1007 (emphasis added).  According to the Court, "[i]t is the
narrowness of [the Agency's] interpretation that must be justified, and the court can only review
that choice of narrowness based on the reasons provided by the FDA; *here, it has provided
none.*" *Teva I*, 182 F.3d at 1011 (emphasis added).  The Court then provided at least three
specific reasons for rejecting the Agency's decision.

   First, the Court found that the Agency had ignored what the Court considered "the
relevant consideration" in determining whether a decision should qualify as a triggering court
decision.  Noting that "the significance of a court's 'decision' or 'holding' often lies in its
preclusive effect," the Court stated that "the relevant consideration is the estoppel of the patent
holder from later claiming that the ANDA applicant is liable for patent infringement." *Teva I*,
182 F.3d at 1008-09.  The Court thus rejected FDA's determination that a judgment on the merits
is necessary because, "[a]lthough the dismissal was not a judgment on the merits . . . , there was

no need for such a procedure here because the dismissal sufficed to estop Syntex from suing Teva for patent infringement. *Id.* at 1009.

Second, the Court stated that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of market exclusivity." *Teva I*, 182 F.3d at 1009. Noting that decisions of patent unenforceability have been deemed sufficient to trigger 180-day exclusivity because, in FDA's own words, "the alternative interpretation . . . would be contrary to Congress' obvious intent in allowing patent challenges . . . and would lead to absurd results," the Court reasoned that the situation presented by the Teva-Syntex Dismissal "appears no less absurd because Teva can never be sued by Syntex for patent infringement." *Id.* at 1009-10. Thus, the Court found that "FDA's application of the statute to this case runs counter to its explanation for permitting unenforceability to qualify as a 'court decision.'" *Id.* at 1010.

Finally, the Court determined that FDA's treatment of the Teva-Syntex dismissal "appears contrary to the FDA's 'Guidance for Industry' in two respects." *Teva I*, 182 F.3d at 1010. First, the Court found that "FDA has effectively declined to proceed on a 'case-by-case basis'" in refusing to respond to "Teva's request for a complete explanation of the rejection of its interpretation." *Id.* The Court noted that FDA had not explained its treatment of the Teva-Syntex dismissal in light of the Agency's treatment of other cases, including FDA's decision to treat the grant of partial summary judgment in the *Granutec* case as a court decision under the statute. The Court stated:

> That *Boehringer* involved a judgment on the merits, while Teva's complaint was dismissed for lack of subject-matter jurisdiction, does not detract from the fact that both proceedings prevent the patent holder from suing the ANDA applicant for patent infringement. *Given that the [Teva-Syntex] dismissal supports estoppel to the same extent as the grant of partial summary judgment at issue in Granutec, it is unclear why the [Teva-Syntex] dismissal would not satisfy the 'court*

> *decision' requirement of § 355(j)(B)(5)(iv)(II).* At least the FDA has not provided
> an explanation wherein there is a material difference for purposes of triggering the
> "court decision" provision.

*Teva I*, 182 F.3d at 1011 (emphasis added). Second, the Court noted that FDA's determination

was "not easily viewed as 'regulating directly from the statute,' as the FDA committed to do."

*Id.*    The Court remarked that, "if the FDA's interpretation of section 355(j)(B)(5)(iv)(II) is

'narrower than the statute [is] able to support,' then its interpretation cannot stand without

justification because the FDA must interpret the statute to avoid absurd results and further

congressional intent." *Id.* Indeed, the Court noted that FDA's interpretation appeared to conflict

with the "purpose of the triggering 'court decision' provision" because FDA's view allows the

patent holder to "manipulate the system in order to block or delay generic competition by stating

that the patent holder will not enforce its patent against the Paragraph IV challenger." *Id.* at

1009. The Court then remanded the case to the district court for consideration of Teva's request

for injunctive relief.

    On remand, Judge Kollar-Kotelly of this Court held that FDA's refusal to

recognize the Teva-Syntex Dismissal as a triggering court decision was arbitrary and capricious.

*See Teva*, 1999 WL 1042743, at *7. The Court rejected all of FDA's renewed arguments,

including that (a) forcing the Agency to look beyond the face of the court order to determine the

basis for the order would "'place an unbearable burden upon OGD staff and would require a

substantial use of OGD's limited resources;'" (b) "'OGD lacks the expertise to make accurate

determinations about the legal effect, such as estoppel, of representations relating to patents that

are not embodied in a court decision;'" (c) "Teva's proposed interpretation would be contrary to

industry expectations that such an interpretation would be adopted by rulemaking," and (d) the

Teva-Syntex Dismissal is distinguishable from the award of partial summary judgment because

the Teva-Syntex Dismissal is not a decision on the merits, nor is it a "holding" finding the patent invalid, unenforceable or not infringed. *Teva*, 1999 WL 1042743, at *5-*6. The Court held that, "[w]hile the FDA may take administrative convenience into account in developing an across-the-board policy for dealing with Paragraph IV ANDAs, application of such a rule to the facts of this case under the FDA's present case-by-case approach is arbitrary and capricious." *Id* at *5. In the Court's opinion, "[s]ome degree of legal analysis is unavoidable in the context of the court decision trigger," thus, "it is unreasonable for the FDA to refuse to make even a cursory inquiry into the basis for the California court's order." *Id.* Finally, the Court rejected FDA's proposed distinction of the *Granutec* decision finding that "FDA's approach elevates the form of a court decision over its substance," and held that, "in the absence of a rational reason for treating the [Teva-Syntex] dismissal differently from [*Granutec*], Teva is entitled to immediate final effective approval for its ticlopidine ANDA." *Id.* at *6-*7.

FDA appealed and again attempted to explain its disparate treatment of the Teva-Syntex Dismissal in light of the *Granutec* decision. FDA explained that "first, on its face, a dismissal for lack of subject matter jurisdiction is not a final decision on the merits invalidating a patent or finding it not infringed; second, to determine whether such a dismissal is tantamount to a 'court decision' as intended by the plain language of the statute, FDA must go behind the face of the order and interpret its meaning based on supplementary materials such as letters between the parties, or the motions and attachments filed in the declaratory judgment action; and, third, because FDA is not an expert in patent matters, the agency is never in a position to look beyond the face of an order to make the kind of determination [the D.C. Circuit] made in *Teva I*." (Rakoczy Decl. Ex. K at 9-10.) The D.C. Circuit found that "FDA did not meaningfully address" how the Agency could reasonably treat the subject matter jurisdiction dismissal at issue

22

in the ticlopidine case differently than it treated a partial grant of summary judgment in *Granutec*. *Teva II*, 2000 WL 1838303, at *1. The Court then, again, determined that "the judgment of the agency fails for want of reasoned decisionmaking." *Id*. at *2. On that basis, the Court affirmed the decision below, that Teva was entitled to immediate final effective approval of its ANDA. *Id*.

Here, once again, FDA has applied this same interpretation to deny approval of Apotex's pravastatin ANDA, even though that interpretation has been rejected repeatedly by the D.C. Circuit and by another judge of this Court. To date, the Agency has failed to address any of the "questions put to it by the *Teva I* court." *Teva III*, 2006 WL 644903, at *4 n.5.

**B.    FDA Concedes—As It Must—That There Are No Material Differences Between The Teva-Syntex Dismissal And The BMS-Apotex Dismissal.**

FDA concedes that "[t]he Teva-Syntex dismissal order at issue in *Teva I* was *no different in substance* than the [BMS-Apotex] Stipulation and Order." (Rakoczy Decl. Ex. E at 47.)    According to FDA, "[i]n both cases, the court accepted the defendant/NDA holder's assurance that the plaintiff/ANDA applicant lacked a reasonable apprehension of suit and dismissed the declaratory judgment action for lack of jurisdiction on that basis." (*Id*.)  FDA further acknowledged that, to the extent that there was a "finding" in the Teva-Syntex case, "Judge Legge's 'finding' in the Teva-Syntex litigation is *functionally indistinguishable* from the 'finding' Judge Pauley necessarily made when he signed off on the Apotex-Bristol stipulated dismissal." (*Id*. at 49.)  Moreover, the Agency argued that any difference in the "form of the dismissal order in Teva-Syntex is of no legal significance for purposes of the court decision trigger." (*Id*. at 50.)  In fact, FDA criticized any attempt to make "hypertechnical distinctions" between the Teva-Syntex Dismissal and the BMS-Apotex Dismissal as improperly "elevat[ing] form over substance." (*Id*. at 51.)

Significantly, FDA also concedes that the BMS-Apotex Dismissal has preclusive effect. FDA admits that it "properly evaluated Bristol's repeated, unequivocal assurances that it had no intention of suing Apotex and determined that those assurances estopped Bristol from suing for infringement." (Rakoczy Decl. Ex. E at 30; *see also id.* at 50 ("Bristol, like Syntex, made representations with preclusive effect."); *id.* Ex. D at 10 ("[T]he [BMS-Apotex] dismissal was predicated upon Bristol's preclusive representations and the court's endorsement of its resulting lack of jurisdiction."); *id.* Ex. F at 10 ("[i]f estoppel is what matters, in our view here, Bristol is estopped"); *id.* Ex. C at 4-5 ("the [BMS-Apotex] dismissal precludes a subsequent suit by BMS against Apotex").) Thus, for purposes of applying FDA's statutory interpretation to the facts of this case, the Teva-Syntex Dismissal and the BMS-Apotex Dismissal are equivalent. Both were dismissed for lack of subject matter jurisdiction based on the patent holder's representations not to sue; both have preclusive effect; and neither Order states on its face that the patent at issue was invalid, not infringed, or unenforceable. FDA cannot argue otherwise now.

### C.    FDA's Application Of Its Statutory Interpretation To The BMS-Apotex Dismissal Is Arbitrary, Capricious And Contrary To Law, And Fails For Want Of Reasoned Decision Making.

Because, according to FDA, there are no material differences between the Teva-Syntex Dismissal and the BMS-Apotex Dismissal, FDA's determination that the BMS-Apotex Dismissal cannot qualify as a court decision trigger "because it does not contain a holding of invalidity, non-infringement, or unenforceability" is just as arbitrary and capricious here as it was in the ticlopidine litigation. (*See* Rakoczy Decl. Ex. D at 8.) All of the arguments that this Court and the D.C. Circuit asserted against FDA in rejecting the Agency's position in the ticlopidine matter apply equally here.

First, FDA's position is unsupported by any particular interpretation of the court decision trigger provision. As before, FDA has provided no explanation for its determination that "the plain language of section 355(j)(5)(B)(iv)(II) does not embrace dismissals of declaratory judgment actions for lack of subject-matter jurisdiction" and that the BMS-Apotex Dismissal "would not qualify as a triggering court decision, because it does not contain a holding of invalidity, non-infringement, or unenforceability." (Rakoczy Decl. Ex. D at 8.) Moreover, FDA previously has acknowledged that this interpretation is "not compelled by the statutory language and, indeed, may be "narrower than the statute may be able to support." *Teva I*, 182 F.3d at 1007; (Rakoczy Decl. Ex. L at 20). The D.C. Circuit already has stated that "the narrowness of [this] interpretation must be justified," yet, once again, FDA has provided none. *Teva I*, 182 F.3d at 1011; *Teva III*, 2006 WL 644903, at *4 n.5. FDA's decision is thus arbitrary, capricious, and contrary to law on this ground alone.

Second, FDA's position ignores the "relevant consideration" of whether, as a result of the dismissal order, the patent holder is estopped "from later claiming that the ANDA applicant is liable for patent infringement." *Teva I*, 182 F.3d at 1009. As the D.C. Circuit has held that the *Teva* decisions did not establish a rule of law which obligates the Agency to treat the BMS-Apotex Dismissal as a court decision trigger, there is no question that, under *Teva I*, FDA's interpretation of the statute must, at the very least, consider the estoppel effect of the court decision in question in evaluating its triggering properties. Indeed, as FDA acknowledges, according to the *Teva I* Court, "[b]ecause 'the significance' of a holding 'often lies in its preclusive effect,' what matters for purposes of the court decision trigger is not what form the 'decision' or 'holding' takes, but whether the patentee is estopped from enforcing its patent." (Rakoczy Decl. Ex. E at 51) (quoting *Teva I*, 182 F.3d at 1008). Here, FDA already has

determined, and steadfastly argued, that the BMS-Apotex Dismissal has "preclusive effect." (Rakoczy Decl. Ex. C at 4-5; *id.* Ex. D at 10; *id.* Ex. E at 30, 50; *id.* Ex. F at 10.) Thus, arguably, FDA's position here is even *more* arbitrary and capricious than that taken in the ticlopidine litigation. Here, FDA already has completed the "legal analysis" required "in the context of the court decision trigger," yet, the Agency intentionally ignores its preclusive findings in making its exclusivity determination. *Teva*, 1999 WL 1042743, at *5; *Teva II*, 2000 WL 1838303, at *1. Such conduct, given FDA's commitment to making a case-by-case determination, is unquestionably arbitrary, capricious, and contrary to law.

Third, FDA continues to take the position that "the court decision trigger provision should be interpreted to require a decision with an actual holding of invalidity or noninfringement." (Rakoczy Decl. Ex. F at 10.) Yet, the D.C. Circuit already has held that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of market exclusivity." *Teva I*, 182 F.3d at 1009. Moreover, the *Teva I* Court further noted that FDA's application of the statute in the ticlopidine case "runs counter to its explanation for permitting unenforceability to qualify as a 'court decision,'" for in both cases the patentee cannot sue the ANDA applicant for patent infringement as a result of the judgment. *Id.* at 1010. That same reasoning applies here. As FDA recognizes, as a result of the BMS-Apotex dismissal and BMS's unequivocal disavowal of any intent to sue Apotex for infringement, under governing Federal Circuit law, BMS cannot sue Apotex for infringement of the pravastatin patents in the future. (Rakoczy Decl. Ex. D at 17-18); *Teva I*, 182 F.3d at 1008; *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995); *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991). FDA's failure to provide an explanation as to why the BMS-Apotex Dismissal should not trigger

exclusivity to the same extent as a finding of patent unenforceability is arbitrary, capricious, and contrary to law.

Fourth, and finally, FDA still has provided no explanation as to why a dismissal for lack of subject matter jurisdiction that "supports estoppel to the same extent as the grant of partial summary judgment at issue in *Granutec* . . . would not satisfy the 'court decision' requirement of § 355(j)(5)(B)(iv)(II)." *Teva I*, 182 F.3d at 1011; *Teva*, 1999 WL 1042743, at *6. This was one of the *Teva I* Court's primary grounds for rejecting FDA's ticlopidine exclusivity determination, yet FDA still has not managed to provide an acceptable explanation for its disparate treatment. Indeed, this Court rejected every single one of FDA's "several bases upon which it rests its conclusion that the two cases are distinguishable." 1999 WL 1042743, at *6. For example, first, this Court rejected FDA's argument that the summary judgment at issue in *Granutec* was a decision on the "actual merits," citing the *Teva I* Court's statement that, "[a]lthough the dismissal was not a judgment on the merits after consideration of evidence by the parties, there was no need for such a procedure here because the dismissal sufficed to estop [Syntex] from suing Teva for patent infringement." *Id.* Second, this Court rejected FDA's claim that the Teva-Syntex Dismissal is not a "holding," citing the *Teva I* Court's finding that "the term 'holding' is 'susceptible to interpretation.'" *Id.* Third, this Court rejected on the same grounds FDA's argument that a court decision requires a holding of patent non-infringement, invalidity or unenforceability. *Id.* And, fourth, this Court rejected FDA's argument that it "cannot and will not go beyond the 'face of the order' to determine the underlying rationale for a putative court decision," *id.*—which the Court had previously dismissed on the basis that "[s]ome degree of legal analysis is unavoidable in the context of the court decision trigger." *Id.* at *5. The law is clear: FDA must treat similar cases in a similar manner unless it can provide a

legitimate reason for failing to do so. *Bracco Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 27 (D.D.C. 1997) (citing *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1258 (D.C. Cir. 1996)). Because FDA has failed to provide any reason, much less a legitimate one, for its disparate treatment of the BMS-Apotex Dismissal, its decision is arbitrary, capricious, and contrary to law.

In sum, for all the same reasons that the D.C. Circuit and this Court previously rejected FDA's "textual" interpretation of the court decision trigger provision, that interpretation fails here too. At the very least, Apotex has demonstrated a substantial likelihood of success on the merits to justify an injunction preserving the *status quo*.

## IV.    An Injunction Would Further The Public Interest.

Finally, the public interest is best served by issuing injunctive relief and maintaining the *status quo* until this dispute can be resolved on the merits. First, the public's interest lies in the "faithful application of the laws", *see Mova*, 140 F.3d at 1066, which, here, is served by requiring the Agency to apply the governing statute in a manner that is consistent with FDA's previous rulings. Second, injunctive relief comports with the purpose of the statute and, in particular, the triggering court-decision provision, which seeks to prevent patent holders from "manipulat[ing] the system in order to block or delay generic competition." *Teva I*, 182 F.3d at 1009. Any other result will undermine the balance struck in Hatch-Waxman and ultimately harm the consuming public. And third, if Apotex ultimately prevails on the merits, the public will benefit from fuller generic competition for pravastatin.

## CONCLUSION

That Apotex will suffer devastating and irreparable harm absent the requested injunction is beyond question. FDA and Teva, on the other hand, would suffer no harm from an order merely preserving the *status quo*. Moreover, Apotex has, at the very least, demonstrated a

substantial likelihood of success on the merits of its challenge to FDA's statutory interpretation—an interpretation that the D.C. Circuit already has twice rejected. For all of these reasons, the Court should enter an order temporarily preserving the *status quo* and delaying the effective date of all pravastatin ANDAs, including Teva's ANDA, until the resolution of this case on the merits, including full briefing and a hearing. A proposed order seeking such relief is submitted herewith.

Dated:  April 5, 2006.                    Respectfully submitted,

APOTEX INC.

By: _____

Arthur Y. Tsien, D.C. Bar No. 411579
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C. 20036-2220
(202) 789-1212
(202) 234-3550 (facsimile)

Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC.<br>150 Signet Drive<br>Weston, Ontario, Canada  M9L 1T9<br><br>Plaintiff,<br><br>v.<br><br>FOOD AND DRUG ADMINISTRATION<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>MICHAEL O. LEAVITT<br>Secretary of Health and Human Services<br>200 Independence Avenue, SW<br>Washington, D.C.  20201<br><br>and<br><br>ANDREW VON ESCHENBACH<br>Acting Commissioner of Food and Drugs<br>5600 Fishers Lane<br>Rockville, MD  20857<br><br>Defendants. | )<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF TAMMY L. MCINTIRE

I, TAMMY L. MCINTIRE, declare as follows:

1.    I am the President of Apotex Corp., which is located in Weston, Florida.  Apotex Corp. is the United States marketing and sales affiliate for Apotex Inc., a Canadian-based pharmaceutical company that develops and manufactures generic drugs for sale in the United States and throughout the world.  For convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this Declaration as "Apotex."

2.     I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3.     I submit this Declaration in support of Apotex's motion for a temporary restraining order to preserve the *status quo* pending resolution of this case on the merits.

4.     In my current position, I am personally involved in the introduction and promotion of new generic drug products for the United States market. I am familiar with the considerable benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180 days. This exclusive "first-mover advantage" generates significant tangible benefits such as enduring market share, increased sales across all product lines, and higher profit margins, as well as intangible benefits such as improved market position, customer goodwill, and reputation.

5.     I am also well aware of the considerable disadvantages and irreparable harm that a company suffers when its approval is delayed by 180-day exclusivity that is improperly granted to another company. These losses include, but are not limited to: significant lost profits and sales across all product lines; an accompanying decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

6.     In short, it is virtually impossible for late-comers to the market to overcome the lasting benefits of the first-mover advantage. That is precisely the irreparable harm that Apotex will suffer if Teva Pharmaceuticals USA, Inc. ("Teva") is allowed to launch its pravastatin

sodium tablets before this dispute is decided and thus enjoy a period of exclusivity to which it may not be entitled.

### Pravachol® (Pravastatin Sodium)

7.    Bristol-Myers Squibb Company ("BMS") currently markets Pravachol® (pravastatin sodium) tablets, in 10 mg, 20 mg, 40 mg, and 80 mg strengths, in the United States for the treatment of heart disease.

8.    Pravachol® is a very lucrative drug for BMS, with worldwide sales in 2005 exceeding $2.25 billion (USD). According to IMS Health, an industry-recognized source in the pharmaceutical market, BMS's total Pravachol® sales for 2005 in the United States alone were $1.7 billion (USD). Given the size of the brand market, pravastatin sodium tablets have an enormous potential for generic sales.

### Apotex's Pravastatin ANDA

9.    Apotex has spent considerable sums developing a generic pravastatin tablet product for eventual sale in the United States, including compiling the information required to submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA"). To date, Apotex has manufactured nearly 2100 kilograms of pravastatin active pharmaceutical ingredient ("API"), with an estimated worth of $6,255,757, for a commercial launch of its product.

### Other Generic Pravastatin ANDAs

10.    Based on publicly available information, at least seven other companies, including Teva, have filed ANDAs with FDA seeking approval to market generic versions of Pravachol®. To date, FDA has not approved any generic pravastatin ANDAs.

3

11.    It is my understanding, however, that FDA intends to approve Teva's ANDA, and that Teva intends to commercially launch its generic product, on or about April 20, 2006, which could happen before the resolution of this action on the merits absent an injunction.    It also is my understanding that FDA intends to award Teva 180-day exclusivity, which will prevent Apotex and others from going to market for at least six months after Teva launches.    Apotex has challenged that exclusivity in this lawsuit.    Unless the Court grants injunctive relief preserving the *status quo* until this dispute is resolved, Teva could enjoy an exclusivity to which it is not entitled.    Such a result would unlawfully deny Apotex and others access to the market, thus causing Apotex irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails.

**Irreparable Harm to Apotex**

12.    As an initial matter, if Apotex is delayed and Teva is permitted to launch its product with 180-day exclusivity, the long-term financial losses to Apotex will be substantial and unrecoverable, even if Apotex is successful on the merits of this litigation.

13.    My experience with other drug products has shown that there are considerable—often incalculable—benefits to receiving 180-day exclusivity and being the first generic entrant to the market.    The first-mover (here, Teva) establishes market dominance that is nearly impossible for other, subsequent entrants like Apotex to overcome.    The period of 180-day exclusivity also allows the first-mover to recover its investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products.    Conversely, subsequent entrants to the market, like Apotex here, find it difficult to find prospective customers, much less recoup product investments and obtain any significant market share.

14.    I have analyzed the potential market share for generic pravastatin during the first 12 months of competition with Pravachol®, based on IMS data showing Pravachol®'s U.S. sales from 2004 and 2005. If Apotex were allowed to launch at the same time as the other seven approvable pravastatin applicants, Apotex projects that it will earn at least $10.5 million in the first 12 months of generic pravastatin competition. If, however, Teva is allowed to launch with six months of exclusivity prior to all other applicants, Apotex projects that it will earn no more than approximately $597,000 in the first 12 months of generic pravastatin competition. This translates into a total and unrecoverable loss of at least $9,903,000 in sales.

15.    Moreover, in reliance on FDA's June 28, 2005 administrative ruling, Apotex's fermentation facility already has manufactured, and Apotex Inc. already has ordered, over $6.25 million worth of pravastatin API in order to produce and formulate the necessary amount of pravastatin tablets required for a product launch. In the event Teva is allowed to launch with six months of exclusivity prior to all other applicants, Apotex would not recoup its development and API investments and costs associated with the product.

16.    It is my understanding that Apotex has no remedy against FDA to recover Apotex's losses, including Apotex's investments and projected lost sales, if Teva is allowed to commercially launch with exclusivity while this litigation is still pending. This is true even if Apotex prevails on the merits.

17.    Furthermore, the effects of an exclusive launch by Teva extend well beyond the unrecoverable loss of sales, market share, profits, and investments. This is because the first company to commercially market a generic drug product generally reaps a long-term benefit that extends well beyond the period of time when it may have the only FDA-approved generic product. This occurs because the first company to reach the marketplace in essence fills the

5

pipeline and is able to enter into long-term contracts with most, if not all, of the major customers. In other words, if Teva is first to hit the market alone, it will be able to tie up valuable distribution channels so that, even after the six-month head-start, the loss of access to major customers would still foreclose Apotex from effectively competing in the pravastatin market.

18.    Apart from the lost opportunity for pravastatin sales (over $9.9 million during the first year of generic pravastatin sales alone) and decreased access to major customers, Apotex also would lose sales across all of its other generic product lines.  When companies like Teva have the opportunity to exclusively launch a unique blockbuster drug such as a generic equivalent to Pravachol® tablets, they have significant leverage to sell other products that they manufacture.  The presence of an exclusive blockbuster in the product line is perhaps the single most effective way to increase sales across all product lines.  Conversely, subsequent entrants to the market like Apotex have no such leverage.  This leads to a loss of market share across all products, which is also irreparable.

19.    Apotex's pravastatin products are significant not only for Apotex, but for its customers.  Apotex's image as an important supplier of generic pharmaceuticals has been established over the years due to its ability to bring lower-cost alternatives of important pharmaceuticals, such as pravastatin, to the market.  If Apotex is forced to delay the sale of its pravastatin products, Apotex would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Apotex sells to its customers today and in the future.

## Conclusion

20.    In sum, emergency injunctive relief preserving the *status quo* is crucial to avoid devastating and irreparable harm to Apotex before this case is decided.  Without immediate injunctive relief, if Teva exclusively launches its pravastatin tablets before this dispute is decided, Apotex will irreparably lose sales over $9.9 million, significant market share for this and other products, and indeed its entire pravastatin investment, as well as customer goodwill and access to major customers.

Dated:  April 5, 2006

7

I, TAMMY L. MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_____
TAMMY L. MCINTIRE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

APOTEX INC.                                        )
150 Signet Drive                                   )
Weston, Ontario, Canada  M9L 1T9                   )
                                                   )
            Plaintiff,                             )        Case No. _____
                                                   )
      v.                                           )
                                                   )
FOOD AND DRUG ADMINISTRATION                       )
5600 Fishers Lane                                  )
Rockville, MD  20857                               )
                                                   )
MICHAEL O. LEAVITT                                 )
Secretary of Health and Human Services             )
200 Independence Avenue, SW                        )
Washington, D.C.  20201                            )
                                                   )
            and                                    )
                                                   )
ANDREW VON ESCHENBACH                              )
Acting Commissioner of Food and Drugs              )
5600 Fishers Lane                                  )
Rockville, MD  20857                               )
                                                   )
            Defendants.                            )
                                                   )

## DECLARATION OF WILLIAM A. RAKOCZY

I, WILLIAM A. RAKOCZY, declare as follows:

1.      I am a partner in the law firm of RAKOCZY MOLINO MAZZOCHI SIWIK LLP, counsel for Apotex Inc. ("Apotex").

2.      I am a practicing attorney and member in good standing of the Bar of the District of Columbia, and am admitted to practice before the United States District Court for the District of Columbia and before the United States Court of Appeals for the District of Columbia Circuit.

3.    I submit this Declaration in support of Apotex's Motion for a Temporary Restraining Order.

4.    I have personal knowledge of the facts stated in this Declaration and am competent to testify to the same.

5.    Attached hereto at Exhibit A is a true and accurate copy of the August 14, 1998 Dismissal Order entered in *Teva Pharmaceuticals USA, Inc. v. Syntex (USA) Inc.*, Civ. A. No. C 98-02314 (CAL) (N.D. Cal.).

6.    Attached hereto at Exhibit B is a true and accurate copy of a letter dated September 7, 2004, and Tabs A and F attached thereto, from William A. Rakoczy and Christine J. Siwik, as counsel for Apotex, to Gary Buehler, Director, Office of Generic Drugs, regarding the 180-day exclusivity period for pravastatin sodium tablets.

7.    Attached hereto at Exhibit C is a true and accurate copy of a letter dated June 28, 2005, from Gary Buehler, Director, Office of Generic Drugs, to William A. Rakoczy and Christine J. Siwik, responding to Apotex's September 7, 2004 correspondence.

8.    Attached hereto at Exhibit D is a true and accurate copy of selected excerpts from the Reply Brief For The Federal Appellants, filed February 6, 2006, in *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-5401, 05-5460 (D.C. Cir.).

9.    Attached hereto at Exhibit E is a true and accurate copy of selected excerpts from the Brief For The Federal Appellants, filed December 22, 2005, in *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-5401, 05-5460 (D.C. Cir.).

10.    Attached hereto at Exhibit F is a true and accurate copy of selected excerpts from the Transcript of the March 9, 2006 Oral Argument before Circuit Judges Randolph and Tatel

and Senior Circuit Judge Williams in *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 05-5401, 05-5460 (D.C. Cir.).

11.    Attached hereto at Exhibit G is a true and accurate copy of the October 29, 2003 Order entered in *Purepac Pharmaceutical Co. v. Thompson*, Civ. A. No. 03-2210 (D.D.C.), granting Purepac's motion for a temporary restraining order.

12.    Attached hereto at Exhibit H is a true and accurate copy of the July 26, 2004 Order entered in *Apotex, Inc. v. FDA*, No. 04-5211 (D.C. Cir.), granting Apotex's motion for a stay pending resolution of the appeal.

13.    Attached hereto at Exhibit I is a true and accurate copy of the November 22, 2005 Order entered in *Teva Pharmaceuticals USA, Inc. v. FDA*, No. 05-5401 (D.C. Cir.), granting Apotex's motion to expedite.

14.    Attached hereto at Exhibit J is a true and accurate copy of a press release dated October 21, 2005, from Teva Pharmaceutical Industries Ltd. announcing Teva's intent to launch its pravastatin products in April 2006.

15.    Attached hereto at Exhibit K is a true and accurate copy of selected excerpts from the Brief For The Federal Appellant, filed March 27, 2000, in *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 99-5287, 99-5342 (D.C. Cir.).

16.    Attached hereto at Exhibit L is a true and accurate copy of selected excerpts from the Brief For The Federal Appellees, filed February 22, 1999, in *Teva Pharmaceuticals USA, Inc. v. FDA*, Nos. 99-5022, 99-5027 (D.C. Cir.).

17.    The foregoing facts are true and correct as I verify and believe.

Dated: April 5, 2006

I, WILLIAM A. RAKOCZY, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

WILLIAM A. RAKOCZY

# EXHIBIT A

# Declaration of William A. Rakoczy

*In support of Apotex Inc. 's Motion For*
*Temporary Restraining Order*

PAGE:  2

FILED

AUG 14  2 21 PM '03

CHARLES R. HINC
S. DIST. OF COURT
DIST. OF COURT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TEVA PHARMACEUTICALS USA, INC.,

v.

Plaintiff,

SYNTEX (USA) INC.,

Defendant.

Case No. C 98-02314 CAL

ORDER DISMISSING COMPLAINT
FOR DECLARATORY JUDGMENT

[Federal Rules of Civil Procedure, Rule
12(b)(1)]

Date:     August 7, 1998
Time:     9:30 a.m.
Place:    Courtroom 10
Judge:    Charles A. Legge

ORDER DISMISSING COMPLAINT
FOR DECLARATORY JUDGMENT

On August 7, 1998 the Motion to Dismiss For Lack of Subject Matter Jurisdiction filed by defendant Syntex (U.S.A.) Inc. ("Syntex") came on regularly for hearing. The parties were represented by counsel. Based on all of the evidence and argument, both written and oral, and good cause appearing therefor, the Court hereby finds:

(1)    Plaintiff Teva Pharmaceuticals USA, Inc. ("Teva") lacked and lacks a reasonable apprehension of suit by Syntex for infringement of U.S. Patent No. 4,591,592 ("'592 Patent").

(2)    There is no justiciable case or controversy between the parties concerning any infringement by Teva of the '592 Patent.

(3)    This Court lacks subject matter jurisdiction over the action.

Based on the foregoing findings, Syntex's Motion is GRANTED and the Complaint is DISMISSED.

IT IS SO ORDERED.

DATED: ___8/14___, 1998

_____
THE HONORABLE CHARLES A. LEGGE
JUDGE, UNITED STATES DISTRICT COURT

ORDER DISMISSING COMPLAINT
FOR DECLARATORY JUDGMENT

# EXHIBIT B

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For
Temporary Restraining Order*


**RAKOCZY MOLINO MAZZOCHI** L.L.P.

William A. Rakoczy
312.222.6301 telephone
312.222.6321 facsimile
wrakoczy@rmmlegal.com

Christine J. Siwik
312.222.6304 telephone
312.222.6324 facsimile
csiwik@rmmlegal.com

September 7, 2004

**CONFIDENTIAL ANDA DOCUMENT—
NOT TO BE DISCLOSED OUTSIDE FDA**

**VIA FedEx® and E-Mail**
Mr. Gary Buehler
Director, Office of Generic Drugs
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
HFD-600, Metro Park North II
7500 Standish Place, Room 150
Rockville, MD 20855-2773

Re:    Apotex Inc.'s ANDA No. 76-341 for Pravastatin Sodium Tablets
       10 mg, 20 mg, 40 mg and 80 mg

Dear Mr. Buehler:

On behalf of Apotex Inc. (formerly known as TorPharm, Inc.), we respectfully request the Agency to confirm that:

- Subject to all other substantive requirements for approval, Apotex will be eligible for, and receive, immediate final approval of its ANDA No. 76-341 for Pravastatin Sodium Tablets 10 mg, 20 mg, 40 mg, and 80 mg on April 20, 2006, when the pediatric exclusivity associated with U.S. Patent No. 4,346,227 ("the '227 patent") expires;

- Apotex's final approval will not be delayed by any unexpired 180-day exclusivity under 21 U.S.C. § 355(j)(5)(B)(iv) for these drug products; and

312.527.2157 main phone
312.527.4205 main fax

www.rmmlegal.com      6 WEST HUBBARD STREET, SUITE 500, CHICAGO, IL 60610

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 2

- The July 23, 2004 Order (Tab A) dismissing Apotex's declaratory judgment action on U.S. Patent Nos. 5,030,447 ("the '447 patent"); 5,180,589 ("the '589 patent"); and 5,622,985 ("the '985 patent") constitutes a "decision of a court" under 21 U.S.C. § 355(j)(5)(B)(iv)(II) that triggered any exclusivity arising out of these patents as of August 22, 2004.

Apotex requests the courtesy of a response by the end of business on September 21, 2004. If we do not hear from the Agency by then, Apotex will assume that its request has been denied and take appropriate action to protect its rights.

## I.    INTRODUCTION

Apotex and at least seven other applicants have filed ANDAs for generic pravastatin sodium tablets with paragraph III certifications to the '227 patent, which blocks generic entry until April 20, 2006 with pediatric exclusivity, and paragraph IV certifications to the remaining three Orange-Book listed patents. Based on information made available by the NDA-holder, other applicants may have filed paragraph IV ANDAs before Apotex. Based on public statements, these applicants claim to have 180-day exclusivity, pursuant to § 355(j)(5)(B)(iv), on the '447, '589, and '985 patents. If such exclusivity exists, the recent dismissal of Apotex's declaratory judgment action against Bristol-Myers Squibb Company ("BMS") triggered that exclusivity.

As detailed below, Apotex filed suit against BMS seeking a declaratory judgment of noninfringement and/or invalidity of the '447, '589, and '985 patents. The district court dismissed that action for lack of subject matter jurisdiction on July 23, 2004, based on BMS's repeated representations that it has no intention now, or in the future, of suing Apotex for infringement of those patents. In light of BMS's representations, this Order, which became final and unappealable on August 22, 2004, has estoppel effect and precludes BMS from suing Apotex on those patents. Under the D.C. Circuit's decisions in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva Pharmaceuticals, USA, Inc. v. FDA*, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) ("*Teva II*"), this dismissal constitutes a "court decision" under § 355(j)(5)(B)(iv)(II), triggering any exclusivity that might have existed for these three patents as of August 23, 2004. Any exclusivity will thus expire no later than February 18, 2005, and cannot delay Apotex's approval beyond April 20, 2006. Apotex now seeks confirmation of this fact from the Agency.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 3

## II.    BACKGROUND

### A.    Reference-listed drug and Orange Book patents

The reference-listed drug on which Apotex based its ANDA is BMS's prescription cholesterol drug Pravachol® (pravastatin sodium) Tablets 10 mg, 20 mg, 40 mg, and 80 mg, first approved by FDA under New Drug Application (NDA) No. 19-898 on October 31, 1991.

BMS has submitted patent information on—and FDA has listed—four patents in the Orange Book in connection with Pravachol® (pravastatin sodium) tablets and NDA No. 19-898. Those patents are:

- The '227 patent, expiring October 20, 2005, with pediatric exclusivity expiring April 20, 2006;

- The '447 patent, expiring July 9, 2008, with pediatric exclusivity expiring January 9, 2009;

- The '589 patent, expiring, July 9, 2008, with pediatric exclusivity January 9, 2009; and

- The '985 patent, expiring April 22, 2014, with pediatric exclusivity expiring October 22, 2014.

### B.    Apotex's ANDA No. 76-341 for Pravastatin Sodium Tablets 10 mg, 20 mg, 40 mg, and 80 mg

On December 21, 2001, Apotex submitted ANDA No. 76-341 for generic pravastatin sodium tablets 10 mg, 20 mg, and 40 mg. Apotex subsequently amended its ANDA to include the 80 mg strength tablet as well. For all tablet strengths, Apotex's ANDA contains a paragraph III certification under 21 U.S.C. § 355(j)(2)(A)(vii)(III) to the '227 patent, thus signifying that Apotex does not intend to market its pravastatin products until after the expiration of the '227 patent, and its corresponding pediatric exclusivity, on April 20, 2006. Apotex submitted paragraph IV certifications, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), to the '447, '589, and '985 patents.[1]

---

[1] The recent Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, 117 Stat. 2066 (2003), made significant changes to the 180-day exclusivity provision of the 1984 Hatch-Waxman Amendments (formally known as the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (codified as amended at 21 U.S.C. § 355 and 35 U.S.C. § 271)). With respect to

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 4


As required by 21 U.S.C. §§ 355(j)(2)(B)(i)-(ii), Apotex provided the requisite notice of
its ANDA and paragraph IV certifications, together with the factual and legal bases for those
certifications, to BMS, the patent owner and NDA-holder. To date, BMS has not sued Apotex
(or any other pravastatin applicant). But, as explained in greater detail below, Apotex filed suit
against BMS seeking declaratory judgments of patent noninfringement and/or invalidity of the
'447, '589, and '985 patents.

On September 30, 2003, FDA issued tentative approval of Apotex's ANDA, finding that
Apotex has satisfied all substantive requirements for approval and that its pravastatin sodium
product "is safe and effective for use as recommended in the submitted labeling." (Tab B,
9/30/03 Tentative Approval Letter at 1.) FDA further stated that final approval of Apotex's
ANDA will not be made effective until the '227 patent (and its pediatric extension) expire on
April 20, 2006. (*Id.* at 2.) Although Apotex's tentative approval letter does not mention
anything about 180-day exclusivity, it is our understanding that FDA may award such exclusivity
to other pravastatin applicants, as discussed below.

**B.    Other pravastatin ANDAs**

Based on publicly available information from FDA and from patent litigation with BMS,
at least seven other applicants apparently have submitted ANDAs for pravastatin sodium tablets
with paragraph IV certifications to the listed '447, '589, and '985 patents. (*See* Tab C, Blischak
Decl. ¶¶ 5, 7.) All such ANDA applicants have submitted paragraph III certifications to the '227
patent, thus delaying their final approval until April 20, 2006. (*Id.*) Further, one or more of the
other paragraph IV ANDAs may have been submitted before Apotex's ANDA. (*See id.* ¶ 7; Tab
D, Pravastatin Tentative Approval List.) For example, we understand that FDA considers Teva
to be the first applicant to submit a paragraph IV ANDA (No. 76-056) for the 10 mg, 20 mg, and
40 mg strength pravastatin sodium tablets, and Geneva to be the first applicant to submit a
paragraph IV ANDA (No. 76-056) for the 80 mg strength tablets.[2] Teva and Geneva have made
public statements to the same effect.

By virtue of these purported previous ANDAs, FDA may consider Teva and Geneva (or

_____

paragraph IV ANDAs, like Apotex's pravastatin ANDA, filed prior to December 8, 2003, the MMA requires a
triggering decision to be a court decision from which no appeal has been or can be taken. *See* MMA § 1102(b)(3).
Because the triggering court decision in this case was not appealed, this change has no relevance here. Unless noted
otherwise, all citations refer to the pre-MMA provisions of the Hatch-Waxman Amendments.

[2]  The agency considers each strength and dosage form of a particular generic drug to be a separate drug product for
which an ANDA applicant may potentially qualify for exclusivity. *See Apotex, Inc. v. Shalala*, 53 F. Supp. 2d 454,
456 (D.D.C. 1999), *aff'd*, No. 99-5231, 1999 U.S. App. LEXIS 29571 (D.C. Cir. Oct. 8, 1999).

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 5

perhaps others) to be eligible for 180-day exclusivity for those drug products pursuant to 21 U.S.C. § 355(j)(5)(B)(iv). Such exclusivity could delay approval of all subsequent ANDAs until 180-days after either first commercial marketing of each drug product by the first-filer or a final court decision on the listed '447, '589, and '985 patents, whichever is earlier.

    C.    **Apotex's offer of confidential access to ANDA No. 76-341**

    On February 3, 2004, in accordance with 21 U.S.C. § 355(j)(5)(C)(i)(III), as amended by the MMA, Apotex extended BMS an offer of confidential access to Apotex's ANDA No. 76-341 for the sole and exclusive purpose of determining whether an infringement action could be brought for infringement of the '447, '589, and '985 patents. By letter dated February 13, 2004, BMS rejected Apotex's offer.

    D.    **Apotex obtains a "decision of a court" that triggers any 180-day exclusivity for pravastatin tablets**

    On April 15, 2004, having satisfied the statutory pre-filing requirements under the MMA, Apotex filed a declaratory judgment action against BMS in the U.S. District Court for the Southern District of New York, pursuant to 21 U.S.C. § 355(j)(5)(C)(i) and 35 U.S.C. § 271(e)(5), as amended by the MMA. In that suit, Apotex sought a declaratory judgment that its pravastatin products will not infringe the '447, '589, and '985 patents and/or that such patents are invalid.

    On May 25, 2004, BMS moved to dismiss the action for lack of subject matter jurisdiction on the ground that BMS has no intention now, or in the future, of suing Apotex for infringement of the '447, '589, and '985 patents. (*See* Tab E, BMS Mot. to Dismiss; Tab F, BMS Mem.) Indeed, BMS has repeatedly and unambiguously represented that it will not sue Apotex on these three patents:

- "BMS nonetheless has no intention, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents . . . ." (Tab C, Blischak Decl. at Ex. G, 2/20/04 Letter from M. Blischak to W. Rakoczy.)

- "[BMS] has repeatedly stated that based on the representations Apotex made regarding its generic pravastatin sodium product, [BMS] has no intention, now or in the future, of suing Apotex for infringement of any of the '447, '589, and '985 patents." (Tab C, Blischak Decl. ¶ 10.)

- "[BMS] has repeatedly stated that it will *not* sue Apotex for infringement of the '447, '589, and '985 patents . . . ." (Tab F, BMS Mem. at 12.)

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 6

- "[BMS] has repeatedly affirmed in writing, in absolute terms, that it has *no* intention of suing Apotex." (*Id.* at 2.)

- "[BMS] had explicitly stated in two separate letters that it would not sue Apotex for infringement of the '447, '589, and '985 patents . . . ." (*Id.* at 9.)

- "All Apotex needs to know is the *fact* that [BMS] does not intend to sue, and [BMS] has made that manifestly plain." (*Id.* at 13.)

The district court struck BMS's motion to dismiss because BMS failed to comply with the court's pre-motion procedures. Before BMS could re-file its motion, however, Apotex's declaratory judgment action was dismissed by stipulation of the parties pursuant to BMS's covenant not to sue Apotex. More specifically, on July 23, 2004, the district court entered an Order dismissing Apotex's action for lack of subject matter jurisdiction based on BMS's representation that it has no intention of suing Apotex for infringement of the '447, '589, and '985 patents. (Tab A, 7/23/04 Order.) The Stipulation and Order provide in pertinent part:

> WHEREAS, prior to Apotex's filing of the Complaint herein, BMS repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

> NOW THEREFORE, based upon BMS's pre-Complaint representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341, Apotex hereby stipulates that Apotex's Complaint seeking a declaratory judgment of noninfringement of the '447, '985, and '589 patents be, and hereby is, dismissed, for lack of subject matter jurisdiction, with each party to bear its own costs.

(*Id.* at 3.) This Order became a final decision from which no appeal has been, or can be, taken on August 22, 2004. On September 3, 2004, in accordance with 21 C.F.R. § 314.107(e), Apotex submitted a copy of this decision to OGD.

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 7

The court's July 23, 2004 decision triggered any exclusivity for pravastatin tablets arising out of the '447, '589, and '985 patents. Consequently, such exclusivity will expire no later than February 18, 2005, thus leaving no barrier to final approval for Apotex on April 20, 2006.

III.    ANALYSIS

A.    Under controlling D.C. Circuit case law, the dismissal of a declaratory judgment action for lack of subject matter jurisdiction, which has estoppel effect, constitutes a triggering "court decision" under § 355(j)(5)(B)(iv)(II)

The relevant statutory provision governing 180-day exclusivity provides as follows:

(iv) If the application contains a [paragraph IV certification] . . . and is for a drug for which a previous application has been submitted under this subsection [containing] such a certification, the application shall be made effective not earlier than one hundred and eighty days after—

(I) the date the Secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, or

(II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv). This provision works by delaying approval of subsequent paragraph IV ANDAs until first commercial marketing by the first-filer or a decision of a court holding that the patent is not infringed or invalid, whichever is earlier. The triggering decision of a court in subclause (II) must be a final decision from which no appeal has been or can be taken. *See* MMA § 1102(b)(3).

The dismissal of Apotex's declaratory judgment action here constitutes a "decision of a court" under § 355(j)(5)(B)(iv)(II). The D.C. Circuit's decisions and interpretation of the statute in *Teva I* and *Teva II* control here. In those cases, the D.C. Circuit explicitly held that a dismissal of a declaratory judgment action for lack of subject matter jurisdiction, which has estoppel effect under the patent laws, is a "court decision" sufficient to trigger the 180-day exclusivity. *See Teva I*, 182 F.3d at 1008; *Teva II*, 2000 WL 1838303. These decisions are

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 8

binding on the Agency here, and require that FDA treat the dismissal of Apotex's declaratory judgment action as a triggering "court decision" under § 355(j)(5)(B)(iv)(II).

The facts and reasoning of the *Teva* decisions control here. In the *Teva* cases, Apotex (then known as TorPharm) submitted the first paragraph IV ANDA for a generic version of Hoffman-La Roche's prescription drug ticlopidine (brand-name Ticlid®). The patentee, Syntex, did not sue Apotex or any subsequent ANDA applicants for infringement. By virtue of submitting the first paragraph IV ANDA, FDA awarded Apotex sole 180-day exclusivity for generic ticlopidine, which delayed the approval of all subsequent applicants until 180 days after first commercial marketing or a court decision of noninfringement, whichever is earlier.

Apotex's competitor, Teva, while awaiting ANDA approval, filed a declaratory judgment action against Syntex seeking a declaratory judgment of noninfringement of Syntex's listed patent. *See Teva I*, 182 F.3d at 1006. Teva did so in order to obtain a "court decision" that would trigger Apotex's 180-day exclusivity period, thereby allowing Teva to market its generic drug. *Id.* at 1004. The same day Teva sued, Syntex sent Teva a letter stating: "We will make no claim of patent infringement based on the sale of ticlopidine hydrochloride tablets having the formulation you have disclosed to us." *Id.* at 1006. Syntex then moved to dismiss the complaint for lack of subject matter jurisdiction, explaining:

> Given Syntex's express assurance that it would not bring suit against Teva on the '592 patent, Teva can have no reasonable apprehension that it will face a lawsuit for infringement of the '592 patent. Without such reasonable apprehension, no actual case or controversy exists of sufficient immediacy or reality to base jurisdiction over Teva's declaratory judgment claim.

*Id.* The district court granted Syntex's motion, holding that Teva "lacks a reasonable apprehension of suit by Syntex for infringement of [the patent]" and, therefore, there was "no justiciable case or controversy between the parties concerning any infringement by Teva of the '592 [p]atent." *Id.*

FDA subsequently refused, without explanation, to recognize the dismissal of Teva's declaratory judgment action as a triggering court decision. Among other things, FDA refused to explain why the Agency had previously recognized as a triggering decision the grant of partial summary judgment based on the patentee's admission of noninfringement, but declined to give similar effect to Teva's California dismissal based on a finding of no reasonable apprehension of suit arising from the patentee's stated intention not to sue.

Teva challenged the Agency's refusal to recognize the California dismissal as a triggering court decision. The district court sided with FDA, holding that the dismissal order did not fall

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 9

within the plain language of the statute, which requires "nothing less than a decision on the merits." *See Teva I*, 182 F.3d at 1007. On appeal, however, the D.C. Circuit reversed, holding that: (1) FDA's interpretation refusing to recognize the California dismissal as a "court decision" is not entitled to *Chevron* deference; (2) FDA "cannot avoid the merits of Teva's contention that the California dismissal satisfies the "court decision" requirement under § 355(j)(5)(B)(iv)(II)"; and (3) FDA's response was arbitrary and capricious. *Id.* In reaching these conclusions, the court made three separate findings that are applicable here.

*First*, the court determined that, as FDA conceded, the Agency's refusal to recognize the dismissal as a triggering "court decision" is not compelled by the statutory language, which merely requires a "decision of a court holding the patent . . . invalid or not infringed." *See Teva I*, 182 F.3d at 1007. Such a "decision," the court explained, can take many forms and "the relevant consideration is the estoppel of the patent holder from later claiming that the ANDA applicant is liable for patent infringement." *Id.* at 1007, 1009. Where estoppel exists, the dismissal constitutes a court decision.

The court noted that "Syntex's declaration and conduct eliminated the need for a declaratory judgment because Syntex would be estopped from challenging Teva's marketing of its generic drug on the ground of patent infringement." *Teva I*, 182 F.3d at 1008. The court further explained:

> The conclusion that the California dismissal has estoppel effect is supported by the decisions of the United States Court of Appeals for the Federal Circuit. That court has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect.

*    *    *

> Put otherwise, the California dismissal appears to meet the requirements of a triggering 'court decision' because that court had to make a predicate finding with respect to whether Syntex would ever sue Teva for infringement in order to conclude that there was no case or controversy between the parties.

*    *    *

> Although the dismissal was not a judgment on the merits after consideration of evidence presented by the parties, there was no need for such a procedure here because the dismissal sufficed to estop Syntex from suing Teva for patent infringement. This is the result that appears to be the purpose of the triggering 'court decision' provision. A contrary view, as Teva contends, means that the

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 10

> patent holder could manipulate the system in order to block or delay generic
> competition by stating that the patent holder will not enforce its patent against the
> Paragraph IV challenger.  For these reasons, the California dismissal would
> appear to meet the requirements of a 'court decision' under § 355(j)(5)(B)(iv)(II).

*Id.* at 1008-09 (citations omitted).

*Second,* the court held that "it is unclear that a triggering 'court decision' need explicitly
hold the patent at issue is 'invalid' or is 'not infringed' in order to trigger the 180-day period of
market exclusivity."  *Teva I,* 182 F.3d at 1009.  In reaching this conclusion, the court aptly noted
that both FDA and the Federal Circuit recognize that a decision that a patent is "unenforceable"
also suffices as a court decision, even though the statute says only if the patent is "invalid" or
"will not be infringed."  *Id.*  FDA included "unenforceability" because, in its own words, it
would lead to absurd results otherwise.  *Id.*  As such, the court rejected as "unpersuasive" any
attempt by FDA to treat unenforceability, which is included in the regulation, any differently
than estoppel for purposes of § 355(j)(5)(B)(iv)(II).  *Id.*  The court explained:

> As the FDA and [Apotex] concede, Syntex cannot sue Teva for patent
> infringement as a result of the California dismissal.  In its regulations, FDA added
> 'unenforceability' to the list of what qualifies as a 'court decision' because it
> concluded that implementing the statute in any other way would be contrary to
> Congress' intent and produce absurd results . . . However, the situation presented
> here appears no less absurd because Teva can never be sued by Syntex for patent
> infringement, but the FDA has nevertheless concluded that the California
> dismissal cannot satisfy the 'court decision' requirement of the statute.  Thus, the
> FDA's application of the statute to this case runs counter to its explanation for
> permitting unenforceability to qualify as a 'court decision.'

*Id.* at 1010 (citations omitted.)

*Third,* the court held that FDA acted contrary to its own guidance in which it committed
to proceed on a case-by-case basis.  FDA conceded in its brief that a dismissal could constitute a
"court decision," yet at the same time refused to recognize Teva's dismissal order as such
without explanation.  *See Teva I,* 182 F.3d at 1010.  FDA compounded this error, the court
explained, by failing to justify how the Agency could refuse to treat the dismissal of a
declaratory judgment action based upon the patentee's representation that it would not sue for
patent infringement as a "court decision," in view of FDA's previous determination that a partial
summary judgment, based on the patentee's admission of noninfringement, constituted a
triggering "court decision."  *Id.* at 1010-11.  That one case involved a judgment on the merits
while Teva's complaint was dismissed for lack of subject matter jurisdiction "does not detract

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 11

from the fact that both proceedings prevent the patent holder from suing the ANDA applicant for patent infringement." *Id.* at 1011. The court further criticized FDA for admittedly adopting, without explanation, an interpretation of the court decision trigger that is narrower than the statute may be able to support. *Id.* Such an interpretation, the court held, "cannot stand." *Id.*

For all these reasons, the D.C. Circuit reversed and remanded to afford FDA the opportunity to address "the merits of Teva's contention that the California dismissal satisfies the 'court decision' requirement." *Teva II*, 2000 WL 1838303, at *1. On remand, however, FDA merely repeated "its claim that the California dismissal did not state on its face that the underlying patent was not infringed and that refusing to look beyond the face of the order served goals of administrative convenience." *Id.* The district court flatly rejected this explanation and entered the permanent injunction requested by Teva. On appeal, the D.C. Circuit agreed, holding that the "judgment of the agency fails for want of reasoned decision making," and stating that the Agency had failed to provide any meaningful basis for departing from its past interpretation and precedent. *Id.* at *2.

The *Teva I* and *II* rulings remain the controlling rule of law on the issue of whether the dismissal of a declaratory judgment decision for lack of subject matter jurisdiction constitutes a "court decision" trigger under § 355(j)(5)(B)(iv)(II).[3] It clearly provided that it has estoppel effect. To date, FDA has done nothing in the way of a formal rulemaking or otherwise to alter the controlling rule of law from *Teva*.

B.    **The dismissal of Apotex's declaratory judgment action triggers any 180-day exclusivity on the '447, '589, and '985 patents and entitles Apotex to final ANDA approval immediately upon expiration of the '227 patent (and its corresponding pediatric exclusivity) on April 20, 2006**

The controlling test for a triggering "court decision" under § 355(j)(5)(B)(iv)(II), as articulated by the D.C. Circuit, is whether the decision estops or precludes the patentee "from later claiming that the ANDA applicant is liable for patent infringement." *Teva I*, 182 F.3d at 1009. If so, it is a triggering court decision under the statute. As applied here, the dismissal of Apotex's declaratory judgment action precludes a future suit by BMS, just as the order in *Teva* precluded such a suit by Syntex.

The July 23, 2004 dismissal Order here explicitly is based on BMS's repeated representations that it will not sue Apotex. FDA need not look beyond the face of the Order to

---

[3] FDA considered a proposed rule under which such a dismissal would not constitute a court decision trigger. *See* 64 Fed. Reg. 42873, 42881 (Aug. 6, 1999). However, after reconsidering the *Teva* decisions and comments, FDA rejected and formally withdrew its proposed rule in November 2002, and continues to regulate directly from the statute, just as it had done before *Teva*. *See* 67 Fed. Reg. 66593, 66594 (Nov. 1, 2002).

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 12

confirm this fact. The Order dismisses Apotex's case based on BMS's repeated "representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341." (Tab A, 7/23/04 Order at 3.) The record and pleadings confirm the preclusive effect of the Order, as they contain numerous unambiguous representations that "[BMS] has no intention, now or in the future, of suing Apotex for infringement of any of the '447, '589, and '985 patents" (Tab C, Blischak Decl. ¶ 10) and that "[BMS] . . . will *not* sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product" (Tab F, BMS Mem. at 12).

These statements could not be any more unequivocal. They clearly evidence BMS's complete disavowal of any intent to sue Apotex. As the D.C. Circuit acknowledged, the Federal Circuit "has recognized that a dismissal of a declaratory judgment action for lack of a case or controversy due to the patent holder's disavowal of any intent to sue for infringement has preclusive effect." *See Teva I*, 182 F.3d at 1008 (citing *Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631, 636-38 (Fed. Cir. 1991) (holding that by filing with the district court a covenant not to sue the declaratory judgment plaintiff for infringement of the patent-in-suit, the patentee was "forever estopped from asserting the . . . patent claims against the [declaratory judgment plaintiff]"); *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059 (Fed. Cir. 1995) (holding that patentee "is forever estopped by its counsel's statement of nonliability, on its face and as explained during oral argument before this court, from asserting liability against Chase in connection with any products that Chase made, sold, or used on or before July 8, 1994. This estoppel, in turn, removes from the field any controversy sufficiently actual to confer jurisdiction over this case."); *see also Fina Research, S.A. v. Baroid Ltd.*, 141 F.3d 1479, 1483-84 (Fed. Cir. 1998) (discussing *Super Sack* and *Spectronics*).

Thus, the dismissal precludes BMS from asserting the '447, '589, and '985 patents against Apotex in the future, which is exactly the relief Apotex sought in its declaratory judgment action. As in *Teva*, the dismissal meets all the requirements of a "court decision" under § 355(j)(5)(B)(iv)(II). Accordingly, there can be no barriers to final approval of Apotex's ANDA on April 20, 2006. Any 180-day exclusivity for pravastatin tablets arising out of the '447, '589, and '985 patents was triggered, at the latest, on August 22, 2004, and will have expired, at the latest by February 18, 2005. Subject to all other substantive requirements for approval, Apotex is entitled to immediate final approval on April 20, 2006.

## IV.    CONCLUSION

For all these reasons, Apotex requests, and is entitled to, confirmation that: (1) Apotex will, subject to all other substantive requirements for approval, receive final approval of its

Mr. Gary Buehler
Center for Drug Evaluation and Research
U.S. Food and Drug Administration
September 7, 2004
Page 13

pravastatin ANDA on April 20, 2006; (2) its final approval will not be delayed by any unexpired
180-day exclusivity on the '447, '589, and '985 patents; and (3) any 180-day exclusivity on the
'447, '589, and '985 patents was triggered by the dismissal of Apotex's declaratory judgment
action.  We look forward to receiving the Agency's response by September 21, 2004.

Should you have any questions, please do not hesitate to contact us.

Very truly yours,

RAKOCZY MOLINO MAZZOCHI LLP

William A. Rakoczy

Christine J. Siwik

Enclosures

cc (*via e-mail*):     Daniel Troy, *Office of Chief Counsel*
Elizabeth Dickinson, *Office of Chief Counsel*
Marcy MacDonald, *Apotex Corp.*
Barinder Sandhu, *Apotex Inc.*

# TAB A

# July 23, 2004 Stipulation and Order

**SULLIVAN & WORCESTER LLP**
Marc A. Lebowitz (ML 7381)
Matthew Giger (MG 3731)
1290 Avenue of the Americas, 29ᵗʰ Floor
New York, New York 10104
Tel: (212) 660-3000
Fax: (212) 660-3001

**RAKOCZY MOLINO MAZZOCHI LLP**
William A. Rakoczy
Deanne M. Mazzochi
Matthew O. Brady
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel: (312) 222-6301
Fax: (312) 222-6321

*Attorneys for Plaintiffs*
*Apotex Inc. And Apotex Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x
APOTEX INC. and APOTEX CORP.,        :
                                     :
              Plaintiffs,            :
                                     :       Civil Action No. 04 CV 2922 (WHP)
     - against -                     :
                                     :       STIPULATION AND ORDER
BRISTOL-MYERS SQUIBB COMPANY.,       :
                                     :
              Defendants.            :
-------------------------------------------x

WHEREAS defendant Bristol-Myers Squibb Company ("BMS") holds approved

New Drug Application ("NDA") No. 19-898 for pravastatin sodium tablets, which BMS sells

under the brand-name Pravachol®.

WHEREAS U.S. Patent Nos. 4,346,227 (the "'227 patent"), 5,030,447 (the "'447

patent"), 5,180,589 (the "'589 patent"), and 5,622,985 (the "'985 patent") (all of which are

-1-

owned by BMS except for the '227 patent) are listed in the Food and Drug Administration's ("FDA") publication, *Approved Drug Products and Therapeutic Equivalence Evaluations*, in connection with BMS's NDA No. 19-898 and Pravachol® oral tablets.

WHEREAS BMS received notice from TorPharm, Inc., now Apotex Inc. ("Apotex"), notifying BMS that Apotex had filed Abbreviated New Drug Application ("ANDA") No. 76-341, pursuant to 21 U.S.C. § 355(j), seeking approval from FDA to engage in the manufacture, sale, and/or use of a generic version of Pravachol® (pravastatin sodium) tablets in 10 mg, 20 mg, 40 mg, and 80 mg strengths.

WHEREAS Apotex's ANDA No. 76-341 contained (1) a "Paragraph (III)" certification with respect to the '227 patent in which Apotex represented to FDA that it did not seek approval to market a generic pravastatin sodium product prior to the expiration date of that patent (which along with an additional 6 months for "pediatric exclusivity" as granted by the FDA means Apotex cannot receive final FDA approval before April 20, 2006), and (2) "Paragraph (IV)" certifications, pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), with respect to the '447, '985, and '589 patents, stating that Apotex seeks FDA approval to market a generic pravastatin sodium product before the expiration of the '447, '985, and '589 patents, and that such patents are invalid and/or would not be infringed by the marketing, sale, and/or use of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

WHEREAS BMS did not sue Apotex for infringement of the '447, '985, and '589 patents.

WHEREAS on April 15, 2004, Apotex filed suit against BMS, pursuant to 28 U.S.C. §§ 2201 and 2202, 21 U.S.C. § 355(j)(5)(C)(i), and 35 U.S.C. § 271(e)(5), seeking a declaratory judgment of noninfringement and/or invalidity of the '447, '985, and '589 patents.

-2-

WHEREAS, prior to Apotex's filing of the Complaint herein, BMS repeatedly represented and assured Apotex that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, it had no intention to bring suit against Apotex for infringement of the '447, '985, and '589 patents with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

NOW THEREFORE, based upon BMS's pre-Complaint representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341, Apotex hereby stipulates that Apotex's Complaint seeking a declaratory judgment of noninfringement of the '447, '985, and '589 patents be, and hereby is, dismissed, for lack of subject matter jurisdiction, with each party to bear it own costs.

Dated July 23, 2004

_____
FITZPATRICK, CELLA, HARPER
  & SCINTO
Robert L. Baechtold, (RB 6866)
Thomas H. Beck (TB 4400)

30 Rockefeller Plaza
New York, New York 10112
Tel: (212) 218-2100
Fax: (212) 218-2200

*Attorneys for Defendant*
*Bristol-Myers Squibb Company*

Dated July ___, 2004

_____
SULLIVAN & WORCESTER LLP
Marc A. Lebowitz (ML 7381)
Matthew Giger (MG 3731)

1290 Avenue of the Americas
New York, New York 10104
Tel: (212) 660-3000
Fax: (212) 660-3001

-3-

SO ORDERED:

_____
WILLIAM H. PAULEY III U.S.D.J.

*Of Counsel:*

RAKOCZY MOLINO MAZZOCHI LLP
William A. Rakoczy
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
Tel:  (312) 222-6301
Fax: (312) 222-6321

*Attorneys for Plaintiffs*
*Apotex Inc. and Apotex Corp.*

SO ORDERED this ____ day of _____, 2004

Honorable William H. Pauley III
United States District Judge

NY_MAIN 441191v1

-4-

# TAB F

# Defendant BMS's Memorandum of Law in Support of its Motion to Dismiss

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

APOTEX INC. and APOTEX CORP.,

   Plaintiffs,

    v.

BRISTOL-MYERS SQUIBB COMPANY,

   Defendant.

Civil Action No. 1:04-CV-2922 (WHP, ECF)

MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT

<u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................. 1

THE RELEVANT STATUTORY SCHEME ..................................................... 3

STATEMENT OF FACTS .................................................................................. 6

    A.    Bristol's NDA .......................................................................... 6

    B.    "Paragraph (IV)" Certification Notices Received By Bristol ................. 7

    C.    Apotex's Efforts To Manufacture A Controversy ............................. 8

ARGUMENT ....................................................................................................... 10

I.    APOTEX'S DECLARATORY JUDGMENT ACTION SHOULD BE
    DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION ..................... 10

    A.    Apotex Has Not And Cannot Demonstrate That An Actual Case Or
        Controversy Exists ................................................................. 10

        i)    The test for an "actual controversy." .................................... 10

        ii)    Apotex was unable to plead sufficient facts to establish an actual
            controversy because they do not exist. .................................. 11

    B.    Apotex Is Not Entitled To The Declaratory Relief It Has Requested ............. 15

        i)    The existence of a patent, even one listed in the Orange Book,
            does not create a case or controversy. ................................... 15

        ii)    Apotex should not succeed in its attempt to manipulate the
            statutory balance. .......................................................... 17

    C.    The Medicare Act Does Not Create An Artificial Case Or Controversy
        For The Purpose Of Bringing A Declaratory Judgment Action ................. 19

II.    EVEN IF THE COURT FINDS AN ACTUAL CONTROVERSY, DISMISSAL
    IS WARRANTED ............................................................................. 23

CONCLUSION ................................................................................................... 25

## TABLE OF AUTHORITIES

Cases

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227 (1937)............................................................. 1

*Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368 (Fed. Cir. 2002).......................................... 3

*BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993) ................ 10, 11, 15, 22, 23

*BP Chems. Ltd. v. Union Carbide Corp.*, 757 F. Supp. 303 (S.D.N.Y. 1991) ....................... 11, 18

*Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491 (1942) ..................................................... 23

*Charles Mach. Works, Inc. v. Digital Control Inc.*, 264 F. Supp. 2d 980
(W.D. Okla. 2003) ...................................................................................................... 15

*Demby v. Schweiker*, 671 F.2d 507 (D.C. Cir. 1981) ............................................................ 21

*Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110 (2d Cir. 2000)........................... 21

*Dr. Reddy's Labs., Ltd. v. Pfizer Inc.*, No. CIV.A.03-CV-726, 2003 WL 21638254
(D.N.J. July 8, 2003).............................................................................................. 14, 16-19

*DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*,
148 F. Supp. 2d 412 (D. Del. 2001).............................................................................. 15

*EMC Corp. v. Norand Corp.*, 89 F.3d 807 (Fed. Cir. 1996)............................................. 23, 24

*Gillette Co. v. Optiva Corp.*, No. 99 CIV. 402, 2000 WL 307389
(S.D.N.Y. Mar. 23, 2000) .......................................................................................... 10

*Mutual Pharm. Co. v. Pfizer, Inc.*, 307 F. Supp. 2d 88 (D.D.C. 2004) .......................... 10, 14, 22

*Mylan Pharms., Inc. v. Thompson*, 268 F.3d 1323 (Fed. Cir. 2001) ........................................ 3

*National Presto Indus., Inc. v. Dazey Crop.*, 107 F.3d 1576 (Fed. Cir. 1997) ......................... 10

*Premo Pharm. Labs., Inc. v. Pfizer Pharms., Inc.*, 465 F. Supp. 1281
(S.D.N.Y. 1979)......................................................................................................... 10, 14

*Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037 (Fed. Cir. 1995) ............................................. 24

*SGM Elettronica v. Vari-Lite, Inc.*, No. 99CIV.11684, 2000 WL 977701
(S.D.N.Y. July 14, 2000) ............................................................................................ 6, 11

*Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed. Cir. 1992)........................................ 10, 11, 15

*SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 210 F.R.D. 547
(E.D. Pa. 2002).................................................................................. 18

*Spectronics Corp. v. H.B. Fuller Co.*, 940 F.2d 631 (Fed. Cir. 1991) ............................... 10, 11, 23

*Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995) .................... 13

*Teva Pharms. USA, Inc. v. USFDA*, 182 F.3d 1003 (D.C. Cir. 1999)................................... 6

*Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 69 U.S.P.Q.2d 1791 (D. Mass. 2003) ..................... 16, 19

*West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295
(Fed. Cir. 1992)............................................................................... 11, 15

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ................................................... 23

## Statutes and Rules

21 U.S.C. § 355....................................................................................... 1

21 U.S.C. § 355(a)-(b)(1)............................................................................. 3

21 U.S.C. § 355(b)(1) .............................................................................. 3, 16

21 U.S.C. § 355(j)(1)................................................................................. 4

21 U.S.C. § 355(j)(2)(A).............................................................................. 4

21 U.S.C. § 355(j)(2)(A)(vii)........................................................................ 4

21 U.S.C. § 355(j)(2)(A)(vii)(III)................................................................... 4

21 U.S.C. § 355(j)(2)(A)(vii)(IV).................................................................... 4

21 U.S.C. § 355(j)(2)(B).............................................................................. 4

21 U.S.C. § 355(j)(5)(B)(ii) ......................................................................... 6

21 U.S.C. § 355(j)(5)(B)(iii)...................................................................... 5, 14

21 U.S.C. § 355(j)(5)(B)(iv)....................................................................... 5, 7

21 U.S.C. § 355(j)(5)(B)(iv) (old) .............................................................. 5, 7, 18

35 U.S.C. § 271...................................................................................... 1

35 U.S.C. § 271(e)(1)................................................................................ 4

35 U.S.C. § 271(e)(5)............................................................................... 20

Fed. R. Civ. P. 12(b)(1) ............................................................................................... 1

U.S. CONST. art. III, § 2, cl. 1 ..................................................................................... 10


Congressional Acts and Legislative Materials

149 CONG. REC. S15562-69 at S15567 (daily ed. Nov. 22, 2003) (statement of
    Sen. Hatch).......................................................................................................... 20

Drug Price Competition and Patent Term Restoration Act of 1984 ......................... 1

*Examining the Senate and House Versions of the "Greater Access to Affordable
    Pharmaceuticals Act"; Hearings Before the Senate Comm. on the
    Judiciary*, 108th Cong. (2003) (statement of Jon W. Dudas, Deputy Under
    Secretary of Commerce for Intellectual Property and Deputy Director of
    the United States Patent and Trademark Office) ................................................. 20

*Examining the Senate and House Versions of the "Greater Access to Affordable
    Pharmaceuticals Act"; Hearings Before the Senate Comm. on the
    Judiciary*, 108th Cong. (2003) (statement of Sheldon Bradshaw, Deputy
    Assistant Attorney General, Office of Legal Counsel, U.S. Department of
    Justice) ................................................................................................................ 20

H.R. CONF. REP. NO. 108-391, at 836 (2003)............................................................ 21

Medicare Act § 1102(b)(1) ......................................................................................... 5

Medicare Act § 1102(b)(3) ......................................................................................... 5

Medicare Act § 1101(d)............................................................................................. 20

Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ........... 1

Prescription Drug and Medicare Improvement Act of 2003, S. 1, 108th Cong.
    § 702..................................................................................................................... 20

Defendant Bristol-Myers Squibb Company ("Bristol") moves to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. This Court lacks jurisdiction because no actual case or controversy exists between Bristol and the plaintiffs (Apotex Inc. and Apotex Corp. – together "Apotex"). Further, even if there were jurisdiction, this Court should decline to accept it to avoid conflict with the policies and interests embodied in the Hatch-Waxman and Medicare Acts.[1]

## INTRODUCTION

Apotex, a generic drug manufacturer, brought this action seeking a declaration that a drug product that it does not yet sell, and does not yet have FDA approval to sell, does not infringe any valid claim of certain Bristol patents. As the facts will show there is no basis for declaratory judgment jurisdiction here because there is no controversy.

The essential Constitutional predicate for subject matter jurisdiction in a declaratory judgment action is that there be a real "case or controversy." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937). In the context of an action seeking a declaration of invalidity or non-infringement of a patent:

1.  The patent owner must have engaged in conduct that creates a reasonable apprehension by the plaintiff that it will be sued, i.e., the patent owner must have "threatened" the plaintiff; and

2.  The plaintiff's allegedly infringing activity must be imminent or ongoing.

---

[1]  The Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the "Hatch-Waxman Act," is the legislation that governs the approval of generic drugs and is codified in pertinent part at 21 U.S.C. § 355 and 35 U.S.C. § 271. Additional amendments were recently made by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (the "Medicare Act"). Except as otherwise noted the Medicare Act revisions do not apply to the issues presently before the Court.

The lack of a real controversy between Apotex and Bristol could not be more plain. Apotex cannot reasonably fear being sued by Bristol, because Bristol has repeatedly affirmed in writing, in absolute terms, that it has *no* intention of suing Apotex.

On November 10, 2003, counsel for Bristol wrote to counsel for Apotex (then TorPharm[2]):

> Based on the information and representations in [Apotex's] paragraph IV notice, and so long as such information and representations remain accurate, *BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents by the product described in ANDA No. 76-341.*

In a letter on February 13, 2004, Bristol's in-house counsel reassured Apotex that based on Apotex's prior representations,

> *[Apotex] has no reason, now or in the future, to be apprehensive that BMS will sue it for infringement based on any of those three patents.*

In a third letter dated February 20, 2004, Bristol's in-house counsel stated yet again that it

> *has no intention, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents* so long as [Apotex's] previous representations about its proposed generic products remain accurate.[3]

Therefore, in the face of Bristol's unequivocal written representations, the fears of suit that Apotex pleads are sham. Its real objective is not to resolve any concerns it has about being sued, but rather to use this suit as an end run to erode another generic pharmaceutical company's marketing exclusivity as granted by the Hatch-Waxman Act.

---

[2]    TorPharm, Inc. is now Apotex Inc. (Complaint ¶ 66). "Apotex" is used in place of "TorPharm" throughout this Memorandum of Law.

[3]    Apotex has never disavowed its representations regarding its product.

Recognizing that its purported standing to sue finds no support in judicial precedent, Apotex asserts that the recent Medicare Act created a new cause of action with relaxed jurisdictional standards. However, as the legislators expressly acknowledged, that is not so, indeed could not be so, because the existence of a legitimate "case or controversy" is a Constitutional requirement for an Article III court. The statutory changes enacted in December 2003 simply did not change or eliminate that fundamental constitutional requirement, nor could they.

## THE RELEVANT STATUTORY SCHEME

The Hatch-Waxman Act is the product of a carefully constructed balance between the policy interest in "inducing pioneering research and development of new drugs" with that of "enabling competitors to bring low-cost, generic copies of those drugs to market." *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). Further balancing was done in the Medicare Act, enacted on December 8, 2003.

A company, such as Bristol, that develops a new drug must submit a comprehensive New Drug Application ("NDA") to the FDA to obtain approval to manufacture and market that drug. *See* 21 U.S.C. § 355(a)-(b)(1). An NDA consists of thousands of pages of safety, pharmacokinetic, efficacy and manufacturing studies and data. "Preparing an NDA is frequently a time-intensive and costly process, because among other things, it must contain detailed clinical studies of the drug's safety and efficacy." *Mylan Pharms., Inc. v. Thompson*, 268 F.3d 1323, 1325 (Fed. Cir. 2001). The NDA holder is also required to inform the FDA of any patents that cover the new drug, which the FDA then "lists" in what is known as the "Orange Book." 21 U.S.C. § 355(b)(1).

After an NDA has been approved by the FDA, a company that wants to manufacture and market a generic version of the drug may submit an Abbreviated New Drug

-3-

Application ("ANDA") to the FDA for approval. 21 U.S.C. § 355(j)(1). The generic drug company is only required to submit information showing that its generic drug is bioequivalent (*i.e.* provides the same amount of drug in the blood) to the brand-name drug; it is allowed to rely on all of the safety and efficacy studies previously submitted in the brand-name drug company's NDA and is spared the investment of time and effort to create that body of data. 21 U.S.C. § 355(j)(2)(A).

The Hatch-Waxman Act states: "It shall not be an act of infringement to make, use, offer to sell, or sell . . . a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs . . . ." 35 U.S.C. § 271(e)(1). Therefore, a company that wants to bring a generic drug to the market may do the bioequivalency studies required for an ANDA application without fear that it will be sued for patent infringement. As part of its ANDA application, however, the generic drug manufacturer must include a certification regarding any patents that have been listed in the Orange Book for the relevant brand-name drug. 21 U.S.C. § 355(j)(2)(A)(vii). If the generic drug company elects to wait to market its generic drug product until a listed patent has expired, it files what is known as a "paragraph (III)" certification. 21 U.S.C. § 355(j)(2)(A)(vii)(III). If the generic company seeks to sell its generic drug product before a listed patent has expired, it must file what is known as a "paragraph (IV)" certification, in which it certifies that the listed patent "is invalid or will not be infringed by the manufacture, use, or sale of the new [generic] drug." 21 U.S.C. § 355(j)(2)(A)(vii)(IV). The ANDA applicant must also provide the patentee with notice and a detailed statement of the basis for the applicant's belief that the patent is invalid or not infringed. 21 U.S.C. § 355(j)(2)(B).

-4-

After receiving the ANDA applicant's "paragraph (IV)" certification statement, the patent owner evaluates the information provided by the ANDA applicant to determine whether to sue for patent infringement. If the patent owner sues the ANDA applicant within 45 days of receiving the "paragraph (IV)" certification statement, the ANDA cannot be finally approved by the FDA (and therefore the generic company cannot enter the market) until the earlier of (i) 30 months from the date that the detailed statement is received, or (ii) the date of a court decision holding the patent invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iii). If the patent owner does not sue within the 45-day window, any patent-based impediment to FDA approval of the generic company's ANDA application is removed, including the statutory 30-month stay.

To encourage ANDA filers to design around or challenge a patent listed in the Orange Book, the Hatch-Waxman Act provides an incentive for early ANDA applicants. It grants a 180-day exclusivity period, during which time the first applicant who makes a "paragraph (IV)" certification (whether based on avoiding infringement or contesting validity) may market its generic drug without competition from all subsequent generic filers. 21 U.S.C. § 355(j)(5)(B)(iv). That exclusivity period expires 180 days after the earlier of (i) actual marketing of the drug by that first ANDA filer, or (ii) a court decision holding the involved patent invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv) (old).[4] Of course, if the first ANDA filer is not sued, there can be no adjudication of the patent in a litigation involving that applicant as a party and, absent any other triggering event, its exclusivity period begins when it commences actual marketing. However, actions involving a subsequent ANDA filer (*e.g.* an adverse adjudication) can prematurely trigger

---

[4]    For ANDA's filed prior to the Medicare Act, a court decision will still start the 180-clock for the first filer. *See* Medicare Act § 1102(b)(1). However, the Medicare Act's definition of a "court decision" as "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken" does apply to these earlier-filed ANDA's. *See* Medicare Act § 1102(b)(3).

the first filer's exclusivity period.[5]  If that happens before the first ANDA filer has its FDA

approval, its marketing exclusivity is eroded or totally lost.  *See generally Teva Pharms. USA, Inc.*

*v. USFDA*, 182 F.3d 1003 (D.C. Cir. 1999).

## STATEMENT OF FACTS

A.    Bristol's NDA

      Bristol developed a formulation of pravastatin sodium, a drug used to treat high

cholesterol conditions and cardiovascular disease.  (Blischak Decl. ¶ 3).[6]  Bristol did the required

extensive studies for an NDA and obtained approval from the FDA to market and sell its

pravastatin sodium formulation, which is currently sold under the brand name Pravachol®.

(Blischak Decl. ¶¶ 3-4).  In addition, the United States Patent and Trademark Office issued a

number of patents to Bristol, which cover Bristol's pravastatin sodium formulation.

      United States Patent No. 4,346,227 ("the '227 patent") issued on August 24, 1982

and covers the pravastatin compound.  That patent expires on October 20, 2005 and is not the

subject of a "paragraph (IV)" certification from any ANDA filer.  (Blischak Decl. ¶ 5).  With an

additional 6 months for "pediatric exclusivity" as granted by the FDA, no generic pravastatin

product can thus receive final FDA approval before April 20, 2006.  *See* Blischak Decl. ¶ 5;

21 U.S.C. § 355(j)(5)(B)(ii).

---

[5]    *See* footnote 4 *supra*.

[6]    "Blischak Decl." refers to the Declaration Of Matthew P. Blischak Under 28 U.S.C. § 1746
In Support Of Defendant's Motion To Dismiss Plaintiffs' Complaint.  "In deciding a
motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary
matters outside the pleadings." *SGM Elettronica v. Vari-Lite, Inc.*, No. 99CIV.11684, 2000
WL 977701, at * 3 (S.D.N.Y. July 14, 2000) (Exhibit 1 to the accompanying Declaration of
Lori A. Klucsarits, Esq. (hereafter "Klucsarits Decl.")).

United States Patent Nos. 5,030,447 ("the '447 patent"), and 5,180,589 ("the '589 patent"), issued July 9, 1991, and January 19, 1993, respectively. These two patents cover a "reduced mass formulation" of pravastatin sodium. Finally, United States Patent No. 5,622,985 ("the '985 patent") issued on April 22, 1997 and covers a method of using pravastatin sodium for one specific class of patients — to reduce the risk of or prevent a second heart attack. (Blischak Decl. ¶ 5). As it was required to do, Bristol informed the FDA of the '227, '447, '589, and '985 patents, and the FDA listed them in the Orange Book for Pravachol®. (Blischak Decl. ¶ 6).

### B.    "Paragraph (IV)" Certification Notices Received By Bristol

At least eight generic drug manufacturers submitted ANDA's seeking to market generic pravastatin products. The '447, '589, and '985 patents were the subject of multiple "paragraph (IV)" certification notices and statements from different generic manufacturers explaining why each company believes that its intended generic product will not infringe these patents and/or why one or more of the patents were believed to be invalid. (Blischak Decl. ¶ 7).

Apotex was not the first generic company from which Bristol received a "paragraph (IV)" certification notice. (Blischak Decl. ¶ 7). As Apotex was not the first to file an ANDA with a "paragraph (IV)" certification, it is not entitled to the 180-days of exclusivity provided by the Hatch-Waxman Act. *See* Complaint ¶ 73; *see also* 21 U.S.C. § 355(j)(5)(B)(iv). To the contrary, pursuant to the time periods provided under the Hatch-Waxman Act, Apotex cannot obtain FDA approval to market until 180 days after the first ANDA filer commences marketing its generic product, unless, prior to that time, there is a court decision finding Bristol's patents invalid or not infringed. *See* Complaint ¶ 77; *see also* 21 U.S.C. § 355(j)(5)(B)(iv) (old).[7]

---

[7]    *See* footnote 4 *supra*.

Bristol has not sued, threatened to sue, or charged infringement of the '447, '589 and '985 patents by *any* of the generic drug companies that have provided Bristol with detailed "paragraph (IV)" certification statements pertaining to the '447, '589 and '985 patents. (Blischak Decl. ¶ 9). Bristol has not taken any action to preclude or delay any generic companies from entering the market with or obtaining FDA approval for their generic pravastatin sodium formulations. (Blischak Decl. ¶ 20).

C.    Apotex's Efforts To Manufacture A Controversy

In correspondence with Apotex regarding the '447, '589, and '985 patents, Bristol has repeatedly affirmed that it does not intend to sue Apotex.

A letter from Apotex's counsel, dated October 27, 2003, (Blischak Decl., Exh. A), asserted that the '447, '589, and '985 patents were improperly listed in the Orange Book and demanded that Bristol withdraw those patents immediately. That letter also demanded that Bristol agree in writing that Apotex's proposed generic pravastatin sodium product "does not and will not infringe the '447, '589, and '985 patents." Counsel for Bristol responded on November 10, 2003 (Blischak Decl., Exh. B), calling Apotex's assertions regarding the listing of the patents, "baseless," but assuring Apotex that

> [b]ased on the information and representations in [Apotex's] paragraph IV notice, and so long as such information and representations remain accurate, *BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents by the product described in ANDA No. 76-341.*

On December 4, 2003, Bristol sent Apotex's counsel a follow-up letter (Blischak Decl., Exh. C) responding in more detail to Apotex's contentions regarding the Orange Book listing of Bristol's patents. Bristol said it would not withdraw the '447, '589, and '985 patents from the Orange Book and explained why the patents are properly listed. But it did not retract its

-8-

previously expressed intention not to sue Apotex or in anyway suggest that its position had changed. Apotex made no further challenge to the listing of the patents.

In a letter dated February 3, 2004 (Blischak Decl., Exh. D), counsel for Apotex extended to Bristol an Offer of Confidential Access to Application. On February 13, 2004, Bristol declined Apotex's offer, and reminded Apotex that Bristol had already indicated that it had no intention of suing Apotex for infringement of Bristol's patents relating to pravastatin. (Blischak Decl., Exh. E). In the February 13 letter, Bristol again reassured Apotex that it had no intention of bringing a suit for the infringement of the '447, '589 and '985 patents, stating that unless Apotex disavowed its prior representations regarding its generic pravastatin sodium product,

> *[Apotex] has no reason, now or in the future, to be apprehensive that BMS will sue it for infringement based on any of those three patents.*

In a letter dated February 15, 2004 (Blischak Decl., Exh. F), Apotex took issue with what it asserted were "glaring inconsistencies in BMS' prior letters" regarding Bristol's position on what was covered by the listed Orange Book patents and Apotex's ANDA. Even though Bristol had explicitly stated in two separate letters that it would not sue Apotex for infringement of the '447, '589, and '985 patents, Apotex accused Bristol of "impliedly" accusing Apotex's product of infringing those patents.

Bristol responded with a letter dated February 20, 2004 (Blischak Decl., Exh. G):

> While [Apotex] may continue to disagree with BMS' interpretation of the claims of the three BMS patents, *BMS nonetheless has no intention, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents* so long as [Apotex's] previous representations about its proposed generic products remain accurate.

Despite Bristol's three clear and timely statements that it has no intention of suing Apotex for infringement of the '447, '589, and '985 patents, Apotex filed this suit for declaratory judgment against Bristol on April 15, 2004.

<u>ARGUMENT</u>

I.    **APOTEX'S DECLARATORY JUDGMENT ACTION SHOULD
      BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

    A.    **Apotex Has Not And Cannot Demonstrate
          <u>That An Actual Case Or Controversy Exists</u>**

        i)    *The test for an "actual controversy."*

        When subject matter jurisdiction is challenged, the burden rests on the plaintiff to

establish its presence. *National Presto Indus., Inc. v. Dazey Crop.*, 107 F.3d 1576, 1580 (Fed. Cir.

1997) ("[T]he party seeking jurisdiction, bears the burden of showing jurisdiction.").

        Under Article III of the United States Constitution, federal jurisdiction does not

exist in the absence of an actual case or controversy. U.S. CONST. art. III, § 2, cl. 1; *see Mutual*

*Pharm. Co. v. Pfizer, Inc.*, 307 F. Supp. 2d 88, 91 (D.D.C. 2004); *Spectronics Corp. v. H.B. Fuller*

*Co.*, 940 F.2d 631, 635 (Fed. Cir. 1991). Although the Declaratory Judgment Act created a new

remedy, it could not eliminate the requirement of "a case of actual controversy" between the

parties. 28 U.S.C. § 2201(a); *BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed. Cir.

1993) ("[T]he controversy must be actual, not hypothetical or of uncertain prospective

occurrence.").[8] If there is no actual controversy between the parties regarding the subject matter

on which a declaratory judgment is sought, the court must dismiss the action for lack of subject

matter jurisdiction. *Spectronics*, 940 F.2d at 634 ("When there is no actual controversy, the court

has no discretion to decide the case."); *see also Gillette Co. v. Optiva Corp.*, No. 99 CIV. 402,

2000 WL 307389, at *3 (S.D.N.Y. Mar. 23, 2000) (Klucsarits Decl., Exh. 2); *Premo Pharm. Labs.,*

*Inc. v. Pfizer Pharms., Inc.*, 465 F. Supp. 1281, 1284 (S.D.N.Y. 1979). A complaint that seeks

declaratory relief "must plead facts *initially* sufficient to establish the existence of an actual

---

[8]    Any appeal in this case would be heard by the Court of Appeals for the Federal Circuit.
       *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885, 888 n.4 (Fed. Cir. 1992).

controversy." *Spectronics*, 940 F.2d at 634 & n.1; *BP Chems. Ltd. v. Union Carbide Corp.*, 757 F. Supp. 303, 304 (S.D.N.Y. 1991) ("The legal standard is an objective one, and its elements must exist at the time the suit is filed."), *aff'd, BP Chems. Ltd. v. Union Carbide Corp.*, 4 F.3d 975 (Fed. Cir. 1993).

For declaratory judgment actions involving patents, a two-pronged test is used to determine whether an "actual controversy" exists. *Spectronics*, 940 F.2d at 634. When subject matter jurisdiction is challenged, the burden is on the plaintiff to show that 1) the patentee's conduct has created a reasonable apprehension on the part of the plaintiff that the patentee will initiate a suit for patent infringement, and 2) the plaintiff has either produced the potentially infringing device or prepared to produce it. *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297 (Fed. Cir. 1992). The court considers the conduct of the patentee-defendant under the first prong and that of the plaintiff under the second prong. *BP Chems.*, 4 F.3d at 978. The declaratory judgment plaintiff must establish by a preponderance of the evidence that a reasonable apprehension of suit exists in order to satisfy the first prong of the test. *BP Chems.*, 757 F. Supp. at 305.

        ii)     *Apotex was unable to plead sufficient facts to establish an actual controversy because they do not exist.*

Under the first prong of the "actual controversy" test, the plaintiff must establish that it has a reasonable apprehension that it will be sued for patent infringement. To do so it must show by a preponderance of the evidence that the patentee's conduct indicates an intent to enforce the specific patent against the plaintiff. *Shell Oil*, 970 F.2d at 887-88. When there are no express charges of infringement, the court will look at the "totality of the circumstances." *Id.* at 888; *SGM*, 2000 WL 977701, at *3.

Apotex cannot have an objectively reasonable apprehension of suit. Its attempts to establish the necessary factual support for a declaratory judgment are based on a distorted interpretation of the correspondence between it and Bristol to fabricate a contrived apprehension of suit where one could not possibly exist. (Complaint ¶¶ 78-89).

Bristol has repeatedly stated that it will *not* sue Apotex for infringement of the '447, '589, and '985 patents, based on the representations Apotex has made regarding its generic pravastatin sodium product. (Blischak Decl. ¶ 10). Bristol's November 10, 2003 letter stated that

> *BMS does not intend to file suit against [Apotex] alleging infringement of any of these three patents by the product described in ANDA No. 76-341.*

(Emphasis added) (Blischak Decl., Exh. B). Bristol's February 13, 2004 letter, repeated that

> *[Apotex] has no reason, now or in the future, to be apprehensive that BMS will sue it for infringement based on any of those three patents.*

(Emphasis added) (Blischak Decl., Exh. E).

When Apotex's counsel sought to fabricate a controversy from the fact that Bristol had declined to accede to Apotex's demand that Bristol remove the '447, '589, and '985 patents from the Orange Book, Bristol responded:

> While [Apotex] may continue to disagree with BMS' interpretation of the claims of the three BMS patents, *BMS nonetheless has no intention, now or in the future, of suing [Apotex] for infringement of any of the three BMS patents* so long as [Apotex's] previous representations about its proposed generic products remain accurate.

(Emphasis added) (Blischak Decl., Exh. G).

Thus, while Bristol declined to engage in an unnecessary debate over claim interpretation, it stated, in three separate letters, that based on Apotex's representations regarding its generic product, Bristol has no intention of suing Apotex for infringement of the '447, '598, and '985 patents. Apotex made representations about what its proposed product does and does not

contain. Bristol said, unequivocally, that if those representations are indeed true, it will not sue Apotex on the '447, '598 or '985 patents. Apotex knows best whether the representations it made *are* true, and its complaint nowhere suggests they are not. Nor has Apotex otherwise disavowed those statements. Whether Apotex and Bristol agree on the reasons *why* Bristol will not sue is a purely academic question. All Apotex needs to know is the *fact* that Bristol does not intend to sue, and Bristol has made that manifestly plain.

Apotex says in paragraph 82 of its Complaint that Apotex's ANDA and pravastatin sodium product "are subject to change or modification during the FDA approval process." That is at most a theoretical possibility. Whether changes will be made and, if so, what they will be, is pure conjecture at this point. Something that is *completely speculative* is not enough to create the "case or controversy" necessary for maintaining a declaratory judgment action. *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1059-60 (Fed. Cir. 1995) ("The residual possibility of a future infringement suit based on [Apotex's] future acts is simply too speculative a basis for jurisdiction . . . ."). That theoretical possibility cannot overcome the fact that Bristol has informed Apotex on multiple occasions that it has no present or future intention of suing Apotex for infringement of the '447, '589, and '985 patents based on Apotex's current representations regarding its generic product.

Not only has Bristol affirmatively expressed that it has no intention of suing Apotex, there are no other actions on the part of Bristol which could have given Apotex an objectively reasonable apprehension of suit. Unlike the '227 patent on the basic active ingredient pravastatin, itself, which *none* of the generic filers challenged, the '447 and '589 patents are directed to specific formulations, with specific, required, additional components. A generic that does not include those other components would not infringe. The '985 patent covers using

-13-

pravastatin for one specific use – in patients who have already suffered a heart attack. A generic
that does not seek approval to sell for that use has not infringed. After receiving several
"paragraph (IV)" certifications, Bristol has not sued any of the ANDA applicants for infringement
of any of those patents (Blischak Decl. ¶ 9), and the 45-day period during which a suit by Bristol
would have invoked the 30-month stay of FDA approval under 21 U.S.C. § 355(j)(5)(B)(iii) has
expired for all of the ANDA filers. (Blischak Decl. ¶ 8). Bristol's decision not to bring suit
against Apotex (or any of the generics that filed "paragraph (IV)" certifications regarding the '447,
'589, and '985 patents) is evidence that Bristol has no intention of suing Apotex on these three
patents. *Dr. Reddy's Labs., Ltd. v. Pfizer Inc.*, No. CIV.A.03-CV-726, 2003 WL 21638254, at *7
(D.N.J. July 8, 2003) ("Furthermore, Pfizer failed to sue DRL within the statutory 45 day period
after the paragraph IV certification for the '699 patent, thus providing some evidence that Pfizer
does not intend to sue DRL.") (Kluesarits Decl., Exh. 3).

       The Apotex Complaint refers to previous litigation between it and Bristol and other
suits by Bristol against third parties, all involving *other* products and *other* patents. (*See*
Complaint ¶¶ 92-94). However, a history of patent enforcement against companies that seek to
market generic versions of a patentee's different brand-name drug, does not create a reasonable
apprehension in and of itself. *Mutual Pharm.*, 307 F. Supp. 2d at 93-94; *Dr. Reddy's Labs*, 2003
WL 21638254, at *7 ("Pfizer's history of enforcing its patent rights does not provide any
indication of Pfizer's intentions with regards to the '699 patent and DRL's generic setraline
product."); *see also Premo Pharm.*, 465 F. Supp. at 1283-84.

       This Court and others have recognized that a history of patent litigation by itself,
even if between the same two parties, does not provide grounds for a reasonable apprehension of
suit. *See Mutual Pharm.*, 307 F. Supp. 2d at 93-94 (previous litigation between the same two

-14-

parties does not create a reasonable apprehension in and of itself); *DuPont Dow Elastomers, L.L.C. v. Greene Tweed of Del., Inc.*, 148 F. Supp. 2d 412, 415 & n.1 (D. Del. 2001) (infringement suits between the same parties but involving different patents do not create a reasonable apprehension).

Nor do suits against unrelated third parties necessarily create an objective, reasonable apprehension in a declaratory judgment plaintiff. *West Interactive*, 972 F.2d at 1298; *Charles Mach. Works, Inc. v. Digital Control Inc.*, 264 F. Supp. 2d 980, 983, 986 (W.D. Okla. 2003) (even where patentee had asserted multiple patents against multiple defendants, there was not sufficient evidence that the patentee had formed an intent to sue the declaratory judgment plaintiff).

Accordingly, Apotex has failed to establish the jurisdictional predicate of conduct by Bristol that would give rise to an objectively reasonable apprehension that Bristol will bring an infringement suit on these patents against Apotex. Absent a credible indication that Bristol intends to bring suit against Apotex, any apprehension of suit on Apotex's part is unreasonable, and the Court should dismiss Apotex's Complaint. *See West Interactive*, 972 F.2d at 1296-98.

**B.**    **Apotex Is Not Entitled To The Declaratory Relief It Has Requested**

        i)    *The existence of a patent, even one listed in the Orange Book, does not create a case or controversy.*

"The Declaratory Judgment Act was intended to protect threatened parties, not to drag a non-threatening patentee into court." *Shell Oil*, 970 F.2d at 889. For an actual controversy in patent cases, "more is required than the existence of an adversely held patent." *BP Chems.*, 4 F.3d at 978. The mere existence of Bristol's '447, '589, and '985 patents is an "insufficient basis for a declaratory action to invalidate the patent[s]." *Id.* at 981. Merely having patents does not equate to brandishing them like a modern-day "Sword of Damocles." (*See* Complaint ¶ 40). More

-15-

is required on the part of the patentee than owning patents, even ones listed in the Orange Book, for an ANDA filer to have an objectively reasonable apprehension of suit.

The statute *requires* that the NDA applicant list all patents that might be asserted. In particular, pursuant to 21 U.S.C. § 355(b)(1), an NDA applicant "*shall*" submit information regarding patents for which "a claim of patent infringement *could reasonably be asserted*." Contrary to Apotex's contention, this does *not* mean that "a suit for infringement *can and will be asserted* against any ANDA applicant that attempts to seek approval for and market a generic version of the NDA drug." (Complaint ¶ 25). By listing the subject formulation patents in the Orange Book, Bristol represented that those patents cover the formulation that *Bristol* sells. Bristol did *not* represent that they cover every conceivable formulation that others might seek to sell. The *statutorily required* listing of patents in the Orange Book simply is, therefore, not enough to give rise to a reasonable apprehension of suit by an ANDA applicant. *Dr. Reddy's Labs.*, 2003 WL 21638254, at *5 ("In the absence of strong objective evidence 'sufficient to indicate intent to initiate an enforcement action,' the mere listing of multiple patents does not create declaratory judgment jurisdiction . . . ." (citation omitted)). A blanket inference that listing a patent in the Orange Book means the patentee has expressly declared its intention to sue any potential infringer, would cover every patent holder that has a listed patent, thereby completely eliminating one of the prongs used to determine whether an "actual controversy" actually exists. *Teva Pharms. USA Inc. v. Pfizer, Inc.*, 69 U.S.P.Q.2d 1791, 1794 (D. Mass. 2003). Thus, contrary to Apotex's assertion, the required listing of patents in the Orange Book does not "*alone* objectively create[] the necessary case or controversy and subject matter jurisdiction for an ANDA-filer to file and maintain a declaratory judgment action" if not sued within the statutory 45-day period. (Complaint ¶ 65, emphasis added).

-16-

ii)    *Apotex should not succeed in its attempt to*
       *manipulate the statutory balance.*

Apotex cannot substantiate its declaratory judgment action with its claim that it and the American public "will be irreparably harmed by the indefinite delay" of its market entry. (Complaint ¶ 9). The timing of Apotex's market entry is governed by the Hatch-Waxman and Medicare Acts. Apotex's suit is purely an attempt to subvert the statutory balance created by Congress to allow Apotex to put its product on the market sooner than it is entitled to under these Acts. *See Dr. Reddy's Labs.*, 2003 WL 21638254, at *7 (recognizing that the plaintiff "wishes to trigger the 180 day exclusivity period before [the first ANDA applicant] begins to actually market its product, thus negating the benefits conferred upon the first generic entrant as an incentive to encourage generic producers of drugs"). If any party is attempting to "manipulate the statutory scheme" in this action (Complaint ¶ 101), it is Apotex.

Bristol has not sued any ANDA applicants, including what it believes to be the first ANDA applicant, for infringement of the '447, '589, and '985 patents. (Blischak Decl. ¶ 9). So the only "delay" to the late-filer Apotex's entry into the market is that which was purposefully created by the Hatch-Waxman and Medicare Acts to reward the first ANDA applicant with an exclusivity period of 180 days. Apotex cannot blame that "delay" on Bristol. Bristol was not obliged to sue any generic ANDA filer even if it infringed, and especially not any that represented that it had designed around, and did not infringe, the listed patents. That Apotex's market entry is subject to the 180-day marketing exclusivity of another generic who acted more quickly is the result of the statutory provisions, not anything Bristol did. The suggestion that Bristol had some obligation to bring patent infringement suits solely because it would benefit Apotex if Bristol *lost* them, is absurd. (*See* Complaint ¶ 90).

-17-

Apotex's real goal here is not to remove any actual fear that it will be sued. Rather, what Apotex hopes is that by filing suit it will obtain either a decision from the court or a consent order from Bristol that its proposed generic product does not infringe, and thereby prematurely start the clock running on the first ANDA filer's 180 days of marketing exclusivity. 21 U.S.C. § 355(j)(5)(B)(iv) (old);[9] *see also SmithKline Beecham Corp. v. Geneva Pharms., Inc.*, 210 F.R.D. 547, 551 (E.D. Pa. 2002) (first ANDA filer Apotex sought to intervene due to concern that dismissal of declaratory judgment counterclaim based on patentee's covenant not to sue would constitute a "court decision" that could jeopardize its 180-day exclusivity period). Because no one has challenged the basic pravastatin compound patent whose exclusivity runs, in combination with the "periodic exclusivity" granted by the FDA, until April, 2006, Apotex's ploy could cause the first filer's exclusivity to run out before it ever gets to the market. This is not a controversy between Apotex and Bristol. It is a marketing strategy aimed at depriving the ANDA filer that beat Apotex into the FDA from receiving the marketing exclusivity that the Hatch-Waxman Act provided as an incentive for prompt filing.

Courts have recognized that declaratory actions brought for such purposes are improper. *See BP Chems.*, 757 F. Supp. at 310 (dismissing complaint where suit found to be brought as part of a marketing strategy). Apotex's claim, that a patent owner's declining to sue created a bottleneck to prevent full generic competition was specifically rejected in *Dr. Reddy's Laboratories, Ltd.*, where the District Court of New Jersey, aptly called it "unpersuasive" and an attempt "to nullify the statutory benefit given as an incentive for generic companies who take the greatest risk of being the first generic entrant on the market." *Dr. Reddy's Labs.*, 2003 WL 21638254, at *7. "[G]iven the intent of the Hatch-Waxman Amendments to encourage challenges

---

[9]     *See* footnote 4 *supra.*

-18-

to market-dominating pharmaceutical patents by" rewarding first filers with 180 days of market exclusivity, any alleged "foot-dragging ... intended to forestall a court decision that might prematurely start the running of [the first ANDA filer's] market exclusivity period" is not actionable. *Teva Pharms.*, 69 U.S.P.Q.2d at 1794-95. Just as the complaints in *Dr. Reddy's Laboratories, Ltd.* and *Teva Pharmaceuticals USA Inc.* were dismissed, so should Apotex's.

The convoluted and unrealistic reasoning Apotex urges on this Court is epitomized by paragraph 90 of its Complaint in which Apotex alleges that Bristol has somehow impeded generic competition by *not* suing Apotex. That bizarre allegation stands logic on its head. By not suing Apotex, Bristol gave up the ability to use the patents in issue to block Apotex's FDA approval. That did not "bottleneck and delay" generic competition, it facilitated it. Indeed, if Bristol *had* sued Apotex, and thereby invoked the statutory 30-month stay on FDA approval, no doubt Apotex would argue that suing was anti-competitive and sham.[10]

C.    **The Medicare Act Does Not Create An Artificial Case Or Controversy For The Purpose Of Bringing A Declaratory Judgment Action**

Recognizing that its standing to seek declaratory relief will not pass muster under prior precedent, Apotex pleads that the Medicare Act created a new "statutory right" under which Apotex is "entitled by law" to invoke this Court's limited subject matter jurisdiction. (Complaint ¶¶ 1, 8, 17, 46, 86, 108, 120).

Apotex is wrong because the Medicare Act's modifications of the Hatch-Waxman provisions have not, and in fact cannot, change the constitutional requirement for a "case or

---

[10]    If Bristol sued Apotex and won the case, Apotex would be precluded from final FDA approval until 2009, when the formulation patents and corresponding pediatric exclusivity terms expire, or even 2014, when the method of use patent and corresponding pediatric exclusivity term expire. (Blischak Decl. ¶ 5). Therefore, Apotex's "bottleneck" theory presupposes that Bristol had a legal obligation to bring a suit that it was pre-ordained to lose.

controversy." Rather, both the language of the Medicare Act and its legislative history reaffirm
that an actual case or controversy is still required for subject matter jurisdiction. The Medicare Act
provides that

> the courts of the United States shall, *to the extent consistent with the
> Constitution,* have subject matter jurisdiction in any action brought
> by such person under section 2201 of title 28 for a declaratory
> judgment that such patent is invalid or not infringed.

Medicare Act § 1101(d) (codified at 35 U.S.C. § 271(e)(5)) (emphasis added). The ANDA
applicant must thus still establish that the constitutionally required case or controversy exists.[11]

The limiting phrase "to the extent consistent with the Constitution" was added after
it was recognized that there were "serious flaws" in the language originally passed by the Senate.[12]
*See* 149 CONG. REC. S15562-69 at S15567 (daily ed. Nov. 22, 2003) (statement of Sen. Hatch)
(Klucsarits Decl., Exh. 5). Jon W. Dudas, Deputy Under Secretary of Commerce for Intellectual
Property and Deputy Director of the United States Patent and Trademark Office, provided
testimony to the United States Committee on the Judiciary on August 1, 2003, warning that "the
proposed amendment to establish an 'actual controversy' for declaratory judgment subject matter

---

[11] Nor does the Act purport to overturn the prior caselaw precedent defining what is required
for a "case or controversy" in the context of a suit for a declaration of non-infringement or
invalidity of a patent. *See* section I.A.i, *supra.*

[12] ' (5) The filing of an application described in paragraph (2) that includes a
certification under subsection (b)(2)(A)(iv) or (j)(2)(A)(vii)(IV) of section 505 of
the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 355), and the failure of the
owner of the patent to bring an action for infringement of a patent that is the subject
of the certification before the expiration of the 45 days after the date on which the
notice given under subsection (b)(3) or (j)(2)(B) of that section is received, *shall
establish an actual controversy between the applicant and the patent owner
sufficient to confer subject matter jurisdiction in the courts of the United States in
any action brought by the applicant under section 2201 of title 28 for a
declaratory judgment that any patent that is the subject of the certification is
invalid or not infringed.*
Prescription Drug and Medicare Improvement Act of 2003, S. 1, 108th Cong. § 702.
(Klucsarits Decl., Exh. 4).

-20-

purposes could undermine the patent system." (Klucsarits Decl., Exh. 6). Sheldon Bradshaw, Deputy Assistant Attorney General, U.S. Department of Justice, testified to the Administration's view that the provision was "inconsistent with Article III of the Constitution" as it "attempts to vest the lower federal courts with jurisdiction over disputes that, because of Article III's case or controversy requirement, the Constitution does not empower these courts to hear." Accordingly, the Administration suggested that the provision be deleted or rewritten. (Klucsarits Decl., Exh. 7). Congress thus considered and rejected the original language of the provision that would have made the failure to file a lawsuit by the patentee a sufficient basis for Federal jurisdiction.

The subsequent Conference Committee Report[13] then explained:

> Through the modifications in this Act, the conferees do not intend for the courts to modify their application of the requirements under Article III that a declaratory judgment plaintiff must, to the extent required by the Constitution, demonstrate a "reasonable apprehension" of suit to establish jurisdiction. The conferees expect the courts to examine as part of their analysis the particular policies served by the Hatch-Waxman Act.
> In determining whether a reasonable apprehension of suit exists where an ANDA has been filed with a paragraph IV certification and the patentee has not brought an infringement suit within the 45 days, the conferees expect courts to examine these specific factors as part of the totality of the circumstances. In any given case, the conferees expect a court may or may not find a reasonable apprehension of suit where these two specific factors are present.

H.R. CONF. REP. NO. 108-391, at 836 (2003) (citations omitted) (Klucsarits Decl., Exh. 8).

Thus Congress did not, and could not, create a new basis for federal jurisdiction over any and all declaratory judgment actions brought by ANDA applicants. It most certainly did

---

[13]   *See Demby v. Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) ("Because the conference report represents the final statement of terms agreed to by both houses, next to the statute itself it is the most persuasive evidence of congressional intent."); *see also Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124-25 (2d Cir. 2000).

not "explicitly mandate[] that an ANDA applicant is entitled to maintain a declaratory judgment action even when it is not sued," as Apotex alleges. (Complaint ¶ 46, *see also* ¶ 48).

Rather, one of the applicable Medicare Act provisions actually limits the right to seek declaratory relief by requiring the ANDA applicant to meet some specific criteria. These criteria are a required condition for a declaratory judgment action by an ANDA filer, but there is no merit to Apotex's allegation that it is "statutorily entitled to institute and maintain an action for declaratory judgment" if that list of statutory pre-requisites are fulfilled. (Complaint ¶ 48). The Act specifically affirms the Constitutional jurisdiction requirement of an "actual controversy," and the legislative history disclaims any intent to relax that requirement. An ANDA applicant must still prove it has an objectively reasonable apprehension of suit by the patentee before subject matter jurisdiction can attach in any declaratory judgment action, and that burden is not met simply by the fact that the ANDA applicant was *not* sued by the patentee. *See Mutual Pharm.*, 307 F. Supp. 2d at 93 (The Federal Circuit has yet to find "that the jurisdictional prerequisites for a declaratory judgment suit are met anytime an ANDA filer that files a paragraph IV certification is not sued by the pioneer patent holder within the 45-day window.").

As Bristol has done nothing to indicate that it is even contemplating a suit against Apotex under the patents laws, and on the contrary, has repeatedly said it will not sue Apotex for infringement of the '447, '589, and '985 patents, there is presently no live case or controversy, and the Medicare Act did not create an artificial case or controversy for ANDA filers. "The obverse of a definite and concrete dispute may be described as an advisory opinion on a situation not ripe for litigation." *BP Chems.* 4 F.3d at 977. In the absence of any affirmative indication from Bristol that it will bring suit, the need for judicial attention here is "prospective and uncertain of

occurrence" rather than "real and immediate." *Id.* at 978. Thus, to avoid rendering an advisory opinion, the Court should dismiss Apotex's request for declaratory relief.

## II.    EVEN IF THE COURT FINDS AN ACTUAL CONTROVERSY, DISMISSAL IS WARRANTED

While the court has no discretion to decide a declaratory judgment action where there is no actual controversy, it is well-settled law that, even when there is an actual controversy, it is still within the court's sound discretion to decline to exercise jurisdiction over it. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494 (1942); *Spectronics*, 940 F.2d at 634. "[A]s long as the district court acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, the court has broad jurisdiction to refuse to entertain a declaratory judgment action." *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 813-14 (Fed. Cir. 1996). In *EMC*, the Federal Circuit affirmed the district court's dismissal of a declaratory judgment action even though it found that the undisputed facts sufficiently established a controversy between the parties. *Id.* at 809, 811. The district court had found that the action was an abuse of the declaratory device and "not one that furthered the objectives of the Declaratory Judgment Act." *Id.* at 814, 815.

What has happened in the present case is precisely what the Hatch-Waxman Act prescribes. Because Bristol has patents that cover its specific formulation, it was required to inform the FDA, and the FDA properly listed those patents in the Orange Book. Because the patents were so listed, generic ANDA applicants studied them, certified their generic product would not infringe and/or that the patents were believed to be invalid, and explained their reasoning to Bristol. Bristol received those notices, carefully studied them, and chose not to bring suit within 45 days, and thereby the approval of those applicants cannot be delayed by any action of Bristol's. Because the first of those ANDA applicants to provide a "paragraph (IV)"

certification fulfilled all of the requirements of the Act before Apotex did, it earned a right of 180 days of marketing exclusivity against all later applicants, specifically against Apotex.

Apotex's alleged fear of being sued by Bristol is contrived, and Apotex's real purpose is not to resolve any dispute between it and Bristol, but rather to impair the statutory exclusivity right of another, first-filing generic, to Apotex's marketing advantage. Apotex's suit here is simply an attempt to subvert the provisions of the Hatch-Waxman and Medicare Acts and to achieve a "court decision" in an effort to prematurely start the 180 days of marketing semi-exclusivity at a time when the first-filing party who is entitled to it is unable to benefit from it, thereby accelerating Apotex's market entry. There is no actual case or controversy here between Bristol and Apotex.

However, if the Court concludes that, notwithstanding Bristol's clear and repeated disclaimers of any intention to sue, there was any basis at all for a reasonable apprehension in Apotex's mind, the Court should exercise its discretion and still decline jurisdiction. This Court should not allow Apotex to impose on the Court or on Bristol the significant expense and effort of unnecessary patent litigation to effectuate its attempt to strip a non-party generic applicant of its right to priority of marketing. *See Serco Servs. Co. v. Kelley Co.*, 51 F.3d 1037, 1039 (Fed. Cir. 1995) (finding that when the investment of the court's time and resources would not be worthwhile, a party has no right to a declaratory judgment). "Simply because there is an actual controversy between the parties does not mean that the district court is required to exercise that jurisdiction." *EMC*, 89 F.3d at 813. Rather, the Declaratory Judgment Act "specifically entrusts courts with discretion to hear declaratory suits or not depending on the circumstances." *Serco*, 51 F.3d at 1039.

-24-

## CONCLUSION

Apotex's suit for a declaratory judgment that Bristol's '447, '589, and '985 patents are invalid and/or not infringed should be dismissed for lack of subject matter as no "actual controversy" exists. Even if this court finds an actual controversy, as required by both the Declaratory Judgment Act and the Medicare Act, this Court should exercise its discretion to deny Apotex's request for declaratory relief where that request is nothing but an attempt to circumvent the Hatch-Waxman and Medicare Acts.

Respectfully submitted,

_s\ Thomas H. Beck_
Robert L. Baechtold (RB 6866)
Thomas H. Beck (TB 4400)
FITZPATRICK, CELLA, HARPER
    & SCINTO
30 Rockefeller Plaza
New York, New York 10112-3801
Telephone: (212) 218-2100
Facsimile: (212) 218-2200

*Attorneys for Defendant*
*Bristol-Myers Squibb Company*

Dated: May 25, 2004.

# EXHIBIT C

# Declaration of William A. Rakoczy

*In support of Apotex Inc. 's Motion For*
*Temporary Restraining Order*

DEPARTMENT OF HEALTH & HUMAN SERVICES                    Public Health Service

ANDA 76-341                                             Food and Drug Administration
                                                        Rockville MD 20857

JUN 2 8 2005

William A. Rakoczy
Christine J. Siwik
Rakoczy Molino Mazzochi L.L.P.
6 West Hubbard Street, Suite 500
Chicago, Il 60610

Dear Mr. Rakoczy and Ms. Siwik:

        This letter responds to your correspondence of September 7, 2004, in which you
requested, on behalf of Apotex, Inc., that the Food and Drug Administration (FDA or agency)
confirm that:

- Subject to all other substantive requirements for approval, Apotex will be eligible for,
  and receive, immediate final approval of its abbreviated new drug application No. 76-341
  for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg., and 80 mg. on April 20, 2006,
  when the pediatric exclusivity associated with U.S. Patent No. 4,346,227 (the '227 patent)
  expires;

- Apotex's final approval will not be delayed by any unexpired "180-day exclusivity" under
  21 U.S.C. § 355(j)(5)(B)(iv) for these drugs; and

- The July 23, 2004 order dismissing Apotex's declaratory judgment action against Bristol-
  Myers Squibb (BMS) regarding U.S. Patent Nos. 5,030,447 (the '447 patent), 5,180,589
  (the '589 patent) and 5,622,985 (the '985 patent) constitutes a "decision of a court" under
  21 U.S.C. § 355(j)(5)(B)(iv)(II) that triggered, as of August 22, 2004, any 180-day
  exclusivity arising out of these patents.

        Grant of 180-day exclusivity under Section 505(j)(5)(B)(iv) of the Federal Food, Drug,
and Cosmetic Act (FDCA or Act) (21 U.S.C. § 355(j)(5)(B)(iv)) can provide a competitive
advantage to an eligible abbreviated new drug application (ANDA) applicant, by delaying
approval of ineligible ANDAs for 180 days.  Your letter seeks confirmation that any 180-day
exclusivity as to the '447, '589, or '985 patents will have expired by April 20, 2006 and,
therefore, will not delay approval of Apotex's ANDA when the pediatric exclusivity[1] associated
with the '227 patent expires.

---

[1] Pediatric exclusivity is intended as an incentive to sponsors to conduct and submit to FDA studies requested by the
agency on the use of drugs in pediatric populations.  It is a six-month exclusivity that attaches to any listed patent or
exclusivity for the drug studied.  21 U.S.C. § 355a.

Based on our review of the July 23, 2004 order, and for the reasons described below, the agency concludes that any 180-day exclusivity arising from the '447, '589 or '985 patent was triggered as of August 22, 2004 by the dismissal of Apotex's declaratory judgment action and, therefore, expired as of February 18, 2005. In determining when Apotex's ANDA may be eligible for final approval, please note that BMS's pediatric exclusivity attaches both to the '227 patent to which Apotex made a "paragraph III" certification and also to the "three-year marketing exclusivity" granted to BMS under 505(j)(5)(D) of the Act (21 U.S.C § 355(j)(5)(D)).[2] The pediatric exclusivity that attaches to the '227 patent expires April 20, 2006. The pediatric exclusivity that attaches to the three-year marketing exclusivity expires April 29, 2006. In addition, other barriers to approval may arise to delay approval of Apotex's ANDA.

Patent Certification

Under Section 505(j)(2)(A)(vii), ANDA applicants must make one of four certifications (named after the sub-paragraphs of section 505(j)(2)(A)(vii) establishing them) to patents listed in the *Approved Drug Products with Therapeutic Equivalence Evaluations* (the Orange Book) as claiming the drug or a use of the drug for which the ANDA applicant is seeking approval. The certifications are: a "paragraph I" certification that patent information has not been filed; a "paragraph II" certification that the patent has expired; a "paragraph III" certification of the date the patent will expire; or a "paragraph IV" certification that the patent is invalid or not infringed.

A paragraph I or II certification indicates that the applicant believes that the patent does not bar immediate approval of the ANDA. A paragraph III certification indicates that the applicant is not challenging the validity or applicability of the patent and that the applicant is seeking ANDA approval only after the patent expires. A paragraph IV certification indicates that the ANDA applicant disputes the applicability or validity of that patent. An ANDA applicant making a paragraph IV certification must provide notice to the new drug application (NDA) holder and patent owner stating that the ANDA has been filed and describing why the patent is invalid, or will not be infringed (21 U.S.C. § 355(j)(2)(B)). This notice provides the NDA holder and patent owner the opportunity to bring suit for patent infringement prior to FDA's granting marketing approval for the ANDA applicant's product. In certain cases, if the NDA holder or patent owner sues the ANDA applicant for patent infringement within 45 days of receipt of the notice, FDA must stay approval of the ANDA for 30 months (21 U.S.C. § 355(j)(5)(B)(iii)).

180-Day Exclusivity

Section 505(j)(5)(B)(iv) of the Act governs the applicability of 180-day exclusivity to the first ANDA applicant to submit a paragraph IV certification. It reads as follows:

---

[2] Three-year marketing exclusivity is granted for a change to an approved drug product (made either in a new application or a supplement) if the change requires new clinical investigations that are essential for approval. 21 U.S.C. § 355(c)(3)(D)(iii), (iv); 21 U.S.C. § 355(j)(5)(D)(iii), (iv). Paragraph III certification and other patent certifications are explained below.

If the application contains a certification described in subclause IV of paragraph (j)(2)(A)(vii) and is for a drug for which a previous application has been submitted under this subsection [containing][3] such a certification, the application shall be made effective not earlier than one hundred and eighty days after -

> (I)    the date the Secretary receives notice from the applicant under the previous application of first commercial marketing of the drug under the previous application, or
>
> (II)    the date of a decision of a court in an action described in clause (ii) holding the patent which is the subject of the certification to be invalid or not infringed,

whichever is earlier.

21 U.S.C. § 355(j)(5)(B)(iv) (2002).[4] FDA interprets this provision to provide that, if an ANDA applicant submits the first paragraph IV certification to a patent, approval of ANDAs containing later filed paragraph IV certifications for that patent will be delayed until 180 days after either the date of first commercial marketing of the drug under that first ANDA containing a paragraph IV certification to that patent or the date of a decision of a court holding the patent that is the subject of that certification invalid, unenforceable, or not infringed, whichever date is earlier. 21 C.F.R. § 314.107(c).[5]

## Dismissals of Declaratory Judgment Actions as Court Decisions

As noted, the decision of a court with respect to any ANDA, in which the court holds the relevant patent invalid, unenforceable or not infringed can start the 180-day period for that patent. 21 U.S.C. § 355(j)(5)(B)(iv) (2002). *See, e.g., Minnesota Mining and Manufacturing Co. v. Barr Labs., Inc.,* 289 F.3d 775 (Fed. Cir. 2002). In *Teva I (Teva Pharms. USA, Inc. v. FDA,* 182 F.3d 1003 (D.C. Cir. 1999)), the District of Columbia Circuit ruled that a dismissal of a declaratory judgment action (DJA) can qualify as a "decision of a court" triggering the running of 180-day exclusivity if the dismissal estops a future action against the ANDA holder for

---

[3] Courts reviewing the statute have commented that the word "continuing" reflects a typographical error and should be "containing." *See, e.g.,* Purepac Pharm. Co. v. Friedman, 162 F.3d 1201, 1203 n.3 (D.C. Cir. 1998); Mova Pharm. Corp. v. Shalala, 140 F.3d 1060, 1064 n.3 (D.C. Cir. 1998).

[4] Amendments made to section 505 of the FDCA as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108-173) (MMA) eliminated the court decision "trigger" for starting 180-day exclusivity periods. However, the court decision trigger still applies to listed drugs for which a "decision of a court" under section 505(j)(5)(B)(iv) occurred prior to December 8, 2003, the enactment date for the MMA, and a modified version of the trigger still applies to listed drugs for which any paragraph IV certification was made prior to December 8, 2003. *See* MMA § 1102(b). Accordingly, the unmodified court decision trigger applies to BMS's Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg., and 80 mg.

[5] FDA has adopted a patent-by-patent approach to 180-day exclusivity. *See* Letter from Gary Buehler, Director, Office of Generic Drugs, to Diane Servello, Andrx Pharmaceuticals, Inc. (Nov. 16, 2002) (available on the FDA website at http://www.fda.gov/cder/ogd/shared_exclusivity.htm). This approach, which is under challenge in the courts, is not directly at issue in this matter.

infringement of the patent with respect to that drug product. The D.C. Circuit concluded that the DJA dismissal at issue before it was based upon the patent holder's express statements that the ANDA applicant's proposed formulation did not infringe the patent and did not warrant a patent infringement action. The court held that that DJA dismissal, therefore, had preclusive effect and could constitute a "court decision" for purposes of triggering 180-day exclusivity.

In *Teva II* (*Teva Pharms. USA, Inc. v. FDA*, 2000 WL 1838303 (D.C. Cir. 2000) (unpublished)), the D.C. Circuit addressed whether calling on the agency to assess the estoppel effect of a dismissal of a DJA would place an undue burden on FDA. The court reasoned that the agency had committed to a case-by-case inquiry in applying the court decision trigger and that, with regard to the DJA dismissal at issue before the court, determining if the dismissal would estop future patent suit would require FDA only to look to the order dismissing the DJA and to the plaintiff's concessionary letter. The court concluded that review of those two documents did not constitute an undue burden.

Factual Background and Events to Date

Four patents are currently listed for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg., and 80 mg.: the '227, '447, '589 and '985 patents. The pediatric exclusivity periods associated with these patents currently expire on April 20, 2006, January 9, 2009, January 9, 2009, and October 22, 2014, respectively. Apotex submitted a paragraph III certification to the '227 patent (indicating the application would not be eligible for approval until this patent expires). ANDA applicants, including Apotex, have submitted paragraph IV certifications to the '447, '589, and '985 patents.

Apotex notified BMS of its paragraph IV certifications to the '447, '589, and '985 patents. BMS did not sue Apotex for infringement of these patents.[6] Apotex sued BMS in the United States District Court for the Southern District of New York (*Apotex Inc. v. Bristol-Myers Squibb Co.* (No. 04 CV 2922)) for declaratory judgment of non-infringement and/or invalidity of these three patents. By a stipulation and order issued on July 23, 2004, the district court dismissed Apotex's action for lack of subject matter jurisdiction. The order stated that the dismissal was based on BMS's "pre-Complaint representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use, sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-431." That order became final and unappealable on August 22, 2004.

Triggering of 180-Day Exclusivity for the '447, '589 and '985 Patents

In accordance with *Teva II*, the agency has reviewed the July 23, 2004 order dismissing Apotex's declaratory judgment action. Based on that review, FDA finds that, under the rule of *Teva*, this dismissal qualifies as a court decision under section 505(j)(5)(B)(iv)(II), triggering the running of 180-day exclusivity for the '447, 589, and '985 patents. As expressly stated in the order itself, the dismissal is based upon BMS's representations that it has no intention to sue Apotex for infringement of these three patents arising from Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-431. Accordingly, the dismissal precludes a

---

[6] Accordingly, no 30-month stay applies to FDA approval of the Apotex ANDA. 21 U.S.C. § 355(j)(5)(B)(iii).

subsequent suit by BMS against Apotex for infringement of these patents, and constitutes a decision of a court. Consequently, any 180-day exclusivity for the '447, '589, and '985 patents was triggered as of August 22, 2004, the date the July 23 order became final, and expired as of February 18, 2005.

If you have any questions regarding this letter, please contact Ms. Cecelia Parise, Regulatory Policy Advisor to the Director, Office of Generic Drugs, at 301-827-5845. All applicants who have submitted ANDAs for Pravastatin Sodium Tablets 10 mg., 20 mg., 40 mg., and 80 mg. will be notified of the agency's decision regarding 180-day exclusivity for these products.

Sincerely,

Gary Buehler
Director
Office of Generic Drugs
Center for Drug Evaluation and Research

# EXHIBIT D

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For
Temporary Restraining Order*

ORAL ARGUMENT MARCH 9, 2006
Nos. 05-5401 & 5460

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TEVA PHARMACEUTICALS USA, INC.,

Plaintiff-Appellee,

v.

FOOD AND DRUG ADMINISTRATION, et al.,

Defendants-Appellants,

and

APOTEX INC.,

Intervenor-Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REPLY BRIEF FOR THE FEDERAL APPELLANTS

OF COUNSEL:

PAULA M. STANNARD
*Acting General Counsel*

SHELDON T. BRADSHAW
*Associate General Counsel*
Food and Drug Division

WENDY S. VICENTE
*Office of the Chief Counsel*
*U.S. Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD 20857*

PETER D. KEISLER
*Assistant Attorney General*

JEFFREY S. BUCHOLTZ
*Deputy Assistant Attorney General*

EUGENE M. THIROLF
*Director*
*Office of Consumer Litigation*

ANDREW E. CLARK
*Attorney, Office of Consumer Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 386*
*Washington, D.C. 20044*
*202/307-0067*

brief, like the agency decision at issue here, is premised on FDA's interpretation of the *Teva* decisions as announcing a binding, substantive rule of law. If, however, Teva's current interpretation is correct, and FDA *is* free to construe section 355(j)(5)(B)(iv)(II) as it believes appropriate, then FDA would reach the opposite decision here with respect to the Apotex-Bristol dismissal.

FDA's position in the *Teva* cases, which FDA believes this Court rejected, was that the court-decision trigger provision should not be interpreted so broadly as to apply to dismissals not actually holding that the patent is invalid, not infringed, or unenforceable. FDA's own position now similarly would be that the plain language of section 355(j)(5)(B)(iv)(II) does not embrace dismissals of declaratory judgment actions for lack of subject-matter jurisdiction. Indeed, FDA would welcome the opportunity to decide court-decision trigger issues on a basis that it believes would be faithful to the statutory text and that would be clear and readily administrable and thus would promote predictability in the industry and with the public. Under such a reading, the Apotex-Bristol dismissal would not qualify as a triggering court decision, because it does not contain a holding of invalidity, non-infringement, or unenforceability.

statements had preclusive effect. *Id.* at 1008.

Here, too, the Apotex-Bristol Stipulation and Order of dismissal qualifies as such a "decision," because it is clear from the face of the Stipulation and Order that the dismissal was predicated upon Bristol's preclusive representations and the court's endorsement of its resulting lack of jurisdiction.

Teva similarly argues that the Apotex-Bristol stipulation does not qualify as a "holding." Br. 34 (arguing that the requirement for a "holding" is analytically distinct from the requirement for a "decision"). Again, however, *Teva I* controls. This Court held that the term "holding" is "susceptible to interpretation," and explained that the significance of a "holding," as with a "decision," "often lies in its preclusive effect." 182 F.3d at 1008.

## 2.    The Apotex-Bristol Case Was Dismissed For Lack Of Subject-Matter Jurisdiction, Not Under Rule 41(a)(1)(ii)

Teva relies on wholly inapposite cases to support its argument that the Apotex-Bristol case was dismissed – not for lack of subject-matter jurisdiction, as the Stipulation and Order expressly states – but pursuant to Fed. R. Civ. P. 41, and thus is not a "decision of a court" with a "holding." None of the Rule 41 cases cited by Teva, however, concerns a dismissal for lack of subject-matter jurisdiction (Br. 29-31), and none involves or relates to the court-decision trigger

10

## II.   FDA AND THE DISTRICT COURT CORRECTLY FOUND THAT BRISTOL WAS ESTOPPED FROM ENFORCING ITS PATENTS AGAINST APOTEX

### A.   Bristol's Repeated Assurances That It Had No Intention To Sue Estop Bristol From Suing Apotex For Infringement

Teva argues in the alternative that the Apotex-Bristol dismissal does not qualify as a triggering court decision because Bristol's underlying representations to Apotex lack preclusive effect.  Br. 43-53.  This argument is meritless.

The Apotex-Bristol Stipulation and Order states in relevant part:

> WHEREAS, prior to Apotex's filing of the Complaint herein, *BMS repeatedly represented and assured Apotex* that, notwithstanding any disagreement on the scope or interpretation of the claims of the '447, '985, and '589 patents, *it had no intention to bring suit against Apotex for infringement of [those] patents* with respect to Apotex's generic pravastatin sodium products that are the subject of ANDA No. 76-341.

JA1042 (emphases added).  Moreover, the Stipulation and Order expressly provides that the dismissal is "based upon [those] pre-Complaint representations that [Bristol] has no intention to sue Apotex for infringement."  *Id.*

These statements estop Bristol from bringing an infringement action against Apotex.  Indeed, Bristol's commitment is present on the face of the Order: "BMS repeatedly represented and assured" Apotex that it "had no intention to bring suit against Apotex for infringement."  *Id.*  Such "assur[ances]" – a term that means "to

17

remove doubt" and "to make certain; ensure"[7] – closely track this Court's

description in *Teva I* of a representation with preclusive effect. 182 F.3d at 1008

("the patent holder's *disavowal of any intent to sue* for infringement has preclusive

effect") (emphasis added). Bristol repeated its assurances to Apotex on no less

than three separate occasions. JA1068. Under Federal Circuit law, such repeated

assurances create an estoppel. *See Sierra Applied Sciences, Inc. v. Advanced

Energy Indus.*, 363 F.3d 1361, 1375 (Fed. Cir. 2004) (holding that a patentee's

repeated statements that it would not sue had estoppel effect).

Teva argues that Bristol's statements reflected nothing more than a "then-

present intention" not to sue and that such statements do not have preclusive effect

"[u]nder well-settled Federal Circuit precedent." Br. 43 (citing *C.R. Bard, Inc. v.

Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983)). But Bristol's actual pre-complaint

assurances went well beyond mere present intentions and expressly committed

Bristol in its *future* conduct. Bristol stated that it "has no intention, *now or in the

future*, of suing TorPharm [Apotex] for infringement of any of the three BMS

patents so long as TorPharm's previous representations about its proposed generic

products remain accurate." JA1053 ¶ 17 (declaration of Bristol's counsel, quoting

---

[7] *See* FDA Br. 30 n.9 (*citing* American Heritage College Dictionary at 84 (3d ed.
2000)).

18

# EXHIBIT E

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order*

[ORAL ARGUMENT NOT YET SCHEDULED]
Nos. 05-5401 & 5460

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

TEVA PHARMACEUTICALS USA, INC.,

Plaintiff-Appellee,

v.

FOOD AND DRUG ADMINISTRATION, et al.,

Defendants-Appellants,

and

APOTEX INC.,

Intervenor-Defendant-Appellant.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

## BRIEF FOR THE FEDERAL APPELLANTS

OF COUNSEL:

PAULA M. STANNARD
*Acting General Counsel*

SHELDON T. BRADSHAW
*Associate General Counsel*
Food and Drug Division

WENDY S. VICENTE
*Office of the Chief Counsel*
*U.S. Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD 20857*

PETER D. KEISLER
*Assistant Attorney General*

JEFFREY S. BUCHOLTZ
*Deputy Assistant Attorney General*

EUGENE M. THIROLF
*Director*
*Office of Consumer Litigation*

ANDREW E. CLARK
*Attorney, Office of Consumer Litigation*
*Civil Division, U.S. Department of Justice*
*P.O. Box 386*
*Washington, D.C. 20044*
*202/307-0067*

Bristol's *"assur[ance]"*[9] that it had no *"intention"* to sue closely tracks this Court's description of a representation with preclusive effect in *Teva I.* 182 F.3d at 1008 ("the patent holder's *disavowal of any intent to sue* for infringement has preclusive effect") (emphasis added).

FDA therefore properly evaluated Bristol's repeated, unequivocal assurances that it had no intention of suing Apotex and determined that those assurances estopped Bristol from suing for infringement – a conclusion with which the district court agreed. JA38 n.6 (stating that BMS's representations "preclude[d] BMS from suing Apotex for infringement").[10] The district court need

---

[9] "Assure" means "1. To state positively, as to remove doubt. 2. To cause to feel sure. 3. To give confidence to; reassure. 4. To make certain; ensure." The American Heritage College Dictionary at 84 (3d ed. 2000).

[10] In addition to the face of the order itself, FDA reviewed the documents submitted to the agency by Apotex in support of its position that the dismissal order constituted a triggering court decision. JA1039-91. Apotex's submission included a declaration by Matthew P. Blischak, Bristol's Senior Counsel for Patent Litigation, who summarized the statements made by Bristol to Apotex that formed the basis of Apotex's agreement to dismiss the suit. JA1049-53; *see also* Stipulation and Order, JA1042 (incorporating Bristol's pre-Complaint representations as a ground for dismissal). Bristol's statements further support the conclusion that Bristol is estopped. Mr. Blischak stated that Bristol "has no intention, now or in the future, of suing TorPharm [Apotex] for infringement of any of the three Bristol patents so long as TorPharm's previous representations about its proposed generic products remain accurate." JA1053 ¶ 17 (quoting a letter sent by Bristol to Apotex's counsel on February 20, 2004).

a declaratory judgment action is dismissed with or without prejudice, however, is

of no significance under the *Teva* decisions.  The "relevant consideration," rather,

"is the estoppel of the patent holder."  *Teva I*, 182 F.3d at 1009.

In short, Judge Pauley did put his express imprimatur on the Apotex-Bristol

dismissal by signing the Stipulation and Order containing Bristol's preclusive

assurances and finding that, as a result of those assurances, jurisdiction was

lacking.  JA1042.  Accordingly, even if the Apotex-Bristol was effected pursuant

to Rule 41, and even if the caselaw relied upon by the district court that involves

issues unrelated to the court decision trigger should inform the decision in this

case, the Apotex-Bristol dismissal had sufficient "judicial imprimatur" to

constitute a "decision of a court."

**C.    The District Court's Distinctions Between the Apotex-Bristol
        Dismissal and the Teva-Syntex Dismissal Are Not Meaningful and
        Needlessly Complicate Analysis Under Section 355(j)(5)(B)(iv)(II)**

1.    The Teva-Syntex dismissal order at issue in *Teva I* was no different in

substance than the Stipulation and Order at issue here.  In both cases, the court

accepted the defendant/NDA holder's assurance that the plaintiff/ANDA applicant

lacked a reasonable apprehension of suit and dismissed the declaratory judgment

action for lack of jurisdiction on that basis.  There is no significant legal or factual

difference under *Teva* between the outcome of the Teva-Syntex case, which Judge

47

Legge dismissed for lack of jurisdiction based on Syntex's uncontested representations, and the Apotex-Bristol case, which Judge Pauley likewise "dismissed, for lack of subject matter jurisdiction" based upon Bristol's representations.

Here, the district court determined, however, that FDA's treatment of the Apotex-Bristol dismissal as a triggering court decision was inconsistent with *Teva* because Judge Pauley made "no implicit, predicate finding of fact" that the patentee was estopped from suing for infringement, as Judge Legge assertedly made in dismissing the Teva-Syntex litigation. JA37. The district court's concern that *Teva* requires a "finding" that is purportedly absent in this case, however, misconstrues the nature of the "finding" discussed in *Teva*, which was nothing more than the court's acceptance of an uncontested representation about the patentee's intention not to sue the declaratory judgment plaintiff and a refusal to make any further determinations because the court lacked jurisdiction to do so. *See* JA24 (stating that Teva and Syntex "agreed that there was, at that time, no case or controversy because Teva could not have a reasonable apprehension that Syntex would sue for infringement"); JA616 ("[Y]ou all agree that [Syntex's] letter eliminates any controversy in this case.").

To the extent the Teva-Syntex dismissal can be said to have been based on a

48

predicate finding, it was not a "finding of fact" in the ordinary legal sense. *See, e.g., Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 163-164 (1988) ("A common definition of 'finding of fact' is, for example, '[a] conclusion by way of reasonable inference from the evidence.' Black's Law Dictionary 569 (5th ed. 1979). . . . '[F]actual findings' includes conclusions or opinions that flow from a factual investigation."). As the hearing transcript makes clear, the court in the Teva-Syntex litigation merely accepted the parties' uncontested representations concerning Teva's lack of reasonable apprehension of suit; it heard no evidence and drew no inferences or conclusions from any sort of factual investigation. JA615-18. As such, Judge Legge's "finding" in the Teva-Syntex litigation is functionally indistinguishable from the "finding" Judge Pauley necessarily made when he signed off on the Apotex-Bristol stipulated dismissal. Whether his signature was necessary to effectuate the dismissal or not, the predicate "finding" underlying both dismissals is identical – the undisputed absence of a case or controversy due to the patentee's preclusive representations that it would not sue, which had the effect, in both cases, of divesting the court of subject matter jurisdiction.

Nor does it matter for purposes of the court decision trigger that, in the Teva-Syntex litigation, the "predicate finding of fact [arose] in the context of a

contested motion." JA38; *see also* JA36 ("the Teva-Syntex dismissal was not wholly uncontested" inasmuch as "there was hearing on the motion regarding the terms, if any, to be attached to the dismissal, and the parties argued passionately at that hearing"). Passionate arguments notwithstanding, the district court was wholly unswayed by any of the parties' entreaties on the contested issues and sent them "out the door" without "finding" anything other than an uncontested fact.

Moreover, all that was truly contested by Teva and Syntex was the form the dismissal order should take. JA615-18. The *substantive* basis for the Teva-Syntex dismissal order – lack of case or controversy – was precisely the same as the basis for the Apotex-Bristol dismissal here at issue, and required the exact same degree of judicial imprimatur. The parties' disagreement over the form of the dismissal order in Teva-Syntex is of no legal significance for purposes of the court decision trigger and does not meaningfully distinguish that case from the case at bar. What matters under the standard set forth in *Teva* is that Bristol, like Syntex, made representations with preclusive effect (as the district court acknowledged), and those statements formed the predicate for the dismissal of Apotex's declaratory judgment action, just as Syntex's statements formed the predicate for dismissal of Teva's action. *Compare* JA1042 *with* JA616. If anything, the Apotex-Bristol dismissal order more clearly meets the *Teva* standard than the Teva-Syntex order

50

itself, because the former, unlike the latter, expressly incorporated the patentee's preclusive representations. *Compare* JA1042 *with* JA592-93. The fact that the Apotex-Bristol dismissal was presented to the court by way of stipulation rather than by motion has no substantive significance.

By resting its decision on hypertechnical distinctions such as those discussed above, the district court elevated form over substance contrary to this Court's clear admonition in *Teva*. As the Court observed in *Teva I*, the term "holding," no less than the term "decision," is "susceptible to interpretation," and a "holding" therefore need not take any particular form. 182 F.3d at 1007-08. Because "the significance" of a holding "often lies in its preclusive effect," *id*. at 1008, what matters for purposes of the court decision trigger is not what form the "decision" or "holding" takes, but whether the patentee is estopped from enforcing its patent. If the dismissal has such preclusive effect, as the dismissal of Apotex's action in this case does, nothing more is required. The central teaching of *Teva* is that matters of form should not obscure the substantive question of whether the patentee is estopped from enforcing its patent against the ANDA applicant-declaratory plaintiff. By narrowly focusing on the form of the Apotex-Bristol dismissal rather than its substantive effect, the district court turned the *Teva* decisions on their head.

51

2.    The technical distinctions emphasized by the district court also will needlessly exacerbate FDA's already difficult task of administering generic exclusivity under the complex Hatch-Waxman regime. Indeed, the court's decision compounds the problems that FDA foresaw in the original *Teva* cases. The Court's decisions in *Teva I* and *II* significantly complicated FDA decisionmaking in that they require the agency to delve into matters beyond its expertise to resolve questions concerning patentee estoppel. As a result of the *Teva* decisions, the agency must determine whether representations made by a third party in another litigation have preclusive effect – a task for which FDA, as an agency that is responsible for regulation of drug safety and efficacy but that has no expertise in patentee estoppel law, is not well suited.

Now, according to the district court in the instant case, FDA must also determine which procedural rule applies to a dismissal order, what jurisdiction's law should apply, and whether under that rule in that jurisdiction the order has sufficient judicial imprimatur to constitute a "decision of a court." It is outside the agency's core function and expertise to make these nuanced determinations of civil procedure.

Apart from the burden it places on FDA itself, the district court's decision injects substantial additional uncertainty into court decision trigger determinations

(which in turn determine the timing of ANDA approvals and the arrival on the market of generic drugs). By adding an additional layer of complexity to what FDA must determine, the district court's decision will make it that much more difficult for the regulated industry to predict whether a given dismissal order will be found to satisfy the court decision trigger and thus will make it more difficult and costly for drug companies to make appropriate business planning decisions.

Because of the huge financial consequences that result from gaining or losing six months of ANDA marketing exclusivity, drug companies have creatively construed the FDCA and relevant court decisions to gain whatever marketing advantage they can. Here, Apotex and Teva are taking legal positions diametrically opposed to the positions they took in the original *Teva* litigation during 1999 and 2000, because their roles are reversed – in today's battle over pravastatin, each company finds itself occupying the seat the other occupied when they battled over ticlopidine. FDA's experience suggests that drug companies will continue to do battle over exclusivity issues as opportunity permits, and the district court's decision, if upheld, will provide ample opportunity by spawning greater uncertainty in this complex area of law. It would be in the public's interest, as well as FDA's own interest, to have exclusivity triggering determinations governed by a legal regime that is clear and easily administered.

53

The considerations that the district court's decision make crucial – whether the dismissal for lack of jurisdiction resulted from a motion or a stipulation, whether the dismissal was effected under one procedural rule or another, whether the dismissal recites that the court found "good cause" for it, whether the court considered papers beyond the motion or stipulation itself, whether the court held a hearing, and the like, *see* JA35-37 – bear no relationship either to whether the decision "hold[s] the patent . . . to be invalid or not infringed" or to what this Court said is "the relevant consideration" under that statutory language, namely, whether the patentee is estopped from suing the declaratory plaintiff for infringement, *Teva I*, 182 F.3d at 1009. Encouraging well-motivated and well-financed litigants to pursue ever-finer distinctions, ever farther removed from the language of the statute and from its purposes, does not advance the public's interest. This Court should reject the district court's interpretation and should hold that, under the broad, functional approach of the *Teva* decisions, a dismissal for lack of jurisdiction that on its face appears to be a decision of a court constitutes a "decision of a court" for triggering purposes if the patentee is estopped from enforcing its patent against the plaintiff.

To be sure, as FDA made clear at the hearing before the district court, if FDA were free to apply its own interpretation of section 355(j)(5)(B)(iv)(II), it

54

would interpret that provision to require that a court decision hold the patent to be invalid, not infringed, or unenforceable, so that dismissals that hold only that jurisdiction is absent would not constitute triggering court decisions. Believing itself bound by the *Teva* decisions to apply a contrary interpretation, however, FDA attempted faithfully to do so. If this Court adheres to what FDA believes is the holding of *Teva I* and *II* – namely, that a dismissal for lack of jurisdiction constitutes a triggering court decision if the patentee is estopped from enforcing its patent against the declaratory plaintiff – then this Court should hold that the Apotex-Bristol dismissal satisfies section 355(j)(5)(B)(iv)(II) and should reverse the district court's judgment.

55

# EXHIBIT F

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For
Temporary Restraining Order*

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

- - - - - - - - - - - - - - - - - - -

TEVA PHARMACEUTICALS, USA,
INC.,

        Appellants,

   v.

FOOD AND DRUG ADMINISTRATION,
ET AL; APOTEX, INC.,

        Appellee.

No. 05-5401

- - - - - - - - - - - - - - - - - - -

Thursday, March 9, 2006

Washington, D.C.

The above-entitled matter came on for oral
argument pursuant to notice.

BEFORE:

    CIRCUIT JUDGES RANDOLPH AND TATEL AND
    SENIOR CIRCUIT JUDGE WILLIAMS

APPEARANCES:

    <u>ON BEHALF OF THE APPELLANTS</u>:

    JEFFREY BUCHOLTZ, ESQ.

    WILLIAM A. RAKOCZY, ESQ.

    <u>ON BEHALF OF THE APPELLEE</u>:

    JAY P. LEFKOWITZ, ESQ.

*Deposition Services, Inc.*
6245 Executive Boulevard
Rockville, MD 20852
Tel: (301) 881-3344 Fax: (301) 881-3338

HDC                                                                    10

1    is whether the patent holder is estopped and not whether there

2    actually is a holding of invalidity or noninfringement, then

3    it doesn't make any sense to engage in this hyper formalistic

4    interpretation of a document that, again, is called an order

5    and has the Court's signature on it and turn it into something

6    that is in the nature of a private agreement rather than the

7    decision of a court.   If estoppel is what matters, in our

8    view here, Bristol is estopped and this action was dismissed

9    for lack of jurisdiction and that ought to be enough.   But

10   again, our preferred view is that the Court decision trigger

11   provision should be interpreted to require a decision with an

12   actual holding of invalidity or noninfringement.   If this

13   Court thinks that it's open to us to adopt that view or if

14   this Court thinks that that's the correct interpretation of

15   the statute, then we'd be happy to hear that.

16          I see my time is up.   Thank you, Your Honors.

17          THE COURT:   Thank you.

18          ORAL ARGUMENT OF WILLIAM A. ROKOCZY, ESQ.

19          ON BEHALF OF THE APPELLANT

20          MR. ROKOCZY:   May it please the Court, William

21   Rokoczy on behalf of the intervenor defendant and appellant

22   Apotex Inc.   Your Honors, I'm put in the difficult position of

23   seeing who I need to address first, the person sitting at my

24   own table or Teva.   While the agency may not care about the

25   result in this case, Apotex certainly doesn't.   It has real

1  (indiscernible) a letter (indiscernible)?

2           MR. BUCHOLTZ:  That is what I'm telling Your Honors

3  FDA would do if at that point somebody went to FDA, whether it

4  be Apotex at that point or someone else and said you should

5  find notwithstanding the vocoder of the prior decisions that

6  the Apathies-Bristol stipulation and order of dismissal was a

7  triggering court decision.  FDA would say, if asked, if FDA

8  were free to adopt its own interpretation of the statute, no

9  it was not a triggering court decision.  It did not contain a

10 holding that the patent was invalid, not infringed or

11 unenforceable.  And then, what I predict would likely happen

12 given the amount of money that's at stake and the importance

13 of these issues to the parties, is we would then be in court

14 on someone's application for a TO and we'd be back before Your

15 Honors on an expedited basis soon.  What I'm asking this Court

16 to do --

17          THE COURT:  (Indiscernible.)

18          MR. BUCHOLTZ:  That's part of my point.  Part of my

19 point is I think we really have tried to make clear what the

20 agency's interpretation would be and why.  If this Court

21 believes that interpretation is --

22          THE COURT:  (Indiscernible.)

23          MR. BUCHOLTZ:  And five.  If this Court believes

24 that the agency's interpretation that we've proffered is at

25 least permissible then I submit there's no reason for the kind

1   of expedited further proceedings that I predict would happen

2   if there were just a vocoder here and everything were back to

3   zero for the parties to try again to reach the result that

4   they want to reach.  Our hope would be that if this Court

5   believes _Tea I_ and II were procedural, this Court holds either

6   of the statute as unambiguous and only can support FDA's

7   interpretation or if this court believes that statute is

8   ambiguous then FDA's interpretation is at least permissible

9   that interpretation should be upheld under ordinary add law

10  principles and the further proceedings that we've been talking

11  about should be short circuited and then we would hope in that

12  situation that Tea, once assured that it had it's exclusivity

13  still, would come to market promptly.  In the absence of a

14  court decision the trigger would be commercial marketing.  We

15  would hope that Tea would come to market promptly so that its

16  exclusivity would be triggered soon and consumers would get

17  the benefit of generic competition sooner rather than later.

18  Which is, in _Tea I_, what this Court said the purpose of this

19  provision is, after all.  Thank you, Your Honors.

20        MR. ROKOCZY:  Thank you, Judge.  Our position would

21  be there can't be a short-circuiting of all these other

22  administrative decisions that haven't even been made yet.  If

23  this Court finds that in fact, _Tea I_ is not binding, while we

24  would disagree with that, that would mean, in fact, that there

25  would have to be a remand.  Because what Tea and the FDA are

# EXHIBIT G

## Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

PUREPAC PHARMACEUTICAL CO.,                )
                                           )
              Plaintiff,                   )
                                           )
      v.                                   )
                                           )
TOMMY G. THOMPSON,                         )         03 2210
Secretary of Health and Human Services,    )
                                           )    Civil Action No. ____-____
      and                                  )
                                           )
MARK B. McCLELLAN,                         )
Commissioner of Food and Drugs,            )
                                           )
              Defendants.                  )

## ORDER

Upon consideration of Plaintiff Purepac's Motion for Temporary Restraining Order, Memorandum of Law, the Declaration of E. Brendan Magrab, and counsel for the Plaintiff and Defendants having been heard on the motion,

The Court finds that Plaintiff has shown that it will be immediately and irreparably harmed absent temporary relief, it is therefore

ORDERED THAT, until further Order of this Court, Defendants Tommy G. Thompson, in his official capacity as Secretary of Health and Hum Services, and Mark B. McClellan, in his official capacity as Commissioner of Food and Drugs:

1. shall immediately take appropriate action to delay the effective date of the final approval granted to Ivax Corp's abbreviated new drug applications for generic metformin extended release 500 mg tablets;

2. shall not grant final approval to any additional abbreviated new drug applications for generic metformin extended release 500 mg tablets; and,

IT IS FURTHER ORDERED THAT

3. Plaintiff Purepac Pharmaceutical Co. shall file a Motion for Preliminary Injunction, together with any supporting memoranda or affidavits, no later than _5_ days from the date of this Order. Defendants shall file any responsive papers no later than _5_

*Thereafter.*
days ~~from the date of this Order~~. Plaintiff shall file any reply memorandum no later than __3__ days ~~from the date of this Order~~. *Thereafter.*

4. All parties shall appear in this Court on *November 12,* 2003, at *2:00* o'clock, for argument on the Plaintiff's Motion for Preliminary Injunction, unless otherwise ordered by the Court.

*5. This Order to be effective upon plaintiff's filing*
SO ORDERED. *of a $100,000 injunction bond.*

United States District Judge

*10/29/03*
Date

*3:00 p.m.*

# EXHIBIT H

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order*

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## No. 04-5211

## September Term, 2003

04cv00605

Filed On: July 26, 2004 [838614]

Apotex, Inc.,
      Appellant

    v.

Food & Drug Administration, et al.,
      Appellees

---

## 04-5046

03cv02401

Apotex, Inc., *f/k/a* Torpharm, Inc.,
      Appellee

    v.

Food & Drug Administration, et al.,
      Appellants

Alphapharm Pty, Limited,
      Appellee

---

Consolidated with 04-5047

**BEFORE:**   Edwards, Sentelle, and Randolph, Circuit Judges

## O R D E R

    Upon consideration of the emergency motion to consolidate No. 04-5211 with No. 04-5046 and expedite consideration of the appeals, the response and opposition thereto, and the reply; the emergency motion for injunction pending appeal in No. 04-5211, the oppositions thereto, and the reply; the motion to participate as <u>amicus curiae</u> in No. 04-5046, the opposition thereto, and the reply, it is

    **ORDERED** that the Food and Drug Administration's final approval of Purepac Pharmaceutical Co.'s gabapentin capsule ANDA be stayed pending resolution of the appeal in No. 04-5211 m. Appellant has satisfied the standards required for a stay

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 04-5211**                                        **September Term, 2003**

pending appeal.  See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2002).  It is

**FURTHER ORDERED** that the motion to consolidate be denied.  The Clerk is directed to schedule No. 04-5211 for argument on the same date and before the same panel as No. 04-5046.  The Clerk is directed to enter a briefing schedule consistent with this order.  It is

**FURTHER ORDERED** that Purepac Pharmaceutical Co.'s motion to participate as amicus curiae be denied.

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:

Deputy Clerk/LD

# EXHIBIT I

## Declaration of William A. Rakoczy

*In support of Apotex Inc. 's Motion For*
*Temporary Restraining Order*

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 05-5401**                                    **September Term, 2005**

05cv01469

**Filed On: November 22, 2005**

[933143]

Teva Pharmaceuticals, USA, Inc.,

Appellee

v.

Food & Drug Administration, et al.,

Appellees

Apotex, Inc.,

Appellant

BEFORE:    Rogers, Tatel, and Griffith, Circuit Judges

## O R D E R

Upon consideration of the motion to expedite and the responses thereto, it is

**ORDERED** that the following briefing schedule will apply in this case:

| | |
|---|---|
| Brief for Appellant (not to exceed 14,000 words) and Appendix | December 22, 2005 |
| Brief for Appellee Teva Pharmaceuticals, USA, Inc. (not to exceed 14,000 words) | January 23, 2006 |
| Reply Brief for Appellant (not to exceed 7,000 words) | February 6, 2006 |

Unless it files an appeal, the Food & Drug Administration ("FDA") may not file a brief challenging the district court's decision. If the FDA files an appeal, it may file a brief (not to exceed 14,000 words) and a reply (not to exceed 7,000 words) in accordance with the above schedule.

The parties are directed to file and serve their briefs by hand on the date due.

The Clerk is directed to schedule this case for oral argument on the first available date following the completion of briefing.

**Per Curiam**

# EXHIBIT J

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order*



## Press Release

**Teva Receives Favorable Court Ruling on Generic Pravachol® Exclusivity**

**Jerusalem, Israel, October 21, 2005** - Teva Pharmaceutical Industries Ltd. (Nasdaq: TEVA) announced today that the U.S. District Court for the District of Columbia has granted the Company's request to enjoin the U.S. Food and Drug Administration from approving subsequent ANDAs for generic Pravastatin Sodium Tablets 10 mg., 20 mg., and 40 mg., until the expiration of Teva's 180-day exclusivity.

Israel Makov, Teva's President and Chief Executive Officer, commented: "We are very pleased with today's court ruling which properly clarifies key exclusivity provisions of the Hatch-Waxman Act, in a manner which maintains the incentives to bring generic products to market. We plan to launch this important product in April 2006 upon the expiration of patent protection."

Pravastatin Sodium Tablets are the AB-rated generic equivalent of Bristol-Myers Squibb's Pravachol® Tablets, and are indicated for the treatment of hyperlipidemia and the primary prevention of coronary events. The 10 mg., 20 mg., and 40 mg strengths have combined annual U.S. branded sales of approximately $1.6 billion.

Teva Pharmaceutical Industries Ltd., headquartered in Israel, is among the top 20 pharmaceutical companies and among the largest generic pharmaceutical companies in the world. The company develops, manufactures and markets generic and innovative human pharmaceuticals and active pharmaceutical ingredients. Close to 90% of Teva's sales are in North America and Europe.

Safe Harbor Statement under the U. S. Private Securities Litigation Reform Act of 1995: This release contains forward-looking statements, which express the current beliefs and expectations of management. Such statements are based on management?s current beliefs and expectations and involve a number of known and unknown risks and uncertainties that could cause Teva?s future results, performance or achievements to differ significantly from the results, performance or achievements expressed or implied by such forward-looking statements. Important factors that could cause or contribute to such differences include whether and when the proposed acquisition of IVAX Corporation will be consummated and the terms of any conditions imposed in connection with such closing, the terms and conditions of the financing utilized by Teva for the IVAX acquisition, Teva's ability to rapidly integrate IVAX's operations and achieve expected synergies, Teva?s ability to successfully develop and commercialize additional pharmaceutical products, the introduction of competitive generic products, the impact of competition from brand-name companies that sell or license their own generic products under generic trade dress and at generic prices (so

# EXHIBIT K

## Declaration of William A. Rakoczy

*In support of Apotex Inc. 's Motion For*
*Temporary Restraining Order*

[ORAL ARGUMENT SCHEDULED SEPTEMBER 8, 2000]
Nos. 99-5287 & 99-5342

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TEVA PHARMACEUTICALS USA, INC., et al.,

Plaintiffs-Appellees,

v.

U.S. FOOD AND DRUG ADMINISTRATION,

Defendant-Appellant,

and

TORPHARM, A DIVISION OF APOTEX, INC.,

Intervenor-Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE FEDERAL APPELLANT

DAVID W. OGDEN
  *Acting Assistant Attorney General*

OF COUNSEL:                         WILMA LEWIS
                                      *United States Attorney*
MARGARET JANE PORTER
*Chief Counsel*                     DOUGLAS N. LETTER
                                      *202/514-3602*
BARBARA STRADLING                   HOWARD S. SCHER
ANNE MILLER                           *202/514-4814*
  *Office of the Chief Counsel*      *Attorneys, Appellate Staff*
  *U.S. Food and Drug*               *Civil Division,*
  *Administration*                   *Department of Justice*
  *5600 Fishers Lane*                *601 D Street, N.W., Rm. 9106*
  *Rockville, MD  20857*             *Washington, D.C.  20530-0001*

the Court's view, "the California dismissal appears to meet the requirements of a triggering 'court decision' because that court had to make a predicate finding with respect to whether Syntex would ever sue Teva for infringement in order to conclude that there was no case or controversy between the parties." Id. at 1009. The Court, therefore, reversed the district court's decision and remanded the case to the district court to allow FDA to provide such explanation (id. at 1009). The Court also directed the district court to "determine anew" whether injunctive relief is appropriate. Id. at 1012.

d.  On July 1, 1999, prior to this Court's ruling, TorPharm began marketing its generic version of ticlopidine after receiving FDA's final approval of its ANDA. TorPharm Br. at 5; JA 243-44. TorPharm's exclusivity, triggered by its commercial marketing, therefore expired 180 days later on December 27, 1999; and it was this exclusivity that kept Teva's product off the market until that date.

e.  On remand, Teva immediately moved for issuance of an injunction. FDA opposed, explaining that a dismissal of a declaratory judgment action for lack of subject matter jurisdiction does not satisfy the "court decision" trigger because of the intersection of several factors: first, on its face, a dismissal for lack of subject matter jurisdiction is not a final decision on the merits invalidating a patent or finding it not infringed;

9

second, to determine whether such a dismissal is tantamount to a "court decision" as intended by the plain language of the statute, FDA must go behind the face of the order and interpret its meaning based on supplementary materials such as letters between the parties, or the motions and attachments filed in the declaratory judgment action; and, third, because FDA is not an expert in patent matters, the agency is never in a position to look beyond the face of an order to make the kind of determination this Court made in Teva I. The district court rejected FDA's explanation and enjoined it to issue an approval "immediate[ly]" (JA 262) to Teva, which FDA did on August 20, 1999. Both TorPharm and FDA appealed this order.

    f.   On August 6, 1999, FDA published its proposed rule to replace the "successful defense" rule invalidated in Mova. See 64 Fed. Reg. 42873 (1999). FDA's proposal is based, in part, on the suggestion this Court made in a footnote in Mova, 140 F.3d at 1071 n.11. See discussion in Point II, infra.

                              STANDARD OF REVIEW

    This Court reviews the question of whether FDA's determination was arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law under a de novo review standard. See, e.g., Deaf Smith County Grain Processors, Inc. v. Glickman, 162 F.3d 1206, 1213 (D.C. Cir. 1998).

## II.

### FDA'S DETERMINATION WAS NOT ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, OR OTHERWISE NOT IN ACCORDANCE WITH LAW.

Introduction.

FDA agrees with the merits arguments set forth in TorPharm's opening brief, and thus limits its argument in this section of the brief to the following points.

### A. FDA's Explanation Was Sufficient To Sustain Its Decision In This Case.

1. When this Court previously remanded the case to the district court for FDA's explanation of its decisionmaking, FDA explained that it did not have the requisite expertise in patent matters, including patent litigation, to go beyond the face of the California dismissal to determine the import of that order. See JA 111 (Sporn Declaration). Indeed, FDA has consistently emphasized that it "does not have the expertise to review patent information" and thus "believes that its scarce resources would be better utilized in reviewing applications rather than reviewing patent claims." 59 Fed. Reg. 50338, 50343 (1994). See also, e.g., 54 Fed. Reg. 28872, 28888 (1989); 59 Fed. Reg. at 50342, 50349, 50352. As a result, FDA's regulations are structured to require the submission of "the order or judgment" of the court ruling in a patent case, 21 C.F.R. 314.107(e)(2)(iv), and not any other

17

documentation.[5/]  The California dismissal stated that Teva had no reasonable apprehension of being sued by Syntex for patent infringement, that there was no justiciable case or controversy, and that the case was dismissed for lack of subject matter jurisdiction.  JA 345.  The order on its face did not say that the patent was invalid, not infringed, or unenforceable.  Accordingly, FDA would have had to go beyond the order to analyze the pleadings, supporting exhibits and documentation, and Federal Circuit case law to determine whether the order was based in some part on a determination that the patent was invalid, not infringed, or unenforceable.  That is precisely what FDA is not equipped to do.  See JA 109-111 (Sporn Declaration); JA 93-95 (FDA's district court memorandum).

Further, FDA noted that a resolution of the import of the California dismissal was not a simple matter of reading the dismissal order in tandem with the Syntex letter (which disavowed any intent to sue Teva).  Ibid.  More was required, as demonstrated by the Teva I Court's analysis of Federal Circuit law.  See Teva I,

---

[5/] Significantly, the FDCA and the Hatch-Waxman Amendments rely on private patent litigation to resolve disputes concerning patent validity and applicability.  Id. at 50348.  Moreover, consistent with this point, in publishing the Approved Drug Products With Therapeutic Equivalence Evaluations (commonly referred to as the "Orange Book") in which FDA publishes patent information related to an NDA, see, e.g., 64 Fed. Reg. at 42873-74, FDA relies entirely on an applicant's assessment of the applicability of the patent to the drug.  FDA makes no independent determination of the correctness vel non of the applicant's assessment.

182 F.3d at 1008-09 (discussing estoppel in the Federal Circuit's patent decisions in <u>Super Sack Mfg. Corp. v. Chase Packaging Corp.</u>, 57 F.3d 1054 (Fed. Cir. 1995); <u>Spectronics Corp. v. H.B. Fuller Co.</u>, 940 F.2d 631 (Fed. Cir. 1991); <u>Fina Research S.A. v. Baroid Ltd.</u>, 141 F.3d 1479 (Fed. Cir. 1998)). See also JA 93-95.

In short, the California dismissal did not on its face state or hold that the Syntex patent was not infringed or that it was invalid or was unenforceable. Having made that determination and lacking any expertise in patent matters, FDA properly rejected Teva's contention that TorPharm's 180-day period of exclusivity was triggered by the California dismissal.[2]

2. a. The district court rejected FDA's explanation in this particular case because, in its view, FDA was proffering basically "administrative convenience" (JA 258) in support of its decision, and in the district court's view, "[s]ome degree of legal analysis is unavoidable in the context of the court decision trigger." JA

---

[2] In <u>Teva I</u>, this Court stated that "it is unclear that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or 'not infringed' in order to trigger the 180-day period of market exclusivity" and cited the fact that "[b]oth the FDA and the Federal Circuit recognize that a certification that patent is 'unenforceable' suffices for purposes of the Paragraph IV certification * * *." 182 F.3d at 1009 (citations omitted). The Court's statement, however, does not resolve the issue posed in this case — namely, <u>how</u> FDA determines that a court has held a patent not infringed or invalid or unenforceable. The fact is that, with respect to unenforceability (as with lack of infringement or invalidity), FDA looks to a court order or judgment that provides such a statement or holding on its face. See 21 C.F.R. 314.107(e)(2)(iv).

# EXHIBIT L

# Declaration of William A. Rakoczy

*In support of Apotex Inc.'s Motion For*
*Temporary Restraining Order*

ORAL ARGUMENT UNSCHEDULED

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 90-5022, 90-5027

APPEAL FROM DENIAL OF PRELIMINARY INJUNCTIVE RELIEF
BY THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE FEDERAL APPELLEES

in its Guidance, or in response to comments on its interim rule.
That is the proper time and setting for Purepac to repeat its
point and to offer its solution." Purepac, 162 F.3d at 1205. As
Mova and Purepac thus implicitly decided, FDA clearly is not
required by the language or structure of the statute to conclude
that a dismissal for lack of subject matter jurisdiction
satisfies the court decision trigger.

    B.   FDA's Interpretation Is Permissible

    Because Teva is unable to show that its interpretation of
the court decision trigger is required under the statute, its
only recourse for demonstrating a likelihood of success on the
merits is to show that FDA's interpretation is impermissible
under Chevron.

    As noted above, FDA's construction of the court decision
trigger arose out of adverse court decisions, in particular Mova,
which invalidated FDA's "successful defense" requirement. As a
result of these decisions, FDA revised its approach to 180-day
market exclusivity. In response to this new regulatory
landscape, FDA will address new questions raised by Mova through
rulemaking, in an orderly and systematic fashion. Until
rulemaking is complete, FDA is making all of its 180-day
exclusivity decisions on a case-by-case basis, based on the
explicit language of the statute. See Guidance at 4-5; JA 251-52.

    FDA precisely followed its post-Mova approach in this case.
FDA concluded that Teva's approval for ticlopidine cannot become
effective until 180 days after the first paragraph IV ANDA

-19-

applicant, TorPharm, begins commercial marketing, or until 180 days after a decision of a court holding the patent invalid or not infringed.  Consistent with the decisions in Mova and Purepac, and with the regulatory approach set out in its Guidance, FDA is not at this time prepared to conclude that dismissal of Teva's declaratory judgment action for lack of subject matter jurisdiction is a "decision of a court" under section 355(j)(5)(B)(iv)(II).  As a result, the agency declined to give Teva final approval of its ticlopidine product on February 10, 1999, the date that Teva argues TorPharm's exclusivity period should end.

    As noted above, this Court has supported FDA's post-Mova interpretation of the court decision trigger.  The Mova Court contemplated the very situation presented in this appeal and did not conclude that dismissal of a declaratory judgment action was a "court decision" holding the patent invalid, not infringed, or unenforceable.  In addition, the Purepac Court recognized FDA's situation and approved its decision to address 180-day exclusivity issues through rulemaking:

> The FDA's current position is that, as a temporary measure pending a rulemaking proceeding, it will not infer requirements for exclusivity that are not in the statutory text.  Its explanation for this position is more than adequate: the decision in Mova forced it to go back to the drawing board.

Purepac, 162 F.3d at 1205.

    FDA acknowledges that its current interpretation of the court decision trigger is narrower than the statute may be able to support.  FDA also acknowledges, as it did in the district

-20-

court below, that Teva's interpretation of the court decision trigger may be permissible.  However, as the Purepac Court recognized, FDA can address Teva's proposed interpretation in its rulemaking process.  Id.  Until that time, the agency's narrow interpretation must be upheld.

In its brief, Teva argues that FDA's interpretation will greatly reduce generic drug competition, thereby defeating one of the primary goals of the Hatch-Waxman Amendments.  Teva Brief at 20.  Teva speculates that innovator drug manufacturers will rarely face competition from generic drug manufacturers, because the first paragraph IV ANDA applicants, acting in concert with innovators, will consistently opt not to market their generic drugs, even if FDA approves the drugs and grants them exclusivity.  Both the Mova and Purepac courts considered this potential problem, however, and neither adopted Teva's interpretation of the court decision trigger as the solution. See, e.g., Mova, 140 F.3d at 1071 n.11.  Rather, both courts suggested that rulemaking is the "proper time and setting" for considering alternative interpretations.  See Purepac, 162 F.3d at 1205.  In the meantime, it is permissible and reasonable for FDA to narrowly construe the statutory provision, as it has in this case.

Teva also argues that FDA has "accepted and acted upon" the principle underlying Teva's interpretation of the court decision trigger during FDA's approval of generic versions of ranitidine hydrochloride.  Teva Brief at 25.  Teva cites FDA's brief in the

-21-

Granutec appeal before the Fourth Circuit, where the agency concluded that a summary judgment decision in favor of the paragraph IV ANDA applicant, based on the patent owner's concession that the ANDA applicant's product does not infringe the patent, satisfied the court decision trigger.

Granutec is distinguishable from this case, however, in that the court "decision" in Granutec was a partial summary judgment, followed by the eventual entry of a final judgment of noninfringement. See Granutec, 1998 WL 153410 at *8 n.2. Thus, the "decision of a court" in Granutec was a final decision on the merits of the case. See Fed. R. Civ. P. 56; 10 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure: Civil § 2712 (3d ed. 1998). A dismissal of a declaratory judgment action for lack of subject matter jurisdiction, in contrast, is not a final decision on the merits, particularly when the order dismissing the case says nothing about the validity, infringement, or enforceability of the patent. Thus, Teva's reliance on FDA's position in Granutec is misplaced.

In any event, even if Granutec were not distinguishable, FDA's position in that case would be irrelevant. After Mova and Granutec, FDA changed its approach to these issues, as stated in its Guidance. FDA's current interpretation of the court decision trigger is neither contrary to the plain meaning of the statute nor an impermissible construction of the statute. For this reason, Teva has no likelihood of success on the merits and the

-22-