# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| APOTEX INC. | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) Case No. 06-627 (JDB) |
|  | ) |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## MEMORANDUM IN SUPPORT OF APOTEX INC.'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

William A. Rakoczy, D.C. Bar No. 489082    Arthur Y. Tsien, D.C. Bar No. 411579
Christine J. Siwik    OLSSON, FRANK AND WEEDA, P.C.
RAKOCZY MOLINO MAZZOCHI SIWIK LLP  1400 16th Street, N.W., Suite 400
6 West Hubbard Street, Suite 500    Washington, D.C. 20036-2220
Chicago, Illinois 60610    (202) 789-1212
(312) 222-6301

Dated: April 14, 2006    *Counsel for Apotex Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION .......................................................................................................... 1

BACKGROUND ............................................................................................................ 4

ARGUMENT ................................................................................................................. 6

I.      The Harm To Apotex Is Substantial And Irreparable. ....................................... 7

II.     The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate
        Injunctive Relief............................................................................................... 9

III.    Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its
        Claims. ............................................................................................................ 10

        A.      FDA's Interpretation Fails For Want Of Reasoned Agency Decision
                Making For The Same Reasons The D.C. Circuit And This Court
                Previously Rejected The Very Same Interpretation in *Teva I*, *Teva I
                Remand,* and *Teva II*. ........................................................................ 11

                1.      FDA cannot justify its impermissibly narrow interpretation on
                        grounds of administrative workability, convenience, and purported
                        lack of expertise. ........................................................................ 11

                2.      FDA's interpretation once again fails in view of its own regulation
                        permitting decisions of patent unenforceability to qualify as a court
                        decision trigger........................................................................... 17

                3.      FDA has failed to justify its disparate treatment of other, similar
                        cases. .......................................................................................... 19

        B.      FDA's Statutory Interpretation Cannot Stand Because The Courts Already
                Have Ruled That It Runs Counter To The Purpose Of The Court Decision
                Trigger............................................................................................... 23

        C.      FDA's Interpretation Is Unreasonable Because It Nullifies And Renders
                Inoperable The Crucial Hatch-Waxman Declaratory Judgment
                Mechanism. ....................................................................................... 26

IV.     An Injunction Would Further The Public Interest. ........................................... 29

CONCLUSION............................................................................................................. 29

# TABLE OF AUTHORITIES

## Federal Cases

*Abbott Labs. v. Young*,
  920 F.2d 984 (D.C. Cir. 1990) ................................................................................. 25

*Asiana Airlines v. FAA*,
  134 F.3d 393 (D.C. Cir. 1998) ................................................................................. 25

*Blackman v. District of Columbia*,
  277 F. Supp. 2d 71 (D.D.C. 2003) ............................................................................. 7

*Bradshaw v. Unity Marine Corp.*,
  147 F. Supp. 2d 668 (S.D. Tex. 2001) ....................................................................... 1

*C.F. Communications Corp. v. FCC*,
  128 F.3d 735 (D.C. Cir. 1997) ................................................................................. 25

*Glaxo, Inc. v. Novopharm, Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997) ............................................................................... 26

\* *Granutec, Inc. v. Shalala*,
  139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998) ................................... 15, 20

*In re Barr Labs., Inc.*,
  930 F.2d 72 (D.C. Cir. 1991) ................................................................................... 26

*Merck & Co. v. Danbury Pharmacal, Inc.*,
  694 F. Supp. 1 (D. Del. 1988) ................................................................................. 17

*Minn. Mining & Mfg. Co. v. Barr Labs., Inc.*,
  289 F.3d 775 (Fed. Cir. 2002) ................................................................................. 27

\* *Mova Pharm. Corp. v. Shalala*,
  140 F.3d 1060 (D.C. Cir. 1998) ........................................................................ passim

*Omar v. Harvey*,
  416 F. Supp. 2d 19 (D.D.C. 2006) ............................................................................. 7

*Pub. Citizen Health Research Group v. FDA*,
  704 F.2d 1280 (D.C. Cir. 1983) ............................................................................... 25

*Raymen v. United Senior Ass'n*,
  No. Civ. A. 05-486(RBW), 2005 WL 607916 (D.D.C. Mar. 16, 2005) ................. 6, 7

*Teva Pharms. USA, Inc. v. FDA*,
  398 F. Supp. 2d 176 (D.D.C. 2005) .......................................................................... 16

\* Authorities upon which
Apotex chiefly relies are
marked with an asterisk.

\* *Teva Pharms. USA, Inc. v. FDA*,
    441 F.3d 1 (D.C. Cir. 2006) ................................................................... 3, 4, 5, 22

\* *Teva Pharms., USA, Inc. v. FDA*,
    182 F.3d 1003 (D.C. Cir. 1999) ................................................................... passim

\* *Teva Pharms., USA, Inc. v. FDA*,
    No. Civ.A. 99-67(CKK), 1999 WL 1042743 (D.D.C. 1999) ........................... passim

\* *Teva Pharms., USA, Inc. v. FDA*,
    Nos. Civ.A. 99-5287, 99-5342, 2000 WL 1838303 (D.C. Cir. 2000) ............................. passim

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ................................................................... 7

### Federal Statutes

21 U.S.C. § 355(j)(5)(B)(iii) ................................................................... 26, 27

21 U.S.C. § 355(j)(5)(B)(iv) ................................................................... 26

21 U.S.C. § 355(j)(5)(B)(iv)(II) ................................................................... 1

21 U.S.C. § 355(j)(5)(C) ................................................................... 27

21 U.S.C. § 355(j)(5)(C)(i)(II) ................................................................... 27

35 U.S.C. § 271(e)(2)(A) ................................................................... 26

35 U.S.C. § 271(e)(5) ................................................................... 27

### Federal Regulations

21 C.F.R. § 314.107(c)(1)(ii) ................................................................... 17

### Other Authorities

149 CONG. REC. S15,746 (daily ed. Nov. 24, 2003) ................................................................... 27

149 CONG. REC. S15,885 (daily ed. Nov. 25, 2003) ................................................................... 28

64 Fed. Reg. at 42,873 (Aug. 6, 1999) ................................................................... 27

H.R. CONF. REP. NO. 108-391 (2003) ................................................................... 27

Apotex respectfully submits this memorandum in support of its motion for a temporary restraining order and/or preliminary injunction requiring FDA to: (a) set aside its administrative decision dated April 11, 2006; (b) refrain from awarding any 180-day exclusivity for pravastatin ANDAs; (c) immediately approve Apotex's pravastatin ANDA; and (d) refrain from approving any other pravastatin ANDA until this determination is made and final approval is granted to Apotex. In the event the Court denies such relief, Apotex respectfully moves for an injunction preserving the *status quo* and staying all pravastatin approvals pending an appeal of this matter to the D.C. Circuit, in order to prevent devastating and irreparable harm to Apotex.

## INTRODUCTION

To borrow an old phrase, "at the end of the day, even if you put a calico dress on it and call it Florence, a pig is still a pig." *Bradshaw v. Unity Marine Corp.*, 147 F. Supp. 2d 668, 671 (S.D. Tex. 2001). Nothing could be truer here. In the April 11, 2006, administrative decision under review, FDA adopted the *same* statutory interpretation and rationale that the D.C. Circuit *twice* rejected for want of reasoned decision making. No matter how FDA attempts to dress up those same arguments, they failed for want of reasoned decision making then, and still do today. The Court, therefore, should set aside FDA's decision again now, before Apotex suffers devastating harm.

This case involves the proper interpretation of the so-called "court decision trigger" of the 180-day generic exclusivity provision, which provides that exclusivity begins to run on "the date of a decision of a court . . . holding the patent which is the subject of the certification to be invalid or not infringed." 21 U.S.C. § 355(j)(5)(B)(iv)(II). Here, Apotex obtained a court decision dismissing its declaratory judgment action for lack of subject matter jurisdiction based on BMS's disavowal of any intent to sue Apotex for infringement of its pravastatin patents. FDA concedes, as it must, that this decision estops BMS from ever suing

Apotex for infringement of the subject patents, thus rendering those patents unenforceable against Apotex.  In this important respect, the BMS-Apotex court decision is indistinguishable from the dismissal order in *Teva I and II*.[1]  In fact, this decision has the same practical effect as a decision on the merits holding the patent not infringed, invalid, or unenforceable.  But FDA nonetheless has unlawfully refused to recognize this decision as a court decision trigger because it purportedly is not "a decision of a court that on its face evidences a holding on the merits that a patent is invalid, not infringed, or unenforceable."  (Tsien Decl. Ex. A at 6, April 11, 2006 FDA Administrative Ruling.)[2]  FDA's so-called "holding-on-the-merits" interpretation fails for want of reasoned agency decision making for the same reasons it failed six years ago in *Teva I* and *II*.

In *Teva I*, the D.C. Circuit rejected this very same interpretation of the court decision trigger, holding that FDA had "fail[ed] to explain adequately its refusal to treat the [Teva-Syntex] Dismissal as a triggering 'court decision' under § 355(j)(5)(B)(iv)(II)," particularly in light of the Agency's own regulation and statutory interpretation in another case. *Teva Pharms., USA, Inc. v. FDA*, 182 F.3d 1003, 1012 (D.C. Cir. 1999) (*Teva I*).  The D.C. Circuit further acknowledged that dismissals of declaratory judgment actions that estop the patent holder from asserting a claim for patent infringement in the future—such as the BMS-Apotex Dismissal Order here—"appear to meet the requirements of a 'court decision' under § 355(j)(5)(B)(iv)(II)," especially given the statutory purpose and the need to avoid manipulation of the generic exclusivity period by the patentee.  *See id*. at 1009, 1011.

---

[1] In its April 11, 2006 administrative decision, FDA referred to the three D.C. Circuit *Teva* decisions as *Teva I* (the 1999 decision), *Teva II* (the 2000 decision), and *Teva III* (the 2006 decision).  To avoid confusion, Apotex will adopt that naming convention in its brief.

[2] All references to "Tsien Decl." are to the Declaration of Arthur Y. Tsien, submitted concurrently herewith.

On remand from *Teva I*, FDA tried again, this time attempting to justify its textual interpretation on grounds of administrative convenience and certainty, and purported lack of expertise to determine whether a decision has estoppel effect under the patent laws. *Teva Pharms., USA, Inc. v. FDA*, No. Civ.A. 99-67(CKK), 1999 WL 1042743, at *7 (D.D.C. 1999), (*Teva I Remand*). In other words, FDA complained that the estoppel-based approach from *Teva I* simply was too hard and uncertain to apply. The district court heartily rejected these reasons as well. *Id.* The D.C. Circuit affirmed, once again holding that FDA's decision and interpretation refusing to treat the dismissal of Teva's declaratory judgment action as a court decision trigger "fail[ed] for want of reasoned decisionmaking." *Teva Pharms., USA, Inc. v. FDA*, Nos. 99-5287, 99-5342, 2000 WL 1838303, at *2 (D.C. Cir. 2000) (*Teva II*).

In *Teva III*, the D.C. Circuit sent FDA back to the drawing board yet again, with express instructions to address the inadequacies of its interpretation. *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) (*Teva III*). But, simply put, nothing—absolutely nothing—has changed from six years ago, except that FDA's interpretation, which took away Apotex's ticlopidine exclusivity, now blocks Apotex's access to the pravastatin market. FDA has had six years to develop an adequate explanation for why a dismissal of a declaratory judgment action for patent non-infringement that "appear[s] to meet the requirements of a 'court decision' under [21 U.S.C.] § 355(j)(5)(B)(iv)(II)" "fails to meet them." *Teva I*, 182 F.3d at 1009. FDA has failed to do so. Each and every one of FDA's so-called explanations—from administrative convenience and lack of expertise, to statutory purpose, to its attempt to distinguish its regulation and prior *Granutec* determination—previously were rejected by the D.C. Circuit and this Court. For these reasons alone, Apotex has a substantial likelihood of succeeding on the merits of its challenge. But there is more.

As Teva itself previously argued and acknowledged, FDA's interpretation impermissibly eliminates the crucial Hatch-Waxman declaratory judgment mechanism, and must fail for that reason, too. FDA's April 11, 2006 administrative ruling is therefore arbitrary, capricious, and contrary to law.

Finally, Apotex indisputably will suffer irreparable harm absent an injunction, even if Apotex ultimately prevails on the merits. Teva and Ranbaxy intend to launch on April 20, 2006, thus securing a *de facto* exclusivity to which they are not entitled and depriving Apotex of the chance to obtain any meaningful relief from this Court.[3]

Accordingly, the Court should enter the requested injunctive relief.

## BACKGROUND[4]

On March 16, 2006, the D.C. Circuit vacated this Court's October 21, 2005 decision with instructions to vacate FDA's June 28, 2005 administrative decision and remand to the Agency for further proceedings. *See Teva III*, 441 F.3d at 5. In doing so, the Court noted FDA's statement that "[the Agency] would employ a 'textual' approach to interpreting the statute, and would take the position that dismissals of declaratory judgment actions are not court decisions holding a patent invalid or not infringed." *Id*. at 5 n.5. On this point, the D.C. Circuit made clear that, to prevail on such an approach, FDA would need to provide a satisfactory explanation for such a decision, stating that the "agency took a similar position in *Teva I* but

---

[3] Ranbaxy claims to have generic exclusivity with respect to 80 mg pravastatin tablets. Apotex has not seen an administrative ruling from FDA so finding, but assumes this to be true for purposes of this motion only.

[4] At the Court's request, Apotex incorporates and relies on the statutory, procedural, and factual background from its prior filings, and recites here only those additional facts needed to support its request for immediate injunctive relief.

failed to provide adequate explanation.  In this litigation the FDA still has not answered the questions put to it by the *Teva I* Court."  *Id.*

In response, on April 11, 2006, FDA issued the administrative decision under review denying Apotex's request for an agency determination that 180-day exclusivity for pravastatin has been triggered and expired; refusing to recognize the BMS-Apotex Dismissal order as a court decision trigger; and refusing to approve Apotex's pravastatin ANDA on April 20, 2006.  (*See* Tsien Decl. Ex. A at 15.)  In reaching this determination, FDA claimed to have been "mindful of the *Teva I* court's criticism of the agency's original position, as well as the *Teva III* court's view that FDA has never adequately addressed that criticism."  (*Id.* at 7.)  Yet, there are more than just similarities between its current interpretative approach and the "textual" approach previously rejected by the D.C. Circuit in *Teva I*, as the Agency suggests.  (*Id.*)  The simple truth is that FDA has once again trotted out the same "textual" approach from six years ago in *Teva I*, although the Agency now calls that approach its "holding-on-the-merits" interpretation.  (*Id*. at 2.)

According to FDA, it is "interpreting the court decision trigger provision to require a *decision* of a *court* that on its face evidences a *holding* on the merits that a patent is invalid, not infringed, or unenforceable."  (*Id*. at 6) (emphasis in original).  This interpretation, FDA claims, "follows most readily from the statutory language."  (*Id*.)  FDA also relies on Black's Law Dictionary definitions of the term "holding" as a "court's determination of a matter of law pivotal to its decision; a principal drawn from such a decision," and the term "merits" as the "elements or grounds of a claim or defense; the substantive considerations to be taken into account in deciding a case, as opposed to extraneous or technical points."  (*Id*. at 7 (citing *Black's Law Dictionary* at 737, 1003 (7th ed. 1999))).  Based on these definitions, FDA

concludes that "[u]nder the agency's interpretation, in the court decision trigger context, the holding must be evidenced by a statement on the face of the court's decision demonstrating that the court has made a determination on the merits of patent invalidity, noninfringement, or unenforceability." (*Id*. at 7.) But this is the same convenience-driven and overly-rigid interpretation that the D.C. Circuit rejected in *Teva I* and *Teva II*, and that the D.C. Circuit cautioned against in *Teva III*.

As a direct result of FDA's decision, Apotex will suffer devastating and irreparable harm on April 20, 2006, absent injunctive relief from this Court. FDA has refused to approve Apotex's pravastatin ANDA on April 20, 2006, but rather will delay that approval for at least 180 days until the exclusivity awarded to Teva and Ranbaxy expires. In contrast, FDA will approve the competing ANDAs of Teva and Ranbaxy at that time, both of whom apparently intend to launch their pravastatin products immediately.

## ARGUMENT

Courts must weigh four factors in deciding whether to grant a preliminary injunction or temporary restraining order: (1) the prospect of irreparable injury to the moving party if relief is withheld; (2) the possibility of harm to other parties if relief is granted; (3) the likelihood that the moving party will prevail on the merits; and (4) the public interest. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998); *Raymen v. United Senior Ass'n*, No. Civ. A. 05-486(RBW), 2005 WL 607916, at *2 (D.D.C. Mar. 16, 2005) (granting temporary restraining order). Plaintiffs "need not prevail on each factor in order to receive injunctive relief." *Raymen*, 2005 WL 607916, at *2. "Rather . . . the factors must be viewed as a continuum, with more of one factor compensating for less of another. If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are

rather weak." *Blackman v. District of Columbia*, 277 F. Supp. 2d 71, 77-78 (D.D.C. 2003) (internal quotations and citation omitted) (granting preliminary injunction).

"[I]ssuing an injunction may be justified 'where there is a particularly strong likelihood of success on the merits even if there is a relatively slight showing of irreparable injury.'" *Raymen*, 2005 WL 607916, at *2 (quoting *Blackman*, 277 F. Supp. 2d at 78). Moreover, "[i]n cases that raise questions 'going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground . . . for more deliberative investigation,' . . . courts should eschew an 'exaggeratedly refined analysis of the merits at an early stage in the litigation.'" *Omar v. Harvey*, 416 F. Supp. 2d 19, 22 (D.D.C. 2006) (quoting *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)).

Apotex satisfies the applicable standard. Apotex indisputably will be irreparably harmed if Teva or Ranbaxy is allowed a 180-day head-start in the pravastatin market; the balance of harms tips decidedly in favor of granting injunctive relief; Apotex has a strong likelihood of prevailing on the merits; and the public will benefit from an order that allows for faithful application of the laws and full generic competition, as Congress intended.

## I.    The Harm To Apotex Is Substantial And Irreparable.

As an initial matter, the harm to Apotex could not be more substantial or imminent. Neither FDA, Teva, nor Ranbaxy can seriously argue otherwise.

FDA's administrative ruling admittedly prevents Apotex from marketing generic pravastatin until 180 days *after* Teva and Ranbaxy launch on April 20, 2006, securing a strangle-hold over the market in the process. With this improper head start, Teva and Ranbaxy will have the opportunity to tie up distribution channels and access to customers; enter into long-term sales agreements; increase sales across all product lines; and retain greater market share in the long-

term. (McIntire Decl. ¶¶ 4, 18-19.)[5] Apotex, on the other hand, will forever lose the opportunity to effectively compete in the lucrative pravastatin market. (*Id*. ¶¶ 5, 13-16, 19.) Thus, absent emergency injunctive relief, FDA's interpretation will deny Apotex access to the market, thus causing Apotex irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails in this action. As the D.C. Circuit found in *Teva I*, and as Teva itself has agreed, this alone constitutes irreparable harm. 182 F.3d at 1012 n.8; *see also Mova*, 140 F.3d at 1066 n.6.

Apotex has spent over $5 million developing and testing its generic pravastatin product. (Sherman Decl. ¶ 5.)[6] As part of its development efforts, Apotex also invested over $100 million in a fermentation facility, designed to manufacture the active pharmaceutical ingredients ("API") used in Apotex's finished dosage forms, including, primarily, pravastatin API. (*Id*. ¶ 6.) Moreover, in reliance on FDA's June 2005 ruling, Apotex already has manufactured over $6 million worth of pravastatin API in preparation for an April 20, 2006 launch. (*Id*. at ¶ 8.)

Apotex conservatively estimates that an unwarranted 180-day head start for Teva and Ranbaxy would result in over $9.9 million in lost sales for Apotex in the first year alone. (McIntire Decl. ¶¶ 15, 19, 23.)[7] Even if Apotex were to prevail in this case, the harm will have been done—Apotex will never be able to recover its development and manufacturing costs, not to mention its lost revenues, profits, and market share. (Sherman Decl. ¶11; McIntire Decl. ¶¶ 12, 15.) In short, Apotex's pravastatin products will be a total and unrecoverable loss.

---

[5] All references to "McIntire Decl." are to the Declaration of Tammy L. McIntire, submitted concurrently herewith.

[6] All references to "Sherman Decl." are to the Declaration of Dr. Bernard C. Sherman, submitted concurrently herewith.

[7] Apotex's lost sales would far exceed $10 million if one or more of the current pravastatin ANDA applicants did not launch immediately. (McIntire Decl. ¶ 14.)

In addition, Apotex will suffer unquantifiable, intangible losses for pravastatin and other product lines.  Apotex, for example, will lose critical access to major customers and the opportunity for long-term contracts.  (McIntire Decl. ¶¶ 5, 18.)  These losses, in turn, would adversely affect Apotex's sales opportunities across all of its product lines.  (*Id*.)  Such lost opportunities will continue to harm Apotex long after Teva's and Ranbaxy's exclusivity expires.  (*Id*. ¶¶ 6, 18-20.)  Such losses are irreparable in every sense of the term and thus warrant emergency injunctive relief.  *See Teva I*, 182 F.3d at 1011 n.8.  Apotex has, therefore, satisfied its burden of establishing the existence of irreparable harm absent immediate injunctive relief.

## II.    The Balance Of Harms Tips Decidedly In Favor Of Granting Immediate Injunctive Relief.

FDA admittedly has no commercial stake in the outcome of this dispute.  Moreover, as a governmental agency, FDA's interests are aligned with the public's interest which, as discussed below, favors injunctive relief.

Similarly, neither Teva nor Ranbaxy would suffer any appreciable harm whatsoever from emergency injunctive relief, whether a preliminary injunction or an injunction preserving the *status quo*.  If Apotex ultimately prevails in this case on the merits, Teva and Ranbaxy had no legal right to launch with exclusivity in the first place.  But, if Teva and Ranbaxy prevail, they can still enjoy exclusivity.

Teva previously suggested that a short stay in this case would somehow cause harm because of an unrelated product (simvastatin) launching in June 2006 or because of a pravastatin "authorized generic."  (McIntire Decl. ¶¶ 21-22.)  Nonsense.  First, simvastatin is an unrelated product that will not, as a matter of law, compete with Teva's pravastatin since the two products will not be substitutable in any case.  (*Id*. ¶ 21.)  Second, the "authorized generic" to which Teva refers is BMS's own branded product sold under a generic label.  (*Id*. ¶ 22.)  Such

authorized generics generally do not launch until *after* ANDA applicants enter the market.  (*Id.*)  Teva points to nothing that even suggests that BMS is considering launching an authorized generic prior to ANDA market entry.  Thus, any alleged harm to Teva on this front is illusory as well.

Accordingly, absent injunctive relief, Apotex stands to lose millions of dollars, goodwill with its customers, and other significant tangible and intangible benefits, while Teva and Ranbaxy stand to lose little to nothing if relief is granted.  As a result, the balance of harms tips decidedly in favor of granting Apotex's request for a temporary restraining order and/or preliminary injunction.  *See Mova*, 140 F.3d at 1066.

## III.    Apotex Has A Substantial Likelihood Of Succeeding On The Merits Of Its Claims.

Apotex challenges the permissibility of FDA's so-called "holding-on-the-merits" interpretation, under which FDA has refused to recognize the BMS-Apotex Dismissal as a court decision trigger, despite the fact that it is indistinguishable from the Teva-Syntex Dismissal that triggered Apotex's exclusivity for ticlopidine.  This Court, however, is not writing on a blank slate.  The D.C. Circuit and another Judge of this Court previously rejected this exact same "textual" interpretation "for want of reasoned decisionmaking."  *Teva II*, 2000 WL 1838303, at *2; *Teva I*, 182 F.3d at 1011-12; *Teva I Remand*, 1999 WL 1042743, at *7.  The question, then, is whether FDA has adequately addressed the inadequacies of this interpretation in view of *Teva I* and *II*.  The answer unequivocally is "no."

FDA's decision merely is a regurgitation of the same tired explanations and rationales that the D.C. Circuit and this Court previously rejected.  FDA cannot transform an otherwise impermissible interpretation into a permissible one using the same rejected rationales.  Nothing FDA has said, or could say, warrants a different result from *Teva I* and *II*.  FDA's "holding-on-the-merits" interpretation is impermissible under *Teva I* and *II*, as well as the

underlying purpose of the controlling statute.   FDA's interpretation also fails because it effectively reads the crucial declaratory judgment mechanism out of the statute.   Apotex thus has demonstrated a substantial likelihood of success on the merits.

> **A.**     **FDA's Interpretation Fails For Want Of Reasoned Agency Decision Making For The Same Reasons The D.C. Circuit And This Court Previously Rejected The Very Same Interpretation in *Teva I, Teva I Remand,* and *Teva II.***

FDA concedes that its holding-on-the-merits interpretation of the court decision trigger—the same from *Teva I* and *II*—"is not compelled by the statutory language" and, indeed, "is narrower than the statute may be able to support."  *Teva I*, 182 F.3d at 1007, 1011.  And the *Teva I* Court ruled that "if the FDA's interpretation of section 355(j)(5)(B)(iv)(II) is 'narrower than the statute is able to support,' then its interpretation cannot stand without justification because the FDA must interpret the statute to avoid absurd results and further congressional intent."  *Id.* at 1011 (citations omitted); *see also id.* ("It is the narrowness of the interpretation that must be justified, and the court can only review that choice of narrowness based on the reasons provided by the FDA.").

In *Teva I*, *Teva I Remand*, and *Teva II*, FDA gave many reasons in an attempt to justify its narrow interpretation.  The D.C. Circuit and this Court rejected them all.  FDA's current decision simply uses new language to dress up those same reasons.  They necessarily must fail yet again.

> **1.**     **FDA cannot justify its impermissibly narrow interpretation on grounds of administrative workability, convenience, and purported lack of expertise.**

Just as it did six years ago, FDA repeatedly argues that its interpretation is permissible for reasons of administrative convenience, workability, and purported lack of expertise.  (*See* Tsien Decl. Ex. A at 7-9.)  Specifically, the Agency asserts that:

> FDA is ill-equipped to make fact-based determinations concerning whether certain statements or actions of a company in litigation to which FDA is not a party may estop that company from enforcing its patent. FDA's interpretation of the court decision trigger provision as requiring a holding on the merits will enable the agency to rely on the face of the court's decision to determine whether there has been a holding that a patent is invalid, not infringed, or unenforceable.

(*Id*. at 9.) In other words, according to FDA, the estoppel-based approach applied in *Teva I* and *II* allegedly is too difficult and too hard to apply (*id*. at 9); the law on estoppel purportedly is not well-developed (*id*. at 8); and the estoppel-based approach purportedly spawns litigation that FDA's "clearer, textually-based standard" would avoid (*id*. at 9). These purported reasons failed in *Teva I* and *II*, and necessarily fail again now.

As an initial matter, FDA's explanation flies in the face of the undisputed facts in this case. As the record amply demonstrates, FDA already "evaluated Bristol's repeated, unequivocal assurances that it had no intention of suing Apotex and determined that those assurances estopped Bristol from suing for infringement." (Tsien Decl. Ex. B at 30, FDA Br., *Teva Pharms. USA, Inc. v. FDA*, Nos. 05-5401, -5460 (D.C. Cir.); *see also id*. at 50 ("Bristol, like Syntex, made representations with preclusive effect."); *id*. Ex. C at 10 ("[T]he [BMS-Apotex] dismissal was predicated upon Bristol's preclusive representations and the court's endorsement of its resulting lack of jurisdiction."), FDA Reply Br. in *Teva Pharms. USA, Inc. v. FDA*, Nos. 05-5401, -5460 (D.C. Cir.); *id*. Ex. D at 10 ("[i]f estoppel is what matters, in our view here, Bristol is estopped"), Mar. 9, 2006 Hrg. Tr., FDA Br. in *Teva Pharms. USA, Inc. v. FDA*, No. 05-5401 (D.C. Cir.); *id*. Ex. E at 4-5 ("the [BMS-Apotex] dismissal precludes a subsequent suit by BMS against Apotex"), June 28, 2005 Administrative Ruling.)

Thus, even if the estoppel-based approach is too hard in some cases (which is not true), the Agency figured it out here. FDA, without difficulty, correctly determined that BMS is forever estopped from suing Apotex on the patents at issue in that patent infringement litigation.

More importantly, the *Teva II* Court flatly rejected the same, indeed the exact same, arguments years ago when FDA referred to this as its "textual" approach.

On remand from *Teva I*, FDA's Office of Generic Drugs attempted to justify the Agency's textual approach with these same excuses, asserting:

- that looking beyond the face of the court order to determine the basis for the order would "'place an unbearable burden upon OGD staff and would require a substantial use of OGD's limited resources'";

- that "'OGD lacks the expertise to make accurate determinations about the legal effect, such as estoppel, of representations relating to patents that are not embodied in a court decision'"; and

- that "[i]f OGD adopted Teva's interpretation of the statute, it may be required to review court documents for all types of dismissals. Because of OGD's lack of expertise in this area and the substantial drain entailed by such an undertaking, I decided that FDA would not adopt the interpretation of the court decision trigger proposed by Teva."

(Tsien Decl. Ex. F, Sporn Decl. ¶¶ 13-14, *Teva Pharms. USA, Inc. v. FDA*, No. 99-67 (D.D.C.).)

FDA reiterated this reasoning in its remand briefing in the district court before Judge Kollar-Kotelly :

- "The primary reason that FDA does not follow the interpretation urged by Teva is that it would require FDA to analyze, under principles of patent law, the patent-law ramifications of court decisions when those ramifications are not apparent on the face of the order or judgment. This would require FDA to make determinations regarding private patent litigation by analysis of, among other things, Federal Circuit case law in complex patent issues. FDA does not have the resources nor the expertise to do so."

- "FDA would have to make determinations about complex patent law issues, such as estoppel, beyond FDA's area of expertise."

- "There are a number of reasons for a court to determine that a declaratory judgment plaintiff has no reasonable apprehension of being sued, and the reasons are wrapped up in the intricacies of patent law. Lacking patent expertise, FDA is not in a position to make a decision on the effect of dismissals on possible future patent litigation."

- "Such an approach would be difficult to undertake and would result in a poor use of FDA's resources."

(Tsien Decl. Ex. G at 2, 5, 6, FDA Opp'n Br., *Teva Pharms. USA, Inc. v. FDA*, No. 99-67 (D.D.C.).)

FDA's prior statements make crystal clear that the present agency decision is nothing more than a dressed up version of these prior explanations, which, to say the least, were not well received by this Court. Judge Kollar-Kotelly rejected each and every one of these rationales, holding that, "[w]hile the FDA may take administrative convenience into account in developing an across-the-board policy for dealing with Paragraph IV ANDAs, application of such a rule to the facts of this case under the FDA's present case-by-case approach is arbitrary and capricious." *Teva I Remand*, 1999 WL 1042743, at *5. In the Court's opinion, "[s]ome degree of legal analysis is unavoidable in the context of the court decision trigger," thus, "it is unreasonable for the FDA to refuse to make even a cursory inquiry into the basis for the California court's order." *Id.* The Court further explained:

> The FDA is certainly free to protect itself from unreasonable administrative burdens, but the Court fails to see how the unique circumstances of the California dismissal present such a burden. (internal citations omitted). Notwithstanding the FDA's characterization of the estoppel analysis as complex and beyond the ken of the FDA, this is not a case where a great deal of sophisticated legal analysis is required. As the Court of appeals found, all OGD had to do in order to determine that the patent holder would be estopped from suing Teva for patent infringement was look at the order and Roche's concessionary letter. As a matter of black letter patent law, these documents suffice to forever estop Roche from suing Teva for patent infringement.

*Id.* The Court further highlighted the "absurdity of [FDA's] contention that administrative convenience adequately justifies its approach," where FDA willingly analyzed the substance of the court decision at issue in *Granutec, Inc. v. Shalala*, 139 F.3d 889, 1998 WL 153410 (4th Cir.

Apr. 3, 1998), in order to ascertain that it constituted a triggering court decision. *Teva I Remand*, 1999 WL 1042743, at *6.

On appeal in *Teva II*, the Agency again argued (as it does now) that "because FDA is not an expert in patent matters, the agency is never in a position to look beyond the face of an order to make the kind of determination [the D.C. Circuit] made in *Teva I*." (Tsien Decl. Ex. H at 10, FDA Br. in *Teva Pharms. USA, Inc. v. FDA*, Nos. 99-5287 and -5342 (D.C. Cir.).) But the D.C. Circuit again rejected these arguments in their entirety. The *Teva II* court affirmed and adopted *in toto* the reasoning of the district court, holding that "FDA did not meaningfully address" how the Agency could reasonably treat the subject matter jurisdiction dismissal at issue in the ticlopidine case differently than it treated a partial grant of summary judgment in *Granutec*. *Teva II*, 2000 WL 1838303, at *1. The D.C. Circuit also rejected the notion that FDA could avoid making such patent law determinations where, as here, the Agency "had obligated itself to undertake a case-by-case inquiry in applying the court decision trigger." *Id.* at *2. The Court then concluded, again, that "the judgment of the agency fails for want of reasoned decisionmaking." *Id.*

Nothing FDA has said in the decision under review here is different from those arguments previously rejected in *Teva I*, *Teva I Remand*, and *Teva II*. For the same reasons, FDA cannot support its textual approach on grounds of administrative convenience or that it is not equipped to make estoppel determinations, especially on the facts of this case. By definition, some degree of legal analysis is unavoidable in applying the court decision trigger. FDA's burden arguments regarding the complexity of estoppel law and FDA's lack of expertise ring especially hollow under the facts of this case, which the Agency readily admits are indistinguishable from *Teva I* and *II*. FDA had no problem here determining that the BMS-

Apotex Dismissal has estoppel effect and precludes BMS from ever suing Apotex.  (*See, e.g.*, Tsien Decl. Ex. B at 30, 50.)

In fact, unlike the ticlopidine case, FDA made that determination here based on the face of the order itself.  (Tsien Decl. Ex. C at 10 (stating that "it is clear from the face of the [BMS-Apotex Dismissal] Order that the dismissal was predicated upon Bristol's preclusive representations.").)  As a matter of black letter patent law, that decision suffices to forever estop BMS from suing Apotex for patent infringement.   In fact, this Court agreed with FDA's determination that the order has estoppel effect.  *See Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 192 n.6 (D.D.C. 2005) (Bates, J.).   If those administrative convenience and burden arguments did not pass muster before, they certainly do not here.  Thus, FDA cannot justify its refusal to treat the BMS-Apotex Dismissal as a court decision trigger based on administrative burden, workability or purported lack of expertise.

Moreover, FDA's claim that its interpretation will create certainty and avoid litigation does not save its textual approach.  The argument simply is another way of saying that the Agency does not want to have to make legal determinations that can be second-guessed in subsequent litigation.  But, as the *Teva I* and *II* Courts repeatedly emphasized, FDA obligated itself to undertake a case-by-case inquiry in applying the court decision trigger.  *Teva I*, 182 F.3d at 1007; *Teva II*, 2000 WL 1838303, at *2.  That determination unavoidably involves some degree of legal analysis, as evidenced by FDA's determination here and in the *Granutec* case.

In sum, the courts already have considered and rejected FDA's administrative convenience arguments no matter how the Agency packages them.  And, in truth, FDA has managed to correctly apply the applicable estoppel law, as previously applied in *Teva I*, to

determine that the BMS-Apotex Dismissal Order has estoppel effect on its face. FDA's administrative decision must be rejected.

> **2.    FDA's interpretation once again fails in view of its own regulation permitting decisions of patent unenforceability to qualify as a court decision trigger.**

FDA also argues that its interpretation is permissible, even though its interpretation runs counter to its own regulation permitting court decisions of unenforceability to qualify as court decision triggers. FDA's attempt to reconcile these positions is, once again, nothing more than the same argument previously rejected by the D.C. Circuit. It fails here, too.

While the court decision trigger provision admittedly says nothing about decisions of patent unenforceability, *see* 21 U.S.C. § 355(j)(5)(B)(iv)(II) (referring only to decisions of non-infringement and invalidity), courts have broadly interpreted the statute to include decisions of patent unenforceability as triggering court decisions. *See Merck & Co. v. Danbury Pharmacal, Inc.*, 694 F. Supp. 1, 2-3 (D. Del. 1988), *aff'd*, 873 F.2d 1418 (Fed. Cir. 1989). In fact, FDA itself interprets the provision the same way, *see* 21 C.F.R. § 314.107(c)(1)(ii), because an "alternative interpretation . . . would be contrary to Congress' obvious intent in allowing patent challenges . . . and would lead to absurd results." *Teva I*, 182 F.3d at 1009.

In *Teva I*, the D.C. Circuit, applying FDA's own logic, reasoned that the dismissal of a declaratory judgment action for lack of subject matter jurisdiction "appear[s] to meet the requirements of a 'court decision' under § 355(j)(5)(B)(iv)(II)'" to the same extent as a decision of patent unenforceability because, to hold otherwise, "appears no less absurd." *Id.* at 1009, 1010. The Court analyzed the effect of a finding of patent unenforceability, noting that such a determination "prevent[s] the patent holder from enforcing the patent against any entity," and compared such decisions to the Teva-Syntex Dismissal. *Id.* at 1009. The Court found that, while "*the estoppel arising from the California dismissal operates only against Syntex as to Teva, this*

*appears to be a distinction without difference for purposes of the 'court-decision' requirement. To start, or trigger, the period of market exclusivity by a 'court decision,' an ANDA applicant need only obtain a judgment that has the effect of rendering the patent invalid or not infringed with respect to itself.*" *Id.* at 1009-10 (internal citations omitted and emphasis added). The Court thus determined that "FDA's application of the statute to this case runs counter to its explanation for permitting unenforceability to qualify as a 'court decision.'" *Id.* at 1010. The same, of course, is true here.

FDA already has evaluated the BMS-Apotex Dismissal and determined that it renders the subject patents unenforceable against Apotex, but yet FDA refuses to recognize this as a court decision trigger. In response to this glaring inconsistency, FDA effectively dodges the issue entirely, arguing that the regulation "expressly requires that there be a court 'decision' and a 'holding' of unenforceability"; that a patentee's statements concerning its intents do not constitute a court decision; and that such patent-related decisions are not within FDA's expertise. (Tsien Decl. Ex. A at 10.) But this circular reasoning does not address the D.C. Circuit's concerns from *Teva I*; namely, how FDA can justify treating the cases differently when the ultimate and practical effect of the court orders is the same. Both the BMS-Apotex Dismissal and the Teva-Syntex Dismissal were based on the patentee's disavowal of any intent to sue, and render the patents at issue unenforceable as against Apotex and Teva, just like a decision of patent unenforceability.

Nowhere does FDA attempt to explain or justify its arbitrary distinction—and for good reason, because, as the *Teva I* court emphasized, it is a distinction without a difference. *Teva I*, 182 F.3d at 1010. What FDA does do is, once again, parrot back arguments rejected in *Teva I* and *II*. Specifically, FDA again argues that triggering exclusivity with an

unenforceability ruling still requires a decision "holding" the patent unenforceable. (Tsien Decl. Ex. A at 10.) But again, the D.C. Circuit rejected this argument for want of reasoned decision making because FDA never adequately justified why it refused to treat the Teva-Syntex Dismissal as a court decision trigger when it has the same functional and practical effect as a decision of patent unenforceability as to Teva. Indeed, the D.C. Circuit found all of FDA's attempts to distinguish unenforceability and estoppel "unpersuasive." *Teva I*, 182 F.3d at 1009. Merely repeating that same tired and circular rationale fares no better here.

At bottom, no one can legitimately dispute that the dismissal of Apotex's declaratory judgment action based on BMS's disavowal of any intent to sue renders the patents unenforceable against Apotex under the doctrine of estoppel and controlling Federal Circuit case law. FDA still has not explained why a decision of patent unenforceability is treated differently than a dismissal that renders the patent unenforceable against the declaratory judgment plaintiff. As such, the Agency's "application of the statute to this case runs counter to its explanation for permitting unenforceability to qualify as a 'court decision,'" and, for that reason alone, must— once again—be rejected. *Teva I*, 182 F.3d at 1010.

### 3.    FDA has failed to justify its disparate treatment of other, similar cases.

As in *Teva I*, FDA once again has failed to explain its treatment of the BMS-Apotex Dismissal in light of the Agency's treatment of other cases. In particular, FDA has failed to address "how, under the existing statute, the agency could reasonably treat the subject matter jurisdiction dismissal at issue in this case differently than it treated a partial grant of summary judgment in *Granutec*." *Teva II*, 2000 WL 1838303, at *1. The best FDA can do, *again*, is trot

out the same excuses that were repeatedly rejected six years ago.[8]  This, too, fails, and renders

the Agency's administrative ruling arbitrary, capricious, and contrary to law.  *See Teva I*, 182

F.3d at 1012.

In *Granutec*, FDA recognized a grant of partial summary judgment based solely

on the patent holder's admission of non-infringement as a court decision trigger.  *Granutec*, 1998

WL 153410, at *5.  The *Teva I* court criticized the Agency for not giving similar effect to the

Teva-Syntex Dismissal.  The Court explained:

> That *Boehringer* involved a judgment on the merits, while Teva's complaint was
> dismissed for lack of subject-matter jurisdiction, does not detract from the fact
> that both proceedings prevent the patent holder from suing the ANDA applicant
> for patent infringement.  *Given that the [Teva-Syntex] dismissal supports estoppel
> to the same extent as the grant of partial summary judgment at issue in Granutec,
> it is unclear why the [Teva-Syntex] dismissal would not satisfy the 'court
> decision' requirement of § 355(j)(B)(5)(iv)(II).*  At least the FDA has not provided
> an explanation wherein there is a material difference for purposes of triggering the
> "court decision" provision.

---

[8]  As a prelude to its discussion of the *Granutec* matter, FDA asserts that "[t]he regulatory
landscape has changed dramatically since FDA's original determination that the Teva-Syntex
dismissal did not constitute a court decision trigger."  (Tsien Decl. Ex. A at 10.)  FDA then
recites the history of its 1998 "Guidance for Industry" in which it announced that it would
regulate "directly from the statute using a "case-by-case approach" pending rulemaking, the
publication of its 1999 180-day exclusivity proposed rule, the 2002 withdrawal of that proposed
rule, and FDA's subsequent determination not to expend its resources on further rulemaking.
FDA concludes by stating "[n]ow, however, FDA is independently interpreting the statute in
accordance with the direction of the *Teva III* court."  (*Id*. at 11.)  While FDA would have this
Court believe that the current, purportedly changed circumstances justify its distinction of the
*Granutec* matter, nothing could be further from the truth.  In the absence of rulemaking, FDA is
back to the same position it was in at the time of *Teva I* in 1999 – regulating directly from the
statute on a case-by-case basis.  Nor did the *Teva III* court provide FDA with any "direction"
regarding the appropriate "independent" interpretation of the statute.  In fact, the *Teva III* court
expressly expressed "no opinion" on the proper interpretation of the statute.  *Teva III*, 441 F.3d
at 5.  Thus, the underlying circumstances have not changed one bit since *Teva I*, and FDA's
decision should be rejected again for want of reasoned decisionmaking.

*Teva I*, 182 F.3d at 1011 (emphasis added).  The Court concluded that "FDA's refusal to treat the [Teva-Syntex] dismissal as a trigger was arbitrary and capricious in light of the FDA's response in another case."  *Teva I*, 182 F.3d at 1012.

On remand to the district court, FDA asserted the same purported distinctions and proposed justifications for its disparate treatment as the Agency uses here.  FDA noted that, first, unlike the Teva-Syntex Dismissal, the summary judgment decision in *Granutec* was a decision on the merits; second, "because the California court did not have the power to reach the merits of the patent case, its dismissal [was] not a 'holding' that the patent was invalid, not infringed, or unenforceable;" third, "[b]ecause the California dismissal did not address the merits of the case, . . . there was no 'holding' related to the patent;" and finally, unlike "the face of the *Boehringer* court's memorandum decision, [which revealed] a finding that defendants' product did not infringe its patents," "[t]he California court's order did not make such a finding."  (Tsien Decl. Ex. G at 8-9.)  FDA further argued that "[a]ssessment of the patent infringement issues before the California court would have required FDA to review materials other than the order of the court, and also Federal Circuit case law regarding estoppel between private parties as it relates to patents.  Such an analysis is beyond FDA's area of expertise."  (*Id.* at 10.)

As previously noted, Judge Kollar-Kotelly rejected each of these arguments, holding that the Agency's discredited "actual merits" argument was not a material distinction, and further that it already had been "squarely rejected" by the D.C. Circuit in *Teva I*.  *Teva I Remand*, 1999 WL 1042743, at *6.  The court also rejected this rationale as "elevat[ing] the form of a court decision over its substance."  *Id.*

On appeal, FDA persisted with the same argument, asserting that there was a "meaningful difference" between the Teva-Syntex Dismissal and the *Granutec* partial summary

judgment order, because the *Granutec* order "stated on its face that the patent at issue was not

infringed." (Tsien Decl. Ex. H at 24.) But the D.C. Circuit in *Teva II* remained unconvinced,

explaining:

> Specifically, the court asked how, under the existing statute, the agency could
> reasonably treat the subject matter jurisdiction dismissal at issue in this case
> differently than it treated a partial grant of summary judgment in *Granutec* . . .
> Indeed, in *Teva I*, we tellingly observed that 'the California dismissal supports
> estoppel to the same extent as the grant of partial summary judgment at issue in
> *Granutec*.' *The FDA did not meaningfully address this question on remand.*
> *Instead, the FDA repeated its claim that the California dismissal did not state on*
> *its face that the underlying patent was not infringed* . . . .

*Teva II*, 2000 WL 1838303, at *1 (emphasis added). For this reason, the judgment of the

Agency, the Court held, failed for want of reasoned decision making. *Id*. at *2.

Incredibly, FDA repeats the very same rationale in its current decision, arguing

that the decisions are distinguishable because the *Granutec* summary judgment was a "holding

on the merits of patent noninfringement," while the Teva-Syntex dismissal was not. (Tsien Decl.

Ex. A at 12.) But no matter how many times FDA repeats this mantra does not change the fact

that no less than three courts have rejected this same argument. And a fourth Court (*Teva III*)

made clear that FDA had still not adequately addressed the issue. *See Teva III*, 441 F.3d at 5 n.5.

It still has not.

In the end, the courts have made it exceedingly clear that just because *Granutec*

may have involved a holding on the merits, while the Teva-Syntex Dismissal did not, does not

justify treating the cases differently. The same is true here. The BMS-Apotex Dismissal Order

states on its face that the dismissal is based on BMS's "representations that it has no intention to

sue Apotex for infringement of the '447, '985, and '589 patents based on the manufacture, use,

sale, offer for sale or importation of Apotex's generic pravastatin sodium products that are the

subject of ANDA No. 76-341." (Tsien Decl. Ex. I at 3, July 23, 2004 Order, *Apotex Inc. v. BMS*,

No. 04-2922 (S.D.N.Y.).)  FDA itself recognized that "it is clear from the face of the [BMS-Apotex Dismissal Order] that the dismissal was predicated upon Bristol's preclusive representations and the court's endorsement of its resulting lack of jurisdiction."  (Tsien Decl. Ex. C at 10.)  Thus, the practical effect of *Granutec* and the BMS-Apotex Dismissal is the same—both proceedings prevent the patent holder from suing the ANDA applicant for patent infringement.  FDA still has not "met the Court of Appeal's challenge that it square its approach to the [BMS-Apotex] dismissal with its handling of [*Granutec*]."  *Teva I Remand*, 1999 WL 1042743, at *6.

**B.     FDA's Statutory Interpretation Cannot Stand Because The Courts Already Have Ruled That It Runs Counter To The Purpose Of The Court Decision Trigger.**

FDA administrative ruling necessarily fails for the following independent reason: both the *Teva I Remand* and *Teva II* courts have concluded that its impermissibly runs afoul of Congressional intent.  Specifically, FDA's interpretation squarely conflicts with the "purpose of the triggering 'court decision' provision," as articulated by the D.C. Circuit in *Teva I*.  182 F.3d at 1009.

After analyzing the effect of the Teva-Syntex Dismissal and determining that "the dismissal sufficed to estop Syntex from suing Teva for patent infringement," the *Teva I* Court stated that "[t]his is the result that appears to be the purpose of the triggering 'court decision' provision."  *Id.*  The D.C. Circuit reached this conclusion because the purpose of the provision is to trigger exclusivity when a subsequent applicant, like Apotex here, secures a decision that renders the patent unenforceable against that applicant.  Once free and clear of the patent, the subsequent applicant should not remain indefinitely stalled behind the first-filer's exclusivity. As both Teva and the D.C. Circuit made abundantly clear in the ticlopidine litigation, a contrary view would allow the patent holder to "manipulate the system in order to block or delay generic

competition by stating that the patent holder will not enforce its patent against the Paragraph IV challenger." *Id*. This, in the D.C. Circuit's view, would result in indefinite delays in generic competition, the exact opposite goal that Congress had when enacting the Hatch-Waxman amendments. *See id*.

In *Teva II*, FDA did not even attempt to seriously grapple with or address this fatal problem, other than to say that Congress' express statutory purpose should not override statutory text even when the potential for delay existed. (Tsien Decl. Ex. G at 12.) FDA thus did not address the essential issue of whether an interpretation that allows—and indeed encourages—the patentee to manipulate a statutory system designed to expedite generic market entry in order to delay generic competition can stand as lawful. Judge Kollar-Kotelly did, however, address this issue head on, ruling that such a statutory interpretation cannot stand, holding that "the purpose of the court decision trigger is to ensure that the patent-holder is estopped from suing the ANDA applicant," and that FDA's interpretation "thwarted" that purpose. *Teva I Remand*, 1999 WL 1042743, at *6. The D.C. Circuit, of course, affirmed in all respects in *Teva II*.

While stating in conclusory fashion that it does not believe that a "textually-based approach is contrary to the purpose of the statute," FDA is mistaken. (Tsien Decl. Ex. A at 7.) Congress clearly intended for subsequent applicants to be able to trigger the 180-day exclusivity period by securing a decision that the patentee is unable to enforce its patent rights against the applicant. *See Mova*, 140 F.3d at 1072-74. Later applicants obtain such decisions most often in declaratory judgment actions. But FDA's decision would allow patentees to defeat a subsequent applicant's ability to use this procedure. This is precisely why Judge Kollar-Kotelly and the D.C. Circuit already rejected as impermissible an interpretation of the court decision trigger that

24

would allow blatant manipulation of the court decision trigger by the patentee.  Because FDA's interpretation continues to allow patentees to manipulate a system designed to expedite generic market entry, it cannot stand under the prior decisions in *Teva I*, *Teva I Remand*, and *Teva II*.[9]

For the same reasons, FDA cannot justify its interpretation on grounds of so-called "policy goals of regulatory clarity and certainty." (Tsien Decl. Ex. A at 12.)  According to FDA, in "the absence of clear Congressional intent to promote another policy objective, the agency considers clarity and certainty of critical importance." (*Id*. at 13.)  But there is no "absence" of Congressional intent or purpose here.  The purpose and intent of the court decision trigger is clear, and has already been articulated by the D.C. Circuit:  to trigger the exclusivity when a subsequent applicant has obtained a decision that clears all patent hurdles.  That is the intent and purpose to which FDA must conform its interpretation, not some undefined, self-serving notion of "clarity and certainty"—which smacks of the administrative convenience and workability arguments repeatedly rejected by the courts.  "The 'reasonableness' of an agency's construction depends on the construction's 'fit' with the statutory language as well as its conformity to statutory purposes." *Abbott Labs. v. Young*, 920 F.2d 984, 988 (D.C. Cir. 1990).  Here, FDA simply cannot square its construction with the purpose and intent of the court decision trigger.

---

[9] The fact is that FDA's interpretation would lead to particularly grievous results in precisely the situation where the court decision trigger is needed most.  Specifically, it would allow holders of invalid, unenforceable or non-infringed patents to thwart the mechanisms that Congress created to expedite generic market entry.  Indeed, perhaps the greatest absurdity of all is that FDA's interpretation encourages such manipulation in precisely those cases where the brand patent is weakest, or where the subsequent ANDA-filer has developed a clearly non-infringing product—as Apotex did here.  (*See* Tsien Decl. Ex. J at 18-20, Teva App. Br., *Teva Pharms. USA, Inc. v. FDA*, No. 99-5022 (D.C. Cir.); *id*. Ex. K at 22, Teva App. Br., *Teva Pharms. USA, Inc. v. FDA*, No. 99-5287, 99-5342 (D.C. Cir.).)  FDA's interpretation therefore protects the very types of patents that the entire paragraph IV scheme was designed to defeat.

**C.    FDA's Interpretation Is Unreasonable Because It Nullifies And Renders Inoperable The Crucial Hatch-Waxman Declaratory Judgment Mechanism.**

"A cardinal principle of interpretation requires [the courts] to construe a statute so that no provision is rendered inoperative, or superfluous, void or insignificant." *Asiana Airlines v. FAA*, 134 F.3d 393, 398 (D.C. Cir. 1998) (internal quotations and citations omitted); *see also Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1285 (D.C. Cir. 1983) (rejecting FDA's interpretation of the Freedom of Information Act for rendering superfluous a major aspect of a "companion provision" of the same act); *C.F. Communications Corp. v. FCC*, 128 F.3d 735, 739 (D.C. Cir. 1997) (rejecting FCC's interpretation of its own rule on grounds that it "violates the familiar principle of statutory construction 'so that no provision is rendered inoperative or superfluous, void or insignificant'" (citation omitted)).

Here, FDA's interpretation violates this cardinal principle by effectively nullifying the crucial declaratory judgment mechanism for ANDA applicants. Specifically, FDA's interpretation virtually guarantees that later-filers, like Apotex, cannot obtain a triggering court decision.

Congress enacted Hatch-Waxman "to get generic drugs into the hands of patients at reasonable prices--fast." *In re Barr Labs.*, *Inc.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Key to achieving that goal is the early resolution of patent disputes. To that end, Hatch-Waxman amended the patent laws to provide that "[i]t shall be an act of infringement to submit [an ANDA with a paragraph IV certification]." 35 U.S.C. § 271(e)(2)(A). This provision created "a defined act of infringement sufficient to create case or controversy jurisdiction to enable a court to promptly resolve *any* dispute concerning infringement and validity." *Glaxo, Inc. v. Novopharm, Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997) (emphasis added). If the patentee files suit within 45 days of receiving notice of a paragraph IV filing, FDA automatically stays ANDA approval for

up to 30 months or until a court decision of non-infringement or invalidity, whichever is earlier. 21 U.S.C. § 355(j)(5)(B)(iii).

As an incentive to challenge suspect patents, Hatch-Waxman grants the first-filer a 180-day period of generic marketing exclusivity. *See* 21 U.S.C. § 355(j)(5)(B)(iv). Significantly, the start of that period is triggered by the earlier of first commercial marketing or a court decision. *Id.* By including the "court decision trigger," Congress expressly provided the means for later ANDA filers (typically companies that have successfully designed around a patent) to prevent the first-filer from "parking" its exclusivity and creating a "bottleneck" that indefinitely delays approval of all other generic products. Indeed, as FDA itself observed:

> [I]f the agency permitted exclusivity for an applicant that lost its litigation and therefore could not market its product, the innovator might avoid generic competition for the life of its patent merely by refusing to sue any subsequent ANDA applicant. This outcome would not be justified by the first applicant's unsuccessful challenge to the patent.

64 Fed. Reg. at 42,873, 42,876 (Aug. 6, 1999). The courts, too, have concluded that later ANDA filers must have the ability to trigger the start of generic exclusivity because "'it would be contrary to the very purpose of the Act to allow the first filer to block market entry of other generic manufacturers because the first filer is involved in protracted litigation.'" *Minn. Mining & Mfg. Co. v. Barr Labs., Inc.*, 289 F.3d 775, 780 (Fed. Cir. 2002) (citation omitted); *accord Mova*, 140 F.3d at 1073.

When the patentee does not sue, as in this case, the only way for a later ANDA filer to obtain a court decision trigger is by filing a declaratory judgment action against the patentee. Hatch-Waxman expressly permits the filing of such an action after the 45-day period has expired. 21 U.S.C. § 355(j)(5)(B)(iii) and § 355(j)(5)(C) (2003). In fact, the ability of a later-filer to bring a declaratory judgment action for purposes of triggering exclusivity is so

crucial that, in 2003, Congress amended Hatch-Waxman to "ensure that the 180-day exclusivity period enjoyed by the first generic to challenge a patent cannot be used as a bottleneck to prevent additional generic competition."  (149 CONG. REC. S15,746 (daily ed. Nov. 24, 2003) (statement of Sen. Schumer).)  More specifically, Congress reaffirmed an ANDA-filer's right to bring "a civil action" under 28 U.S.C. § 2201 "for a declaratory judgment that the [listed] patent is invalid or will not be infringed by the drug for which the applicant seeks approval . . . ."  21 U.S.C. § 355(j)(5)(C)(i)(II) (2003).  Congress also directed federal courts to exercise jurisdiction over such actions "to the extent consistent with the Constitution . . . ."  35 U.S.C. § 271(e)(5) (2003).

Congress made these changes, which retroactively apply to all ANDAs (including pravastatin ANDAs), for the express purpose of ensuring that "courts . . . find jurisdiction . . . to prevent . . . improper effort[s] to delay infringement litigation between generic drug manufacturers and pioneer drug companies."  (H.R. CONF. REP. NO. 108-391, at 836 (2003).)  Congress intended to prevent the very delay tactic that BMS employed here, *i.e.*, suing only the first-filer in order to use the 180-day exclusivity period to delay generic market entry:

> [W]hen generic applicants are blocked by a first generic applicant's 180-day exclusivity, the brand drug company could choose not to sue those other generic applicants so as to delay a final court decision that could trigger the 'failure to market' provision and force the first generic to market.

(149 CONG. REC. S15,885 (daily ed. Nov. 25, 2003) (statement of Sen. Kennedy).)

Significantly, the Hatch-Waxman declaratory judgment mechanism will *never* work for the purpose Congress intended if FDA's administrative decision stands.  Under that decision, the patentee can manipulate and avoid a court decision trigger, thus further delaying generic competition.  Indeed, FDA's interpretation not only permits, but encourages, this type of manipulation by the patentee.  As Teva repeatedly argued to the D.C. Circuit, FDA's interpretation therefore defeats and renders inoperable the underlying purpose of the declaratory

judgment mechanism.  (*See* Tsien Decl. Ex. J at 18-20; *id.* Ex. K at 22.)  This mechanism, as Teva acknowledged, is crucial where, as here, the subsequent applicant did a particularly good job of producing a non-infringing product.  (*Id.*)  Unless set aside by this Court, FDA's interpretation will render the crucial declaratory judgment mechanism meaningless.

*    *    *

In sum, for all the same reasons that the D.C. Circuit and this Court previously rejected FDA's "textual" interpretation of the court decision trigger provision in the ticlopidine litigation, that interpretation fails here too.

## IV.    An Injunction Would Further The Public Interest.

The public interest is best served by issuing injunctive relief and maintaining the *status quo* until this dispute can be resolved on the merits.  First, the public's interest lies in the "faithful application of the laws" (*Mova*, 140 F.3d at 1066), which, here, is served by requiring the Agency to apply the governing statute in a manner that is consistent with FDA's previous rulings.  Second, injunctive relief comports with the purpose of the statute and, in particular, the triggering court-decision provision, which seeks to prevent patent holders from "manipulat[ing] the system in order to block or delay generic competition."  *Teva I*, 182 F.3d at 1009.  Any other result will undermine the balance struck in Hatch-Waxman and ultimately harm the consuming public.  And third, if Apotex ultimately prevails on the merits, the public will benefit from fuller generic competition for pravastatin.

**CONCLUSION**

Apotex will, without question, suffer devastating and irreparable harm absent the requested injunction.  FDA, Teva and Ranbaxy, on the other hand, would suffer no harm from an order merely preserving the *status quo*.  Moreover, Apotex has, at the very least, demonstrated a substantial likelihood of success on the merits of its challenge to FDA's statutory

29

interpretation—an interpretation that the D.C. Circuit already has twice rejected.  For all of these reasons, the Court should enter an order requiring FDA to:  (a) set aside its administrative decision dated April 11, 2006; (b) refrain from awarding any 180-day exclusivity for pravastatin ANDAs; (c) immediately approve Apotex's pravastatin ANDA; and (d) preserve the *status quo* by refraining from approving any other pravastatin ANDA until this determination is made and final approval is granted to Apotex.  In the event the Court denies such relief, the Court nonetheless should enter an injunction preserving the *status quo* and staying all pravastatin approvals pending an appeal of this matter to the D.C. Circuit, in order to prevent devastating and irreparable harm to Apotex.  A proposed order seeking such relief is submitted herewith.

Dated:  April 14, 2006.                                   Respectfully submitted,

                                                          APOTEX INC.


                                    By:  _____/s/_____
                                          Arthur Y. Tsien, D.C. Bar No. 411579
                                          OLSSON, FRANK AND WEEDA, P.C.
                                          1400 16th Street, N.W., Suite 400
                                          Washington, D.C. 20036-2220
                                          (202) 789-1212
                                          (202) 234-3550 (facsimile)
Of Counsel:
William A. Rakoczy, D.C. Bar No. 489082
Christine J. Siwik
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
(312) 222-6301
(312) 222-6321 (facsimile)

*Counsel for Apotex Inc.*