## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC. )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>FOOD AND DRUG ADMINISTRATION, *et al.* )<br>)<br>Defendants. )<br>) | Case No. 06-627 (JDB) |

## DECLARATION OF TAMMY L. MCINTIRE

I, TAMMY L. MCINTIRE, declare as follows:

1. I am the President of Apotex Corp., which is located in Weston, Florida. Apotex Corp. is the United States marketing and sales affiliate for Apotex Inc., a Canadian-based pharmaceutical company that develops and manufactures affordable generic medicines. For convenience and clarity, I will refer to Apotex Inc. and Apotex Corp. collectively in this Declaration as "Apotex."

2. I have personal knowledge of the facts set forth herein, or believe them to be true based on my experience in the pharmaceutical industry and information I have received in the course of my duties, and am competent to testify to the same.

3. I submit this Declaration in support of Apotex's motion for temporary restraining order and/or preliminary injunction.

4. In my current position, I am personally involved in the introduction and promotion of new generic drug products for the United States market. I am familiar with the considerable benefits and advantages of so-called "180-day exclusivity," which generally allows one generic company to market and sell its product without other generic competition for 180

days. This exclusive "first-mover advantage" generates significant tangible benefits such as enduring market share, increased sales across all product lines, and higher profit margins, as well as intangible benefits such as improved market position, customer goodwill, and reputation.

5. I am also well aware of the considerable disadvantages and irreparable harm that a company suffers when its approval is delayed by 180-day exclusivity that is improperly granted to another company. These losses include, but are not limited to: significant lost profits and sales across all product lines; an accompanying decrease in overall market share; decreased access to important customers; loss of customer goodwill; and diminished reputation—all of which prevent a company from effectively competing in the ultra-competitive generic drug industry.

6. In short, it is virtually impossible for late-comers to the market to overcome the lasting benefits of the first-mover advantage. That is precisely the irreparable harm that Apotex will suffer if Teva and Ranbaxy are allowed to launch their pravastatin sodium products before this dispute is decided and thus enjoy a period of exclusivity to which neither may be entitled.

## Pravachol® (Pravastatin Sodium)

7. Bristol-Myers Squibb Company ("BMS") currently markets Pravachol® (pravastatin sodium) tablets, in 10 mg, 20 mg, 40 mg, and 80 mg strengths, in the United States for the treatment of heart disease.

8. Pravachol® is a very lucrative drug for BMS, with worldwide sales in 2005 exceeding $2.25 billion (USD). According to IMS Health, an industry-recognized source in the pharmaceutical market, BMS's total Pravachol® sales for 2005 in the United States alone were $1.7 billion (USD).

**Apotex's Pravastatin ANDA**

9. Apotex has spent considerable sums developing a generic pravastatin tablet product for eventual sale in the United States, including compiling the information required to submit an abbreviated new drug application ("ANDA") to the Food and Drug Administration ("FDA"). To date, it is my understanding that Apotex has manufactured over 2000 kilograms of pravastatin active pharmaceutical ingredient ("API"), with an estimated worth of over $6 million, for a commercial launch of its product.

**Other Generic Pravastatin ANDAs**

10. Based on publicly available information, at least seven other companies, including Teva and Ranbaxy, have filed ANDAs with FDA seeking approval to market generic versions of Pravachol®. To date, FDA has not approved any generic pravastatin ANDAs.

11. It is my understanding that, on April 11, 2006, FDA issued an administrative ruling determining that one or more parties is entitled to 180-day exclusivity for pravastatin tablets, thus preventing Apotex and all other later-filers from going to market for at least six months after such first-filers launch. It is my understanding that Teva may have exclusivity as to pravastatin 10 mg, 20 mg and 40 mg tablets, and that Ranbaxy claims to have exclusivity as to the 80 mg product. It further is my understanding that FDA intends to approve Teva's and Ranbaxy's ANDAs, and that both companies intend to commercially launch their generic products, on April 20, 2006. Apotex has challenged FDA's administrative ruling and exclusivity determination in this lawsuit. Unless the Court grants injunctive relief, Teva and Ranbaxy could enjoy an exclusivity to which neither is entitled. Such a result would unlawfully deny Apotex and others access to the market, thus causing Apotex irretrievable financial losses and other unquantifiable harm, even if it ultimately prevails.

**Irreparable Harm to Apotex**

12.   As an initial matter, if Apotex is delayed and Teva and Ranbaxy are permitted to launch their products with 180-day exclusivity, the long-term financial losses to Apotex will be substantial and unrecoverable, even if Apotex is successful on the merits of this litigation.

13.   My experience with other drug products has shown that there are considerable—often incalculable—benefits to receiving 180-day exclusivity and being the first generic entrant to the market. The first-mover (such as Teva and Ranbaxy, here) establishes market dominance that is nearly impossible for other, subsequent entrants like Apotex to overcome. The period of 180-day exclusivity also allows the first-mover to recover its investment and earn profits prior to others entering the market, all of which can then be used for developing and marketing new products. Conversely, subsequent entrants to the market, like Apotex here, find it difficult to find prospective customers, much less recoup product investments and obtain any significant market share.

14.   I have analyzed the potential market share for generic pravastatin during the first 12 months of competition with Pravachol® based on IMS data showing Pravachol®'s U.S. sales from 2004 and 2005. If Apotex were allowed to launch as soon as the period of pediatric exclusivity expires on April 20, 2006, Apotex projects that it will earn at least $10.5 million in the first 12 months of generic pravastatin competition, assuming a simultaneous launch by all other seven approvable ANDA applicants as well as the authorized generic product. In my experience, however, it is more likely that one or more tentatively-approved applicants will be unable to launch at that time. Under such circumstances, it is likely that Apotex would actually earn substantially more than its projections, and possibly even several times more than that.

15.     On the other hand, if Teva and Ranbaxy are allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex projects that it will earn no more than approximately $600,000 in the first 12 months of generic pravastatin competition. This translates into a total and unrecoverable loss of at least $9.9 million in sales.

16.     Moreover, in reliance on FDA's June 28, 2005 administrative ruling, in which the Agency determined that no party was eligible for 180-day exclusivity for pravastatin, Apotex's fermentation facility already has manufactured, and Apotex Inc. already has ordered, over $6 million worth of pravastatin API in order to produce and formulate the necessary amount of pravastatin tablets required for a product launch. In the event Teva and Ranbaxy are allowed to launch with six months of exclusivity prior to all subsequent applicants, Apotex would not recoup its development and API investments and costs associated with the product.

17.     It is my understanding that Apotex has no remedy against FDA to recover Apotex's losses, including Apotex's investments and projected lost sales, if Teva and Ranbaxy are allowed to commercially launch with exclusivity while this litigation is still pending. This is true even if Apotex prevails on the merits.

18.     Furthermore, the effects of an exclusive launch by Teva and Ranbaxy extend well beyond the unrecoverable loss of sales, market share, profits, and investments. This is because the first company to commercially market a generic drug product generally reaps a long-term benefit that extends well beyond the period of time when it may have the only FDA-approved generic product. This occurs because the first company to reach the marketplace in essence fills the pipeline and is able to enter into long-term contracts with most, if not all, of the major customers. In other words, if Teva and Ranbaxy are first to hit the market alone, they will be able to tie up valuable distribution channels so that, even after the six-month head-start, the loss

of access to major customers would still foreclose Apotex from effectively competing in the pravastatin market.

19. Apart from the lost opportunity for pravastatin sales (at least $9.9 million during the first year of generic pravastatin sales alone) and decreased access to major customers, Apotex also would lose sales across all of its other generic product lines. When companies like Teva and Ranbaxy have the opportunity to exclusively launch a unique blockbuster drug such as a generic equivalent to Pravachol® tablets, they have significant leverage to sell other products that they manufacture. The presence of an exclusive blockbuster in the product line is perhaps the single most effective way to increase sales across all product lines. Conversely, subsequent entrants to the market like Apotex have no such leverage. This leads to a loss of market share across all products, which is also irreparable.

20. Apotex's pravastatin products are significant not only for Apotex, but for its customers. Apotex's image as an important supplier of generic pharmaceuticals has been established over the years due to its ability to bring lower-cost alternatives of important medicines, such as pravastatin, to the market. If Apotex is forced to delay the sale of its pravastatin products, Apotex would suffer not only a financial loss in terms of sales, but also a significant loss of goodwill in the eyes of its customers. This loss of goodwill could potentially adversely impact sales of other generic products Apotex sells to its customers today and in the future.

**No Harm To Teva or Ranbaxy**

21.     It is my understanding that Teva has suggested that it would be harmed by any short delay in approval due to another brand product that will be genericized in a matter of a few months. It is my understanding that the drug product to which Teva is referring is simvastatin, marketed under the brand-name Zocor®, which loses patent protection on June 23, 2006. However, simvastatin is a completely different drug product that is not equivalent to pravastatin, nor can it be automatically substituted for pravastatin by qualified dispensers and pharmacists. There is thus no reason to believe that Teva or Ranbaxy are at risk of losing any significant sales of their proposed pravastatin products due to the sale of a competing simvastatin product—especially given that simvastatin will not enter the market for at least another two months.

22.     It also is my understanding that Teva has suggested that it would be harmed by any short delay in approval due to the launch of an "authorized generic" pravastatin product. An "authorized generic" product is the brand drug product itself, manufactured by the brand company and approved under the brand's NDA, but sold under a generic label. In this case, it is my understanding that BMS's authorized generic arrangement has been publicly known since at least February 2006. Notably, however, there is no reason to believe that an authorized generic version of Pravachol® will enter the market before Teva or Ranbaxy enter the market. It has been my experience that brand companies will permit the launch of an authorized generic version of their products only after, or at the same time, that the first ANDA generic enters the market. The reasoning is simple. The brand company, such as BMS here, has every incentive to wait until the first ANDA generic enters the market before launching its authorized generic product in order to preserve the market as long as it can for its higher-priced brand-name product. There is

7

simply no reason to believe, or evidence to suggest, that BMS will act any differently with respect to its authorized generic Pravachol® products.

## Conclusion

23.     In sum, if Teva and Ranbaxy exclusively launch their pravastatin products before this dispute is decided, Apotex will irreparably lose sales of at least $9.9 million, significant market share for this and other products, and indeed its entire pravastatin investment, as well as customer goodwill and access to major customers.  It would also irreparably damage Apotex's ability to compete in the ultra-competitive U.S. market.

Dated:  April 14, 2006

I, TAMMY L. MCINTIRE, hereby declare, under penalty of perjury under 28 U.S.C. § 1746 and the laws of the United States of America, that the foregoing Declaration is true and correct.

_____
TAMMY L. MCINTIRE