# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| APOTEX INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-627 (JDB) |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| RANBAXY LABORATORIES LIMITED, | ) | |
| *et al.*, | ) | |
| | ) | |
| Intervenor-Defendants. | ) | |

## FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

PAULA M. STANNARD
Acting General Counsel

SHELDON T. BRADSHAW
Chief Counsel
Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
WENDY S. VICENTE
Associate Chief Counsels
U.S. Dept. of Health & Human Services
Office of the General Counsel
5600 Fishers Lane
Rockville, MD 20857

PETER D. KEISLER
Assistant Attorney General

JEFFREY S. BUCHOLTZ
Deputy Assistant Attorney General

EUGENE M. THIROLF
Director
Office of Consumer Litigation

ANDREW E. CLARK
Attorney
Office of Consumer Litigation
U.S. Department of Justice
P.O. Box 386
Washington, D.C.  20044
Tel:  (202) 307-0067
Fax:  (202) 514-8742

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.     Apotex Is Not Likely to Succeed on the Merits . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.     FDA's Decision Is Entitled to Deference . . . . . . . . . . . . . . . . . . . . . . . 5

        B.     FDA's Statutory Construction is Permissible . . . . . . . . . . . . . . . . . . . . 9

        C.     Apotex's Arguments Are Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

              1.     FDA Has Adequately Justified and Explained Its Decision to Adopt a Relatively Narrow Textual Approach to Construing the Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              2.     FDA's Statutory Interpretation is Consistent With Its Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

              3.     FDA's Interpretation is Consistent with the *Granutec* Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

              4.     FDA's Interpretation is Consistent With Legislative Intent . . . . 23

              5.     FDA's Interpretation Does Not Prevent Generic Applicants From Obtaining Patent Certainty Through Declaratory Judgment Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    II.    Apotex Has Not Shown That It Will Suffer Irreparable Harm Without Preliminary Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    III.    FDA and the Public Will Be Harmed if Apotex's Request for Relief Is Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

## INTRODUCTION

Plaintiff Apotex Inc. ("Apotex"), a manufacturer of generic drugs, asks this Court to set aside a decision of the Food and Drug Administration ("FDA" or "Agency") that will permit certain of Apotex's competitors to exclusively market generic versions of the blockbuster drug Pravachol (also known by its generic name, "pravastatin") for 180 days before Apotex will be eligible for approval of its own generic pravastatin product. Apotex's request for immediate approval of its pravastatin abbreviated new drug application ("ANDA"), however, is based on a statutory interpretation that has no likelihood of success on the merits following the D.C. Circuit's March 16, 2006, decision in *Teva Pharmaceuticals USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) (*"Teva III"*). The *Teva III* court held that FDA is not bound to apply Apotex's preferred interpretation of the so-called "court decision trigger" provision, 21 U.S.C. § 355(j)(5)(B)(iv)(II), under which 180-day generic exclusivity can be triggered by the dismissal of a declaratory judgment suit when the dismissal is based on a patent owner's statements that estop it from suing the declaratory plaintiff for infringement ("estoppel theory" or "estoppel-based approach"). Believing itself obligated to do so at the time by judicial precedent, FDA had previously applied the estoppel-based interpretation and determined that the dismissal of an action brought by Apotex against Bristol-Myers Squibb Company ("Apotex-Bristol dismissal") constituted a court decision trigger of exclusivity for pravastatin.

Now, in light of *Teva III*, and pursuant to the court's express direction on remand, the agency has brought its "experience and expertise to bear," *Teva III*, 441 F.3d at 5 (quoting *PDK Labs., Inc. v. DEA*, 362 F.3d 786, 797-98 (D.C. Cir. 2004)), and adopted its own independent interpretation of the statute. In its April 11, 2006, decision letter, FDA interpreted the court

decision trigger provision in accordance with the statutory text[1], congressional intent, and the agency's experience and policy considerations to require "a court decision with an actual 'holding' on the merits that the patent is invalid, not infringed, or unenforceable."  Supp. AR Tab 39, at 2.  Having reasonably adopted a "holding on the merits" interpretation of the court decision trigger, FDA has properly concluded that the Bristol-Apotex stipulated dismissal does not constitute a court decision trigger because it does not contain a court's holding that the relevant patents are invalid, not infringed, or unenforceable.

In seeking to overturn FDA's April 11 decision, Apotex's principal claim is that the agency's newly-announced statutory construction, and the reasoning underlying it, have previously been rejected by this Court and the D.C. Circuit on multiple occasions.  Apotex could not be more wrong.  Indeed, Apotex's argument is based upon a fundamental misapprehension of the D.C. Circuit's *Teva III* decision and what that court said about its previous rulings in *Teva I* and *Teva II*.  *See Teva Pharm., USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) ("*Teva I*") and *Teva Pharm., USA, Inc. v. FDA*, No. 99-5287, 2000 U.S. App. LEXIS 38,667 (D.C. Cir. Nov. 15, 2000) ("*Teva II*").  Contrary to Apotex's claim, FDA's interpretation has never previously been rejected by the D.C. Circuit because, as the court made crystal clear in *Teva III*, the agency had not heretofore proffered its own independent interpretation of the statute for the court to review. The FDA decisions at issue in *Teva I* and *Teva II* were overturned solely for what the court termed "want of reasoned decisionmaking" based upon the agency's failure to adequately explain its actions at a time when the agency had obligated itself to regulate directly from the statute on a

_____

[1] The statute provides, in relevant part, that exclusivity is triggered by "a decision of a court . . . holding the patent which is the subject of the certification invalid or not infringed."  21 U.S.C. § 355(j)(5)(B)(iv)(II); *see also* 21 C.F.R. § 314.107(c)(1)(ii) (exclusivity triggered on date of "a decision of the court holding the relevant patent invalid, unenforceable, or not infringed").

case-by-case basis, and not because the court found – then or now – that the agency had impermissibly construed the statute.  To the contrary, the court found that the agency had not previously construed the statute at all, and thus, in *Teva III*, not only invited, but virtually directed, the agency to do so on remand.

Now that the agency has done so, the landscape is completely and inarguably different from what it was when *Teva I* and *Teva II* were decided, and FDA was still regulating on a case-by-case basis (with the intention of eventually promulgating a rule interpreting the court decision trigger).  Because the agency has now adopted its own interpretation of the statute, the considerations underlying the rulings in *Teva I* and *II* are no longer controlling, and the sole issue before this Court is whether the agency's statutory interpretation is "permissible" under the standards of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843-44 & n.11 (1984).  Thus, while Apotex insists that FDA's new interpretation "fails for want of reasoned decision making for the same reasons it failed six years ago in *Teva I* and *II*" (Br. at 2), it is not enough for Apotex to simply relitigate *Teva I* and *II* and hope to prevail here.  Notwithstanding Apotex's claim that FDA has simply outfitted the same pig in a new calico dress (Br. at 1), the truth is, FDA's post-*Teva III* statutory interpretation is not a pig at all; it is a different animal entirely.

Taken to its logical conclusion, Apotex's argument suggests that the only permissible interpretation of the court decision trigger would be a reinstatement of the estoppel theory that Teva advanced in the original *Teva I* and *II* litigation.  The *Teva III* court made quite clear, however, that "[o]ur decisions never announced such a rule."  *Teva III*, 441 F.3d at 4.  Indeed, the post-*Teva III* remand would be pointless if FDA were bound by *Teva I* and *II* to apply the estoppel theory.  Instead, the *Teva III* court directed the agency to make a reasoned policy choice

and provide an explanation for its decision, which the agency has now done. Unhappy with the agency's choice, Apotex would prefer that FDA continue to follow an interpretation that the agency has repeatedly stated, based on its experience and expertise, is unclear, unworkable, and inconsistent with Congress' intent that the judiciary rather than the agency determine whether and when a challenged patent no longer precludes an ANDA holder from marketing its drug.

Because FDA's interpretation of the statute is permissible under *Chevron*, Apotex cannot succeed on the merits of its challenge. Nor has Apotex, the largest pharmaceutical company in Canada, established that it will suffer irreparable harm without the relief that it seeks. For these and other reasons explained in greater detail below, Apotex is not entitled to a TRO or preliminary injunctive relief.

## BACKGROUND

This Court is familiar with the statutory and procedural background of this case, the most pertinent of which is set forth in FDA's April 11, 2006 decision. Supp. AR Tab 39. Accordingly, pursuant to the Court's instructions, we will omit any such background discussion from this brief except where necessary to provide context for specific points of argument.

## ARGUMENT

To obtain either a TRO or a preliminary injunction, a party must demonstrate that: (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury in the absence of preliminary relief; (3) other interested parties will not be substantially injured if the requested relief is granted; and (4) granting such relief would serve the public interest.[2] *See*

---

[2] FDA believes that Apotex's motion for injunctive relief should be consolidated with a hearing on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2), for the same reasons of judicial economy cited by this Court when it did so in its previous adjudication of this matter. *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 181 n.1 (D.D.C. 2005). Alternatively,

*Boehringer Ingelheim Corp. v. Shalala,* 993 F. Supp. 1, 1 (D.D.C. 1997); *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  The Court must balance the four factors in deciding whether to grant the injunctive relief.  *Id.*

      The injunctive relief Apotex seeks is "an extraordinary form of judicial relief" and is not to be granted lightly.  *Mylan v. Thompson*, 139 F. Supp. 2d 1, 17 (D.D.C.) ("*Mylan (buspirone)*"), *rev'd other grounds*, 268 F.3d 1323 (Fed. Cir. 2001); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996).

## I.    Apotex Is Not Likely to Succeed on the Merits

### A.    FDA's Decision Is Entitled to Deference

      Notably absent from Apotex's brief is any discussion of *Chevron* or the standard the Court is to apply in reviewing FDA's newly announced statutory construction.  *Chevron*, however, is critical if not determinative in this case.  In *Teva I*, the D.C. Circuit pointedly rejected FDA's claim that it was entitled to *Chevron* deference because the agency had not offered an independent interpretation of the statute: "The FDA maintains that its interpretation of the 'court decision' provision is entitled to deference under *Chevron* . . . . In fact, however, the FDA has offered no particular interpretation of that provision, relying instead on its authority to

---

because the facts necessary for a resolution of this case are not disputed, summary judgment may be appropriate with respect to Apotex's claims against FDA.  Federal Rule of Civil Procedure 56(c) provides that a party is entitled to a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The federal defendants have filed an administrative record in this case, and there is no known dispute about the contents of that record.  Courts have held that it is appropriate to provide judgment for the non-moving party in such circumstances if the court's determination of the legal issues establishes that the defendant is entitled to such a judgment.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (noting that courts may grant summary judgment *sua sponte*).

interpret the provision narrowly until it promulgates a new rule." *Teva I*, 182 F.3d at 1007

(citation omitted).  That criticism was echoed in *Teva III*, in which the court observed that "*Teva I* found the court decision trigger to be ambiguous, but the FDA provided no interpretation of its

own." *Teva III*, 441 F.3d at 5.

In those circumstances, the *Teva III* court declined to construe the statute itself in the first

instance, noting that, under *Chevron*, it was the duty of the administrative agency to offer its own

construction of ambiguous statutory language and thus fill any statutory gaps prior to judicial

review:

> In a suit challenging agency action, "it is not for the court to choose between
> competing meanings" of an ambiguous statute when the agency charged with its
> administration has not weighed in first. . . . When a statute is ambiguous,
> Congress has left a gap for the agency to fill. . . . We therefore generally remand
> for an agency to make the first interpretation of an ambiguous statutory term when
> it has failed to do so previously.

*Id*. at 4-5 (citations omitted).  Thus, consistent with *Chevron*, the court declined to pass judgment

on FDA's proposed textual approach to interpreting the court decision trigger – just as the *Teva I*

and *II* courts declined to pass judgment before – and instead remanded the case to the agency to

render for the first time an independent interpretation of the court decision trigger provision.  As

the court explained, "[i]t is up to the agency to 'bring its experience and expertise to bear in light

of competing interests at stake' and make a reasonable policy choice. . . . The FDA has not yet

done so." *Id*. at 5 (citation omitted).

Now that the FDA *has* done so, *Chevron* provides "the appropriate legal lens" under

which the agency's interpretation is to be evaluated by the Court.  *Mylan Labs., Inc. v.

Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (quoting *Barnhart v. Walton*, 535 U.S. 212,

222 (2002)).  Under *Chevron*, a court's first step is to determine "whether Congress has spoken

to the precise question at issue." *Consumer Elec. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir.

2003) (citing *Chevron*, 467 U.S. at 842) ("*Chevron* step one"). Where the statutory language is

clear, "that is the end of the matter; for the court as well as the agency, must give effect to the

unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.

If, as in this case, however, the statute is ambiguous with respect to the specific issue,

then Congress has not spoken clearly, and the courts will defer to the agency if its interpretation

is permissible. *Chevron*, 467 U.S. at 843-44 & n.11 ("*Chevron* step two"); *Bell Atl. Tel. Co. v.*

*FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997). *See also Barnhart*, 535 U.S. at 218; *United States*

*v. Mead Corp.*, 533 U.S. 218, 229 (2001). In such circumstances, "Congress has left a gap for

the agency to fill," *Teva III*, 441 F.3d at 4 (citing *Chevron*, 467 U.S. at 843-44). So long as the

agency's chosen interpretation is "permissible," it should be upheld, even if it is not the only

reading the agency permissibly could have adopted or even the reading the court itself would

have reached. *Chevron*, 467 U.S. at 843-44 & n.11.[3]

The D.C. Circuit has repeatedly given *Chevron* deference to FDA's interpretation of the

Federal Food, Drug, and Cosmetic Act ("FDCA"), as well as the agency's own implementing

regulations. *See, e.g., Novartis Pharms. Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006)

("We have held on a number of occasions that FDA interpretations of the FDCA receive

deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent

---

[3] Moreover, when, as here, a court is evaluating an agency's interpretation of its own regulation, the agency is entitled to "substantial deference." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994); *United States Air Tour Ass'n v. FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002) (courts "defer to an agency's reading of its own regulation, unless that reading is 'plainly erroneous or inconsistent with the regulation'") (internal citations omitted); *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 52 (D.C. Cir. 1999) (agency's construction of own regulation is controlling unless plainly erroneous or inconsistent with regulation); *Bristol-Myers*, 923 F. Supp. at 216.

with the regulations."); *Mylan v. Thompson*, 389 F.3d at 1281; *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). Moreover, *Chevron* deference extends to administrative determinations that are not embodied in rulemaking or formal adjudication, including, as in this case, a decision letter setting forth the agency's statutory construction of a provision of the FDCA. *See Mylan v. Thompson*, 389 F.3d at 1279-80.[4] Thus, contrary to Apotex's implication (Br. at 20 n.8), FDA's statutory interpretation need not be codified in a regulation in order for it to serve as an official agency pronouncement that will govern future cases and merit deference under *Chevron*.

As noted above, the D.C. Circuit has already concluded that the statutory court decision trigger provision here at issue is ambiguous, and it has charged FDA with the task on remand of interpreting the statute in the first instance. *Teva III*, 441 F.3d at 4-5. Consistent with the court's direction, FDA has brought "'its experience and expertise to bear in light of competing interests at stake,'" and made "a reasonable policy choice." *Id.* at 5 (quoting *PDK Labs.*, 362 F.3d at

---

[4] *Chevron* deference applies where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law. . . ." *Gonzales v. Oregon*, 126 S. Ct. 904 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). "Delegation of such authority may be shown in a variety of ways. . . ." *Mead Corp.*, 533 U.S. at 227. With the FDCA, Congress has authorized and directed FDA to decide what drugs may lawfully enter the marketplace, and when and how they may enter. *See, e.g.*, 21 U.S.C. §§ 355(c), 355(d), 355(e), 355(f), 355(j). Even if FDA were not entitled to *Chevron* deference, FDA is, at a minimum entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944) (courts give "considerable and in some cases decisive weight" to statutory interpretations "made in pursuance of official duty, [and] based upon more specialized experience and broader investigations and information" than a court is likely to have, provided that the administrative decision is carefully and thoughtfully made). Here, FDA's interpretation and implementation of the court decision trigger involves a "highly detailed" regulatory scheme to which the agency has brought its "specialized experience" to bear. *Mead*, 533 U.S. at 235. The decision letter that Apotex challenges "claim[s] the merit of its writer's thoroughness, logic and expertness," and thus would be entitled to deference under *Skidmore* even if this were not a *Chevron* step two case. *Id.*

797-98).  Having done so, the agency's choice is to be judged under the framework of *Chevron*, and the only issue before this Court is whether the agency's chosen interpretation is a permissible reading of the statute.  *See United States v. Labonte*, 520 U.S. 751, 778 (1997) ("Were the [Sentencing] Commission a typical administrative agency, we would ask whether its 'policy' choice is 'reasonable,' hence 'permissible,' given the statute . . . . [a]nd we would give the Commission considerable interpretive leeway in light of the fact that the choice here at issue lies at the very heart of the Commission's policy-related 'expertise.'") (citing *Chevron*, 467 U.S. at 843-44, 866); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-52 (1990) ("[P]ractical agency expertise is one of the principal justifications behind *Chevron* deference.").

Here, as in *Barnhart*, "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that *Chevron* provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue."  535 U.S. at 222.  As demonstrated below, the agency's reasonable and well-considered interpretation of the court decision trigger is clearly permissible.  As such, it merits deference under *Chevron* and should be upheld.

### B.    FDA's Statutory Construction is Permissible

"[T]he starting point . . . in any case involving the meaning of a statute, is the language of the statute itself."  *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 500 (1993) (quoting *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979)).  Indeed, as the D.C. Circuit has observed,  "[T]he best guide to what a statute *means* is what it *says*."  *Stewart v. Nat'l Shopmen Pension Fund*, 730 F.2d 1552, 1561 (D.C. Cir. 1984) (emphasis in original).  Thus, when interpreting a statute, "a court should always turn first to one, cardinal canon before all

9

others.  We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

In light of these principles, there can be no doubt that FDA has adopted a clearly permissible reading of the statute.  As noted, FDA's interpretation requires evidence on the face of the court's decision that there has been a holding on the merits that the patent is invalid, not infringed, or unenforceable.  Supp. AR Tab 39, at 7.  This interpretation is by far the most natural reading of the language of the statutory text.  As the D.C. Circuit has observed in interpreting the exclusivity provision, "[b]ecause the balance struck between [the competing goals of promoting innovation and early generic drug entry] is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment."  *See Teva Pharm. Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005).  Here, the agency's interpretation gives effect to the words that Congress actually used in the statute, which are the best evidence of Congress's intent that exclusivity be triggered only in the circumstances when that language is met, *i.e.*, when there has been a "decision of a court . . . holding" on the merits that the patent is invalid, not infringed, or unenforceable.  *See* 21 U.S.C. § 355(j)(5)(B)(iv)(II); Supp. AR Tab 39, at 6, 8.

By contrast, the estoppel-based approach that Apotex favors requires substantial deviation from the statutory text and presumed congressional purpose, substituting an administrative prediction as to the estoppel effect of the patentee's representations for Congress' clear direction that a *court* determine the merits of the patent dispute before the exclusivity period is triggered.  While Apotex's reading of the statute may, in some cases, result in earlier generic competition by preventing an exclusivity holder from indefinitely blocking generic entry by "parking" its

exclusivity, it can also have the less desirable result of triggering an exclusivity period before the

exclusivity holder has had an opportunity to enjoy it, thus diminishing the value of exclusivity

and potentially deterring future patent challenges.  Indeed, that would have been the result in this

case had FDA recognized Apotex's declaratory judgment dismissal as a triggering court decision.

Given these competing policy considerations, FDA wisely recognized that, in choosing

between a broad or narrow interpretation of the statute, the choice most likely to implement

congressional intent would be the reading that hews most closely to the language Congress itself

chose.  As the agency explained:

> A relatively broad interpretation of the court decision trigger, such as the
> estoppel standard, makes it easier to trigger 180-day exclusivity.  In any specific
> case, this may speed approval of subsequent ANDA applicants and, therefore,
> competition in the marketplace.  However, a relatively broad trigger for 180-day
> exclusivity could diminish the value of 180-day exclusivity to ANDA applicants,
> and thus it might also reduce the incentive for ANDA applicants to challenge an
> innovator's patents.  A relatively narrow interpretation, such as the "holding-on-
> the-merits" standard, may slow approval of subsequent ANDAs and competition
> in a specific case.  It could, however, make exclusivity more valuable, and thus
> make patent challenges more common overall.  In any event, the legislative
> history offers little if any guidance as to which interpretation Congress might have
> preferred, and thus it is appropriate to apply the interpretation most consistent
> with the plain language of the provision.  *See, e.g., Teva*, 410 F.3d at 54.

Supp. AR Tab 39, at 13.

Not only is FDA's textual interpretation of the statute the most natural reading of the

statutory language and most consistent with congressional intent, but it also furthers other

important policy goals and is eminently sensible from a practical standpoint as well.  Indeed, the

FDA decision letter here at issue thoroughly details the agency's rationale for adopting a

"holding on the merits" interpretation rather than a broader interpretation that would encompass

dismissals for lack of subject matter jurisdiction. Supp. AR Tab 39.  FDA thus faithfully adhered

to the court's direction that it "'bring its experience and expertise to bear in light of competing

interests at stake' and make a reasonable policy choice." *Teva III*, 441 F.3d at 5 (quoting *PDK Labs.,* 362 F.3d at 797-98).

FDA's decision letter explains, for instance, why an interpretation of the statute based on the estoppel theory has proved virtually unworkable. Supp. AR Tab 39, at 8-9. FDA lacks the expertise and, because it is not a party to the underlying case, all the facts necessary to evaluate whether a patentee's statements may or may not have estoppel effect, which makes any agency determination in this regard especially vulnerable to legal challenge. *Id.* at 14. Moreover, the law that the *Teva I* court looked to regarding estoppel does not directly address the question whether there has been estoppel. *Id.* at 8. Rather, the Federal Circuit cases generally address the question whether there is a reasonable apprehension of suit sufficient to support declaratory judgment jurisdiction. *Id.* Thus, the estoppel approach requires FDA to make decisions outside its area of expertise based on FDA's interpretation of caselaw that has limited (if any) relevance to estoppel determinations. Unsurprisingly, therefore, the estoppel approach has spawned repeated challenges to FDA's decisions, which FDA believes will be largely averted in the future under a text-based interpretation. In contrast, because FDA's new interpretation creates a clear standard, based on the text of the statute and regulation, exclusivity determinations will be governed by a legal regime that is straightforward, easily administered, and more predictable to the regulated industry.

In addition, FDA's interpretation is more consistent with the important policy goals of regulatory clarity and certainty than is the estoppel theory. *Id.* at 12-14. The estoppel theory would require FDA to make a determination, based on a patentee's statements in litigation to which FDA was not even a party, as to whether that patentee was in fact estopped from suing for infringement, and, if so, treat that estoppel as a proxy for a "holding" of patent unenforceability.

As noted, such decisions are not governed by a clear legal regime and are outside the agency's expertise. By contrast, FDA's "holding on the merits" interpretation will limit FDA's determination to whether a court has held on the merits that a patent is invalid, not infringed, or unenforceable, which FDA fully expects will be more easily administered and predictable.

In short, FDA's "holding on the merits" interpretation is the product of a deliberate, thoughtful, and well-considered choice between two competing interpretations of the statute. As such, the agency's interpretation is entitled to deference. Indeed, it cannot be seriously argued that the agency's textual reading of the statutory language is not at least permissible, no matter how many doomsday scenarios Apotex may imagine stemming from the agency's choice. Given the competing policy goals discussed above, and the limitless imagination of lawyers and litigants on all sides, it is safe to say that no interpretation of the statute – whether FDA's or Apotex's – will yield perfect results in every case. But FDA's choice preserves the value of the exclusivity incentive, and has the substantial benefit of promoting clarity and certainty, resulting in a legal regime that is transparent and easily administered – a critical consideration for industry and the public alike. Furthermore, FDA's construction faithfully adheres to the statutory language and thus gives voice to Congress' intent that the judiciary – and not FDA – determines whether and when patent hurdles have been cleared such that a first-filer's 180-day exclusivity should begin. Because the statute clearly reflects a congressional intent that exclusivity be triggered by a "court" decision – and not by an administrative determination regarding patent estoppel and enforceability – FDA's proffered construction of the statute is indisputably permissible, and it is entitled to deference under *Chevron*.[5]

---

[5] To the extent the agency's April 11 decision also construes its regulation implementing the statutory court decision trigger, 21 C.F.R. § 314.107(c)(1), which similarly requires a "court"

### C.    Apotex's Arguments Are Meritless

As noted above, Apotex's principal ground for challenging FDA's newly-announced "holding on the merits" construction of the court decision trigger is its mistaken contention that the agency's interpretation, and its underlying rationale, have already been repeatedly rejected by the courts in the prior *Teva I* and *II* litigation.  Apotex thus claims that "[e]ach and every one of FDA's so-called explanations . . . previously were rejected by the D.C. Circuit and this Court" (Br. at 3), and that "FDA cannot transform an otherwise impermissible interpretation into a permissible one using the same rejected rationales."  (Br. at 10).  As *Teva III* makes abundantly clear, however, FDA's actions in the prior Teva litigation were struck down for what the court called a "want of reasoned decisionmaking," not because the court found FDA's textual interpretation of the statute unreasonable or impermissible.  *Teva III*, 441 F.3d at 4-5.  As the court explained, "[w]e declined to evaluate the reasonableness of the FDA's statutory interpretation because the agency provided no explanation why it thought dismissals for lack of jurisdiction were or were not triggering events."  *Id*. at 4.  In fact, as the court emphasized, it would have been inappropriate for the *Teva I* or *II* courts to pass judgment on the permissibility of the textual approach the agency has now adopted because FDA had not at that time actually proffered its own interpretation.  *Id*. (court should not choose between competing meanings of an ambiguous statute "when the agency charged with its administration has not weighed first").

Now that FDA has issued an independent and considered interpretation of the court decision trigger provision, the permissibility of the agency's construction is before the Court for the first time.  As such, Apotex's claim that "nothing – absolutely nothing – has changed from

---

decision holding the patent invalid, not infringed, or unenforceable, that interpretation is entitled to "substantial deference."  *Thomas Jefferson Univ.*, 512 U.S. at 512.

six years ago" (Br. at 3) is breathtakingly wrong.  Six years ago, FDA had "provided no

interpretation of its own."  *Teva III*, 441 F.3d at 5.  Now it has.  Moreover, six years ago, FDA

was regulating directly from the statute on a case-by-case basis, with the intention of eventually

promulgating a rule interpreting the court decision trigger.  *See 180-Day Generic Drug

Exclusivity under the Hatch-Waxman Amendments to the Federal Food, Drug, and Cosmetic Act*

(June 1998); *see also Teva I*, 182 F.3d at 1007 ("FDA has offered no particular interpretation of

that provision, relying instead on its authority to interpret the provision narrowly until it

promulgates a new rule").  Now, however, FDA is no longer regulating on a case-by-case basis

but has, instead, officially rendered its own interpretation of the statute – an across-the-board,

rule that will apply to all future (non-MMA[6]) cases going forward.  Supp. AR Tab 39.[7]

    As such, Apotex's reliance on the courts' criticism of FDA's prior position in the *Teva I*

---

[6] Congress amended 21 U.S.C. § 355(j) in 2003.  *See* The Access to Affordable Pharmaceuticals provisions of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (Dec. 8, 2003) ("MMA").  As noted in FDA's decision letter, the agency's determination to construe the pre-MMA statutory court decision trigger to require a "holding-on-the-merits" does not reflect an agency view as to the proper scope or interpretation of any provision of the MMA.  Supp. AR Tab 39, at 11 n.7.

[7] Apotex's claim that "[i]n the absence of rulemaking, FDA is back to the same position it was in at the time of *Teva I* in 1999 – regulating directly from the statute on a case-by-case basis" is meritless.  Br. at 20 n.8.  An agency "is not precluded from announcing new principles in an adjudicative proceeding and . . . the choice between rulemaking and adjudication lies in the first instance within the [agency]'s discretion."  *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *see also LaRouche v. FEC*, 28 F.3d 137, 142 (D.C. Cir. 1994) ("As we have repeatedly held, an agency may, in its discretion, choose to make new policy through either rulemaking or adjudication.")(citation and quotation marks omitted).  An agency's statutory interpretation is thus no less of an "official" agency position merely because it was announced in a decision letter rather than a regulation.  *See Mylan v. Thompson*, 389 F.3d at 1279-80; *Purepac Pharm. Co. v. TorPharm, Inc.*, 354 F.3d 877, 888-90 (D.C. Cir. 2004) (upholding FDA decision letter interpreting ambiguous statutory provision).  And, as the decision letter itself makes clear, FDA's adoption of a formal statutory interpretation to apply in all future court decision trigger determinations means that the agency will no longer regulate directly from the statute on a case-by-case basis.  Supp. AR Tab 39, at 2, 6-7, 10-11.

and *II* litigation is wholly misplaced. Because the agency has now adopted its own interpretation of the statute, the considerations underlying the rulings in *Teva I* and *II* are no longer controlling, and the sole issue before this Court is whether the agency's statutory interpretation is "permissible" under the standards of *Chevron* step two. To be sure, many of those considerations remain relevant to the *Chevron* step two analysis: a "permissible" interpretation must still "avoid absurd results and further congressional intent" (*Teva I*, 182 F.3d at 1011) – which the agency's "holding on the merits" interpretation clearly does. But, since the agency is no longer proceeding on a case-by-case basis, the court's concern that the agency did not adequately explain its reasons for not recognizing the Teva-Syntex dismissal at issue in *Teva I* as a triggering court decision, or its allegedly differing treatment of the partial summary judgment at issue in *Granutec*, are essentially moot. What matters now is not how the agency handled prior court decision trigger cases, but whether or not the agency's newly-announced interpretation of the court decision trigger – which will be applied in all non-MMA cases henceforth – passes muster under *Chevron* as a permissible interpretation of the statute.

### 1.    FDA Has Adequately Justified and Explained Its Decision to Adopt a Relatively Narrow Textual Approach to Construing the Statute

Rather than addressing the overall logic and reasoning of FDA's explanation of its current interpretation, which seeks to balance competing considerations, Apotex takes a scattershot approach to attack specific and limited points in FDA's decision. Apotex suggests that FDA's statutory interpretation is suspect simply because it is "narrower" than other potential interpretations. Br. at 11. Obviously, when a statute contains ambiguous wording that is susceptible to different interpretations, some interpretations will be narrower than others. There is nothing, however, about the breadth of the interpretation that in itself makes it more or less

valid.  Apotex cites *Teva I* as its sole authority for this proposition, but it misconstrues that decision.  *Teva I* held only that FDA could not simply state that it would interpret the provision "narrowly until it promulgates a new rule" without supplying a justification for its interpretation. 182 F.3d at 1007.

Apotex next asserts that FDA is not permitted to consider the difficulty in applying the estoppel theory, FDA's lack of expertise on the law of estoppel, and the burden placed on its resources  (collectively, the administrative burden rationale), in determining which interpretation is preferable.  Br. at 11-17.  Apotex urges the Court to reject FDA's justification because Apotex believes that the estoppel-based approach is not difficult to apply.  *Id.* at 12.  Apotex fails to explain, however, why the Court should accept Apotex's assessment of FDA's capabilities and expertise and the burdens placed on the administrative process, and reject FDA's assessment. Given that FDA's assessment is based on its particular experience and Apotex's assessment is based on speculation, FDA is in a far better position to evaluate the consequences attendant to any particular interpretation of the statutory provision.

More importantly, Apotex misses the larger point that Congress intended exclusivity to be triggered by a *court* decision holding that a patent is invalid or not infringed – not an administrative determination that a particular patent could no longer be enforced against a particular applicant.  Regardless of the difficulty in determining estoppel in a particular case, there is nothing in the statutory language to suggest that Congress ever meant for FDA to make such determinations of patent estoppel and enforceability instead of the judiciary.  Indeed, FDA's belief that it is ill-equipped to resolve such issues is fully consistent with Congress' clear intent in assigning this role to the courts.

Apotex further contends that the agency's administrative burden rationale was rejected by

Judge Kollar-Kotelly on remand from *Teva I*, and because her decision was affirmed "*in toto*" by the *Teva II* court, this Court should therefore reject it as well. *Id*. at 13-15. Apotex's argument is off the mark for several reasons. For one, Apotex treats the administrative burden argument as the sole basis for the agency's current interpretation. That is simply not an accurate representation of FDA's decision. As is clearly apparent from the face of FDA's decision, FDA relied on the language of the statute, the language of its long-standing regulation, and a variety of policy considerations to support its decision. Administrative burden was only one of these considerations.

Second, Judge Kollar-Kotelly did not find that administrative burden was never a reasonable policy consideration. Instead, she rejected that justification as the sole basis for FDA's decision on the facts of that particular case because she found that the "unique circumstances" of the patent court decision made the estoppel question clear in that case. On appeal in *Teva II*, Judge Edwards (dissenting), acknowledged that the patent question may be obvious in that particular case, but explained that administrative burden was a reasonable basis for rejecting the estoppel-based approach across-the-board. *Teva II*, 2000 U.S. App. LEXIS 38,667 at *9. The majority, in response to Judge Edwards, explained that, because FDA at that time had promised to take a case-by-case approach to the court decision question, the agency was not permitted to rely on across-the-board policy resolutions. *Id*. at *6.

The *Teva II* court's conclusion regarding administrative burden was thus confined to the facts of that case, as *Teva III* makes clear. 441 F.3d at 4-5. Indeed, *Teva II* has little, if any, bearing upon FDA's current statutory interpretation, because, now that the agency has adopted an across-the-board interpretation of the statute, it is no longer regulating on a case-by-case basis. In any event, the fact that FDA reasonably took administrative and other practical considerations

into account in choosing to adopt a textual interpretation of the statute does not thereby render what is clearly a permissible reading of the statute somehow impermissible.[8]

### 2.    FDA's Statutory Interpretation is Consistent With Its Regulation

Apotex argues that FDA's current interpretation is inconsistent with the agency's regulation,  21 C.F.R. § 314.107(c)(1)(ii), which recognizes a judicial holding of unenforceability as a triggering event.  Br. at 17-19.  Specifically, FDA's regulation describes the court decision trigger as the "date of a decision of the court holding the relevant patent invalid, unenforceable, or not infringed."  21 C.F.R. § 314.107(c)(1)(ii).  Thus, the regulation repeats the language of the statute but adds the term "unenforceable."  In its April 11 decision, FDA explained that the "inclusion of 'unenforceable' in its regulation serves the salutary purpose of encouraging patent challenges based on unenforceability.  *See* 59 Fed. Reg. at 50,339.  However, the regulation, consistent with the statute, expressly requires that there be a court 'decision' and a 'holding' of unenforceability."  Supp. AR Tab 39, at 10.  FDA's regulation, therefore, does not adopt the estoppel-based approach, and FDA does not interpret it to do so.  That interpretation is entitled to deference.  *United States Air Tour Ass'n*, 298 F.3d at 1005 (courts "defer to an agency's reading of its own regulation, unless that reading is plainly erroneous or inconsistent with the regulation").

---

[8] Apotex also contends that FDA cannot now refuse to engage in substantive estoppel analysis because the agency previously evaluated the substance of an underlying court decision in *Granutec, Inc. v. Shalala*., 139 F.3d 889, 1998 WL 153410 (4th Cir. Apr. 3, 1998).  Br. at 14-15. As discussed more fully below, FDA explained in its April 11 decision why it thinks the administrative decision at issue in *Granutec* is consistent with its current interpretation.  Supp. AR Tab 39, at 12.  Be that as it may, *Granutec* is not binding on the agency or this Court.  The *Teva III* court essentially wiped the slate clean and directed the agency to start anew with a reasonable and adequately justified statutory interpretation.  Now that FDA has done so, and is no longer proceeding on a case-by-case basis, how it applied the court decision trigger in prior cases is of little, if any, relevance.

What Apotex is really arguing is not that FDA's interpretation is inconsistent with its regulation (which it clearly is not), but that the agency's interpretation is inconsistent with portions of the court's analysis in *Teva I*. Br. at 17-19. In *Teva I*, the court noted the inclusion of unenforceability in FDA's regulation, and suggested that estoppel and unenforceability should be treated the same under the court decision trigger provision. 182 F.3d at 1009-10 ("Although it is true that a determination of unenforceability . . . and the estoppel arising from the [patent court] dismissal operate[] [differently] . . ., this *appears* to be a distinction without a difference for purposes of the 'court-decision' requirement.") (emphasis added). If Apotex were correct that this analysis is binding on FDA, however, there would be little point in the *Teva III* court's remand to the agency for a new decision and re-analysis. Indeed, while parts of the *Teva I* analysis contain statements that would seem to indicate that the court's views are fixed, the court's ultimate conclusions are more tempered. As noted in the parenthetical quote above, the court chose to moderate its analysis with "appears," and, in the same section of the opinion, observed only that *"it is unclear* that a triggering 'court decision' need explicitly hold the patent at issue is 'invalid' or is 'not infringed' in order to [be a court decision trigger]." 182 F.3d at 1009 (emphasis added). Thus, the *Teva I* court offered tentative analysis on this subject, but did not rule definitively.

Contrary to Apotex's assertion that FDA has failed to respond to the unenforceability argument raised in *Teva I* (Br. at 18), FDA directly addressed the issue in its decision. Supp. AR Tab 39, at 10. While it may be true that, in certain circumstances, the legal effect of an estoppel and unenforceability of a patent may be similar, the distinction between representations made by a party, on the one hand, and a "decision" with a "holding" on the merits, on the other hand, is significant. *Id.* Indeed, the concept of estoppel based on a party's representations is nowhere

reflected in the express language of the statute or regulations.  As FDA explained in its decision,

the language in its regulation, a "*decision of the court* holding the relevant patent invalid,

unenforceable, or not infringed," 21 C.F.R. § 314.107(c)(1)(ii) (emphasis added), by its very

terms, does not encompass, and is not equivalent to, "a patentee's statements concerning its

intentions not to enforce a patent, even if reflected in the dismissal."  Supp. AR Tab 39, at 10.

Thus, as the agency's decision makes clear, even if estoppel could in some circumstances

perhaps be viewed as tantamount to unenforceability, FDA's regulation, like the statute,

expressly requires a *court* to make the determination of unenforceability, not FDA.  *Id*.  There is

no evidence Congress meant for FDA to determine whether and when a patent could no longer be

enforced against an ANDA applicant any more than it intended FDA to make determinations of

patent invalidity or infringement.[9]  That is for the courts alone to do.  And only when a court has

actually done so – *i.e.* when a court has rendered a decision holding a patent invalid,

unenforceable, or not infringed – will there be a trigger of exclusivity under both the statute and

the regulation.

### 3.    FDA's Interpretation is Consistent with the *Granutec* Decision

Apotex next argues that FDA has failed to reconcile its current interpretation with its

decision finding a court decision trigger in the *Granutec* litigation.  (Br. at 19-23).  As noted

above, however, the *Teva III* court essentially wiped the slate clean and directed the agency to

start anew with a reasonable and adequately justified interpretation of the statute.  In the wake of

---

[9] The task of determining the estoppel effect of a dismissal order is made more difficult because "a declaratory judgment action can be dismissed for a variety of reasons, and such a dismissal cannot uniformly serve as a proxy for a determination of preclusive effect;" it is inappropriate for FDA to make such determinations because "patent-related decisions are not within the agency's expertise, nor does the statute require FDA to make those decisions."  Supp. AR Tab 39, at 10.

the D.C. Circuit's action, FDA is not required to reconcile every decision and every regulatory position it has taken in the past, particularly now that it has affirmatively construed the statute and is no longer regulating on a case-by-case basis.  Contrary to Apotex's claim, FDA is most certainly not "back to the same position it was in at the time of *Teva I* in 1999."  Br. at 20 n.8.

In any event, FDA explained in its April 11 decision how the agency's current position is consistent with *Granutec* :

> The underlying decision in *Granutec* was a memorandum decision by the court granting a motion for partial summary judgment of noninfringement based on the patentee's concession that the defendant's product did not infringe.  *Glaxo, Inc. v. Boehringer Ingelheim Corp.*, No. 95-CV-01342 (D. Conn. Oct. 7, 1996) (memorandum decision).  The court's grant of summary judgment is clearly a holding on the merits of patent noninfringement as a matter of law.   See Fed. R. Civ. Proc. 56(c) ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

Supp. AR Tab 39, at 12.  Thus, the underlying decision in *Granutec* falls squarely within the language of the statute and regulation as now interpreted by FDA and it is clearly distinguishable from the case at hand based on that interpretation.  Indeed, one would almost have to presume the correctness of the estoppel-based approach in order to find *Granutec* indistinguishable from the underlying decision in this case.

Apotex again argues that FDA's explanation is inconsistent with the analysis of the *Teva I* and *Teva II* courts, and of the district court on remand from *Teva I*.  Br. at 20-23.  As noted above, however, the *Teva I* and *II* decisions were directed to the specific facts of the cases and were not definitive statements as to the correct interpretation of the statute.  The *Teva III* court has specifically directed FDA not to view those decisions as mandating a particular construction of the court decision trigger provision, and FDA therefore was not bound to adopt the court's

analysis in rendering its own, original interpretation of the statute.

### 4.    FDA's Interpretation is Consistent With Legislative Intent

Although Apotex would have the Court believe that there is a singular purpose behind the Hatch-Waxman Amendments, the statute is, in fact, far more complex – with multiple, and often conflicting, goals and purposes. With respect to the provisions governing exclusivity, on the one hand, the purpose of the paragraph IV provision is to encourage generic drug applicants to challenge innovator patents by rewarding the first challenger with 180-day exclusivity, which in turn promotes the goal of encouraging generic competition to innovator drugs. *See, e.g., TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 72 (D.D.C. 2003) ("as an incentive to generic drug applicants willing to risk litigation in order to challenge a pioneer manufacturer's patent, the statute provides that the first applicant whose ANDA included a paragraph IV certification is entitled to a 180-day period of market exclusivity"), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004); *id*. at 83 n.15 ("The purpose of the paragraph IV mechanism is to give generic manufacturers an incentive (the 180-day exclusivity) to risk pre-approval patent litigation in order to get generic drugs on the market quickly."). If that exclusivity is easily triggered by a third-party so that exclusivity has run before the first applicant's ANDA is eligible for approval, that applicant receives little benefit from filing the first paragraph IV certification. Thus, the mechanism for rewarding the first applicant would be thwarted. That, in fact, would be the outcome here if Apotex were to prevail.

On the other hand, the existence of the 180-day exclusivity period can at times lead to a delay in the marketing of any generic version of a particular drug where the approval or marketing of the first applicant's product is delayed, and thus the exclusivity does not start to run. The court decision trigger provides a mechanism for triggering exclusivity in this situation.

Because a subsequent ANDA applicant can seek a triggering court decision in a declaratory judgment action, the court decision trigger has the potential to (1) prematurely trigger exclusivity before the first applicant's ANDA is eligible for approval (so that the exclusivity benefit is eviscerated) and (2) prevent unreasonable delay of the triggering of exclusivity and speed the day when competition from multiple ANDA applicants can occur. A narrow interpretation of the provision would provide greater protection of the first applicant's exclusivity against a premature triggering event; a broad interpretation would provide greater protection against delay.

In reaching its decision here, FDA recognized these conflicting purposes. As FDA explained in its April 11 decision:

> [T]he D.C. Circuit has recognized that the exclusivity provision reflects a Congressional balancing of competing policy goals. *See Teva Pharmaceutical Indus. v. FDA*, 410 F.3d 51, 54 (D.C. Cir. 2005). "Because the balance struck . . . is quintessentially a matter for legislative judgment," the interpretation should "attend closely to the terms in which Congress expressed that judgment." *Id.*

Supp. AR Tab 39, at 8. FDA's interpretation thus hews to the text of the statute in order to properly balance the competing policy interests:

> The court decision trigger provision expressly requires a decision of a court holding in favor of the ANDA applicant. The agency's "holding-on-the-merits" standard may provide a more limited trigger than an estoppel-based standard, but it is Congress itself that chose to impose the requirements of a "decision of a court" and a "holding." . . . FDA believes that it is appropriate to apply the most facially supportable interpretation of the statutory language to give effect to Congress's purpose for the court decision trigger provision, and that nothing less than a court decision with a holding on the merits of the patent claims should qualify as a court decision trigger.

*Id*. at 8.

Apotex contends that FDA's interpretation will lead to blatant manipulation of the court decision trigger. Br. at 25. FDA understands that many parties – manufacturers of both innovator drugs and generic drugs, including first and subsequent filers of paragraph IV

24

certifications – may attempt to manipulate rules and policies for their own economic benefit. The advantage of FDA's current bright-line interpretation is that the parties and the court presiding over the patent litigation will be able to predict with certainty the implications for 180-day exclusivity of a dismissal order or any other resolution of a patent dispute.  Under the estoppel-based approach, with estoppel determinations left to FDA's subsequent consideration (and the prospect of more litigation to follow), there is no such certainty.

### 5.    FDA's Interpretation Does Not Prevent Generic Applicants From Obtaining Patent Certainty Through Declaratory Judgment Actions

Apotex next argues that FDA's interpretation should be rejected because it nullifies or renders inoperable the declaratory judgment mechanism as a trigger for 180-day exclusivity.  Br. at 26-29.  The provision in question permits an ANDA applicant, in certain circumstances, to bring a declaratory judgment action against a patent holder regarding a patent that was the subject of a paragraph IV certification.  21 U.S.C. § 355(j)(5)(C) (2005) (replacing prior language at 21 U.S.C. § 355(j)(5)(B)(iii)).  Apotex asserts that (1) Congress' sole purpose in enacting this provision was to allow an ANDA applicant to use the declaratory judgment mechanism to obtain a court decision to trigger the running of the first applicant's exclusivity period; and (2) FDA's current interpretation eviscerates using the declaratory judgment mechanism for that purpose, so that the declaratory judgment mechanism is nullified.  Br. at 28-29.  Neither assertion is correct.

The availability of the declaratory judgment mechanism has two effects: (1) to provide certainty as to whether a patent has been infringed, is invalid or is unenforceable (under FDA regulations) and (2) to enable an ANDA applicant that has made a subsequent paragraph IV certification to trigger 180-day exclusivity for an ANDA applicant eligible to receive it.  The legislative history for the MMA reflects Congressional awareness of both effects.  *See* 149 Cong.

Rec. S15,884, 15,885 (Nov. 25, 2003) (statement of Sen. Kennedy) ("Amendments made by this bill to both [the FDCA and the patent code] clarify that generic applicants may bring declaratory judgment acts to ensure timely resolution of patent disputes. . . . This clarification of a generic applicant[']s right to bring a declaratory judgment action is crucial to ensuring prompt resolution of patent issues, which is essential to achieve our goal of speeding generic drugs to market.").[10]

Bringing a successful declaratory judgment action for the first purpose would allow an ANDA applicant to market its product without fear of damages from patent infringement, and thereby promote the goal of placing generic drugs on the market sooner. Apotex does not suggest that FDA's current interpretation impinges at all on an ANDA applicant's ability to use the declaratory judgment mechanism for this purpose. FDA's interpretation also does not nullify the second effect. FDA's administrative decision makes clear the type of order that will qualify as a court decision trigger. The parties are free to argue during the patent litigation that, to the extent it is legally sustainable, the court should render a decision with a holding on the merits that the patent at issue is invalid, not infringed, or unenforceable.

Admittedly, an ANDA applicant may not always be successful in convincing the court to issue a decision holding on the merits of the patent claims, particularly where the court finds that the case should be dismissed for reasons unrelated to the merits. And when, as here, a

---

[10] Apotex mistakenly refers to the MMA legislative history in support of its argument that the declaratory judgement mechanism was intended to prevent the first applicant from creating a "bottleneck" to prevent additional generic competition. Br. at 28. The MMA provisions at issue in the legislative history to which Apotex refers are inapplicable in this case. This case concerns the pre-MMA court decision trigger, which the MMA removed from the Act. The legislative history addresses the interaction between the declaratory judgment mechanism and MMA provisions that establish forfeiture provisions to address the so-called bottleneck issue on a going forward basis. Those forfeiture provisions, however, do not apply in this case. *See* MMA, § 1102(b)(1).

declaratory judgment action is resolved on jurisdictional grounds rather than on the merits, the court decision trigger will not be implicated. Limiting the effectiveness of the provision from the perspective of the subsequent ANDA applicant, however, is a far cry from rendering the provision a nullity. *See Teva*, 410 F.3d at 54-55 (rejecting Teva's argument that limiting the 180-day exclusivity provision to delay only the approval of ANDAs of later-certifying applicants rendered that provision a nullity). Apotex has no basis, and no authority, for arguing that FDA's interpretation renders the declaratory judgment mechanism meaningless. *See* Br. at 28-29.[11]

Further, Apotex's purported concern with "parking" and "bottlenecks" by first applicants (Br. at 27), is not an issue on the facts of this case. There is no indication before the agency or before the Court that any first applicant intends to delay marketing its product once it is approved.[12] To the contrary, Apotex itself maintains both Teva and Ranbaxy intend to launch their generic products immediately upon approval of their ANDAs (Br. at 4), and Teva, for one, has confirmed its intention to do so. *See* http://www.tevapharm.com/pr/2005/pr_553.asp

---

[11] Indeed, Apotex's real complaint appears to be with the result reached by the Federal Circuit in *Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324 (Fed. Cir. 2005), which dismissed a case brought by an ANDA applicant for lack of case or controversy. Pfizer, the patentee in that case, remained silent about its intentions to sue, and the court held that Teva lacked a reasonable apprehension of suit. *Id*. at 333. Thus, although Congress intended that courts exercise jurisdiction in declaratory judgment cases "to the extent consistent with the Constitution," citing 35 U.S.C. § 271(e)(5)(2003), that latter requirement as interpreted by the courts – not FDA's interpretation of the court decision trigger – has posed a considerable barrier to the ability of generic applicants to bring declaratory judgment actions for the purpose of obtaining patent certainty.

[12] Apotex also incorrectly asserts that Bristol-Myers has engaged in the "very delay tactic" that Congress intended to prevent, *i.e.*, "suing only the first-filer in order to use the 180-day exclusivity period to delay generic market entry." Br. at 28. In fact, Bristol did not sue any ANDA applicants on the subject patents.

**II.     Apotex Has Not Shown That It Will Suffer Irreparable Harm Without Preliminary Injunctive Relief**

Apotex has failed to demonstrate that it will suffer irreparable harm absent injunctive relief or that the balance of hardships tips in its favor.  Courts insist that only *irreparable* harm justifies the issuance of a preliminary injunction.  Indeed, "[t]he *sine qua non* of granting any preliminary injunctive relief is a clear and convincing showing of irreparable injury to the plaintiff."  *Experience Works, Inc. v. Chao*, 267 F. Supp. 2d 93, 96 (D.D.C. 2003).  Because Apotex's likelihood of success is slim, Apotex "would have to make a very substantial showing of severe irreparable injury" to prevail on its motion.  *Nat'l Pharm. Alliance v. Henney,* 47 F. Supp. 2d 37, 41 (D.D.C. 1999).  Irreparable injury is a "very high standard."  *See Varicon Int'l v. OPM*, 934 F. Supp. 440, 447 (D.D.C. 1996); *Bristol-Myers,* 923 F. Supp at 220 .  The injury alleged must be certain, great, actual, and imminent, *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985), and it must be "more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff."  *Mylan (buspirone)*, 139 F. Supp. 2d at 27 (quoting *Gulf Oil Corp. v. Dept. of Energy*, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

It is well settled that mere economic loss in and of itself does not constitute irreparable harm.  *Wisconsin Gas*, 758 F.2d at 674; *Mylan Pharms., Inc. v. Thompson*, 207 F. Supp. 2d 476, 485 (N.D. W. Va. 2001); *Boivin v. US Airways, Inc.*, 297 F. Supp. 2d 110, 118 (D.D.C. 2003); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 42 (D.D.C. 2000) ("*Mylan (terazosin)*"); *Bristol-Myers*, 923 F. Supp. at 220.  "Mere injuries, however substantial, in terms of money, time and energy necessarily expended" are inadequate.  *Wisconsin Gas*, 758 F.2d at 674 (quoting *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Even irrecoverable economic loss does not rise to the level of irreparable harm unless the financial

28

injury is so great as to "cause extreme hardship to the business, or even threaten destruction of the business." *Gulf Oil*, 514 F. Supp. at 1025; *see also Wisconsin Gas*, 758 F.2d at 674 (recoverable monetary loss may constitute irreparable harm only where it "threatens the very existence of the movant's business"); *Experience Works, Inc.*, 267 F. Supp. 2d at 96 ($21.1 million reduction in funding is serious financial blow, but one frequently faced by other similar entities, and not an economic loss that threatens survival of the business); *Sociedad Anonima Vina Santa Rita v. Dep't of Treasury*, 193 F. Supp. 2d 6, 14 (D.D.C. 2001) ("financial harm alone cannot constitute irreparable injury unless it threatens the very existence of the movant's business").

Apotex asserts that it will be harmed if Teva and Ranbaxy are granted a six-month "head start" in the generic pravastatin market, and that FDA's interpretation "admittedly prevents Apotex from marketing generic pravastatin until 180 days *after* Teva and Ranbaxy launch on April 20, 2006 . . . ." Br. at 7 (emphasis in original). There is no reason to believe, however, that this litigation will take more than six months to reach a resolution on the merits. Assuming Apotex prevails on the merits of its claim, its ANDA could conceivably be approved well *before* expiration of the exclusivity period, especially if, as FDA has suggested, the Court consolidates the merits with Apotex's motion for preliminary injunction. Thus, even if FDA's decision grants Apotex's competitors some head start, it is unclear that such a head start would be of sufficient duration to afford any meaningful marketing advantages. The scenario that Apotex posits – that Apotex must wait 180 days after the first applicants launch – would likely occur only if Apotex loses this litigation on the merits.

For this same reason, Apotex's assertedly "conservative[]" estimate that it will lose over $9.9 million in sales in the first year if FDA grants exclusivity to Teva and Ranbaxy is

meaningless. *Id*. at 8.  The relevant time period within which to calculate Apotex's claimed

harm is not over an entire year, but only the period between the time Apotex's competitors

launch on or about April 20, and the time the case is resolved on the merits, at which time, if

Apotex has prevailed on its claims, Apotex will be permitted to launch its product as well.[13]

In any event, Apotex's claimed financial loss, as well as its claim of intangible losses,

such as "critical access to major customers and the opportunity for long-term contracts" (*id.* at 9),

are speculative and are merely forms of economic loss that do not meet the high standards set

forth above.  Allegations of lost sales and a lost opportunity to gain certain market advantages are

a far cry from the required demonstration of a "serious" and "irretrievable" loss that "would

significantly damage its business above and beyond a simple diminution in profits."  *Mylan*

*(buspirone)*, 139 F. Supp. 2d at 27; *Mylan (terazosin)*, 81 F. Supp. 2d at 42.  Apotex has failed to

demonstrate that obtaining a smaller market position than it had anticipated would result in

economic injury "sufficiently large in proportion to [its] operations that the loss of the amount of

money involved would also cause extreme hardship to [its] business, or even threaten destruction

of [its] business." *Gulf Oil*, 514 F. Supp. at 1025.[14]

---

[13] Apotex's request that the court order FDA to "immediately approve" its pravastatin ANDA is untenable – even if Apotex prevails on its claims. Br. at 1, 30; *see* Proposed Order.  In such circumstances, the court should, at most, hold that the exclusivity period has expired and thus poses no barrier to FDA approval of any otherwise eligible ANDA.  Given the variety of scientific and regulatory considerations that FDA must take into account before issuing final approval to any drug product, a court should ordinarily stop well short of ever ordering the agency to actually *approve* a particular drug application.

[14] Apotex's claimed $9.9 million loss pales in comparison to the company's worldwide annual revenue of over $800 million (Canadian).  *See* http://www.apotex.com/CorporateInformation/Default.asp?flash=Yes

Apotex's concern that it would obtain a smaller-than-anticipated market position rings especially hollow here, where Apotex concedes that there are at least eight companies that have filed ANDAs for generic pravastatin. McIntire Decl. ¶ 10. Thus, even if this Court were to grant Apotex's request for injunctive relief and open the door for all eligible pravastatin applicants to begin marketing on April 20, 2006, Apotex would potentially be merely one of eight competitors launching a generic pravastatin product at approximately the same time. Here, the stakes appear to be much lower for Apotex than for the applicants entitled to exclusivity, who stand to lose their entire exclusivity periods. Indeed, any harm that Apotex might suffer in the absence of preliminary injunctive relief would be at least equaled, if not exceeded, by the harm to the pravastatin exclusivity holders should they be wrongfully deprived of their exclusivity reward.[15]

## III.    FDA and the Public Will Be Harmed if Apotex's Request for Relief Is Granted

Apotex has also failed to show that any harm it will suffer in the absence of injunctive relief outweighs the potential harm to FDA and other parties, or that the entry of such relief would further the public interest – the third and fourth requirements for preliminary injunctive relief. Although FDA has no commercial stake in the outcome of this litigation, FDA is the government agency charged with implementing the statutory scheme governing exclusivity and the approval of generic drugs. As such, FDA's interest coincides with the public interest. *Serono*, 158 F.3d at 1326 (determining that the public interest is "inextricably linked" to

---

[15] In this respect the case is much like *Mylan (terazosin)*, in which Mylan sought immediate final approval of its ANDA, arguing, as Apotex does here, that another company was not entitled to exclusivity. 81 F. Supp. at 44-45. Even though the court determined that Mylan was likely to succeed on the merits, the court denied the requested injunctive relief, noting that Mylan's claims of economic losses did not constitute irreparable harm, and that the harm of losing exclusivity would be much greater than Mylan's alleged losses. *Id.*

Congress' purpose in passing the Hatch-Waxman Amendments); *Mylan (terazosin)*, 81 F. Supp. 2d at 44-45.

FDA agrees that the public benefits from the entry of lower cost drugs into the marketplace, but it is equally important to ensure that such entry occurs in accordance with the statutory scheme that Congress enacted and that the rewards and incentives contained in the statute are properly allocated in the manner Congress intended. FDA has independently interpreted the court decision trigger provision in accordance with *Teva III's* remand order and consistent with the statutory language and purpose. In so doing, the agency has reasonably determined that exclusivity is triggered only when a court holds on the merits that a patent is invalid, not infringed, or unenforceable. Exclusivity for pravastatin was therefore not triggered by the Apotex-Bristol stipulated dismissal and, assuming that the ANDAs eligible for exclusivity are ready for final approval as of April 20, 2006, FDA anticipates granting final approval to those applicants, and only those applicants, on that date, in accordance with the Hatch-Waxman statutory regime for generic drug approvals. The preliminary injunctive relief sought by Apotex would upset the agency's careful balancing of the statutory factors, disrupt the agency's administration of the Hatch-Waxman provisions governing exclusivity, and thwart the interests of the public and industry alike in a strong exclusivity incentive and a clear and predictable standard for the triggering of exclusivity periods.[16]

---

[16] Apotex's request that the Court stay the approval of *any* pravastatin ANDA pending resolution of its preliminary injunction motion is equally unwarranted. Br. at 1, 30. Indeed, such action would only further delay the entry of generic pravastatin into the marketplace. Nor is there any legal basis for entry of a stay to preserve what Apotex characterizes as the current *status quo.* Although Apotex has challenged FDA's decision that exclusivity has not yet been triggered, nowhere in Apotex's pleadings does it suggest that the approval of Teva's or Ranbaxy's ANDAs (or any other applicant's ANDA) would be improper or unwarranted. To the contrary, Apotex's only claim is that its ANDA should be approved at the same time as the first applicants. Under

32

Because FDA's conclusion that there has been no court decision trigger of exclusivity for pravastatin is based on a reasonable interpretation of the statute in accordance with the *Teva III* decision and the agency's own expertise and policy preferences, both the balance of harms and the public interest weigh strongly against Apotex's claim for preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, Apotex's motions for a TRO and preliminary injunction should be denied, and judgment entered for the federal defendants.

Respectfully submitted,

Of Counsel:

PAULA M. STANNARD                        PETER D. KEISLER
Acting General Counsel                   Assistant Attorney General

SHELDON T. BRADSHAW                      JEFFREY S. BUCHOLTZ
Chief Counsel                            Deputy Assistant Attorney General
Food and Drug Division
                                         EUGENE M. THIROLF
ERIC M. BLUMBERG                         Director
Deputy Chief Counsel, Litigation         Office of Consumer Litigation

KAREN E. SCHIFTER
WENDY S. VICENTE                         _____/s/_____
Associate Chief Counsels                 ANDREW E. CLARK
U.S. Dept. of Health & Human Services    Attorney
Office of the General Counsel            Office of Consumer Litigation
5600 Fishers Lane                        U.S. Department of Justice
Rockville, MD 20857                      P.O. Box 386
                                         Washington, D.C.  20044
                                         Tel:  (202) 307-0067
                                         Fax:  (202) 514-8742

Dated:  April 18, 2006

---

these circumstances, Apotex's bid to stay the agency's approval of all pravastatin ANDAs until these issues are resolved is serious overreaching, and would only result in an unwarranted extension of Bristol-Myers' current market monopoly.

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order and/or Preliminary Injunction to be served via the District Court's electronic filing (ECF) system upon:

Arthur Y. Tsien
OLSSON, FRANK AND WEEDA, P.C.
1400 16th Street, N.W., Suite 400
Washington, D.C.  20036-2220
*Counsel for Plaintiff Apotex Inc.*

William A. Rakoczy
RAKOCZY MOLINO MAZZOCHI SIWIK LLP
6 West Hubbard Street, Suite 500
Chicago, IL 60610
*Counsel for Plaintiff Apotex Inc.*

Jay P. Lefkowitz
John C. O'Quinn
KIRKLAND & ELLIS
655 15th Street, N.W., Suite 1200
Washington, D.C. 20005
*Counsel for Intervenor-Defendant Teva Pharmaceuticals USA, Inc.*

Kate C. Beardsley
BUC & BEARDSLEY
919 Eighteenth Street, N.W.
Suite 600
Washington, D.C.  20006
*Counsel for Intervenor-Defendants Ranbaxy Laboratories Limited, et al.*

this 18th day of April, 2006.


_____/s/_____
Andrew E. Clark