# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ──────────────────────── | ) | |
| APOTEX INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-627 (JDB) |
| | ) | |
| FOOD AND DRUG ADMINISTRATION, *et al.* | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| TEVA PHARMACEUTICALS USA, INC., | ) | |
| RANBAXY LABORATORIES LIMITED, | ) | |
| RANBAXY INC., and RANBAXY | ) | |
| PHARMACEUTICALS, INC. | ) | |
| | ) | |
| Intervenors-Defendants. | ) | |
| ──────────────────────── | ) | |

## OPPOSITION TO APOTEX INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

Of Counsel:
Richard Egosi
*Senior Vice President & General Counsel*
David M. Stark
*Senior Director, Legal Affairs*
Teva Pharmaceuticals USA, Inc.
425 Privet Road
Horsham, PA  19044-8005
(215) 293-6400

Jay P. Lefkowitz (DC 449280)*
Steven A. Engel (DC 484789)
John C. O'Quinn (DC 485936)
Michael D. Shumsky (DC 495078)
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, DC  20005
(202) 879-5000

*Counsel for Intervenor-Defendant
Teva Pharmaceuticals USA, Inc.*

April 18, 2006

* Counsel of Record

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................1

BACKGROUND ...............................................................................................................3

LEGAL STANDARD FOR INJUNCTIVE RELIEF .....................................................6

ARGUMENT ....................................................................................................................7

I.     APOTEX HAS NO CHANCE OF SUCCESS ON THE MERITS. ...................................7

       A.     The FDA's Interpretation, Which Is Entitled To Deference Under
              *Chevron*, Is Reasonable And Thus Apotex Cannot Prevail. ...................................7

       B.     Regardless Of The Line Drawn By The FDA, As This Court Previously
              Held, A Stipulated Dismissal Is Not A "Decision Of A Court." ..........................16

II.    THE BALANCE OF HARMS STRONGLY FAVORS TEVA. .......................................19

III.   THE PUBLIC INTEREST STRONGLY FAVORS DENYING
       A TRO OR PRELIMINARY INJUNCTION. ..................................................................23

CONCLUSION ..................................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrx Pharms., Inc. v. Biovail Corp.*,
   276 F.3d 1368 (Fed. Cir. 2002) .............................................................................. 3

*Bailey v. United States*,
   516 U.S. 137 (1995) ................................................................................................ 9

*Biacore v. Thermo Bioanalysis Corp.*,
   79 F. Supp. 2d 422 (D. Del. 1999) ........................................................................ 12

*Biogen, Inc. v. Amgen, Inc.*,
   913 F. Supp. 35 (D. Mass. 1996) ........................................................................... 12

*Bristol Myers Squibb Co. v. Shalala*,
   923 F. Supp. 212 (D.D.C. 1996) .............................................................................. 6

*Bryan Ashley Int'l., Inc. v. Shelby Williams Indus., Inc.*,
   932 F. Supp. 290 (S.D. Fla. 1996) ......................................................................... 12

\*  *Buckhannon Board & Care Home v. West Virginia Department of Health & Human Resources*,
   532 U.S. 398 (2001) ........................................................................................ 1, 5, 17

*C.R. Bard, Inc. v. Schwartz* , 716 F.2d 874 (Fed. Cir. 1983) .................................... 12

\*  *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) ...................................................................................... 1, 9, 10

*CityFed Fin. Corp. v. OTS*,
   58 F.3d 738 (D.C. Cir. 1995) ................................................................................... 7

*Clinton Mem'l Hosp. v. Shalala*,
   10 F.3d 854 (D.C. Cir. 1993) ................................................................................... 9

*Connecticut Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ................................................................................................ 9

*Dart Drug Corp. v. Schering Corp.*,
   320 F.2d 745 (D.C. Cir. 1963) ............................................................................... 18

*Dorfmann v. Boozer*,
   414 F.2d 1168 (D.C. Cir. 1969) ............................................................................... 6

*Gambale v. Deutsche Bank AG*,
   377 F.3d 133 (2d Cir. 2004) ................................................................................... 17

*Glaxo Wellcome, Inc. v. Pharmadyne Corp.*,
   No. AMD-96-455, 1996 WL 432290 (D. Md. July 23, 1996) ........................................ 12

*Granutec, Inc. v. Shalala*,
   No. 97-1873, 1998 WL 153410 (4th Cir. April 3, 1998) ................................................... 14

\*  *Hester Industries, Inc. v. Tyson Foods, Inc.*,
   160 F.3d 911 (2d Cir. 1998) ............................................................................................ 18

*In re Barr Labs.*,
   930 F.2d 72 (D.C. Cir. 1991) ........................................................................................... 23

*In re Wolf*,
   842 F.2d 464 (D.C. Cir. 1988) ......................................................................................... 17

\*  *Kokkonen v. Guardian Life Insurance Co. of America*,
   511 U.S. 375 (1994) ................................................................................................ 1, 5, 17

*Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.*,
   826 F. Supp. 112 (D. Del. 1993) ...................................................................................... 12

*Mova Pharm. Co. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998) ......................................................................................... 7

*Mova Pharm. Corp. v. Shalala*,
   955 F. Supp. 128 (D.D.C. 1997) ........................................................................................ 7

*Nat'l Pharm. Alliance v. Henney*,
   47 F. Supp. 2d 37 (D.D.C. 1996) ....................................................................................... 7

\*  *Oil, Chemical & Atomic Workers Int'l Union v. Dep't of Energy*,
   288 F.3d 452 (D.C. Cir. 2002) ......................................................................................... 18

*Pension Benefit Guar. Corp. v. LTV Corp.*,
   496 U.S. 633 (1990) ......................................................................................................... 10

*Shopmen Pension Fund*,
   730 F.2d 1552 (D.C. Cir. 1984) ......................................................................................... 9

\*  *Teva Pharms. USA, Inc. v. FDA*,
   398 F. Supp. 2d 176 (D.D.C. 2005) ........................................................................... passim

\*  *Teva Pharms. USA, Inc. v. FDA*,
   404 F. Supp. 2d 243 (D.D.C. 2005) ....................................................................... 2, 5, 19

\*  *Teva Pharms. USA, Inc. v. FDA*,
   441 F.3d 1 (D.C. Cir. 2006) ....................................................................................... passim

*Teva Pharms. USA, Inc. v. Pfizer, Inc.*,

395 F.3d 1324 (Fed. Cir.),
*cert. denied*, 126 S. Ct. 473 (2005) .................................................................. 15

*Teva Pharms., USA, Inc. v. FDA*,
182 F.3d 1003 (D.C. Cir. 1999) ....................................................... 4, 5, 8, 11

*Teva Pharms., USA, Inc. v. FDA*,
254 F.3d 316, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000)................. 4, 8

*United Parcel Service, Inc. v. N.L.R.B.*,
92 F.3d 1221 (D.C. Cir. 1996) ........................................................... 10

*United Sweetener USA, Inc. v. Nutrasweet Co.*,
760 F. Supp. 400 (D. Del. 1991) ........................................................ 12

**Statutes**

21 U.S.C. § 355(j)(5)(B)(iv) ............................................................. 3, 19

21 U.S.C. § 355(j)(5)(B)(iv)(II) ............................................................ 13

35 U.S.C. § 282 ......................................................................... 13

Medicare Modernization Act,
Pub. L. No. 108-173, ___ Stat. ___ (2003)................................................. 3, 14

**Rules**

D.C. Circuit Rule 28(c)(1)(A) ............................................................ 4

Fed. R. Civ. P. 12(b)(1)................................................................. 6

Fed. R. Civ. P. 41(a)(1)................................................................ 17, 18

Fed. R. Civ. P. 62(c)................................................................... 21

\* denotes authorities upon which Teva chiefly relies

## INTRODUCTION

There is a strong sense of *déjà vu* with respect to this action for the simple reason that all of the pertinent issues presented in Apotex Inc.'s motion for a temporary restraining order and/or preliminary injunction have been previously decided by this Court in favor of Teva Pharmaceuticals USA, Inc. ("Teva"). The injunctive relief Apotex seeks would come at a tremendous expense to the public and to Teva, and is sought against the backdrop of an action in which Apotex ultimately has **no chance of success on the merits**. The Food and Drug Administration's ("FDA's") reasoned interpretation of the court-decision trigger provisions of the Hatch-Waxman Act is based on the plain text of the statute, is justified by the policy choices left by Congress to the FDA's discretion, and is subject to substantial deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). In any event, it is not enough for Apotex to merely quibble with the FDA's reasoning—to secure immediate relief it must show it is likely to prevail in *its* interpretation of the Hatch-Waxman Act, under which a private agreement requiring no court decision and having **nothing** to do with the invalidity or non-infringement of a patent would constitute a "decision of a court … holding the patent … invalid or not infringed." It cannot possibly make that showing.

Even if the Court disagreed with the line drawn by the FDA and undertook its own review, the Hatch-Waxman Act cannot reasonably be interpreted to encompass a consensual stipulation of dismissal that says nothing about infringement or invalidity. As this Court previously held (relying on, *inter alia*, the Supreme Court's decisions in *Kokkonen v. Guardian Life Insurance Co. of America*, 511 U.S. 375 (1994), and *Buckhannon Board & Care Home v. West Virginia Department of Health & Human Resources*, 532 U.S. 398 (2001)), a stipulated dismissal cannot possibly be the decision of a court—and thus cannot trigger Teva's exclusivity—for the simple reason that such a dismissal "lacks sufficient judicial imprimatur to

transform it from a private agreement between the parties into a finding of fact made by a district court." *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d 176, 191 (D.D.C. 2005).

Nor can Apotex satisfy the other requirements for a T.R.O. or a preliminary injunction. Indeed, this Court squarely addressed this exact issue when it denied Apotex's motion for a stay pending appeal in the prior litigation. As the Court held then, "[a]t best the hardships that Apotex may suffer if the emergency injunctive relief is denied are equal to the hardships that Teva will suffer … [e]ither way, some party may face significant economic disadvantage." *Teva Pharms. USA, Inc. v. FDA*, 404 F. Supp. 2d 243, 246 (D.D.C. 2005). Now, with Teva poised to launch its generic pravastatin product into the market, the harm to Teva from even a temporary delay is even more substantial than it was at that time. As explained herein, a one-week delay could cost Teva *tens of millions* of dollars that it could not recover, while (despite all of its irrelevant rhetoric about expenses and investment), Apotex only identifies a harm of approximately $9.9 million. *See* Apotex Br. 8.

Make no mistake, should the Court grant Apotex a T.R.O. or injunctive relief based on its long-shot attempt to litigate around this Court's previous decision, the real loser will be the public. A T.R.O. or preliminary injunction would merely extend BMS's monopoly of the pravastatin market by precluding any genuine generic competition. In the absence of an injunction, Teva intends to launch its product following FDA approval and bring price relief to consumers. This Court previously rejected Apotex's virtually identical public interest argument in seeking a stay pending appeal, and nothing has changed to alter the analysis.

At bottom, nothing has changed since this Court grappled with these issues and decided *Teva Pharmaceuticals USA, Inc. v. FDA*, No. 05-1469, just a few short months ago. While the dance partners may have changed, the song remains the same. Having rejected Apotex's

2

interpretation of the Hatch-Waxman Act and its arguments in favor of injunctive relief pending appeal, the Court should reject them again and turn back Apotex's strained attempt to forestall judgment day.

## BACKGROUND[1]

Congress enacted the Hatch-Waxman Act of 1984 to lower the regulatory barriers facing generic drug companies and to encourage those companies to challenge the patents blocking generic entry to the market. *See, e.g.*, *Andrx Pharms., Inc. v. Biovail Corp.*, 276 F.3d 1368, 1371 (Fed. Cir. 2002). To accomplish those goals, the statute provides that the first generic drug company to identify and challenge a brand-name patent by filing a regulatory statement with the FDA—thereby assuming the risks and costs of potential patent litigation—shall receive the exclusive right to market the generic product for a period of 180 days. *See* 21 U.S.C. § 355(j)(5)(B)(iv) (2002). The statute provides that this exclusivity period shall begin when the generic company first commercially markets its product or, if earlier, if and when a court issues a decision "holding the patent which is the subject of the certification to be invalid or not infringed." *Id.*[2]

Teva was the first applicant to file a Paragraph IV certification for pravastatin sodium in 10 mg, 20 mg, and 40 mg doses. In an effort to "trigger" Teva's exclusivity, Apotex filed a

---

[1] At the Court's request, Teva incorporates and relies on the statutory, procedural, and factual background from its previous filings in *Teva Pharmaceuticals USA, Inc. v. FDA*, No. 05-1469, and only provides a brief summary here to give context to the issues presented.

[2] The Medicare Modernization Act of 2003 ("MMA") amended the Hatch-Waxman Act provisions governing exclusivity. However, most of those amendments do not apply here because Teva's ANDA was filed prior to the enactment of the 2003 Act. *See* Pub. L. No. 108-173 § 1102(b)(1). The MMA does, however, define the term "decision of a court" in the pre-amended statute as "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken." *Id.* § 1102(b)(3).

declaratory judgment action against the patentee, Bristol-Myers Squibb ("BMS"). That action was voluntarily dismissed by the parties without prejudice in a stipulated dismissal, requiring no action by the trial court at all. Moreover, the stipulated dismissal itself says nothing about infringement or invalidity, and BMS **never** represented to Apotex that its formulation did not infringe BMS's patents.

Despite the plain language of the statute—requiring a **court decision** holding that the patent is "invalid or not infringed"—the FDA ruled in a June 28, 2005 letter that the stipulated dismissal in Apotex's declaratory judgment action constituted a court-decision trigger and that the agency intended to permit Apotex and other generic companies to begin to sell their products without granting Teva its statutory exclusivity. The FDA believed its decision to be required by an erroneous reading of the D.C. Circuit's decision in *Teva Pharmaceuticals, USA, Inc. v. FDA*, 182 F.3d 1003 (D.C. Cir. 1999) (*Teva I*), and an unpublished, non-precedential opinion in *Teva Pharmaceuticals, USA, Inc. v. U.S. FDA*, 254 F.3d 316, No. 99-5287, 2000 WL 1838303 (D.C. Cir. Nov. 15, 2000) (Table) (*Teva II*).[3] In those cases, the Court of Appeals merely vacated the FDA's action on procedural grounds, "for want of reasoned decisionmaking," *Teva II*, 2000 WL 1838303, at *2, even while recognizing that the litigants had advanced several "permissible construction[s] of the 'court decision' requirement" in the case, *Teva I*, 182 F.3d at 1012.

---

[3] D.C. Circuit Rule 28(c)(1)(A) provides that "[u]npublished orders or judgments of this court, including explanatory memoranda and sealed opinions, entered before January 1, 2002 are not be cited as precedent." Although they may be cited when "the binding (i.e., the res judicata or law of the case) or preclusive effect of the disposition, rather than its quality as precedent, is relevant," *id*., the D.C. Circuit's recent decision in *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1 (D.C. Cir. 2006) (*Teva III*), makes clear that nothing in *Teva II* was res judicata or preclusive.

On July 26, 2005, Teva brought suit in this Court arguing that the FDA's action was arbitrary and capricious and/or contrary to law because (1) the agency misread *Teva I & II* to require a substantive outcome under the statute, when those decisions merely faulted the FDA for failing to provide a reasoned explanation for its statutory interpretation; and (2) the agency could not interpret the statute to find a trigger here because, *inter alia*, "the court's approval of Apotex's request for a dismissal simply cannot be understood as a 'decision of a court … holding' anything." Without reaching the first issue, the Court agreed with Teva on the second. Relying on *Kokkonen*, 511 U.S. 375, and *Buckhannon*, 532 U.S. 398, this Court "conclude[d] that the BMS-Apotex dismissal order **lacks the necessary judicial imprimatur** to convert the parties' private agreement underlying the stipulation into an enforceable provision of the dismissal order." *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d at 190 (emphasis added). The Court therefore concluded "that, under both Second Circuit and D.C. Circuit law, the BMS-Apotex dismissal is not a 'decision of a court' under the Hatch-Waxman Act and, accordingly, the 180-day exclusivity period for Teva as the first ANDA applicant was not triggered by the filing or court approval of that dismissal." *Id*. at 190-191.  Apotex sought a stay pending appeal from this Court, which was denied. *See Teva Pharms. USA, Inc. v. FDA*, 404 F. Supp. 2d at 246.

On appeal, the D.C. Circuit held that the FDA had erred in treating *Teva I & II* as creating a binding interpretation of the Hatch-Waxman Act. *See Teva III*, 441 F.3d at 3-4. It observed that "the FDA treated the *Apotex* dismissal as a 'decision of a court … holding the patent … invalid or not infringed' solely because it thought our decisions in *Teva I* and *Teva* [*II*] compelled that result." *Id*. (internal citations omitted).  The D.C. Circuit concluded that "[a]lthough [it previously] stated that the statute **could** be interpreted to include dismissals of declaratory judgment actions as triggering events, it left the final decision to the FDA." *Id*. at 4

(internal citations omitted). In *Teva I*, the D.C. Circuit merely remanded for want of reasoned decision making because the FDA had made no effort to reconcile its decision with its prior decisions. And in *Teva II*, the D.C. Circuit reversed because the FDA failed to meaningfully address the question on remand. Because "[t]he FDA mistakenly though itself bound by [the D.C. Circuit's] decisions in *Teva I* and *Teva II*" the D.C. Circuit vacated this Court's decision and remanded with instructions to vacate the FDA's decision and remand to the agency so that the FDA would have the opportunity to interpret the statute in the first instance. *Id*. at 5; *see id*. at 4. The D.C. Circuit further noted that "the statute may preclude treating voluntary dismissals (or, for that matter, dismissals under Fed. R. Civ. P. 12(b)(1)) as triggering events," but ultimately "express[ed] no opinion on the matter." *Id*. at 5 (internal citations omitted).

This Court remanded to the FDA, which, by letter dated April 11, 2006, concluded that the court decision trigger requires "an actual 'holding' on the merits that the patent is invalid, not infringed, or unenforceable." 4/11/06 Letter at 2 (attached as Exhibit 1). The FDA reasoned that its interpretation "follows most readily from the statutory language" because "Congress itself … chose to impose the requirements of a 'decision of a court' and a 'holding.'" *Id*. at 6, 8. Here there was no holding of any kind by the trial court. After prematurely filing this action on April 5, Apotex filed the instant motion on April 14, 2006.

## LEGAL STANDARD FOR INJUNCTIVE RELIEF

In this Circuit, the standard for a T.R.O. or preliminary injunction is well-established. The relief Apotex seeks is "an extraordinary remedy and must be sparingly granted." *Bristol Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 215 (D.D.C. 1996) (citing *Dorfmann v. Boozer*, 414 F.2d 1168 (D.C. Cir. 1969)). To demonstrate an entitlement to temporary injunctive relief a plaintiff must show that (1) there is a substantial likelihood of success on the merits, (2) that the plaintiff would suffer irreparable injury if the requested injunction is denied; (3) an injunction

will not substantially injure the opposing party or other third parties; and (4) the public interest will be furthered by the issuance of the injunction.  *See Mova Pharm. Co. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998).  The district court must "balance the strengths of the requesting party's arguments in each of the four required areas."  *CityFed Fin. Corp. v. OTS*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Mova Pharm. Corp. v. Shalala*, 955 F. Supp. 128, 131 (D.D.C. 1997).  As discussed herein, Apotex cannot demonstrate a substantial chance of success on the merits.  "Here, because the likelihood of success is slim, plaintiff[] would have to make a very substantial showing of severe irreparable injury in order to prevail on [its] motion."  *Nat'l Pharm. Alliance v. Henney*, 47 F. Supp. 2d 37, 41 (D.D.C. 1996); *see also CityFed*, 58 F.3d at 747.  Moreover, the balance of harms strongly counsels against granting temporary injunctive relief.  An injunction on the eve of Teva's launch of generic pravastatin will irreparably harm Teva and will greatly injure the public by extending the patent-holder's monopoly for the life of this litigation.

## ARGUMENT

### I.    APOTEX HAS NO CHANCE OF SUCCESS ON THE MERITS.

#### A.    The FDA's Interpretation, Which Is Entitled To Deference Under *Chevron*, Is Reasonable And Thus Apotex Cannot Prevail.

Apotex would have the Court believe that the FDA's textualist interpretation of the Hatch-Waxman Act—requiring an express decision by a court holding a patent invalid or not infringed—was previously rejected by the D.C. Circuit.  Of course, were Apotex's revisionist version of history true, then the D.C. Circuit in *Teva III* would have had no occasion to remand this case.  However, the FDA did not advance this reasoning (nor any other reasoning, for that matter) in support of its position in *Teva I*.  Indeed, as the D.C. Circuit noted in *Teva I*, the FDA had ***refused to respond*** to Teva's request for an effective approval date and "offered no

particular interpretation of [the court decision] provision, relying instead on its authority to interpret the provision narrowly until it promulgates a new rule." *Teva I*, 182 F.3d at 1007. Similarly, in *Teva II*, the FDA did not offer any reasoning to support the line it drew, but merely "refus[ed] to look beyond the face of the order" because that "served goals of administrative convenience." *Teva II*, 200 WL 1838303, at *1. The D.C. Circuit, in turn, held (in an unpublished opinion) that "the judgment of the agency fails for want of reasoned decisionmaking." *Id*. at *2.

Thus, the FDA has not previously articulated the rationale before the Court. That rationale—that the statute itself most naturally requires "a ***decision*** of a ***court*** that on its face evidences a ***holding*** on the merits that patent is invalid [or] not infringed"—is consistent with the plain text of the statute and entitled to deference under *Chevron*. 4/11/06 Letter at 6. ***This is precisely the interpretation suggested by the D.C. Circuit at oral argument on appeal in Teva III***, noting that a dismissal for lack of subject matter jurisdiction may be a "holding of the court but it's not a holding or decision on the invalidity or noninfringement" of a patent. *Teva III*, Oral Arg. Tr. at 16 (attached as Exhibit 2). Indeed, one of the panel members remarked at oral argument that Apotex's position "strikes me as exceedingly odd," because it means there could be a "holding" that the patent is invalid or not infringed ***even where there is no underlying case or controversy***. *Id*. at 15. And, of course, it was ***Congress***, not the FDA, that "chose to impose the requirements of a 'decision of a court' and a 'holding.'" 4/11/06 Letter at 8. In reality, Apotex's complaint is not with the FDA's decision, but with Congress's.

FDA's interpretation plainly furthers the intent of Congress, which provided that exclusivity should only be triggered by a court decision that actually holds something about the patent. Indeed, "the best guide to what a statute ***means*** is what it ***says***." *Stewart v. Nat'l*

*Shopmen Pension Fund*, 730 F.2d 1552, 1561 (D.C. Cir. 1984) (emphasis in original); *see also Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253-54 (1992). If Apotex were right that a stipulation of dismissal could be enough, then it would read the "court decision" and "holding" requirements right out of the statute. As the FDA notes, "[t]he estoppel-based approach … renders the terms 'decision,' 'holding,' and 'invalid or not infringed' superfluous, in contravention of accepted cannons of statutory construction." 4/11/06 Letter at 8 (citing *Bailey v. United States*, 516 U.S. 137, 146 (1995)). Private parties, through collusive agreements, could systematically undermine the 180-day exclusivity absent any actual consideration of the issues by the court. However, Congress "clearly believed that ANDA applicants need an incentive beyond the prospect of earlier generic market entry to take on the litigation risks associated with challenging drug patents." 4/11/06 Letter at 12. In weighing between a relatively broad approach to the court-decision trigger, which "could diminish the value of the 180-day exclusivity to ANDA applicants" and "reduce the incentive for ANDA applicants to challenge an innovator's patents," and a more narrow interpretation based on the plain text of the statute, which could "make exclusivity more valuable, and thus make patent challenges more common overall," the FDA reasonably chose the latter approach. *Id*. at 13. Thus, far from simply relying on administrative convenience (which is, in and of itself, a legitimate basis for choosing between competing interpretations, *see, e.g., Clinton Mem'l Hosp. v. Shalala*, 10 F.3d 854, 860 (D.C. Cir. 1993)), the FDA has made a policy decision to preserve the value of the 180-day exclusivity period. To choose among permissible interpretations of an ambiguous principle, of course, is to make a policy decision, and since *Chevron* it has been clear that "[t]he responsibilities for assessing the wisdom of such policy choices … are not judicial ones." *Chevron*, 467 U.S. at 866. Rather, "a federal agency, which is controlled by the political branches of the federal

9

government, is constitutionally better suited than a federal court to render policy decisions." *United Parcel Service, Inc. v. N.L.R.B.*, 92 F.3d 1221, 1225 (D.C. Cir. 1996) (citing *Chevron*, 467 U.S. at 865-66); *see also Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-52 (1990) ("[P]ractical agency expertise is one of the principal justifications behind *Chevron* deference.").

The Generic Pharmaceutical Association ("GPhA")—the generic industry's primary trade association, whose membership includes both Teva and Apotex—submitted an *amicus* brief in Teva's favor in the prior action to address a similar issue. As GPhA explained, the position advocated by Apotex would "cut the legs out from under what Congress determined to be the appropriate incentive for bringing generic products to market." No. 05-1469, Br. of the Generic Pharmaceutical Association as *Amicus Curiae*, at 4 (filed Aug. 30, 2005) (attached as Exhibit 3); *see also id.* at 5-6, 10-11. Under Apotex's approach, private parties can act together to deprive the first applicant of exclusivity without any judicial oversight. Thus, it is Apotex's approach, not the FDA's, which impermissibly allows patentees to manipulate the system.

Despite the D.C. Circuit's clear statement that "it is not for the court to choose between competing meanings of an ambiguous statute when the agency charged with its administration has not weighed in first," *Teva III*, 441 F.3d at 4, Apotex persists in arguing for its "estoppel" approach to interpreting the Hatch-Waxman Act's court-decision trigger as though the D.C. Circuit had mandated it. *See* Apotex Br. 23-25. The problem for Apotex, however, is that, regardless of whether this is a "relevant consideration," the ***statute*** itself says nothing about estoppel. It requires a "holding" that the patent is "invalid or not infringed." Moreover, this is "an ambiguous statute" and, as the D.C. Circuit held last month, "[w]hen a statute is ambiguous, Congress has left a gap for the agency to fill." *Teva III*, 441 F.3d at 4. Apotex, however, would

10

have the Court rely on vague connotations of statutory "'purpose,'" instead of deferring to the agency's gap-filling authority. Apotex Br. 23 (quoting *Teva I*, 182 F.3d at 1009). As the FDA notes, "[e]stoppel can be raised in different contexts." 4/11/06 Letter at 8. Thus, a patentee could be estopped from suit for any number of reasons having absolutely ***nothing to do with patent invalidity or non-infringement***, which would also provide no pathway for future generic competition. The FDA reasonably rejected that non-textual approach to the statute in favor of one requiring a holding on the merits of invalidity or noninfringement. Unlike estoppel, a holding on the merits necessarily opens the market to generic competition. A holding of invalidity completely clears the patent thicket. And a holding of non-infringement demonstrates a pathway to generic competition—subsequent generic applicants need only follow the path demonstrated by the first applicant. The kind of private agreement entered here, which says nothing about invalidity or infringement, does nothing to clear the patent thicket and promote generic competition.

To be sure, estoppel might be relevant in determining whether there was an ***implicit*** holding of invalidity or non-infringement in a particular court decision (such as in *Teva I*, where there was a dismissal for lack of subject matter jurisdiction based on a representation of non-infringement), but it is at most a necessary, not a sufficient, condition. And, of course, where the statute is ambiguous, it is for the FDA to fill the gaps left by Congress.

In any event, there is simply no estoppel here because BMS's representations about its present intention lack preclusive effect. Federal Circuit caselaw—which *Teva I* recognized governs the estoppel question in patent cases, *see* 182 F.3d at 1008-09—clearly establishes that the unadorned statements of a patentee's "intentions" about future infringement litigation are manifestly insufficient to preclude a future suit. Indeed, that is the precise holding of *C.R. Bard,*

*Inc. v. Schwartz*, where the Federal Circuit addressed the (in)sufficiency of virtually identical representations regarding a party's present intentions with respect to future litigation:

> That affidavit said Schwartz had and ***has no intention*** of terminating the license agreement or suing for infringement. ***Intentions, however, may change over time.*** Schwartz did not say that he would not terminate the agreement and would not bring an infringement suit. Thus, ***under the terms of his own affidavit Schwartz was free to terminate the agreement at a time of his choosing and institute an infringement action.***

716 F.2d 874 (Fed. Cir. 1983) (emphasis added); *see also Biogen, Inc. v. Amgen, Inc.*, 913 F. Supp. 35, 39 (D. Mass. 1996); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. AMD-96-455, 1996 WL 432290, at \*6 (D. Md. July 23, 1996); *Biacore v. Thermo Bioanalysis Corp.*, 79 F. Supp. 2d 422, 454 (D. Del. 1999); *Bryan Ashley Int'l., Inc. v. Shelby Williams Indus., Inc.*, 932 F. Supp. 290, 292 (S.D. Fla. 1996); *Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.*, 826 F. Supp. 112, 114 (D. Del. 1993); *United Sweetener USA, Inc. v. Nutrasweet Co.*, 760 F. Supp. 400, 407 (D. Del. 1991). Thus, even if an estoppel approach were warranted, it has no application in this case.[4]

Despite Apotex's suggestion to the contrary, *see* Apotex Br. 17-18, the FDA quite rightly distinguishes between estoppel that may (or may not) arise based on a patentee's statements concerning its intention not to sue to enforce a patent, and the patent-law doctrine of

---

[4] In its prior opinion, this Court suggested in a footnote that because the "representations made by BMS in this case sufficed to prevent any reasonable apprehension from arising … they also preclude BMS from suing Apotex for infringement." *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d at 192 n.6. Teva respectfully submits that the two inquires are different, as the FDA noted in its appeal to the D.C. Circuit. The fact that BMS's representations sufficed to prevent ***Apotex's*** apprehension of suit merely meant that no federal court ***would have subject matter jurisdiction*** over a declaratory judgment action ***brought by Apotex against BMS***. As *C.R. Bard* makes abundantly clear, however, BMS's carefully chosen words left it free to change its mind ***in the future***, and if and when it did, to sue Apotex without being bound by its prior expressions of ***then-past*** intent.

unenforceability, which is concededly beyond "the agency's expertise." 4/11/06 Letter at 10. Whether or not the patentee is estopped from enforcing its patent against Apotex based on its representations, that is not akin to a "a 'decision' and a 'holding' of unenforceability" in the patent-law sense of the term. *Id*. The FDA's "long-standing" regulation includes unenforceability to "serve[] the salutary purpose of encouraging patent challenges based on unenforceability," which, like invalidity, effectively renders a patent void. 4/11/06 Letter at 6, 10. As the FDA previously explained, "precluding applicants challenging patents as unenforceable from filing certifications under paragraph IV, would be contrary to Congress' obvious intent in allowing patent challenges under [ANDAs] and would lead to absurd results." 59 Fed. Reg. 50338, 50339 (1994).[5] A finding of unenforceability, like invalidity, clears a path that others may follow. The FDA's reasoning is entirely consistent with the statutory trigger based on a "holding the patent [is] not infringed," 21 U.S.C. § 355(j)(5)(B)(iv)(II), since ***unenforceability is a statutory defense to infringement***, 35 U.S.C. § 282(1). In any event, the "unenforceability" aspect of the FDA's regulation cannot possibly be implicated in this action for the simple reason that Apotex ***never pleaded*** that BMS's patent was unenforceable. *See* Complaint, S.D.N.Y. No. 04-2922 (attached as Exhibit 4). Unenforceability must specifically be pleaded, *see* 35 U.S.C. § 282, however, one will search Apotex's complaint in vain for even a passing reference to unenforceability. Thus, whether or not "the dismissal of Apotex's declaratory judgment action based on BMS's disavowal of any intent to sue renders the patents

---

[5] Notably, Apotex has never suggested that estoppel, which presumably arises (if ever) ***after*** a Paragraph IV certification is filed and a suit commenced, can itself serve as a basis for filing a Paragraph IV certification. However, the FDA has determined that an assertion of unenforceability is a basis for filing a Paragraph IV certification, and, it follows that a finding of unforceability triggers exclusivity. 21 C.F.R. § 314.107(c)(1)(ii).

unenforceable against Apotex" in the colloquial sense, Apotex Br. 19, (in other words, even if BMS is estopped from suing Apotex), it does not render *the patent* unenforceable in the (relevant) patent-law sense.

Apotex's contention that the FDA's decision is inconsistent with that at issue in *Granutec, Inc. v. Shalala*, No. 97-1873, 1998 WL 153410 (4th Cir. April 3, 1998)—which it is not, as explained by the FDA, *see* 4/11/06 Letter at 12—is wholly without merit for the simple reason that *Granutec* has been superceded by statute. As the FDA notes in the April 11 letter decision, "[t]he regulatory landscape has changed dramatically since FDA's original determination that the Teva-Syntex dismissal did not constitute a court decision trigger." *Id*. at 10. *Granutec* involved a partial summary judgment decision; however, one change worked by the MMA which took effect immediately was that Congress interpreted "decision of a court" to mean "a final decision of a court from which no appeal (other than a petition to the Supreme Court for a writ of certiorari) has been or can be taken." Pub.L. 108-173, Title XI, § 1102(b)(3), 117 Stat. 2460 (Dec. 8, 2003). *Partial* summary judgment is not enough. Thus, whatever the FDA's reasoning in treating the decision in *Granutec* as a court-decision trigger, it is now beside the point. In any event, while there were similarities between the partial summary judgment decision in *Granutec* and the Teva-Syntex dismissal at issue in *Teva I*, in that both were based on an express representation of non-infringement, there is nothing remotely similar between the *Granutec* decision and the Apotex-BMS dismissal. With respect to the latter, there was no representation of non-infringement and no holding of non-infringement (either explicit or implicit). Indeed, there was no "holding" at all in the Apotex-BMS dismissal because it was the product of a private, stipulated dismissal that did not even require judicial action.

14

Finally, Apotex invokes the canon of statutory interpretation against adopting a construction that renders a provision of a statute inoperative or superfluous, and asserts that FDA's interpretation violates this principle by "nullifying the crucial declaratory judgment mechanism for ANDA applicants." Apotex Br. 26. Not so. Nothing in the FDA's interpretation in any way addresses, much less voids, the declaratory judgment provision. ANDA applicants who are not sued within 45 days of giving notice of their ANDA remain free to file suit against patentees, and nothing in the FDA's interpretation in any way affects that. The only constraint on them is one placed by the Constitution—not the FDA: that they can demonstrate that there is an actual case or controversy. However, when the applicant lacks a reasonable apprehension of suit, a court lacks jurisdiction to hear the case under Article III. *See Teva Pharms. USA, Inc. v. Pfizer, Inc.*, 395 F.3d 1324, 1333 (Fed. Cir.), *cert. denied*, 126 S. Ct. 473 (2005) (dismissing declaratory judgment action for lack of subject matter jurisdiction despite the patentee's refusal to provide assurance that it would not subsequently sue). If Apotex has a problem, it is with the constitutional limits on the jurisdiction of federal courts, rather than the FDA's interpretation of the Hatch-Waxman Act's court-decision trigger. Here, of course, we will never know whether a *court* would have found that Apotex had a reasonable apprehension of suit and was thus entitled to go forward with its declaratory judgment action against BMS, because Apotex and BMS voluntarily dismissed the action via stipulation. Where a subsequent applicant faces a reasonable apprehension of suit, it may proceed with a declaratory judgment action that, if successful, could have the effect of triggering the first applicant's exclusivity. In any event, Apotex's argument that the potential ineffectiveness of declaratory judgment actions by subsequent ANDA filers will somehow delay the public's access to generic drugs is belied by this very case. Generic pravastatin will available upon final approval of Teva's ANDA by the FDA, and treating

Apotex's private agreement to dismiss its case as a court-decision trigger would not get it to the market any sooner.

In sum, the FDA has engaged in reasoned decisionmaking and has adopted an interpretation of the statute that follows from the plain language of the statute. That interpretation is entitled to deference under *Chevron*. Thus, Apotex has little chance for success in its challenge to the FDA's interpretation.

> **B.    Regardless Of The Line Drawn By The FDA, As This Court Previously Held, A Stipulated Dismissal Is Not A "Decision Of A Court."**

Apotex cannot prevail on the merits (and a TRO or preliminary injunction is thus unwarranted) for a second reason: Apotex must demonstrate that the stipulated dismissal at issue here could be a "decision of a court" within the meaning of the statutory text. This it cannot do. Now that the FDA has "weighed in first," *Teva III*, 441 F.3d at 4, this Court owes the FDA's interpretation the deference it is due under *Chevron*. And, should it reject that interpretation, this Court has already considered *de novo* the exact issue presented here and rejected Apotex's interpretation in favor of Teva's precisely because Apotex's interpretation would impermissibly read the words "decision" and "holding" right out of the statute. The D.C. Circuit, in turn, left this Court's reasoning untouched. *Id*. at 5. And nothing in the FDA's April 11, 2006 letter takes issue with this Court's prior decision. Indeed, it is encompassed within the FDA's own approach, requiring "a ***decision*** of a ***court*** that on its faces evidences a ***holding*** on the merits that a patent is invalid, not infringed, or unenforceable." 4/11/06 Letter at 6. Thus, whether or not the Court accepts the precise line drawn by the FDA as reasonable within the *Chevron* framework, Apotex cannot succeed on the merits of its claim.

Apotex's argument proceeds as if this case were being litigated in a vacuum. Apotex again argues that the Apotex-BMS dismissal is no different from the Teva-Syntex dismissal at

issue in *Teva I & II*.  However, this Court squarely rejected that argument.  It noted the two were distinguishable in "several ways."  *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d at 191.  "To begin with, the latter resulted directly from a motion to dismiss, not a consensual stipulation procured and filed under Rule 41(a)(1)(ii)."  *Id*.  And the "Teva-Syntex dismissal was not wholly uncontested—there was a hearing."  *Id*.  The trial court dismissing in Teva-Syntex "had made a predicate finidng of fact when it dismissed."  *Id*.  By contrast, "the BMS-Apotex dismissal at issue here … was wholly voluntary and entirely uncontested."  *Id*.  "Thus, the district court could only review the voluntary, private settlement agreement:  it did not have to weigh evidence, or make any implicit determinations."  *Id*.  Indeed, as this Court held, "the filing of the signed stipulation of dismissal automatically effectuated the dismissal without any court action."  *Id*.  It is, of course, well-established that the filing of a stipulation divests the court of jurisdiction over the case, whether or not the court endorses the stipulation.  *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 139 (2d Cir. 2004) (a Rule 41(a)(1)(ii) dismissal "divests the court of its jurisdiction over a case, irrespective of whether the district court approves the stipulation."); *In re Wolf*, 842 F.2d 464, 466 (D.C. Cir. 1988) ("the entry of such a stipulation of dismissal is effective automatically and does not require judicial approval") (internal quotation omitted).  The fact that the trial court acknowledged the stipulation neither makes the document a "decision of a court" nor transforms it into an opinion "holding" anything.

Under Supreme Court precedent (*see Kokkonen*, 511 U.S. 375; *Buckhannon*, 532 U.S. 398), as well as the settled law of both this Circuit and the Second Circuit (the forum in which the stipulation was signed), a stipulation of dismissal is plainly not a judicial "decision" because it requires no deliberative judicial act, and it is not a "holding," because the stipulation's words are those of the parties themselves.  Apotex argues that the stipulation became a court decision

17

when the court wrote "so ordered" at the bottom, but such approval "was merely a formality" that did not change the nature of the stipulation. *Oil, Chemical & Atomic Workers Int'l Union v. Dep't of Energy*, 288 F.3d 452, 457-58 (D.C. Cir. 2002). The Second Circuit also rejected this precise argument in *Hester Industries, Inc. v. Tyson Foods, Inc.*, 160 F.3d 911, 916 (2d Cir. 1998). There, as here, the parties submitted the stipulation to the court, "for review, approval and signature." And as here, the district court approved the stipulation with the dictate, "So Ordered," but went further and included a short explanation for its decision, recognizing that the action was dismissed with prejudice "in accordance with the terms of the attached Settlement Agreement." *Id.* at 913-14. When the parties later disputed the terms of the settlement, the plaintiff sought to impose sanctions on the ground that its adversary violated a court order. The Second Circuit squarely rejected this contention, explaining that the fact that the judge had approved the order "did not change the nature of the dismissal." *Id.* at 916. "Because the dismissal was effectuated by stipulation of the parties," it was necessarily a Rule 41(a)(1) dismissal, and the court's adoption of the order did not give the dismissal the effect of an order of the court. *Id.* So too here. Likewise, the fact that the stipulation refers to Apotex's belief on "jurisdiction" in no way means that the court actually ruled on jurisdiction, because the stipulation's terms "represent the agreement of the parties, and not the independent examination … by the court." *Dart Drug Corp. v. Schering Corp.*, 320 F.2d 745, 749 (D.C. Cir. 1963).

In sum, the Hatch-Waxman Act may pose some tough questions of statutory interpretation, but the one raised by Apotex is not among them. This Court properly held that the parties' stipulated dismissal of a patent lawsuit does not satisfy Hatch-Waxman's "judicial decision trigger" because, under well-established precedent, a stipulation written and executed by the parties "lacks sufficient judicial imprimatur to transform it from a private agreement

18

between the parties into a finding of fact made by the district court." *Teva Pharms. USA, Inc. v. FDA*, 398 F. Supp. 2d at 191.  Nothing has changed since that decision.  As this Court held, a stipulated dismissal is not a "decision of a court" at all, much less a "decision" with a "holding" that the patents in question "invalid or not infringed."  21 U.S.C. § 355(j)(5)(B)(iv).  Given that determination, Apotex cannot possibly succeed on the merits and there is no basis for granting temporary injunctive relief.

## II.    THE BALANCE OF HARMS STRONGLY FAVORS TEVA.

Because Apotex has virtually no chance of success on the merits, it must demonstrate that the harm to Apotex greatly outweighs the harm to Teva.  It cannot.  By filing the first Paragraph IV ANDA for generic pravastatin in 2000, Teva obtained a statutory entitlement to be the first and exclusive seller of generic pravastatin for 180 days.  Teva intends to begin marketing upon FDA approval, following the expiration of the '227 patent on April 20, 2006, and in order to prepare for that launch, Teva has made a substantial investment.  As this Court previously held when weighing injunctive relief pending appeal, "it cannot be said that the balance of hardships tips in favor of Apotex."  *Teva Pharms. USA, Inc. v. FDA*, 404 F. Supp. 2d at 246.  Now, four months later with Teva poised to launch its product, the balance tips decisively in Teva's favor.

To be clear, Teva claims the exclusive right to market three doses of generic pravastatin as of April 20, 2006, while Apotex claims no more than the right to be one of eight companies to enter the market at that time.  Whereas the costs of granting a TRO or a preliminary injunction will be borne singularly by Teva, any costs to the subsequent applicants from the denial of an injunction would be shared across the industry.  Despite all of the confusing rhetoric about its investments, including the long-term capital development of a fermentation facility used for many of "Apotex's finished dosage forms" (which, at the moment is being used for pravastatin), Declaration of Bernard Sherman ¶ 6 (filed by Apotex on Apr. 14, 2006), Apotex only identifies

an irreparable loss of $9.9 million in lost sales (itself a suspect number given that Apotex previously represented its loss would be $12.5 million in its motion for a stay pending appeal, *see* No. 05-1469, Mem. in Support of Apotex Inc.'s Motion for Injunctive Relief Pending Appeal at 17 (attached as Exhibit 5)).  By contrast, even a one-week delay could cost Teva ***tens of millions*** of dollars.  *See* Declaration of David Marshall ("Marshall Decl.") ¶ 13 (attached as Exhibit 6).  And if Teva were erroneously deprived of its statutory right, then Teva would lose several hundred million dollars.  *See* No. 05-1469, Mem. in Support of Application for Preliminary Injunction at 30.

The issuance of a TRO or a preliminary injunction would have a tremendous adverse effect on Teva in the marketplace.  An injunction would not only preclude Teva from launching its generic pravastatin product, but it would create tremendous uncertainty that undercuts Teva's ability to negotiate long-term contracts and impair access to major customers.  By contrast, BMS has entered into an agreement with Watson Pharmaceuticals, Inc. ("Watson") to market an authorized generic—and it could enter the market on April 20, ***regardless of any injunction granted by the Court***.  *See* Marshall Decl. ¶¶ 7, 9.  Watson is already negotiating long-term contracts with major potential customers of generic pravastatin.  *Id*. ¶ 8.  If Teva is unable to enter the market on an equal footing on the same day as an authorized generic, Teva will be left behind.  Even a one-week delay would cost Teva ***tens of millions*** of dollars if Watson launched an authorized generic product.  *Id*. ¶ 13.  With Teva held up by a TRO or preliminary injunction, and unable to launch its product, Watson will proceed to cause the very harm to Teva that Apotex asserts it may befall—namely "tie up distribution channels and access to customers; enter into long-term sales agreements; increase sales across all product lines; and retain greater market share in the long-term."  Apotex Br. at 7-8; *see also* Marshall Decl. ¶ 11.  While some

20

authorized generics do not launch until after ANDA applicants enter the market, some do. *See* Marshall Decl. ¶ 12. Teva should not be required to bear the risk that Watson will not take advantage of a short window of uncertainty and tie up the market while Teva struggles under the specter of a T.R.O. or preliminary injunction.[6]

Teva will likely also face competition from another similar generic product, simvastatin, as soon as June 2006. If generic simvastatin is launched by multiple parties in June 2006, simvastatin would cost less than generic pravastatin during Teva's exclusivity period for pravastatin. *See id.* ¶ 17. Simvastatin, like pravastatin is a HMG-CoA reductase inhibitor, used in the treatment of high cholesterol. *See* Marshall Decl. ¶ 15. It is no answer to say that this is an "unrelated product," Apotex Br. 9, particularly where simvastatin and pravastatin are in the same class of drugs, *see* Marshall Decl. ¶ 15. Although they may not be "substitutable" in the regulatory sense of the word, Apotex Br. 9, it is fanciful to suggest they will not compete, *see* Marshall Decl. ¶ 18 ("Even though simvastatin is a different product, because it is in the same class of drugs it would compete with pravastatin."). Depending on their specific condition, certain patients would be able to switch to simvastatin and would do so for the lower cost product. *See id.* Because a launch of generic simvastatin would likely begin to convert the market from pravastatin in June 2006, Teva only has a short window in which to maximize profits while, at the same time, bringing price relief to customers by offering competition in the pravastatin market. *See id* ¶ 19. The likelihood of a generic launch of simvastatin in June 2006

_____

[6] Although Apotex cannot make a case for a T.R.O. or preliminary injunction, if the Court were to consider granting the motion, it should do so on the condition that Apotex put its money where its mouth is and post a substantial bond to guarantee that Teva would suffer no irreparable harm. Indeed, no T.R.O. or preliminary injunction may issue except upon the giving of security by the applicant. *See* Fed. R. Civ. P. 62(c).

reduces the time in which Teva can seek to recover costs and obtain profits for its sales of pravastatin. Even a short delay would cost Teva *millions* if generic simvastatin were widely launched in June 2006. *See id*. ¶ 20. Thus, given these different competitive threats to Teva, any delay in launching pravastatin would likely be tremendously costly. *See id*. ¶ 21.

By contrast, the "harm" posited by Apotex necessarily assumes that Teva is not entitled to 180 days of exclusivity. If, as this Court previously held, Teva is entitled to exclusivity, then the "harm" to Apotex is merely the reward to Teva for being the first applicant to file a Paragraph IV certification for pravastatin in 10 mg, 20 mg, and 40 mg doses. Given the potential for at least *tens of millions* of dollars of harm to Teva from a delay in launching, at most Apotex can say the harms are balanced. That is insufficient to justify an injunction.

One of the key differences between this case and the gabapentin case cited by Apotex in its April 5, 2006 T.R.O. papers is the fact that Teva is ready to launch its product once approved by the FDA. *See* Apotex 4/5/06 Br. at 15 (citing *Apotex, Inc. v. FDA*, No. 04-5211 (D.C. Cir.) ("*Gabapentin*")). In *Gabapentin*, the D.C. Circuit initially granted a stay pending appeal where the first applicant *was unwilling to launch its product*. The first filer successfully obtained a vacatur of the stay from the D.C. Circuit once it represented that it was ready to launch its generic product and explained that it likely faced competition from another closely related product that was not stayed by its exclusivity. *See* Emergency Mot. of Purepac Pharm. to Vacate Stay of Final Regulatory Approval, *Apotex v. FDA*, No. 04-5211 (D.C. Cir.) (attached as Exhibit 7); Sep. 16, 2004 Order Vacating Stay, *Apotex v. FDA*, No. 04-5211 (D.C. Cir.) (attached as Exhibit 8). Here, with Teva ready to launch and facing competition on multiple fronts, the Court should not enjoin or otherwise restrain Teva from immediately introducing generic pravastatin into the market.

22

Given that Teva prevailed in the previous action, and that the irreparable harm to Teva from an improper injunction would likely be even more costly than an improper decision against Apotex, the Court should not grant a T.R.O. or preliminary injunction.  As this Court previously recognized, Apotex cannot show that the balance of hardships favor it rather than Teva.  Nothing has changed in Apotex's favor.  Rather, now, more than ever, Teva stands to lose the most from an erroneous decision.

III.    **THE PUBLIC INTEREST STRONGLY FAVORS DENYING A TRO AND A PRELIMINARY INJUNCTION.**

The requested injunction will severely harm the public interest by denying patients access to generic pravastatin pending this Court's resolution of proceedings.  At present BMS has a monopoly on the market for pravastatin product.  Sales for the 10 mg, 20 mg, and 40 mg dosages are approximately ***$1.7 billion***.  *See* Marshall Decl. ¶ 5.  That monopoly would end on April 20 if this Court does not enjoin Teva from launching its generic product.  Extending BMS's monopoly will give BMS a windfall of as much as ***$4.6 million a day*** at the expense of the American public.  Even the launch of an authorized generic will not bring the kind of price relief that accompanies true competition from a genuine generic product.  Thus, patients will indisputably be harmed by restricting access to generic pravastatin, despite the clear purpose of the Hatch-Waxman Act, which is to "get generic drugs into the hands of patients at reasonable prices—fast."  *In re Barr Labs.*, 930 F.2d 72, 76 (D.C. Cir. 1991).

Notably, Apotex does not suggest otherwise.  Rather, it merely falls back on the general public interest in "faithful application of the laws."  Apotex Br. 29.  Such a vague, general interest is insufficient to justify extending BMS's monopoly to the detriment of the public.

## CONCLUSION

For the foregoing reasons, Teva respectfully requests that the Court deny in all respects

Apotex's motion for a temporary restraining order and/or preliminary injunction.

Respectfully submitted,

_____/s/_____

Of Counsel:                                          Jay P. Lefkowitz (DC 449280)*
Richard Egosi                                        Steven A. Engel (DC 484789)
*Senior Vice President & General Counsel*            John C. O'Quinn (DC 485936)
David M. Stark                                       Michael D. Shumsky (DC 495078)
*Senior Director, Legal Affairs*                     KIRKLAND & ELLIS LLP
Teva Pharmaceuticals USA, Inc.                       655 15th Street NW, Suite 1200
425 Privet Road                                      Washington, DC 20005
Horsham, PA 19044-8005                               (202) 879-5000
(215) 293-6400

*Counsel for Intervenor-Defendant*
*Teva Pharmaceuticals USA, Inc.*

April 18, 2006                                       * *Counsel of Record*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 18th day of April 2006, at true and correct copy of the foregoing Opposition to Apotex Inc.'s Motion for a Temporary Restraining Order and/or Preliminary Injunction, and the attachments thereto was served via email and ECF filing as follows:

Arthur Y. Tsien
Olsson, Frank and Weeda, P.C.
1400 16th St., NW  Suite 400
Washington, D.C.  20036-2220

William A. Rakoczy
Rakoczy Molino Mazzochi Siwik LLP
6 West Hubbard Street, Suite 500
Chicago, Illinois 60610
*Counsel for Plaintiff Apotex Inc.*

Andrew E. Clark
U.S. Department of Justice
Office of Consumer Litigation
Room 950 North
1331 Pennsylvania Ave., NW
Washington, D.C. 20004
*Counsel for the Federal Defendants*

Kate C. Beardsley
Carmen M. Shepard
Buc & Beardsley
919 18th St., NW, Suite 60
Washington D.C.  20006
*Counsel for Intervenors-Defendants Ranbaxy Laboratories Limited,*
*Ranbaxy Inc., and Ranbaxy Pharmaceuticals, Inc.*

_____/s/_____
John C. O'Quinn
*Counsel for Intervenor-Defendant*
*Teva Pharmaceuticals USA, Inc.*

25