UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TEVA PHARMACEUTICALS USA, INC. ) <br> ) <br> *Plaintiff*, ) <br> ) <br> v. ) <br> ) <br> FOOD AND DRUG ADMINISTRATION, ) <br> MICHAEL O. LEAVITT, and ) <br> LESTER M. CRAWFORD, ) <br> ) <br> *Defendants*. ) | Civil Action No. 1:05-CV-01469 (JDB) |

**BRIEF OF THE
GENERIC PHARMACEUTICAL ASSOCIATION
AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

Theodore Case Whitehouse
DC Bar No. 298331
WILLKIE FARR & GALLAGHER LLP
1875 K Street, NW
Washington, DC 20006-1238
202-303-1000

Counsel for *Amicus Curiae*
The Generic Pharmaceutical Association

Apotex filed its declaratory judgment action, but before the court ruled on BMS's motion to dismiss, the court approved the parties' stipulated dismissal, which was based on "BMS's pre-Complaint representations that it has no intention to sue Apotex." *Apotex, Inc. v. BMS*, No. 04 CV 2922 (S.D.N.Y. July 23, 2004) (stipulation and order granting dismissal) (PI Mem. Ex. E at 3). The stipulated dismissal did not include any findings, nor did it enter a holding as to the validity, infringement, or enforceability of the pravastatin patents. *Id.*

On June 28, 2005, the FDA issued a letter stating that the district court's entry of the stipulated dismissal had triggered the 180-day exclusivity period for generic pravastatin sodium, and that the exclusivity period had expired in February 2005. *See* June 28, 2005 Letter from Director of the FDA Office of Generic Drugs Gary Buehler to Philip Erickson ("FDA Letter") (PI Mem. Ex. A).

## ARGUMENT

I. **THE FDA'S CONCLUSION THAT EXCLUSIVITY MAY BE TRIGGERED BY A STIPULATED DISMISSAL WITHOUT A HOLDING ON THE MERITS OF THE PATENT CONTRAVENES BOTH THE TEXT AND THE PURPOSE UNDERLYING THE HATCH-WAXMAN ACT.**

The FDA's conclusion that a stipulated dismissal that does not include a holding as to invalidity, non-infringement, or unenforceability triggers 180-day exclusivity is an improper interpretation of the cases decided under the Hatch-Waxman Act (as Teva argued) and is also in conflict with the clear language of the Hatch-Waxman Act. There, Congress specified which types of court decisions—those holding the underlying patents to be invalid or not infringed—could trigger exclusivity. Although it could have chosen to do so, Congress did not provide that any and all court decisions could trigger exclusivity. Thus, only those court decisions—regardless of who is a party to the court decisions—that meet the congressionally-specified criteria can trigger the running of the 180-day exclusivity period.

3

More significantly, the FDA's conclusion, if upheld, would unsettle the incentive system of the Hatch-Waxman Act. Congress included the 180-day exclusivity provision, and specified when the attending benefits would be triggered, to ensure that the promise of exclusivity would provide generic companies with the incentive to come to market as soon as possible. By disregarding the limitation on which court decisions can trigger exclusivity and allowing *any* court decisions, including those that do not adjudicate and clear void or blocking patents, the FDA has cut the legs out from under what Congress determined to be the appropriate incentive for bringing generic products to market. As a result of the FDA's action, manufacturers are free to bring "challenges" that, in fact, are designed to do no more than run out the clock on exclusivity before the generic can ever come to market. The result under both the pre-amended Hatch-Waxman Act and the MMA will be to discourage generic manufacturers from competing to get exclusivity in the first place, given the likelihood of their losing it before ever receiving its benefits.

### A. The 180-Day Exclusivity Period, As It Was Established By Congress, Is Essential To The Balance Of Interests And Incentives In The Hatch-Waxman Act.

Generic pharmaceuticals reduce healthcare costs by providing consumers and insurers with access to safe and lower cost pharmaceuticals, often before the patents on the branded versions of those pharmaceuticals expire. Because the principal barrier to early generic entry is the lawful monopoly granted to holders of drug patents, Congress passed the Hatch-Waxman Act of 1984, which reflects a legislative compromise between the interests of brand and generic pharmaceutical manufacturers that encourages and hastens generic drug entry. *See generally* Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585

4

(1984); *see* 21 U.S.C. §§ 301 *et seq.*[1]; H. Rep. No. 98-857, at 14-15 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 2647, 2647-48 (the statute seeks to "make available more low cost generic drugs" and "to create an incentive for increased expenditures for research and development of certain products which are subject to premarket government approval").

While validating, and even extending, protections for branded pharmaceuticals, Hatch-Waxman reduced barriers to generic entry by establishing an expedited approval process, known as an ANDA, within the FDA. Filing an ANDA, and providing the requisite certification to the patent holder (known as a Paragraph IV certification), is the first step a generic manufacturer takes on the road to challenging the "thicket" of potentially invalid or non-infringed patents that can block generic entry. Because the first company to file a complete ANDA is necessarily the first company to put the patent holder on notice that a generic product will be marketed prior to the expiration of the pertinent patents, the first ANDA filer bears the primary risk of being sued by the patent holder and defending against expensive and time-consuming patent litigation. *See* 21 U.S.C. § 355(j)(5)(B)(iii) (2000). Congress created significant incentives in the Hatch-Waxman Act to encourage generic drug manufacturers to assume that risk and file ANDAs with Paragraph IV certifications.

The key incentive that Congress included for generic manufacturers is the promise of 180 days of marketing exclusivity for the first ANDA filer, before other generic manufacturers can market their products. During that 180-day period, consumers and insurers save money because of the availability of the generic alternative, and the first-filing generic drug company can recover for the risk and expense it incurred by filing the Paragraph IV ANDA in the first place.

---

[1] The Hatch-Waxman Act was amended by the Medicare Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2066 (2003), however the old Act governs this matter because the pertinent ANDA was filed before the new Act took effect.

5

Significantly, Hatch-Waxman bestows exclusivity on the first company to file a complete ANDA, not on the first company to bring a legal challenge to the brand manufacturer's patents, thus encouraging generic manufacturers to move their products through the FDA approval pipeline, rather than encouraging them to engage in intra-industry litigation.

It is this cycle, of which the 180-day exclusivity period is a considered and integral part, that results in generic pharmaceuticals coming to market as soon as possible. *See* FDA, *Guidance for Industry: 180-Day Exclusivity When Multiple ANDAs Are Submitted on the Same Day* 3 (July 2003), http://www.fda.gov/cder/guidance/5710fnl.pdf. *See also* FTC, *Generic Drug Entry Prior to Patent Expiration: An FTC Study* (July 2002), http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf. Two decades after the Hatch-Waxman Act, generics now represent more than half of the total prescriptions dispensed in the United States but less than 10 percent of the total dollar amount spent on prescription drugs. *See* GPhA, *Generic Pharmaceuticals: Getting More and Spending Less*, http://www.gphaonline.org/policy/pdf/statement1.pdf.

In 2003, Congress amended the Hatch-Waxman Act as part of the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA"). Pub. L. No. 108-173, 117 Stat. 2066 (2003). In the MMA, Congress added to the attraction of the 180-day exclusivity period by creating a shared exclusivity provision. Under the new Act and rules, exclusivity is "shared" among those companies that file a complete ANDA on the first day of filing. *See* FDA Guidance for Industry, at 4-5. Thus, Congress very recently recognized and validated the importance of incentivizing generic manufacturers to bring their products to market as soon as possible. As with the earlier Act, Congress again chose to grant market exclusivity to those companies that are quick to meet the substantive requirements of filing an ANDA with the FDA, as opposed to

6

reinforced in its Amendments the policy that patent invalidity or noninfringment, and thus removal of the patent barrier to legal entry into the market of the generic drug, is the proper trigger for exclusivity.

Even though this case is to be decided under the old Act, the FDA's position threatens the exclusivity benefit under the MMA as well. The FDA has disregarded the clear limits set by Congress in the old Act on proper triggers of the 180 day periods. The MMA, like the previous provision, also includes specific, congressionally-mandated limits on what can trigger the 180 days: unappealable final judgments, entry of settlement orders, and consent decrees that indicate on the merits that "the patent is invalid or not infringed." 21 U.S.C. § 355 (j)(5)(D)(i)(I)(bb)(AA)-(CC). If the FDA is allowed to ignore the limits set forth in the old Act, the agency easily could use such precedent to ignore these limits (or other unrelated provisions) in the MMA as well.

### C. The FDA Action Undermines The Value of 180-Day Exclusivity, The Key Incentive That Congress Established To Bring Generic Pharmaceuticals To Market, To The Detriment Of Consumers And Insurers.

Congress crafted and calibrated the 180-day exclusivity provision to ensure that the generic pharmaceutical industry is incentivized to develop and bring to market generic drugs. In marked contrast to the Hatch-Waxman Act—both in its original form and as amended by the MMA—the FDA's position inevitably will dis-incentivize the industry, chilling the very patent challenges that the Hatch-Waxman Act was designed to induce.

The FDA's position undermines the market exclusivity incentive because it permits exclusivity to be triggered by any kind of court decision, including those that do not in any way resolve the underlying patent dispute. Congress created the judicial-decision trigger to ensure that, once the legal barrier to generic competition has been removed, the first generic drug company will have a strong incentive to come to market as quickly as possible. If exclusivity

10

begins to run before the underlying patent challenge is resolved, then exclusivity could expire—as in the pravastatin sodium case—before any generic drug company could bring its product to market. If the judicial-decision trigger can be subject to such manipulation, then the 180-day incentive provision can no longer serve the purpose of encouraging generic companies to file the first ANDA challenge and begin the process of bringing the generic alternative to market. By allowing court-decisions that do not resolve the merits of patent disputes to trigger and run down the exclusivity period, the FDA has markedly undercut the value of the incentive that Congress established to encourage generic market entry.

The inevitable and cumulative result of the FDA's decision will be to discourage generic manufacturers from competing for exclusivity by filing early ANDAs. The erosion of the incentive effects intended to be achieved by exclusivity will result in a collective action problem and massive opportunity costs for the entire industry. Rather than race to file ANDAs early and run the risk of costly patent litigation without the exclusivity benefit, generic manufacturers that would have filed early ANDAs could sit on the sidelines until another generic manufacturer challenges the brand patents and opens the gateway for generic entry. As the ANDA filings drop off, the rate at which generic pharmaceuticals come to market will also slow, harming the generic market, consumers, and insurers. Ultimately and ironically, the only companies that will benefit from the FDA's position are the brand-name companies: After 20 years of vibrant generic industry competition under Hatch-Waxman, the brands will be back in a world where their patents are not readily challenged before they expire because the primary incentive to challenge them has been eviscerated, consequently allowing the brands to enjoy their pharmaceutical monopolies longer, to the continuing detriment of the public.