PUBLIC VERSION

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 04-5211

APOTEX, INC.,

Plaintiff-Appellant,

v.

FOOD AND DRUG ADMINISTRATION,
TOMMY G. THOMPSON, Secretary of
Health and Human Services, and
LESTER M. CRAWFORD, Acting
Commissioner of Food and Drugs,

Defendants-Appellees,

and

PUREPAC PHARMACEUTICAL CO.,

Intervenor-Defendant-Appellee.

## EMERGENCY MOTION OF APPELLEE PUREPAC
## PHARMACEUTICAL CO. TO VACATE STAY OF FINAL
## REGULATORY APPROVAL FOR GABAPENTIN

Appellee Purepac Pharmaceutical Co. ("Purepac") hereby respectfully moves on

an emergency basis, for an order vacating this Court's *pendente lite* stay of the FDA's

final regulatory approval of Purepac's Abbreviated New Drug Application (ANDA) for

gabapentin capsules imposed by the Court's order entered on July 26, 2004, in response

to the following four changed circumstances which are inequitably costing Purepac

PUBLIC VERSION

millions of dollars under the burden of the stay:

(1)     On September 1, 2004, appellant Apotex, the party whose motion resulted in the stay, acknowledged in writing that Apotex has no inventory of gabapentin capsules and has not even begun production of gabapentin capsules, contrary to Apotex's earlier statement to this Court that it stood to lose $169 million in gabapentin sales if the Court did not enter the stay.

(2)     On September 3, 2004, the board of Purepac's parent company authorized a commercial launch of Purepac's generic gabapentin capsule drug product upon a lifting of the stay, despite an unresolved patent infringement action involving gabapentin.

(3)     On August 18, 2004, the generic gabapentin market was opened up by the launch of a generic gabapentin tablet product by another company, Ivax Corp., a commercial development that will render the market for generic gabapentin capsules irretrievably lost, even according to Apotex, unless Purepac is able to market its gabapentin capsules.

(4)     According to recent press reports, Pfizer Inc., manufacturer of Neurontin®, (the brand name version of gabapentin capsules), expects to imminently launch the drug pregabalin, a drug chemically related to gabapentin.  Pregabalin will reduce the gabapentin market and therefore Purepac's potential share of that market due to anticipated aggressive efforts by Pfizer to persuade physicians to prescribe pregabalin (which has no generic competition) instead of gabapentin (which does).

PUBLIC VERSION

These significant changed circumstances, coupled with the fact the district court below ruled in favor of Purepac, not Apotex, and the likelihood that Purepac will prevail on the merits of this appeal as explained below, fully warrant vacation of the stay. In the alternative, Apotex should be required to post a bond in the amount of $          as security for the lost profits Purepac will incur if the stay remains in place and Purepac prevails.

## ARGUMENT

This is an appeal of a district court order dismissing appellant Apotex's complaint challenging a determination by the U.S. Food and Drug Administration (FDA) that appellee Purepac is eligible for 180 days of generic market exclusivity for the anti-epilepsy prescription drug gabapentin in capsule dosage form. Briefing dates have been set, and oral argument is scheduled for December 6, 2004.

On July 26, 2004, the Court granted Apotex's motion for a stay of the FDA's final regulatory approval of Purepac's Abbreviated New Drug Application (ANDA) for gabapentin capsules, pending a decision in this appeal.

Now, substantial changes in circumstances since the Court entered the stay warrant an immediate lifting of the stay.

### A.     The Court is Empowered to Vacate the Stay

It is well established that an appellate court has equitable discretion to respond to changed circumstances, and to take corrective action, when its prior *pendente lite*

REDACTED

3

·PUBLIC VERSION

injunctive order threatens to foster rather than forestall irreparable harm. Consolidated
Edison Company of New York v. Federal Power Commission, 511 F.2d 372, 378 (D.C.
Cir. 1974). See also: Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 383-84, 112
S.Ct. 748, 760, 116 L.Ed.2d 867 (1992); Marsh v. Johnson, 263 F.Supp.2d 49, 52
(D.D.C. 2003); Purolite Int'l Ltd. v. Rohm & Haas Co., 24 U.S.P.Q.2d 1857, 1859-60
(E.D. Pa. 1992); Atchison, Topeka and Santa Fe Railway Co. v. Callaway, et al., 431 F.
Supp. 722 (D.D.C. 1977).

**B.    Significant, Marked Changes in Circumstances Mandate
Lifting the Stay of Purepac's Approval for Gabapentin Capsules**

**1.    Apotex Cannot Go to Market**

When it moved this Court for a stay, appellant Apotex represented to the Court
that it would be irreparably harmed absent a stay because "[i]f allowed to launch, Apotex
would earn at least $193 million in sales…[b]ut those sales would drop to $24 million if
Purepac is permitted to launch during this appeal." (Emergency Motion of Plaintiff-
Appellant Apotex Inc. for Injunctive Relief Pending Appeal, filed June 21, 2004, p. 18;
Supporting McIntire Declaration, Ex. 1, pp. 107, 111, copies annexed as Exhibit A).

Yet this allegation of $169 million in lost sales by Apotex is squarely contradicted
by recent admissions Apotex has made to Purepac. Just last week, Apotex's chairman
and CEO informed Purepac's parent company Alpharma. Inc., in a written
communication:

" 2.    Apotex has no capsule inventory whatsoever, and has not begun
production.

PUBLIC VERSION

3.    Apotex will not have a tablet product, and has not even yet submitted an ANDA for same."

(Letter from Apotex, Inc. to Alpharma, Inc., dated September 1, 2004, p. 1 (see Exhibit B, accompanying Declaration of Matthew T. Farrell, Executive Vice President and Chief Financial Officer of Alpharma, ¶ 10, Appendix ("App.") 1).

And in another written communication three weeks earlier, Apotex's chairman and CEO had similarly conceded to Alpharma: "Apotex does not even have [gabapentin] launch quantities available, and therefore poses little overall threat to Alpharma and its partner Teva." (Letter from Apotex, Inc. to Alpharma, dated August 21, 2004, Ex. B, Farrell Decl., ¶ 11, App. 2, p. 5). [1]

Thus, Apotex either misrepresented to this Court its capability to launch gabapentin capsules to obtain a stay of a market launch by Purepac, or Apotex has somehow encountered a change in circumstance that obviates its ability to make any sales of gabapentin whatsoever during the pendency of this appeal. [2]

Either way, Apotex is not entitled to a continuation of the stay of Purepac's gabapentin capsule ANDA approval, and was plainly not entitled to the stay in the first

---

[1]    Apotex has no viable claim to exclude these letters from the Court's consideration. Fed. R. Evid. 408, marked on the letters, only applies to statements made in compromise negotiations offered as evidence of liability or claim validity during a trial. The rule does not require exclusion of statements merely because they occur during the course of compromise negotiations, or when the proffer is made for some other purpose. Here, Purepac presents the letters to show Apotex's lack of good faith, and change in its capability to market gabapentin capsules.

[2]    The notion that Apotex recently discovered a capability problem is highly suspect. Apotex must have known what its launch capability would be in September when it moved to stay Purepac's approval just two and a half months ago.

PUBLIC VERSION

place. Apotex will not suffer any harm, no less "irreparable" harm, if Purepac launches its gabapentin capsule product. Apotex does not even have product available to earn the $169 million contended would be lost absent the stay. Simply put, Apotex is not in any position to lose gabapentin capsule sales—because it has no gabapentin capsules to sell.

Apotex's shift from an assertion of $169 million in lost sales, to an acknowledgment that it has no present ability to market its product, is obviously a drastic change of circumstance presented to the Court that dramatically alters the landscape. In and of itself, this newly disclosed situation cries out for a lifting of the stay.

### 2.    Purepac Is Ready to Launch Gabapentin

In contrast, Purepac does have launch quantities available, and is ready and able to commercialize its gabapentin capsule product. (Ex. B, Farrell Decl, ¶ 9). On September 3, the board of directors of Alpharma authorized a launch of Purepac's generic gabapentin capsules as soon as the stay is lifted. (Ex. B, Farrell Decl., ¶ 8). There were no other qualifications. *Id.* [3]

Gabapentin is a critical product for Purepac and Alpharma, highly leveraged companies who are counting on the product's success. (Ex. B, Farrell Decl., ¶¶ 5-7). Such success should result, in part, from substantial sales during the first six months, due to the award of 180-day generic market exclusivity from the FDA when Purepac will have the only generic gabapentin capsule on the market. (Ex. B, Farrell Decl., ¶ 2).

---

[3]    Purepac has decided to launch despite an unresolved patent infringement action involving gabapentin brought by Pfizer in New Jersey.

PUBLIC VERSION

Purepac is ready and able to go to market upon the grant of the instant emergency motion, a further changed circumstance supporting this motion.

Unlike Apotex, Purepac will suffer          harm if it cannot launch its capsule product before the Court decides this appeal (conservatively in February 2005, two months after oral argument). This harm arises from two additional recent events that will diminish the value of Purepac's gabapentin opportunity.

3.    **Ivax Has Introduced Gabapentin Tablets,**
      <u>**Which Will Take Away Purepac's Sales**</u>

The generic gabapentin market has very recently been entered by another company, Ivax Corp., who started to sell a generic gabapentin drug product in tablet form on August 18, 2004 (see Ivax press release annexed as Exhibit C).

Ivax's gabapentin tablets are not blocked from the market by Purepac's 180-day exclusivity because they are tablets rather than capsules, and the FDA regulates different dosage forms as separate drug products. However, Ivax's gabapentin tablets can be generically substituted for the Neurontin® brand-name version of gabapentin capsules under the laws of a number of states and third-party prescription drug plans (see article in *The Pink Sheet*, a pharmaceutical industry trade publication, dated August 23, 2004, copy annexed as Exhibit D).

If Purepac's gabapentin capsule, which is generically substitutable for Neurontin® capsules in all states, cannot be launched until the stay expires upon a decision in this appeal (conservatively, in February 2005), generic gabapentin sales that would go to Purepac will instead go to Ivax. Every day Ivax is selling and Purepac is not represents a loss of market share at Purepac's expense. (Ex. B, Farrell Decl., ¶ 4). Purepac has

REDACTED

PUBLIC VERSION

calculated that Ivax's gabapentin tablet product will garner $ ____ million of sales during the next six months if Purepac's product is not on the market. (Ex. B, Farrell Decl., ¶ 14, App. 3, Scenario 2).[4]  Indeed, even Apotex concedes that Ivax's launch makes the generic gabapentin market "irretrievably lost" unless Purepac gets to market now. (Apotex Letter of August 21, 2004 to Alpharma, Ex. B, Farrell Decl., App.2, p. 4).

Thus, the launch of Ivax's generic gabapentin tablet is a significant new development potentially harming Purepac's gabapentin sales, and constitutes a third changed circumstance justifying removal of the stay that impedes Purepac's ability to sell.

### 4.   Pfizer's Pregabalin Will Reduce the Size of the Gabapentin Market

The generic market for gabapentin is further jeopardized by the imminent market launch of pregabalin, another Pfizer drug chemically related to gabapentin for which Pfizer has received an "approvable" letter from the FDA (see *Pink Sheet* article in Exhibit E and stock research report in Exhibit F).  Final FDA approval is imminent.  (See Exs. E, F).

The trade press and industry are predicting that Pfizer will launch pregabalin as early as November in a counterattack to generic gabapentin competition (see *Wall Street Journal* and USA Today articles annexed in Exhibit G).  Pfizer's counterattack involves a "switch strategy" whereby Pfizer convinces prescribing physicians to switch patients

REDACTED

---

[4]  Purepac also has a gabapentin tablet product awaiting final FDA approval.  The figure of $ ____ million in lost sales to Ivax would not be altered if Purepac were to receive approval and begin to sell its tablet during the next six months, because Purepac's tablet will be available in different dosage strengths than Ivax's tablet, and generic substitution can only be made for the identical strength.

PUBLIC VERSION

from gabapentin to its new pregabalin product (see Exhibits E, F, G). Pfizer's strategy, even if only moderately successful, will decrease physician and consumer demand for generic gabapentin products, thereby reducing the size of the gabapentin market and the volume of generic gabapentin sales.

Accordingly, the advent of pregabalin is a fourth changed circumstance calling for an end to the stay.

**C.    Purepac Will Be Irreparably Harmed Unless the Stay is Vacated**

Unless the stay of FDA approval for its gabapentin capsule is dissolved immediately, the harm that Purepac will suffer, due to significant erosion of the generic gabapentin market before it has a chance to launch, will be irreparable.[5]

Purepac does have significant gabapentin capsule quantities available for a commercial launch. Purepac is under contract to purchase $75 million in gabapentin raw material. So far, it has converted approximately $      million worth of that material into capsule dosage forms to prepare for its commercial launch. (Ex. B, Farrell Decl., ¶ 9). The only way for Purepac to fully capitalize on this launch investment, as well as the millions of dollars that it has spent so far litigating Pfizer's patent infringement suit in New Jersey and Apotex's multiple challenges to Purepac's exclusivity at the FDA, is for this Court to lift this stay and permit Purepac to begin commercially marketing its capsule

REDACTED

---

[5]    The Court's order of July 26 evidently sought to preserve the *status quo* pending the outcome of this appeal. However, the Court's order has not preserved the *status quo* for Purepac, but has put Purepac in a worse position than it was before, by depriving Purepac of the opportunity to begin marketing its generic gabapentin capsule product, an opportunity that had been granted to Purepac by the FDA's final approval of its ANDA.

**PUBLIC VERSION**

product now. (See Ex. B, Farrell Decl., ¶¶ 19).

Purepac will make $ million in net gabapentin capsule sales through February 2005 if it launches by October 1, 2004. (Ex. B, Farrell Decl., ¶ 16, App. 3, Scenario 1). If Purepac cannot launch until this appeal is decided (conservatively, in February 2005), it will only have net sales of $ million during the first six months of marketing. (Ex. B, Farrell Decl., ¶ 17, App. 3, Scenario 2). This is a loss of

dollars ( ) in net sales and dollars

($ ) in profits. (Ex. B, Farrell Decl. ¶ 18, App. 3, Scenarios 1, 2). [6]

Each day this Court's stay remains in effect, the value of Purepac's gabapentin opportunity decreases. Even Apotex acknowledges that the generic gabapentin market will be "decimated" unless Purepac is able to get its product to market promptly. (See Apotex Letter of August 21, 2004 to Alpharma, Ex. B, Farrell Decl., App. 2, p. 4). This decrease in value translates into $ million in lost gabapentin profits for Purepac (not even counting sales during the subsequent months if this appeal is not decided by then). If Purepac cannot launch its gabapentin product until this Court decides the appeal, it stands to lose these of dollars in sales, a significant blow to a company striving to remain competitive in the U.S. generic pharmaceutical industry.

---

[6]    These figures assume that Ivax will be in the market with its tablet product during the next six months, that Pfizer will launch pregabalin by November 1, that Ivax's and Purepac's products are priced at 65-70% of the Neurontin® capsule price in Scenario 1 and 50-70% in Scenario 2, that Purepac's 180-day exclusivity for gabapentin capsules is in place, and that Apotex is not in a position to enter the market as evidenced by its recent disclosures. (See Ex. B, Farrell Decl., App. 3, Scenarios 1, 2). Purepac in this context means Purepac and its partner and active ingredient supplier Teva Pharmaceutical Industries Ltd., which will have the right to market its own gabapentin capsule during Purepac's exclusivity period upon meeting certain conditions of an agreement between the parties. (Ex. B, Farrell Decl., ¶16; n.2). Purepac alone, however, has the capacity to achieve $402 million of sales during the relevant period. Id.

10

(Ex. B, Farrell Decl. ¶ 18). There is no way for Purepac to recoup these losses. (Ex. B, Farrell Decl. ¶ 7, 18). This irretrievable loss is surely irreparable harm, for it goes not merely to lost sales but to the viability of the company. Thus, continuation of the stay inappropriately fosters rather than forestalls irreparable harm. <u>Consolidated Edison</u>, 511 F.2d at 378.

But if this Court lifts the stay, a successful commercial launch of Purepac's gabapentin capsules will ensue, representing a defining moment for the company and its parent Alpharma. (Ex. B, Farrell Decl. ¶¶ 4-5). The income from the gabapentin sales that Purepac anticipates if the stay is lifted represent a significant and irreplaceable opportunity for Purepac's corporate parent, Alpharma, to reduce its outstanding debt so that it can invest the substantial funds necessary to keep its business competitive with other leading manufacturers of generic drugs. (Ex. B, Farrell Decl. ¶ 5).

Vacating the stay will also serve the public interest in these cost-conscious times for health care, by making Purepac's lower-priced generic gabapentin capsules, which are substitutable for Neurontin® capsules in all states and third party prescription drug plans, available to consumers immediately.

**D.    Purepac Will Likely Prevail on the Merits**

In addition to its above showing of irreparable harm, Purepac's 180-day generic market exclusivity award for gabapentin capsules will likely be affirmed. This is so irrespective of the Court's ultimate holding on the FDA's patent-by-patent interpretation of the Hatch-Waxman 180-day exclusivity provision. As the district held, Apotex's

PUBLIC VERSION

claim against Purepac's exclusivity is barred by *res judicata*, an entirely separate ground

warranting dismissal of Apotex's claim (see Purepac's Opposition to Motion by Apotex,

Inc. for Injunctive Relief Pending Appeal, pp. 9-13)).

**E.      In the Alternative, Apotex Should be Required to Post a Bond**

When a stay or injunction pending the outcome of an appeal is imposed by a

Court of Appeals, the Court may require the party who moved for the stay to post a bond

in a proper amount for the payment of costs and damages that are incurred by the

enjoined party who is ultimately found to have been wrongfully enjoined.  Fed. R. App.

P. 8(a)(2)(E).  See also Fed. R. Civ.P. 65(c). [7]

Here, if the stay is not lifted, the Court should require Apotex to post as security a

bond in the amount of $          the amount of lost profits Purepac will suffer if it is

not permitted to market its generic gabapentin capsules between October 1, 2004 and

February 28, 2005. (Ex. B, Farrell Decl., ¶18).

## CONCLUSION

This Court's July 26th order staying Purepac's final gabapentin capsule ANDA

approval effectively prohibits Purepac from commercially marketing its gabapentin

capsules until this appeal is decided or the stay is vacated.  Because Apotex's "showing"

of harm has now been exposed as a sham, and market challenges from Ivax and Pfizer

REDACTED

---

[7]    That the stay technically enjoined the FDA's final approval of Purepac's ANDA does not
alter this result, since the true enjoined party in interest suffering harm from the stay is Purepac.
See Timken Co. v. United States, 6 C.I.T. 76, 569 F. Supp. 65, 71-72 (1983).

PUBLIC VERSION

have upset the *status quo* and will visit irreparable harm on Purepac, this Court should

vacate the stay forthwith and allow Purepac to launch its gabapentin capsules.

Due to the immediacy of the market situation set forth herein, Purepac

respectfully requests a decision on this motion by September 17, 2004.

Dated: September **10** , 2004          Respectfully submitted,

Charles J. Raubicheck
Edgar H. Haug
Terri-Lee Young Nataline
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, New York 10151
TEL.:   (212) 588-0800
FAX:   (212) 588-0500


William B. Schultz
Alexandra W. Miller
ZUCKERMAN SPAEDER LLP
1201 Connecticut Avenue, N.W.
Washington, D.C. 20036
TEL.:   (202) 778-1800
FAX:   (202) 822-8106


*Attorneys for Intervenor-Defendant-Appellee*
PUREPAC PHARMACEUTICAL CO.

13