UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| APOTEX INC., <br><br> Plaintiff, <br><br> v. <br><br> FOOD AND DRUG ADMINISTRATION, MICHAEL O. LEAVITT, and ANDREW VON ESCHENBACH, <br><br> Defendants, <br><br> and <br><br> TEVA PHARMACEUTICALS USA, INC., <br><br> and <br><br> RANBAXY LABORATORIES LIMITED, RANBAXY INC. and RANBAXY PHARMACEUTICALS, INC., <br><br> Intervenor-Defendants. | CIVIL NO. 1:06-CV-627 |

RANBAXY'S OPPOSITION TO APOTEX INC.'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

INTRODUCTION

Ranbaxy Laboratories Limited, Ranbaxy Inc., and Ranbaxy Pharmaceuticals, Inc.

(collectively "Ranbaxy") hereby oppose Apotex Inc.'s Motion for Temporary Restraining Order

and/or Preliminary Injunction. In order to obtain a preliminary injunction or a temporary

restraining order, a party must show (1) that there is a substantial likelihood the plaintiff will

succeed on the merits; (2) that the plaintiff will be irreparably injured if the injunction is not

granted; (3) that the injunction will not substantially injure other parties; and (4) that the public

interest will be furthered by the injunction. Serono Labs. Inc. v. Shalala, 158 F.3d 1313, 1317-

18 (D.C. Cir. 1998). The plaintiff, Apotex Inc. ("Apotex") has failed to demonstrate that it can

satisfy any of these prongs. In particular, the likelihood of success and the balance of harms

weigh heavily against the grant of preliminary relief.

    The procedural and factual background of this case is set out in this Court's Oct. 21, 2005

opinion, Teva Pharms., USA, Inc. v. FDA, 398 F. Supp. 2d 176 (D.D.C. 2005), and the March

16, 2006 decision of the Court of Appeals, Teva Pharms., USA, Inc. v. FDA, 2006 U.S. App.

LEXIS 6384 (D.C. Cir. 2006) ("Teva III"). In accordance with this Court's Order, this

background will not be repeated here.

ARGUMENT

I.    Apotex Is Unlikely to Prevail on the Merits of Its Claim that FDA's Decision Is Arbitrary,
      Capricious and Contrary to Law.

    Apotex alleges that Food and Drug Administration's ("FDA") April 11, 2006 decision

finding that 180-day exclusivity for pravastatin has not been triggered (the "2006 Decision")

violates the Administrative Procedure Act ("APA") for want of reasoned decision-making.

Apotex Mem. in Support of Apotex's Mot. for Temp. Restr. Order and/or Prelim. Inj. at 11-23

("Apotex Brief"). In fact, the 2006 Decision easily survives APA scrutiny.

    Following the specific direction provided by the Court of Appeals in Teva III, FDA has

provided an interpretation of the Hatch Waxman court decision trigger and applied it to the facts

of this case. 21 U.S.C. § 355(j)(5)(B)(iv)(II) ("the date of the decision of a court . . . holding the

patent which is the subject of the certification to be invalid or not infringed"); see also 21 C.F.R.

§ 314.107(c)(1)(ii) ("the date of a decision of the court holding the relevant patent invalid,

unenforceable, or not infringed"). Consistent with the plain language of the statute, FDA is

interpreting the court decision trigger "to require a decision of a court that on its face evidences a holding on the merits that a patent is invalid, not infringed, or unenforceable." 2006 Decision at 6.

Review of this interpretation is governed by "the familiar and deferential two-part framework of Chevron, USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984)." Mylan Labs, Inc. v. Thompson, 389 F.3d 1272, 1279 (D.C. Cir. 2004). Under the Chevron framework, if Congress has spoken to the precise question at issue, then Congress' intent must be given effect, but if the statute is ambiguous, then the question is whether the agency's position rests on a permissible construction of the statute. Id. at 1280.

It is up to the agency to "bring its experience and expertise to bear in light of the competing interests at stake" and make a reasonable policy choice. PDK Labs, Inc. v. DEA, 362 F.3d 736, 797-98 (D.C. Cir. 2004). To be upheld, an agency's interpretation need not be the only one it permissibly could have adopted. Chevron, 467 U.S. at 843 n.11; Ranger Cellular v. FCC, 333 F.3d 255, 260 (D.C. Cir. 2003). The reviewing court should not attempt to make up for deficiencies, but may uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., 419 U.S. 281, 285-86 (1974).

A. The Decision Is Based on a Principled Reading of the Relevant Statute.

Reviewed under the familiar and deferential principles of the APA, the 2006 Decision easily survives scrutiny. Apotex argues that the 2006 Decision is not reasoned decision making because it does nothing more than repeat the agency's previous rationale, which the courts have already rejected. Apotex seriously misreads the 2006 Decision.

Until the 2006 Decision, FDA had never provided a full administrative explanation of its analysis of 21 U.S.C. § 355(j)(5)(B)(iv)(II).  When the Court of Appeals first considered the circumstances in which a declaratory judgment would trigger exclusivity in Teva I , FDA had offered no rationale for its decision.  Teva Pharms., USA, Inc. v. FDA, 182 F.3d 1003, 1007 (D.C. Cir. 1999) ("Teva I") (noting that "FDA has offered no particular interpretation of that provision. . . .")  In fact, the agency had refused even to meet with Teva to discuss the matter.  Id. at 1006.  Following remand to this Court, FDA produced a declaration from its Office of Generic Drugs offering its reason for rejecting Teva's interpretation, i.e., that analyzing patent law ramifications of court decisions was beyond FDA's resources and expertise, but still did not meaningfully address the question on remand.  Teva III, 2006 U.S. App. LEXIS at *10 (quoting Teva Pharms., USA, Inc. v. FDA, 2000 U.S. App. LEXIS 38667 at *1-2) ("Teva II").

The 2006 Decision does meaningfully address the question.  The 2006 Decision rests primarily on FDA's conclusion that it is "most appropriate to interpret the statute consistently with its plain language."  2006 Decision at 6.  FDA's analysis begins, as it should, with the words of the statute.  Bell Atl. Tel. Cos. v. FCC, 131 F.3d 1044, 1047 (D.C. Cir. 1997) ("The first traditional tool of statutory construction focuses on the language of the statute.")  Having concluded that triggering exclusivity requires a decision of a Court holding the patent to be invalid, not infringed, or unenforceable, FDA notes the central place of the word "holding" in construing the provision.  FDA applies well settled principles of statutory construction to adopt a definition of the word "holding" consistent with its dictionary definition.  2006 Decision at 7. See, e.g., Carey v. Saffold, 536 U.S. 214, 219-220 (2002) (using dictionary as means of determining meaning of words used in the statute); Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co., 505 U.S. 214, 222, (1992) (same); PDK Labs., Inc. v. United States DEA, 362

F.3d 786, 801-02 (D.C. Cir. 2004) (Roberts, C.J., concurring) (same). The definition that FDA

has chosen requires that, to be a holding, the court must have made a determination of a matter of

law pivotal to its decision. This approach, notes FDA, is most likely to give effect to Congress'

purpose and is most consistent with the canons of statutory construction. Apotex fails even to

recognize that the primary basis for FDA's decision is statutory.

Apotex also ignores FDA's analysis of the ways in which its interpretation will effectuate

Congressional intent. FDA considered, as it should, see Northpoint Tech., Ltd. v. FCC, 412 F.3d

145, 152 (D.C. Cir. 2005), how its interpretation is consistent with the broader purpose of Hatch

Waxman to promote generic competition, and Congress' clearly expressed intent to promote

challenges to listed patents so that generic drugs can reach the market earlier. By narrowing the

range of circumstances in which 180-day exclusivity can be triggered and thereby made

meaningless to the first ANDA filer, FDA's decision serves the Congressional purpose of

encouraging such challenges. 2006 Decision at 12-13. An agency interpretation that serves the

statute's objectives is reasonable. Continental Air Lines, Inc. v. Dep't of Transp., 843 F.2d

1444, 1452 (D.C. Cir. 1988).

Apotex instead focuses on FDA's references to the agency's lack of expertise in making

judgments about estoppel in the patent law context and the difficulty of making such judgments.

See, e.g., Apotex Brief at 11-15. There is nothing inappropriate, however, in FDA having done

so. Teva II, 2000 U.S. App. LEXIS 38667 (D.C. Cir 2000) ("...the FDA may take

administrative convenience into account on developing an across-the-board policy for dealing

with paragraph IV ANDAs,. . . ."); Clinton Mem'l Hosp. v. Shalala, 10 F.3d 854, 860 (D.C Cir.

1993).

Apotex also fails to recognize the importance of FDA's conclusion that its decision will promote certainty and avoid litigation. Contrary to Apotex's assertions, FDA's focus on certainty and avoidance of litigation is not just another way to address FDA's desire for administrative convenience; FDA here speaks to benefits that accrue to the public and to the generic drug industry as a whole. 2006 Decision at 12-14. Ranbaxy can attest to the importance of both clarity and certainty in applying the Hatch Waxman framework. The time involved in and cost of developing non-infringing generic drugs is substantial. See Second Declaration of Jayadeep R. Deshmukh, Apr. 18, 2006 ("Deshmukh Decl.") ¶¶ 14-17. The promise of exclusivity is an important incentive in encouraging a generic company to undertake the task quickly, even when no one has previously developed a non-infringing drug and there is no assurance that the company's efforts will be successful. Id. ¶ 26. Facing a high risk of losing its exclusivity due to an innovator's or generic competitor's efforts to undermine it may well deter a generic company from challenging patents. Id. ¶ 28. A generic company cannot plan and allocate resources in a sensible manner if the standards for awarding exclusivity and determining when exclusivity may be lost are not clear. Id. ¶ 29. The 2006 Decision helps preserve exclusivity and provides a framework in which generic companies will know earlier and with greater certainty whether their exclusivity has been lost.

FDA's interpretation is based on the language chosen by Congress, Congress' intent, and the agency's experience in implementing the statute. These are hallmarks of sound administrative judgment.

B. FDA Has Resolved Any Conflict with Its Own Regulations or Its Decisions in Other Situations.

Apotex argues that FDA has failed to explain how its approach resolves the specific conflicts and inconsistencies raised by the D.C. Circuit in Teva I. Apotex Brief at 17-23. In fact,

the 2006 Decision specifically identifies each issue and addresses it in detail. By explaining the statutory basis for its interpretation, which FDA had not done at the time the Teva I court raised these issues, the agency has provided a context for explaining the distinctions among situations that might otherwise appear to be inconsistent. See 2006 Decision at 9-10 (explaining how the 2006 Decision is consistent with FDA's inclusion of unenforceability in its regulation); id. at 10-12 (explaining how its interpretation is consistent with FDA's 180-day exclusivity guidance and the Granutec decision).

Although the Court of Appeals noted that the interpretation advanced in Teva I was not likely to be the only permissible construction of the statute, Teva I, 182 F.3d at 1012, and explicitly stated that it expressed "no opinion" on whether the statute precludes treating voluntary dismissals as triggering events, Teva III, 2006 U.S. App. LEXIS at *13, the 2006 Decision evidences careful consideration of these possible interpretations. It recognizes the advantages of the estoppel-based interpretation that the D.C. Circuit found attractive in Teva I and discusses each of the principal arguments for choosing an estoppel-based approach. 2006 Decision at 7-8. Mindful of the Court of Appeals' direction, in Teva I, that FDA have the opportunity to make its own judgment, 182 F.3d at 1009, and the D.C. Circuit's instruction to do so in Teva III, 2006 U.S. App. LEXIS at *13, however, FDA has concluded that the better choice is to adopt the interpretation that most faithfully reflects the governing statutory language. See Continental, 843 F.2d at 1452. FDA's decision must be upheld because it is reasoned decision-making. Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 46-57 (1983).

C.  The 2006 Decision Is Not Contrary to Congress' Intent.

Apotex argues that the 2006 Decision cannot stand because Teva I "ruled" that Congress' intent in adopting the court decision provision is to trigger exclusivity when the patent holder is

estopped from suing an ANDA applicant for patent infringement. Apotex Brief at 23-25. This argument is flawed in several respects. First, the Teva I court made no such ruling. As the D.C. Circuit stated in Teva III, "[t]here is no indication that the court intended to . . . establish its own binding interpretation." 2006 U.S. App. LEXIS at *12. Second, as FDA concludes in the 2006 Decision, it is perfectly reasonable, even preferable, to look to the words Congress chose in ascertaining Congress' intent. 2006 Decision at 8. Here, Congress spoke of a "holding," not of preclusive effect. Third, as previously discussed, FDA's approach gives effect to Congress' intent with respect to 180-day exclusivity, of which the court decision trigger is a part, by encouraging patent challenges. Narrowing the situations in which subsequent ANDA applicants can trigger a first applicant's exclusivity increases the incentives to obtain exclusivity, and therefore the probability that ANDA applicants will challenge the NDA holder's patents as quickly as possible. Acknowledging that it is not knowable whether the textual or estoppel interpretation best reflects Congress' intent, FDA has evaluated all relevant factors and determined which interpretation better serves the broad purposes of Hatch Waxman. 2006 Decision at 13. There is nothing unreasonable in doing so.

D.     The 2006 Decision Does Not Undermine the Statute's Declaratory Judgment Provisions.

Apotex also argues that the Hatch Waxman declaratory judgment mechanism "will *never* work for the purpose Congress intended if FDA's administrative decision stands." Apotex Brief at 28 (emphasis in original). The problem with this argument is twofold. First, it is not true that declaratory judgment actions will not be able to trigger 180-day exclusivity. Second, if declaratory judgment actions rarely trigger exclusivity, that is because they rarely present a case or controversy, not because FDA misinterprets the 180-day triggering provisions.

Declaratory judgment actions can and have triggered 180-day exclusivity. See, e.g., Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 811 (D.C. Cir. 2001); Teva Pharms.,

USA, Inc. v. FDA, 182 F.3d 1003 (D.C. Cir. 1999).  Obviously, when there is a case or

controversy, a court decision is likely, though not certain, to result from litigation, and thereby

trigger exclusivity.

It is correct that the lack of a case or controversy when there is no reasonable

apprehension of suit may, under certain circumstances, delay the triggering of exclusivity and

subsequent entry by generic competitors.  Apotex Brief at 28 (quoting Sen. Kennedy, 149 Cong.

Rec. 515, 885 (daily ed. Nov. 25, 2003)); Teva Pharms., USA Inc. v. Pfizer Inc., 395 F.2d 1324,

1338, rh'g denied, 405 F.3d 990 (Fed. Cir. 2005), cert denied, 2005 U.S. LEXIS 7632 (2005).

This limitation, however, stems from the interplay of Article III and the statutory scheme, id., not

from FDA's administrative determination in this case.  To the extent there is any shortcoming in

the declaratory judgment mechanism in Hatch Waxman, the solution rests with Congress, which

has already addressed the issue in the Medicare Prescription Drug Improvement and

Modernization Act of 2003, Pub. L. No. 108-173, 117 Stat. 2006.  Id.

E.    FDA's Conclusion that Exclusivity Has Not Been Triggered in this Case is Correct.

Decisions and holdings can take many forms.  Teva I, 182 F.3d at 1007-08.  It is

conceivable that FDA's analysis may not account for all possible litigation outcomes.  But the

possibility that FDA's approach might be challenged in other factual scenarios does not render

this decision arbitrary or capricious.  Whatever the outcome in another case, FDA reached the

right conclusion in this case.  The Stipulation and Order does not contain a holding on the merits

of patent invalidity, non-infringement or unenforceability.  Moreover, FDA's conclusion that the

180-day exclusivity has not been triggered is correct for another reason.  As this Court held, "the

BMS-Apotex dismissal is not a 'decision of a court' under the Hatch-Waxman Act. . . ."  See

Teva, 398 F. Supp. 2d at 190.

II.  There Is No Court Decision with Preclusive Effect as to the 80 mg Drug.

Because FDA concluded that the Stipulation and Order does not trigger any pravastatin exclusivity, FDA was not required to, and expressly did not, decide whether, under an estoppel-based approach, the factual differences related to the 80 mg strength compel a different conclusion on the 80 mg strength than the conclusion the agency reached on the 10 mg, 20 mg, and 40 mg strengths.  2006 Decision at 14-15, n.10.  Even under Apotex's estoppel-based reading of the statute, the Stipulation and Order could not have triggered 180-day exclusivity for the 80 mg strength.  This is so for two reasons.  First, Apotex's declaratory judgment suit did not include the 80 mg strength.  Second, the statute precluded Apotex from bringing a declaratory judgment suit over the 80 mg strength, and the court therefore had no authority to decide the merits of a patent infringement declaratory judgment action on the 80 mg strength.  Thus, whether considered under FDA's "holding-on-the-merits" standard, or the "estoppel" standard advocated by Apotex, the Stipulation and Order cannot be considered a court decision triggering 180-day exclusivity.

FDA has determined, and the courts have agreed, that each strength of a drug is a separate drug.  Apotex v. Shalala, 53 F. Supp. 2d 454, 461-63 (D.D.C. 1999).  A court decision triggering exclusivity with respect to a particular strength does not trigger exclusivity as to all other strengths.  Id.  Accordingly, each strength must be evaluated separately.

Apotex's Stipulation and Order could not trigger exclusivity on the 80 mg strength because the lawsuit that it resolved did not, directly or indirectly, encompass a claim of infringement regarding the 80 mg formulation.  Apotex filed its declaratory judgment action against BMS seeking a judgment that its 10 mg, 20 mg and 40 mg formulations did not infringe the '447, '589 and '985 patents.  The 80 mg formulation was never mentioned, directly or indirectly in the complaint.  BMS moved to dismiss Apotex's complaint, likewise without

mentioning the 80 mg strength. See FDA Administrative Record, filed Aug. 16, 2005 ("A.R."),

Tab 32, Tab F. Apotex never amended its declaratory judgment action to include the 80 mg

drug.

The Stipulation and Order dismissing the action explicitly states that Apotex's complaint

is dismissed for lack of subject matter jurisdiction "based on BMS's pre-Complaint

representations that it has no intention to sue Apotex for infringement of the '447, '985, and '589

patents," A.R., Tab 32, Tab A at 3. Those representations did not mention or refer to the 80 mg

formulation. None of the letters from BMS that preceded the suit even mentioned the 80 mg

drug, let alone represented that BMS would not sue for infringement of Apotex's formulation of

its 80 mg tablet. See generally A.R., Tab 32, Tab C. No statement, pleading or any other

document binds BMS not to sue Apotex for infringement based on the formulation of the 80 mg

drug.

Apotex's failure to litigate over the 80 mg drug was not a mere technical error or

oversight. Apotex could not, as a matter of law, have filed a declaratory judgment suit over the

80 mg drug when it brought the declaratory judgment action. Section 505(j)(5)(B) of the Food,

Drug and Cosmetic Act ("FDCA") prohibits any declaratory judgment suit until forty-five days

after a notice conforming with Section 505(j)(2)(B) has been received by the NDA holder:

> Until the expiration of forty-five days from the date the notice
> made under paragraph (2)(B)(i) is received, no action may be
> brought under section 2201 of title 28, United States Code, for a
> declaratory judgment with respect to the patent.

21 U.S.C. § 355(j)(5)(B) (2002). The notice cannot be sent until a paragraph IV certification is

made. 21 U.S.C. §355(j)(2)(B)(iii). Apotex did not even submit its paragraph IV certification on

the 80 mg strength, let alone the required notice, until after its declaratory judgment action had

been dismissed. A.R., Tab 29, Section II Patent Certification. While the Stipulation and Order

recites that Apotex provided notice to BMS of its paragraph IV certifications as to the 80 mg strength, Apotex could not have submitted a Section 505(j)(2)(B)(i) notice prior to Aug. 9, 2004, since it had not submitted paragraph IV certification as to the 80 mg drug prior to that date. The statutory notice requirement cannot be satisfied simply by telling the holder that an ANDA applicant intends to submit a paragraph IV certification; the notice must be sent after a paragraph IV certification is made and the notice also must meet other statutory and regulatory requirements.[1]

Because Apotex could not have brought a declaratory judgment action over the 80 mg drug as of July 23, 2004, the declaratory judgment court had no authority to entertain a declaratory judgment action nor to issue any decision regarding the 80 mg drug at the time it signed the Stipulation and Order. Had it done so, such an order would have been void. CFTC v. Nahas, 738 F.2d 487, 492 n.10 (D.C. Cir. 1984) (quoting Valley v. N. Fire & Marine Ins. Co., 254 U.S. 348, 353-54 (1920) ("Courts are constituted by authority and they can not go beyond the power delegated to them. If they act beyond that authority and certainly in contravention of it, their judgments and orders are regarded as nullities. They are not voidable, but simply void, and this even prior to reversal.")); Nat'l Ass'n for Mental Health, Inc. v. Wagshal, 717 F.2d 1451, 1460 (D.C. Cir. 1983) (holding that a court may ignore a previously entered order that was void). Accordingly, the Stipulation and Order cannot be read as a "court decision" containing a holding or finding that the court had no authority to make.

---

1. The notice required under paragraph (2)(B)(i) is to be made by "an [ANDA] applicant who makes a certification described in subparagraph A(vii)(IV) [a paragraph IV certification.]" 21 U.S.C. § 355(j)(2)(B)(i). The notice must include the patent number and expiration date of each patent alleged to be invalid, unenforceable or not infringed, a description of the basis for the paragraph IV certification, 21 C.F.R. § 314.95(c), and must be sent by registered or certified mail to the owner of the patent which is the subject of the certification and the NDA holder. 21 U.S.C. § 355(j)(2)(B)(iii) (2002); 21 C.F.R. § 314.95(a).

III. <u>The Balance of Harms Weighs Heavily against Preliminary Relief.</u>

To satisfy the second prong of the injunctive relief analysis, the moving party must demonstrate that it will face irreparable harm if such relief is not granted. <u>Teva Pharms., USA, Inc. v. FDA</u>, 404 F. Supp. 2d 243, 244 (D.D.C. 2005). The third prong requires the moving party to show that other parties will not be substantially injured if injunctive relief is granted, or, put differently, that "the balance of hardships tips in its favor." <u>Id.</u> These criteria are essentially two sides of the same coin, and are particularly so in cases where 180-day exclusivity under the Hatch Waxman Amendments to the FDCA is at issue, since all parties involved usually have significant financial interests at stake.

It is true that Apotex would lose potential sales if it is not permitted to sell its product until the conclusion of the 180-day exclusivity period beginning April 20, 2006 — if Apotex is prepared to start selling its pravastatin product on that day. This "if" is critical to Apotex's allegations of harm. If Apotex is not able to start selling its product on April 20, 2006, which is two days from now, then Apotex stands to suffer no harm whatsoever, at least until the date that it would be able to make its first sale.

In order to sell its product, Apotex must not only have enough active ingredient, it must have manufactured the tablets and be ready to supply them. The Declarations submitted by Apotex represent only that Apotex has manufactured significant amounts of pravastatin active pharmaceutical ingredient ("API"). <u>See</u> McIntire Decl. ¶¶ 9, 16; Sherman Decl. ¶¶ 6, 8. No declarant states that any final product has been or is being produced. Indeed, although Dr. Sherman asserts that Apotex has manufactured API "in preparation for an April 20,

2006 commercial launch," Apotex has given no indication that it will actually be able to begin selling its product on this date.  Sherman Decl. ¶¶ 8, 12; Apotex Brief at 8.[2]

While it is uncertain whether Apotex would suffer any harm at all, Ranbaxy faces certain and significant injury in the event that it is not permitted to recoup its substantial investment in its pravastatin product with 180 days of exclusive marketing rights.  Apotex is seeking two types of injunctive relief: a mandatory injunction that would allow all of the manufacturers of generic pravastatin to compete simultaneously, or, alternatively, a preliminary injunction that would prohibit all from entering the market.[3]  In both cases, Ranbaxy's and Teva's period of exclusivity would be shortened and both would suffer irreparable injury.  Apotex alleges that Teva and Ranbaxy "can still enjoy exclusivity" if and when they prevail on the merits and thus "neither . . . would suffer any appreciable harm whatsoever from emergency injunctive relief . . . ."  Apotex Brief at 9.  This is simply not true for several reasons.

---

2.  In a previous case, Apotex obtained a stay of approval of a competitor's ANDA by alleging, much as it has here, that it had invested millions in research and development of an ANDA, that it had invested over $10 million to purchase machinery to prepare its finished product, that it had acquired the raw material necessary to produce the finished product and that it stood to lose millions if it was not allowed to launch.  As it turned out, Apotex was not ready to market because it had not even begun production of the finished product.  Upon learning this fact, the Court of Appeals for the District of Columbia dissolved the stay it previously granted Apotex.  Emer. Mot. of Appellee Purepac Pharm. Co. to Vacate Stay of Final Reg. Approval for Gabapentin, Apotex Inc. v. FDA, Appeal No. 04-5211, filed Sep. 10, 2004; Apotex's Response in Opp. to Purepac's Emer. Mot., filed Sep. 14, 2004; Order (D.C Cir. Sep. 16, 2004).

3.  The standard for a mandatory injunction is very high.  Lincoln Hockey, LLC v. Semin, 2005 U.S. Dist. LEXIS 34047 (D.D.C. 2005) ("[A] party who seeks a mandatory injunction to change (rather than preserve) the status quo 'must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction.'" (quoting Veitch v. Danzig, 135 F. Supp. 2d 32, 35 n.2 (D.D.C. 2001))).

Most importantly, Merck's patent exclusivity for simvastatin expires on June 23, 2006, leaving the door open for the sale of generic simvastatin products.[4]  FDA, Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book"), available at http://www.fda.gov/cder/orange/obannual.pdf (26th ed. 2006).  Contrary to Apotex's contentions that "simvastatin is an unrelated product that will not, as a matter of law, compete with Teva's pravastatin," Apotex Brief at 9, simvastatin has many indications in common with pravastatin's, and as a matter of fact, the two drugs are quite substitutable for many patients even though they do not share the same bioequivalence rating in the Orange Book.  See Marcia Angell, M.D., The Truth About Drug Companies 80-81 (Deshmukh Decl. Exh. A) (the former editor of the New England Journal of Medicine discusses the interchangeability of the "statin" drugs); Department of Veterans Affairs, "Drug Class Review: [Statins]" (Deshmukh Decl. Exh. B) (comparing the effectiveness and safety of "statin" drugs).  Moreover, there is evidence indicating that simvastatin is often a preferred method of treatment for some of the same conditions for which pravastatin is prescribed.[5]  Thus in actuality there is only a narrow 60-day window of potential exclusivity that terminates on June 23, 2006; after this date the value of Ranbaxy's and Teva's exclusivity will plummet.  Each day that Ranbaxy's and Teva's exclusivity is postponed will result in substantial irrecoverable losses for both companies.

---

4.  The award of exclusivity for simvastatin is also the subject of litigation brought by IVAX, now Teva, and Ranbaxy.  Ranbaxy Laboratories Limited v. Leavitt, Civ. No. 05-1838(RWR); IVAX Pharmaceuticals, Inc. v. Leavitt, Civ. No. 05-2180(RWR).  It is possible that, as a result, marketing of generic simvastatin may be delayed beyond June 23.

5.  Zocor outsells Pravachol by four to one.  Deshmukh Decl. ¶ 22.  According to Consumer Reports Best Buy Drugs, insurers and pharmacy benefit managers are already urging people to switch to Zocor "so they can take advantage of generic simvastatin when it becomes available." Deshmukh Decl. Exhs. C, D.

These losses will be exacerbated by the fact that Ranbaxy and Teva will not exactly have exclusive generic marketing rights even if they are granted 180-day exclusivity. This is because of the inevitable presence of an authorized generic on the market. BMS has already worked out a deal with Watson Pharmaceuticals to begin selling a generic version of pravastatin when BMS' exclusivity expires. Deshmukh Decl. Exh. E. In addition to cutting into profits, if Ranbaxy's and Teva's market access is delayed by a temporary restraining order and the authorized generic hits the market first, Ranbaxy and Teva will be deprived of all of the intangible benefits that go along with being one of the first market entrants, such as earliest customer and distribution channel access, access to long-term contracts, cross-over benefits that help boost other product lines, and acquisition of market share.

Were Ranbaxy's market access delayed, it would also lose the difference between the present value and the future value of its profits. This is no small sum. Ranbaxy estimates $15 million to $20 million in Ranbaxy pravastatin sales in the first six months of marketing. Deshmukh Decl. ¶ 18.

Finally, even if Apotex is presently prepared to begin selling its product, the "balance of hardships" still tips heavily in Ranbaxy's favor. While Apotex's alleged losses consist primarily of the profits that it would earn as one of seven generic competitors, McIntire Decl. ¶ 10, Ranbaxy stands to lose the profit potential of the entire generic market. Each day of foregone sales costs Ranbaxy and Teva many times more than it does Apotex.

Unlike Apotex, Ranbaxy has unequivocally announced that it is ready to begin selling its pravastatin product immediately following the expiration of patent exclusivity on April 20, 2006. Deshmukh Decl. ¶¶ 12, 16. Balancing the harms in a similar situation, this Court found that the party with 180-day exclusivity on the line faced significantly greater injury than the party

seeking the injunction. Ivax Pharms., Inc. v. FDA, 2004 U.S. Dist. LEXIS 29233 (D.D.C. 2004) ("[A]n injunction would seriously injure the defendant-intervenor . . . since it has indicated that it is prepared to launch its generic drug. If plaintiff were to obtain the relief that it seeks, [defendant-intervenor's] exclusivity rights . . . would be irreparably compromised."). That is equally true in this case.

IV. The Public Interest Weighs against Preliminary Relief.

It is also in the public interest to deny Apotex's motion for injunctive relief. Apotex is correct that the public's interest rests in the "faithful application of the laws." Apotex Brief at 29 (quoting Mova, 140 F.3d at 1066). However, the faithful application of the laws does not turn on consistency as Apotex argues, but on whether the FDCA is correctly interpreted and applied. While FDA rulings are certainly a means, the end is accurate effectuation of the carefully constructed incentive scheme enacted by Congress so that its and the public's purposes may be served. As discussed above, the plain language of the statute requires a holding on the merits of the patent claims for the 180 day period to be triggered. 2006 Decision at 8. Any other interpretation would diminish the value of the 180-day exclusivity to ANDA applicants and reduce their incentive to challenge innovators' patents. 2006 Decision at 13. As Apotex points out, another public interest at stake is the benefit gained "from fuller generic competition for pravastatin." Apotex Brief at 29. However, if Apotex's preliminary injunction is granted and all generics are prohibited from entering the market, the public's access to lower-priced generic pravastatin will be delayed in the short run, and its interests' and Congress' purposes in enacting Hatch Waxman will be undermined to an even greater extent in the long run.

<u>CONCLUSION</u>

For the reasons stated above, Apotex's motion for temporary restraining order and/or a preliminary injunction should be denied.

Respectfully submitted,

Kate C. Beardsley
D.C. Bar No. 416806
Carmen M. Shepard
D.C. Bar No. 331314

Buc & Beardsley
919 Eighteenth Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 736-3600

Counsel for Intervenor-Defendants